# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MRS. FIELDS FRANCHISING, LLC, a Delaware limited liability company,<br><br>        Plaintiff and Counterclaim-Defendant,<br><br>v.<br><br>MFGPC, INC., a California corporation,<br><br>        Defendant and Counterclaim-Plaintiff,<br><br>and<br><br>MRS. FIELDS FAMOUS BRANDS, a Delaware limited liability company, d.b.a. Famous Brands International,<br><br>        Third-Party Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING MFGPC'S MOTION FOR SUMMARY JUDGMENT**<br><br><br>Case No. 2:15-cv-00094-JNP<br><br>District Judge Jill N. Parrish |

Before the court are: (1) a Motion for Summary Judgment (ECF No. 99) filed by Mrs. Fields Franchising, LLC and Mrs. Fields Famous Brands, LLC (collectively, "Mrs. Fields"); (2) a Motion for Leave to File Amended Complaint (ECF No. 101) filed by MFGPC; (3) a Motion Under Rule 56(d) to Defer or Deny Consideration of Defendants' Motion for Summary Judgment (ECF No. 102) filed by MFGPC; (4) a Request for a Status and Scheduling Conference (ECF No. 103) filed by MFGPC; and (5) a Motion for Summary Judgment (ECF No. 120) filed by MFGPC.

# I.     INTRODUCTION

This is a contract case. MFGPC and Mrs. Fields entered into a Licensing Agreement. MFGPC received a license to manufacture and sell prepackaged popcorn bearing the "Mrs. Fields" trademark. In exchange, Mrs. Fields received royalties. The parties performed under the Agreement for over a decade.

In the eleventh year, Mrs. Fields purported to terminate the Agreement, citing MFGPC's failure to pay a "Guaranteed Royalty." But MFGPC had paid the Guaranteed Royalty in full, so MFGPC informed Mrs. Fields that the termination was ineffective. Mrs. Fields never responded and instead filed suit.

Mrs. Fields' lawsuit sought a declaration that it had properly terminated the Agreement. MFGPC asserted a counterclaim for breach of contract. MFGPC alleged that Mrs. Fields' attempted termination was without basis and therefore constituted a repudiation of the Agreement.

Mrs. Fields moved to dismiss the counterclaim, and the court granted the motion. Because the court held that MFGPC failed to state a claim for breach of contract, Mrs. Fields moved to dismiss its complaint as moot. The court granted the motion and dismissed Mrs. Fields' complaint.

MFGPC appealed, arguing, among other things, that the court erred when it dismissed the claim for breach of contract. The Tenth Circuit agreed, reversing the dismissal of the claim for breach of contract and remanding the case for further proceedings. On remand, MFGPC's counterclaim for breach of contract is the only remaining claim.

Both parties have moved for summary judgment. Mrs. Fields argues that the undisputed facts establish that it properly terminated the Agreement. MFGPC contends that the undisputed

facts establish the opposite: that the termination was without basis and therefore constituted a repudiation of the Agreement.

## II.     UNDISPUTED FACTS AND PROCEDURAL BACKGROUND

On April 30, 2003, Mrs. Fields, through a predecessor entity, entered into a Trademark Licensing Agreement with LHF, Inc. Under the Agreement, LHF obtained a license to develop, manufacture, package, distribute, and sell prepackaged popcorn products bearing the "Mrs. Fields" trademark. Christopher Lindley executed the Agreement on behalf of LHF. On June 30, 2003, LHF assigned its right and obligations under the Agreement to MFGPC—another entity owned and operated by Mr. Lindley.

### 1.   The Initial Term, the Guaranteed Royalty, and Running Royalties

The Agreement provides for an "Initial Term" of five years. The Initial Term began on April 30, 2003. At the end of the Initial Term, the Agreement automatically renewed for successive five-year terms if certain conditions were met. These terms are called "Option Periods."

During the Initial Term, MFGPC was required to pay Mrs. Fields a "Guaranteed Royalty." Section 6(a) of the Agreement defines the Guaranteed Royalty as four guaranteed payments due at the end of the second, third, fourth, and fifth years of the Initial Term. The schedule for payment of the Guaranteed Royalty is as follows:

Year 1:    $0.00
Year 2:    $50,000
Year 3:    $100,000
Year 4:    $100,000
Year 5:    $100,000[1]

---

[1] After setting forth this schedule, the Agreement provides that "[t]he foregoing guaranteed payments shall be referred to herein as the 'Guaranteed Royalty' and shall be due within 45 days of said twelve month period."

During the Initial Term and all Option Periods, MFGPC was required to pay "Running Royalties." Running Royalties are "5% of Net Sales of Royalty Bearing Products."[2] MFGPC was required to remit these royalties to Mrs. Fields "on the last day of the month following the end of each calendar quarter covered by the Agreement."

Section 7 provides that "[i]f [MFGPC] fails to generate royalties sufficient to meet its Guaranteed Royalty as set forth in Section 6(a) . . . , [Mrs. Fields] shall have the option to receive additional Running Royalties from [MFGPC] in the manner and in an amount equal to the Running Royalties that would have been paid had [MFGPC] met its Guaranteed Royalty, and if paid, [MFGPC] shall retain the exclusive license described herein."

As noted above, at the end of the Initial Term, the Agreement would automatically renew if certain conditions were met. Specifically, Section 16(a) provides:

> The initial term of this Agreement shall begin upon the execution hereof and shall continue for a period of sixty (60) months. So long as [MFGPC] is not in material default and subject to Section 7, has met and/or paid Running Royalties based on its Guaranteed Royalty as described in paragraph 6(a) hereof, this Agreement would then automatically renew for successive five year terms ("Option Periods") until such time as either party terminates the Agreement upon no more [sic] than twenty (20) days prior written notice to the other party.[3]

Both parties agree that the Agreement automatically renewed at the end of the Initial Term.

---

[2] "Net Sales" are "gross sales minus slotting, promotional allowances, returns, and cash discounts for early payments." "Royalty Bearing Products" are "[h]igh quality, pre-packaged, popcorn products" bearing the Mrs. Fields trademark.

[3] The final sentence is curious. It should likely read "no less than," not "no more than." Neither party argues that this sentence applies in this case, and neither party has attempted to explain its meaning. The most plausible interpretation of the sentence is that it gave either party a right to prevent the Agreement from automatically renewing at the end of the Initial Term or an Option Period. For example, Mrs. Fields could have given notice that it intended to terminate the Agreement twenty days before the end of the Initial Term, thereby preventing the Agreement from renewing for a successive five-year term. This interpretation is bolstered by the fact that this sentence appears in Section 16(a), which is titled "Term," whereas Section 16(b) is titled "Termination." In any event, because neither party relies on the final sentence of Section 16(a), the court need not address it further.

## 2. Termination Provisions

The resolution of this lawsuit turns on the Agreement's termination provisions. Section 16(b) of the Agreement provides the only grounds on which either party could terminate the Agreement. There are six paragraphs in Section 16(b). The first three are relevant here:

(i)     If [MFGPC] defaults in the payment of any Running Royalties then this Agreement and the license granted hereunder may be terminated upon notice by [Mrs. Fields] effective thirty (30) days after receipt of such notice, without prejudice to any and all other rights and remedies [Mrs. Fields] may have hereunder or by law provided, and all rights of [MFGPC] hereunder shall cease.

(ii)    If [MFGPC] fails to pay its Guaranteed Royalty as set forth in paragraph 6(a) hereof, then, this Agreement and the license granted hereunder may be terminated upon receipt of such notice by [MFGPC], without prejudice to any and all other rights and remedies [Mrs. Fields] may have hereunder or by law provided, and all rights of [MFGPC] shall cease.

(iii)   If [MFGPC] fails to perform in accordance with any material term or condition of this Agreement (other than described in paragraph 16(b)(i) and (ii) above) and such default continues unremedied for thirty (30) days after the date on which [MFGPC] receives written notice of default, unless such remedy cannot be accomplished in such time period and [MFGPC] has commenced diligent efforts within such time period and continues such efforts until the remedy is complete, then this Agreement may be terminated upon notice by [Mrs. Fields], effective upon receipt of such notice, without prejudice to any and all other rights and remedies [Mrs. Fields] may have hereunder or by law provided.

In summary, Section 16(b)(i) covers termination based on MFGPC's failure to pay Running Royalties, Section 16(b)(ii) covers termination based on MFGPC's failure to pay the Guaranteed Royalty, and Section 16(b)(iii) covers termination based on MFGPC's failure to perform any other "material term or condition" of the Agreement. Notably, before Mrs. Fields could terminate the Agreement under Section 16(b)(iii), it was required to give MFGPC "written notice of default" and an opportunity to cure.

### 3. The First Two Option Periods

MFGPC paid the Guaranteed Royalty in full during the Initial Term. In June 2008, at the end of the Initial Term, the Agreement automatically renewed for a five-year Option Period that ran from June 1, 2008 to April 30, 2013. The parties continued to perform under the Agreement, and it automatically renewed for another five-year Option Period in June 2013 that ran from June 1, 2013 to April 30, 2018. Indeed, an employee from Mrs. Fields sent MFGPC an email on June 21, 2013, in which the employee wrote, "Your agreement just Auto-Renewed for another 5 years."

### 4. The Notice of Termination

On December 22, 2014, counsel for Mrs. Fields, Avery Samet, sent a letter to MFGPC. The letter states, in relevant part:

> Our records indicate that MFGPC . . . has paid royalties of merely $5,206.22 since the fourth quarter of 2011 and no payments whatsoever since the third quarter of 2012. Pursuant to section 6(a) of the [Agreement], MFGPC was required to pay [Mrs. Fields] a Guaranteed Royalty of $100,000 a year.

> Pursuant to Section 16 of the [Agreement], the Agreement would not automatically renew at the conclusion of its five-year term in 2012 if, among other things, MFGPC had failed to remit its Guaranteed Royalty to [Mrs. Fields]. Because of MFGPC's failure to do so, the Agreement did not renew, the license terminated and MFGPC lost any right to use the Mrs. Fields mark or to represent itself as a licensee of Mrs. Fields.

> To the extent that MFGPC claims that the Agreement did renew, notwithstanding the failure to pay Guaranteed Royalties, the Agreement is hereby terminated pursuant to Section 16(b)(ii) for MFGPC's failure to pay Guaranteed Royalties for periods beyond July 2012.

This letter was inaccurate for a number of reasons. *First*, there was no requirement that MFGPC pay "a Guaranteed Royalty of $100,000 a year." The Guaranteed Royalty is defined as four payments that MFGPC was required to make during the Initial Term. *Second*, the second Option Period ended in 2013, not 2012. *Third*, the Agreement *did* automatically renew at the end

of the second Option Period, and MFGPC therefore retained a license to manufacture and sell "Mrs. Fields" branded popcorn. *Fourth*, the Agreement could not be terminated "pursuant to Section 16(b)(ii) [based on] MFGPC's failure to pay Guaranteed Royalties," because MFGPC had paid the Guaranteed Royalty in full.

### 5. MFGPC's Response

On January 19, 2015, counsel for MFGPC, Carolyn Dye, responded to Mrs. Fields' termination letter. Ms. Dye explained that the letter was inaccurate:

> [Y]our letter is inaccurate because there is no requirement of any Guaranteed Royalties beyond the initial term
>
> . . .
>
> The words "initial term" are defined in the License as the first five years of the agreement. Following that definition, Section 6(a) clearly provides that Guaranteed Royalties were to be paid only during the "Initial Term" and the payment schedule in Section 6(a) follows that definition.
>
> . . .
>
> As of August 15, 2008, 100% of the . . . Guaranteed Royalty due [Mrs. Fields] by MFGPC during the Initial Term had been [paid] in full.
>
> . . .
>
> You also suggest in your letter that because MFGPC failed to pay Guaranteed Royalties beyond July 2012, the License was actually terminated at that time. Again, you misread the contract. Nothing in Section 16 . . . , which discusses the "Terms and Termination" aspects of the Agreement, can be read to permit a termination on that basis. Because Guaranteed Royalties were fully paid, the License automatically renewed (and without any notice required for renewal) every five years unless there has been a default of another kind, and even in that event, there must be a required notice and opportunity to cure pursuant to Section 16(b)[iii].

Ms. Dye also explained that Mrs. Fields could not terminate the Agreement based on MFGPC's failure to pay Running Royalties, even though Mrs. Fields had not attempted to do so. She noted that, during the course of the parties' relationship, Mrs. Fields had purchased

prepackaged popcorn from MFGPC and that, from time to time, the parties would offset the amount Mrs. Fields owed for the popcorn against the amount MFGPC owed in Running Royalties. Ms. Dye, in her letter, explained that Mrs. Fields owed MFGPC $70,222.60 for popcorn and that MFGPC currently owed Mrs. Fields $43,562.17 in Running Royalties. Accordingly, Ms. Dye notified Mrs. Fields that MFGPC was owed the difference: $26,660.43. Ms. Dye requested a response on or before January 26, 2015 and indicated that, in the absence of a response, MFGPC would assume that Mrs. Fields "[would] not change its position." Mrs. Fields never responded and instead filed suit less than a month later.

### 6. Procedural Background

Mrs. Fields sued MFGPC on February 10, 2015. Mrs. Fields sought a declaration that it had properly terminated the Agreement. In response, MFGPC asserted counterclaims for, among other things, breach of contract, arising from Mrs. Fields' attempt to terminate the Agreement.

#### a. The Motion for a Temporary Restraining Order and a Preliminary Injunction

MFGPC eventually moved for a preliminary injunction that would have prohibited Mrs. Fields from interfering with MFGPC's right to sell pre-packaged popcorn bearing the "Mrs. Fields" trademark. In connection with the motion, MFGPC submitted a declaration from its President, Mr. Lindley.

Mr. Lindley's declaration provides, in relevant part:

- MFGPC paid the royalties required of it during the "initial" term of the License Agreement . . . .

- On January 13, 2013, there was a fire at a business next to MFGPC's chocolate drizzling co-packer . . . . This left [the co-packer's] plant filled with smoke and damaged most all of the Mrs. Fields inventory and packaging, rendering them valueless.

- Neal Courtney [Mrs. Fields' CEO] was sympathetic to the position that MFGPC had been put in by the fire and he agreed that MFGPC could forego payment of

Q4 2012 and all of 2013 Running Royalties until 2014 to assist it in getting its operations back into production and restarting its revenue streams.

- Because of this forbearance agreement and notwithstanding the accrual of net royalties due [Mrs. Fields], between January and December 2013[,] Mr. Courtney allowed [Mrs. Fields] to release payments of over $144,000 to MFGPC on account of MFGPC product that had been sold through [Mrs. Fields].

- [T]he accrual of net royalties due to [Mrs. Fields] did not last very long. Mindful of the accrued royalties, MFGPC delayed invoicing [Mrs. Fields] for orders that shipped in March and September of 2014[,] and MFGPC was soon the party that was owed money. As is shown in the spreadsheet attached [to the declaration], the Running Royalties owed between Q4 2012 through 2014 were less than the combined open invoices payable to MFGPC from [Mrs. Fields]. By December, 2014, there was a balance owed [to] MFGPC of $26,660.43.

The spreadsheet attached to the declaration shows that MFGPC owed Mrs. Fields $43,562.17 in Running Royalties and that Mrs. Fields owed MFGPC $70,222.60 for popcorn. Thus, according to the spreadsheet, Mrs. Fields owes MFGPC $26,660.43.

In response, Mrs. Fields submitted a declaration from Mr. Courtney. It provides, in relevant part, "Although I was sympathetic to [Mr. Lindley's] plight, I did not agree that MFGPC was no longer obligated to pay royalties under the License Agreement for the fourth quarter of 2012 or for 2013. In addition, I did not agree that MFGPC could postpone paying royalties for the fourth quarter of 2012 or for the year 2013 until the second half of 2014." Judge Dee Benson, who was assigned to the case at the time, denied MFGPC's motion for a preliminary injunction.

b. *The Motion to Dismiss*

Mrs. Fields later moved to dismiss MFGPC's counterclaim for breach of contract. Mrs. Fields argued that MFGPC was bound by the facts in Mr. Lindley's declaration (*e.g.*, that MFGPC had not paid Running Royalties during the fourth quarter of 2012, all of 2013, and all of 2014) and that MFGPC therefore failed to allege that it had substantially performed its obligations under the Agreement. Judge Benson agreed and dismissed the breach-of-contract counterclaim.

*c. The Appeal*

MFGPC appealed Judge Benson's ruling. On appeal, the Tenth Circuit held that Judge Benson erred by considering Mr. Lindley's affidavit in connection with the motion to dismiss and that MFGPC had, in fact, alleged a plausible claim for breach of contract. Accordingly, the Tenth Circuit reversed dismissal of MFGPC's claim for breach of contract and remanded the case for further proceedings. The Tenth Circuit made clear that it "express[ed] no opinion on the merits of a future motion for summary judgment." Judge Benson recused from the case.

*d. Mrs. Fields' Motion for Summary Judgment*

Less than a month after the Tenth Circuit issued its mandate, Mrs. Fields filed a motion for summary judgment. Mrs. Fields argued that the court can simply consider Mr. Lindley's affidavit (as Judge Benson did) and then grant judgment in favor of Mrs. Fields.

MFGPC, in response, submitted a second declaration from Mr. Lindley. It provides, in relevant part:

- Mrs. Fields['] then-CEO Neal Courtney in direct communications with me negotiated a forbearance of payment and accounting for Running Royalties with MFGPC . . . . Courtney, acting in his capacity as Mrs. Fields' CEO, instructed me and MFGPC not to report the Q4 2012 Royalties to Mrs. Fields at all, in support of a voluntary forbearance by Mrs. Fields.

- In addition, Courtney caused Mrs. Fields to continue paying MFGPC invoices for popcorn products purchased by Mrs. Fields, totaling $130,318.70, without deduction for Q4 2012 or any future royalties, throughout Q1 and Q2 2014 (the "Forbearance Period"). No definite end to the Forbearance Period was specified, but the parties at that time agreed to proceed to the end [of the Option Period] and, if required, reevaluated whether continued forbearance would be required.

- Courtney also instructed me in my capacity as MFGPC's CEO not to file required Quarterly Royalty Reports in January of 2013 because they would confuse Mrs. Fields' accounting department into thinking that it should collect on royalties. Courtney continued to approve payments on invoices, including $130,318.70 . . . without making a single deduction from or offsetting any royalties due.

- From the Agreement's inception through at least September 2014, [Mrs. Fields] sold MFGPC packaged popcorn in Mrs. Fields gift packages shipped to retailers carrying Mrs. Fields products, to Mrs. Fields' customers directly, and directly to Mrs. Fields.

- When MFGPC sold products to Mrs. Fields, MFGPC would generate invoices, and Mrs. Fields would pay the invoices. From time to time, Mrs. Fields and MFGPC engaged in the practice of offsetting MFGPC's Running Royalty payments against amounts [Mrs. Fields] owed to MFGPC for the MFGPC prepackaged popcorn sold by [Mrs. Fields] to [its] customers.

- As previously described, [Mrs. Fields] accepted royalty payments via a reduction in the amount it owed to MFGPC for [Mrs. Fields'] sale of MFGPC prepackaged popcorn to Mrs. [Fields'] customers.

- After crediting [Mrs. Fields] for Running Royalties due to MFGPC under the Agreement, [Mrs. Fields] still owed MFGPC $26,660.43 . . . .

- MFGPC directed Mrs. Fields to deduct royalties owed by MFGPC from the amount that [Mrs. Fields] owed to MFGPC for licensed popcorn sales—a practice Mrs. Fields had engaged in without complaint in the past . . . .

- Having never paid the $70,222.60 owed on the invoices, Mrs. Fields did as a matter of fact . . . recoup its royalty payment, and [the Running Royalties were] paid.

Mrs. Fields does not attempt to contradict Mr. Lindley's second declaration with affidavits or declarations from its own employees. Instead, Mrs. Fields argues that Mr. Lindley's second declaration is a "sham" declaration and that the court should therefore disregard it. Specifically, Mrs. Fields contends that the second declaration contradicts the first because the first declaration provides, "MFGPC could forego payment of Q4 2012 and all of 2013 Running Royalties until 2014," while the second provides, "No definite end to the Forbearance Period was specified, but the parties at that time agreed to proceed to the end and, if required, reevaluated whether continued forbearance would be required." According to Mrs. Fields, these statements are contradictory and the court should therefore strike the second declaration.

*e. MFGPC's Motion for Summary Judgment*

The court reviewed Mrs. Fields' motion for summary judgment and requested that MFGPC file a supplemental brief on the issue of whether Mr. Lindley's second declaration constitutes a sham declaration.

The court also issued an order in which it indicated that "the question of whether [Mrs. Fields] improperly repudiated the Licensing Agreement appears to be a question of law that the court can decide based on the facts that are not in dispute (*e.g.*, the plain language of the Licensing Agreement, specifically [Section] 16(b) . . .)." Accordingly, the court gave MFGPC leave to file a motion for partial summary judgment and indicated that, in the absence of such a motion, the court was providing notice that it "may grant partial summary judgment in favor of the nonmovant [MFGPC]."

Shortly after the court issued this order, MFGPC filed what is titled a "Motion for Summary Judgment." The motion, however, is better characterized as a motion for partial summary judgment because it merely seeks a ruling that Mrs. Fields breached the Agreement by purporting to terminate it; the motion does not address the issue of damages—an essential element of a claim for breach of contract. Mrs. Fields, in opposition, submitted no additional evidence.

## III. DISCUSSION

The court first considers the motion for partial summary judgment filed by MFGPC. MFGPC contends that the undisputed facts establish that Mrs. Fields breached the Agreement by purporting to terminate it based on MFGPC's failure to pay the Guaranteed Royalty when that royalty had in fact been paid. Mrs. Fields tries to retroactively justify the notice of termination but ignores the plain language of the Agreement. In fact, because Mrs. Fields had no right to

terminate the Agreement, it was the one in breach when it repudiated the Agreement by purporting to terminate it.

## A. SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is not a "disfavored procedural shortcut" but rather "an integral part of the Federal Rules as a whole" that is designed "to secure the just, speedy, and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

## B. MR. LINDLEY'S SECOND DECLARATION IS NOT A SHAM DECLARATION

Mrs. Fields contends that Mr. Lindley's second declaration is a sham declaration because it contradicts his first declaration. In response, MFGPC argues that the two declarations are not in "irreconcilable conflict" and that the court should decline to strike Mr. Lindley's second declaration. The court agrees with MFGPC.

"[A] [declaration] submitted on a summary judgment motion [that] conflicts with the [declarant's] earlier sworn testimony is not automatically disregarded." *Durtsche v. Am. Colloid Co.*, 958 F.2d 1007, 1010 n.2 (10th Cir. 1992). Indeed, a court may not disregard a declaration "[solely] because it conflicts with the [declarant's] prior sworn statements." *Law Co. v. Mohawk Const. & Supply Co.*, 577 F.3d 1164, 1169 (10th Cir. 2009) (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).

The court will disregard a declaration submitted in opposition to a motion for summary judgment only if the declaration attempts to create a sham factual issue. *Id.* When two declarations do "not indicate a clear, irreconcilable conflict," the court must find that the second declaration is "not an attempt to create a sham fact issue." *Durtsche*, 958 F.2d at 1010 n.2. Indeed, mere variations in a witness' testimony "create an issue of credibility as to which part of

the testimony should be given the greatest weight if credited at all." *Chanute v. Williams Nat. Gas. Co.*, 743 F. Supp. 1437, 1448 n.8 (D. Kan. 1990), *aff'd*, 955 F.2d 641 (10th Cir. 1992) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986)). And witness credibility and weight of the evidence issues are questions of fact that must be resolved by the trier of fact. *Id.*

Here, Mr. Lindley's two declarations do not create a clear, irreconcilable conflict, so his second declaration is not a sham declaration. The second declaration provides that the parties "negotiated a forbearance of payment and accounting of running royalties" and that "[n]o definite end of the Forbearance Period was specified, but the parties at that time agreed to proceed to the end and, if required, reevaluate whether continued forbearance would be required."[4] The first declaration provides that "[Mrs. Fields] agreed that MFGPC could forego payment of Q4 2012 and all of 2013 Running Royalties until 2014 . . . ." Read together, the second declaration merely clarifies that the forbearance lasted *at least* until 2014, at which time the parties intended to reevaluate their sitaution. Indeed, the first declaration does not provide that the forbearance *ended* in 2014—it merely provides that MFGPC could forego payment of Running Royalties "until 2014." Accordingly, Mr. Lindley's second declaration is not a sham declaration because it is not in irreconcilable conflict with his first.[5]

## C. Mrs. Fields Has Failed to Dispute Key Factual Assertions

The material facts are not in dispute, and there are at least two key factual assertions that Mrs. Fields has failed to properly dispute. First, MFGPC asserted that the parties would sometimes offset the amount Mrs. Fields owed for popcorn against the amount MFGPC owed in

---

[4] Presumably, Mr. Lindley meant "to the end [of the Option Period]."

[5] Moreover, both of Mr. Lindley's declarations are lengthy, covering many topics. The fact that Mrs. Fields can point to what is, at most, a minor conflict between the two declarations further undermines the argument that the second declaration is a sham declaration.

Running Royalties. In support of this, MFGPC cited a declaration from Mr. Lindley in which he states: "From time to time, Mrs. Fields and MFGPC engaged in the practice of offsetting MFGPC's Running Royalty payments against amounts [Mrs. Fields] owed to MFGPC for the MFGPC packaged popcorn sold by [Mrs. Fields] to their customers. Attached as Exhibit 1 hereto is email correspondence with Mrs. Fields' employees documenting Mrs. Fields' practice of offsetting royalty payments due to Mrs. Fields against invoices due to MFGPC." That is, MFGPC supported its factual position by citing to Mr. Lindley's declaration. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including . . . affidavits or declarations . . . .").

Mrs. Fields did not offer any evidence to contradict this assertion. Instead, Mrs. Fields asserted that the emails attached as Exhibit 1 to Mr. Lindley's declaration did not establish a practice of offsetting. But Mrs. Fields ignores the fact that MFGPC was not relying on the emails to establish its factual assertions. Instead, it was relying on what Mr. Lindley said in his declaration. Accordingly, there is no genuine dispute that the parties engaged in the practice of offsetting Running Royalty against the amount Mrs. Fields owed for popcorn because Mrs. Fields failed to properly dispute that fact under Rule 56(c)(1). That rule requires that Mrs. Fields show that the *materials cited* (*i.e.*, Mr. Lindley's declaration) do not establish the absence of a genuine dispute. Mrs. Fields failed to do so. If Mrs. Fields wanted to create a genuine dispute of fact, it should have submitted a declaration that contradicted Mr. Lindley's.[6]

---

[6] Moreover, the emails suggest that the parties did engage in a practice of offsetting. An employee from Mrs. Fields wrote, "Here are the balances we show as approved in our system. It is okay for you to deduct the $38,217.40 from your payment to us . . . ."

Second, MFGPC asserted that Mrs. Fields owes MFGPC $26,660.43 after accounting for Running Royalties MFGPC owed to Mrs. Fields. In support of this, MFGPC relied on Mr. Lindley's declarations. At the hearing on the motions now before the court, Mrs. Fields took issue with this assertion, arguing that there was no way for it to know whether it was owed more in Running Royalties than MFGPC represented. But Mrs. Fields did not even attempt to respond to this assertion in connection with the motion for summary judgment. Put simply, it was undisputed. *See* Fed. R. Civ. P. 56(e) ("If a party fails to . . . properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . ."). And Mrs. Fields never asked that the court defer ruling on the parties' motions, even after the court pointed out that Mrs. Fields had failed to offer evidence as to the amount of Running Royalties owed. In fact, Mrs. Fields opposed MFGPC's request that the court defer ruling on the pending motions so that the parties could engage in discovery. If Mrs. Fields wanted the court to defer ruling so that the parties could engage in discovery as to the amount of Running Royalties owed, there is a mechanism for that: a request to defer ruling under Rule 56(d). But Mrs. Fields made no such request, so the court now turns to the merits.

### D. BREACH OF CONTRACT

The elements of a claim for breach of contract are: "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Mrs. Fields Franchising, LLC v. MFGPC*, 721 F. App'x 755, 760 (10th Cir. 2018) (citation omitted).

#### 1. The Agreement Automatically Renewed in 2013

The existence of the first element—a contract—is not in dispute. Both parties agree that they were bound by the Licensing Agreement. The Initial Term ended on April 30, 2008, and the Agreement automatically renewed for a five-year Option Period at the end of the Initial Term. The first Option Period ran from June 1, 2008 to April 30, 2013.

Mrs. Fields, in the letter purporting to terminate the Agreement, stated that the Agreement had not automatically renewed at the end of the first Option Period. But that statement was patently false. The Agreement renewed for a second Option Period that ran from June 1, 2013 to April 30, 2018. Indeed, it is undisputed that an employee from Mrs. Fields sent an email to MFGPC on June 21, 2013, in which the employee wrote, "Your agreement just Auto-Renewed for another 5 years," and the parties continued doing business under the Agreement thereafter. Consequently, the Agreement was in effect when Mrs. Fields sent the notice of termination on December 22, 2014.[7]

### 2. Substantial Performance and Breach

MFGPC argues that Mrs. Fields repudiated the Agreement by attempting to terminate it without a valid justification. But Mrs. Fields contends that MFGPC cannot allege a breach because it had not substantially performed its own obligations under the Agreement. Thus, the questions of whether MFGPC substantially performed and whether Mrs. Fields breached are intertwined.

#### a. Substantial Performance and Material Breach

"The substantial performance defense has been explained as follows: 'As a rule, a party first guilty of a substantial or material breach of contract cannot complain if the other party thereafter refuses to perform.'" *Brown v. Richards*, 840 P.2d 143, 149 n.3 (Utah Ct. App. 1992) (quoting *Fernandez v. Purdue*, 518 P.2d 684, 686 (Utah 1974) (Ellett, J., dissenting)). "Substantial performance exists 'where there has been no willful departure from the terms of the contract, and no omission in essential points, and the contract has been honestly and faithfully

---

[7] In the letter purporting to terminate the Agreement, counsel for Mrs. Fields mistakenly wrote that the Agreement did not "automatically renew at the conclusion of its five-year term in 2012." But, as noted above, the first Option Period ended in 2013, not 2012.

performed in its material and substantial particulars.'" *Reliance Ins. Co. v. Utah Dep't Transp.*, 858 P.2d 1363, 1370 (Utah 1993) (citation omitted) *abrogated on other grounds by Commercial Real Estate Inv., L.C. v. Comcast of Utah II, Inc.*, 285 P.3d 1193 (2012).

"The doctrine of material breach is simply the converse of the doctrine of substantial performance." E. Allen Farnsworth, *Contracts* § 8.12 (4th ed. 2004). "Substantial performance is performance without a material breach, and a material breach results in performance that is not substantial." *Id.* "As a general proposition, a party to a contract has a right of rescission and an action for restitution as an alternative to an action for damages where there has been a [m]aterial breach of contract by the other party." *Polglycoat Corp. v. Holcomb*, 591 P.2d 449, 451 (Utah 1979). Put another way, a material breach gives the non-breaching party the right to terminate the contract and to then sue for restitution. *Id.* "What constitutes so serious a breach as to justify rescission is not easily reduced to a precise statement, but certainly a failure of performance which 'defeats the very object of the contract' or 'is of such prime importance that the contract would not have been made if default in that particular had been contemplated' is a material failure." *Id.* (footnote and alteration omitted) (quoting *Havas v. Alger*, 461 P.2d 857, 862 (Nev. 1969)).[8]

---

[8] The Utah Supreme Court has used "material breach" to refer to a breach that allows the non-breaching party to terminate, or rescind, a contract *as well as* a breach that allows the non-breaching party to suspend performance. *Compare Polglycoat*, 591 P.2d at 451 (material breach gives non-breaching party right to rescind contract) *with Eggett v. Wasatch Energy Corp.*, 94 P.3d 193, 199 (Utah 2004) (material breach "excuses further performance by the nonbreaching party"). To avoid confusion, it may make sense to refer to a breach that gives the non-breaching party the right to terminate a contract as a *total* breach, as opposed to a *material* breach. As one treatise points out, "The word *total* is sometimes used instead of *material* to describe a breach that justifies suspension of performance, but it seems preferable to use *material* for this purpose and to reserve *total* to describe a breach that justifies termination of the contract." Farnsworth, *supra* § 8.16; *see also* Restatement (Second) Contracts § 242 (discussing circumstances to consider when determining whether a party's "uncured material failure to render or to offer performance" *discharges* the other party's remaining obligations). In this case, Mrs. Fields

### b. *Repudiation and Anticipatory Breach*

"An anticipatory breach occurs when a party to an executory contract manifests a positive and unequivocal intent not to render performance when the time fixed for performance is due." *Kasco Servs. Corp. v. Benson*, 831 P.2d 86, 89 (Utah 1992). "The other party can immediately treat the anticipatory repudiation as a breach, or it can continue to treat the contract as operable and urge performance without waiving any right to sue for that repudiation." *Id.*

"An especially troublesome situation arises when a party's statements result from an honest but mistaken understanding of its rights under the contract." Farnsworth, *supra* § 8.21. But "[t]he traditional view is that the party's good faith will not prevent the statement from amounting to a repudiation." *Id.* "A party is therefore at its peril if that party, insisting on what it mistakenly believes to be its rights, refuses to perform its duty." *Id.*; *accord United Cal. Bank v. Prudential Ins. Co. of Am.*, 681 P.2d 390, 431 (Ariz. Ct. App. 1983) ("[T]he adverse effects of a dispute over the meaning of a contract shall be borne by the mistaken party, even if acting in good faith, and not by the party insisting upon proper performance.") (cited in *Kasco*, 831 P.2d at 89). This rule applies when a party attempts to terminate a contract before it has a right to do so: "an injured party that acts precipitously and terminates before it is entitled to do so loses its defense, as well as the possibility of claiming . . . damages for total breach, and will itself be liable for damages for total breach." Farnsworth, *supra* § 8.18.

### c. *Mrs. Fields Repudiated the Agreement Based on the Plain Language of Section 16(b)*

The parties' dispute turns on Section 16(b). Mrs. Fields argues that MFGPC committed various breaches that gave Mrs. Fields the right to immediately terminate the Agreement under

---

attempted to terminate the Agreement, so the court, to maintain consistency with the Utah Supreme Court, will use "material breach" to mean a breach that would have given Mrs. Fields a right to terminate, or rescind, the Agreement. *See Polyglycoat*, 591 P.2d at 451.

Section 16(b). Put another way, Mrs. Fields asserts that the undisputed facts establish that MFGPC committed a material breach based on the plain language of Section 16(b). But MFGPC contends that the undisputed facts establish that there was no material breach, so Mrs. Fields had no right to terminate the Agreement. The court agrees with MFGPC.

"The interpretation of a contract is controlled by the intentions of the parties." *Mid-Am. Pipeline Co. v. Four-Four, Inc.*, 216 P.3d 352, 356 (Utah 2009) (citing *Cent. Fla. Invs., Inc. v. Parkwest Assocs.*, 40 P.3d 599, 605 (Utah 2002)). In determining the intentions of the parties, the court first looks to "the four corners of the agreement." *Id.* "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Cent. Fla. Invs.*, 40 P.3d at 605. Contract language is ambiguous "only if it is reasonably susceptible to more than one interpretation." *Mid-Am. Pipeline*, 216 P.3d at 356–57.

Here, Mrs. Fields repudiated, or renounced, the Agreement by purporting to terminate it immediately based on MFGPC's failure to pay the Guaranteed Royalty. Mrs. Fields' notice of termination states that the Agreement did not renew at the end of the first Option Period because MFGPC failed to pay the Guaranteed Royalty and that "[t]o the extent that MFGPC claim[ed] that the Agreement did renew . . . , the Agreement [was] . . . terminated pursuant to Section 16(b)(ii) [based on] MFGPC's failure to pay Guaranteed Royalties . . . ." MFGPC, however, had paid the Guaranteed Royalty, so it urged Mrs. Fields to rescind the notice of termination and acknowledge that the Agreement was still in effect.[9] Mrs. Fields never responded and instead filed suit.

---

[9] MFGPC was able to "urge performance without waiving [its] right to sue for . . . repudiation." *Kasco*, 831 P.2d at 89.

Mrs. Fields' actions—sending the notice of termination and then refusing to respond to MFGPC's letter—unequivocally indicated that Mrs. Fields no longer intended to perform under the Agreement. And Mrs. Fields had no right to terminate the Agreement under Section 16(b)(ii) because MFGPC had paid the Guaranteed Royalty in full. It is irrelevant that Mrs. Fields may have mistakenly believed that it had a right to terminate the Agreement: Mrs. Fields' decision to terminate the Agreement was "fraught with peril, for should such determination, as viewed by a later court in the calm of its contemplation, be unwarranted, [Mrs. Fields] will have been guilty of material breach and . . . have become the aggressor, not an innocent victim." *Walker & Co. v. Harrison*, 81 N.W.2d 352, 355 (Mich. 1957).

Mrs. Fields attempts to retroactively justify the notice of termination by arguing that MFGPC was required to pay what Mrs. Fields conveniently calls "Guaranteed Royal*ties*." Although there is no reference to "Guaranteed Royal*ties*" in the plural form in the Agreement, Mrs. Fields contends that MFGPC was required to pay "Running Royalties in an amount equal to the Guaranteed Royalty" during the Option Periods. But this position does not comport with the plain language of the Agreement.

Section 6(a) defines the Guaranteed Royalty as four guaranteed payments that MFGPC was required to make during the Initial Term. But that provision says nothing about "Guaranteed Royal*ties*" during Option Periods. Nevertheless, Mrs. Fields argues that Section 7 and Section 16(a), when read in conjunction, require MFGPC to pay Running Royalties in an amount equal to the Guaranteed Royalty during each Option Period. This argument fails for at least two reasons.

*First*, MFGPC was not required to pay any guaranteed royalties during the Option Periods under the plain language of the Agreement. Mrs. Fields' reliance on Section 7 and

Section 16(a) to suggest the opposite is misplaced. Section 7 provides that "[i]f MFGPC fails to generate royalties sufficient to meet its *Guaranteed Royalty as set forth in Section 6(a) . . .*, [Mrs. Fields] shall have the option to receive additional Running Royalties from [MFGPC] in the manner and in an amount equal to the Running Royalties that would have been paid had [MFGPC] met its Guaranteed Royalty . . . ." (emphasis added). There is nothing in Section 6(a) to suggest that MFGPC was required to pay "Guaranteed Royal*ties*" during Option Periods.[10] Section 7 merely gave Mrs. Fields the right to demand that MFGPC make additional payments if Running Royalties *during the Initial Term* were insufficient to cover the Guaranteed Royalty. This right was extinguished when MFGPC paid the Guaranteed Royalty in full.

Mrs. Fields next relies on Section 16(a), which provides that the Agreement would "automatically renew for successive five year terms" so long as MFGPC "is not in material default *and subject to Section 7*, has met and/or paid Running Royalties based on its Guaranteed Royalty *as described in paragraph 6(a)*." (emphasis added). According to Mrs. Fields, Section 7 must "outlive" the Initial Term because Section 16(a) provides that all renewals, not just the first, are "subject to Section 7."

But, as discussed above, Section 7 merely gave Mrs. Fields the right to demand that MFGPC make additional payments if Running Royalties during the Initial Term were insufficient to cover the Guaranteed Royalty. So even if all renewals are "subject to Section 7," that requirement is met for all renewals if, during the Initial Term, MFGPC paid the Guaranteed

---

[10] Curiously, the definition section of the Agreement refers to a "Guaranteed Amount." The Guaranteed Amount is defined as "hav[ing] the meaning set forth in Section 5." But the phrase "Guaranteed Amount" is absent from Section 5. Perhaps the parties intended to include a requirement that MFGPC generate Running Royalties in an amount equal to the "Guaranteed Amount." Or perhaps the parties removed the term after MFGPC objected to it. But the fact remains that there is nothing in Section 5 or Section 6(a) that suggests that MFGPC was required to pay "Guaranteed Royal*ties*" during Option Periods. And the Agreement "represent[s] the entire agreement" between the parties and "supersede[s] any prior agreements and negotiations."

Royalty. Admittedly, the language of Section 16(a) is not a model of clarity. But that fact does not allow the court to rewrite Section 7 to give Mrs. Fields the right to receive "Guaranteed Royal*ties*" during Option Periods. Because Mrs. Fields had no right to receive Running Royalties in an amount equal to the Guaranteed Royalty during Option Periods, MFGPC could not have breached the Agreement by failing to pay Mrs. Fields some guaranteed amount of royalties. Accordingly, Mrs. Fields cannot rely on MFGPC's failure to pay "Guaranteed Royal*ties*" to justify the notice of termination.

*Second*, even if MFGPC were required to pay Running Royalties in an amount equal to the Guaranteed Royalty during Option Periods (it was not), Mrs. Fields could not have immediately terminated the Agreement under Section 16(b)(ii) based on MFGPC's failure to pay. Section 16(b)(ii) provides that "[i]f [MFGPC] fails to pay its *Guaranteed Royalty as set forth in paragraph 6(a) hereof*, then, this Agreement and the license granted hereunder may be terminated . . . ." (emphasis added). Whatever royalties Mrs. Fields believes it was owed are not the "Guaranteed Royalty as set forth in paragraph 6(a)." And it is undisputed that MFGPC paid the Guaranteed Royalty. Thus, even if MFGPC were required to pay "Guaranteed Royal*ties*" after the Initial Term, any failure to do so would not constitute a failure to "pay [the] Guaranteed Royalty as set forth in paragraph 6(a)," the only ground for termination under Section 16(b)(ii).

Because Section 16(b)(ii) is not applicable, Mrs. Fields would need to rely on either Section 16(b)(i) or (b)(iii) to justify the notice of termination. But neither gives Mrs. Fields the right to terminate the Agreement effective immediately, so Mrs. Fields necessarily breached the Agreement by purporting to terminate it immediately. *See ProMark Grp. v. Harris Corp.*, 860 P.2d 964, 967 (Utah Ct. App. 1993) (defendant breached contract when it ceased performance on the same day it sent notice of termination because contract required 90 days' written notice of

termination); *In re Pickel*, 493 B.R. 258, 268 (Bankr. D.N.M. 2013) ("Plaintiff's improper declaration of termination was plainly contrary to the Agreement, and constituted an anticipatory breach of the Agreement.").

Mrs. Fields attempts to retroactively justify the notice of termination by pointing to other ways in which MFGPC allegedly breached the Agreement. But these arguments likewise fail based on the plain language of the Agreement and the undisputed facts before the court.

Mrs. Fields argues that MFGPC defaulted by failing to pay Running Royalties. But as previously discussed, any default in the payment of Running Royalties was not grounds for immediate termination, and in any event, the undisputed facts establish that MFGPC did not default in the payment of Running Royalties.

The undisputed testimony of Mr. Lindley establishes that the parties had a practice of offsetting amounts Mrs. Fields owed for popcorn against the amount MFGPC owed in Running Royalties. Mrs. Fields owed MFGPC $70,222.60 for prepackaged popcorn, and after accounting for Running Royalties owed, Mrs. Fields still owed MFGPC $26,660.43. Put simply, Mrs. Fields was in possession of whatever Running Royalties were owed *and then some*. MFGPC may not have paid Running Royalties in the exact manner contemplated by the Agreement, but it did not "default[] in the payment of any Running Royalties."[11] Because MFGPC did not "default[] in the

---

[11] Section 5(b) requires that MFGPC remit Running Royalties owed to Mrs. Fields "on the last day of the month following the end of each calendar quarter covered by the Agreement." MFGPC may have committed a technical breach by paying Running Royalties by way of offset, but it is unimaginable that such a breach gave Mrs. Fields the right to terminate the Agreement. *See* Restatement (Second) Contracts § 241 (when determining whether a breach is material, courts should consider "the extent to which the injured party will be deprived of the benefit . . . reasonably expected"). Mrs. Fields could terminate the Agreement under Section 16(b)(ii) only if MFGPC defaulted in the payment of Running Royalties; Mrs. Fields could not terminate the Agreement under Section 16(b)(ii) merely because MFGPC failed to pay Running Royalties in the manner specified by the Agreement.

payment of . . . Running Royalties," Mrs. Fields had no basis for terminating the Agreement under Section 16(b)(ii).[12]

Mrs. Fields also contends that MFGPC materially breached the Agreement by failing to maintain adequate product liability insurance. Section 14 of the Agreement requires that MFGPC obtain and keep in force product liability insurance of "no less than" $10 million.[13] MFGPC admits that it had only $5 million in product liability insurance, but it contends that it nevertheless substantially performed because Mrs. Fields had no right to terminate the Agreement based on this breach. The court agrees.

In arguing that it could terminate the Agreement immediately based on MFGPC's failure to maintain adequate insurance Mrs. Fields relies on Section 14, which provides that "[t]he requirements of this Section 14 are acknowledged by [MFGPC] to be a material term of this Agreement as defined in paragraph 16(b)(ii)." According to Mrs. Fields, this means that it was able to terminate the Agreement under Section 16(b)(ii) if MFGPC failed to maintain adequate insurance. But Mrs. Fields' proffered interpretation is not supported by the plain language of the Agreement.

As previously discussed, Section 16(b)(ii) provides that "[i]f [MFGPC] fails to pay its Guaranteed Royalty as set forth in paragraph 6(a) hereof, then, this Agreement and the license granted hereunder may be terminated . . . ." Section 16(b)(ii) says nothing about "material terms." So, looking at Section 14 and Section 16(b)(ii) in isolation, the sentence "[t]he

---

[12] Even assuming that Mrs. Fields could justify the notice of termination based on Section 16(b)(i) (it cannot), Mrs. Fields could not have terminated the Agreement effective immediately. Instead, the termination would have been effective thirty days after MFGPC received notice. Consequently, even if MFGPC had defaulted in the payment of Running Royalties, Mrs. Fields would be liable for breach because it terminated the Agreement without giving MFGPC thirty days' notice.

[13] There is a dispute as to whether Mrs. Fields waived strict compliance with this provision, but the dispute is immaterial to the court's resolution of the pending motions.

requirements of this Section 14 are acknowledged by [MFGPC] to be a material term of this Agreement as defined in paragraph 16(b)(ii)" makes no sense. How could the requirements of Section 14 be a material term as defined in Section 16(b)(ii) when Section 16(b)(ii) does not use, let alone define, the phrase "material term"?

When the Agreement is viewed as a whole it becomes clear that the reference to Section 16(b)(ii) is the result of a drafting error and that the parties actually intended to refer to Section 16(b)*(iii)*. Section 16(b)(iii) provides that "[i]f [MFGPC] fails to perform in accordance with any *material term* . . . of this Agreement . . . and such default continues unremedied for thirty (30) days after the date on which [MFGPC] receives written notice of default, . . . then this Agreement may be terminated upon notice to [MFGPC], effective upon receipt of such notice . . . ." (emphasis added). In short, the only plausible interpretation of the Agreement is that Section 14 should read, "The requirements of this Section 14 are acknowledged by [MFGPC] to be a material term of this Agreement as defined in paragraph 16(b)*(iii)*," not (b)(ii). Accordingly, the requirement that MFGPC maintain adequate liability insurance is a material term as that phrase is used in Section 16(b)(iii). Therefore, Mrs. Fields was required to comply with Section 16(b)(iii) before it could terminate the Agreement based on MFGPC's failure to maintain adequate insurance.

Under Section 16(b)(iii), Mrs. Fields was required to (1) give MFGPC notice that it did not have adequate insurance and (2) give MFGPC thirty days to obtain adequate insurance. It is undisputed that Mrs. Fields gave MFGPC neither notice nor an opportunity to cure, so Mrs. Fields had no right to terminate to the Agreement based on MFGPC's failure to maintain adequate insurance. While MFGPC maintained only $5 million in product liability insurance, this was not a material breach because MFGPC was given neither notice that this was inadequate

nor an opportunity to cure. Accordingly, Mrs. Fields cannot justify the notice of termination based on MFGPC's failure to maintain adequate insurance.

Finally, Mrs. Fields contends that MFGPC breached the Agreement by failing to provide (1) periodic and annual reports of products sold and (2) a summary of all written consumer complaints. MFGPC argues that, even assuming these breaches, Mrs. Fields had no right to terminate the Agreement based on them (*i.e.*, they were not material breaches). Again, the court agrees.

The Agreement speaks directly to these issues. As noted above, Section 16(b)(iii) provides that "[i]f [MFGPC] fails to perform in accordance with any material term or condition of this Agreement (other than as described in paragraph 16(b)(i) [Running Royalties] and (ii) [the Guaranteed Royalty] and such default continues unremedied for thirty (30) days after the date on which [MFGPC] receives written notice of default, . . . then this Agreement may be terminated upon notice to [MFGPC], effective upon receipt of such notice . . . ." (emphasis added). Thus, before it could terminate the Agreement based on MFGPC's failure to provide reports of products sold and summaries of consumer complaints, Mrs. Fields was required to give MFGPC notice and an opportunity to cure. Mrs. Fields gave neither, so Mrs. Fields cannot justify the notice of termination based on these alleged breaches.

*       *       *

MFGPC did not materially breach. The undisputed facts establish that MFGPC paid Running Royalties and the Guaranteed Royalty. And while MFGPC may have breached the Agreement by (1) failing to maintain adequate insurance, (2) failing to provide reports of products sold, and (3) failing to provide summaries of consumer complaints, those breaches did not give Mrs. Fields the right to terminate the Agreement without first giving notice and then an

27

opportunity to cure. Mrs. Fields gave neither. By terminating the Agreement without a contractual right to do so, Mrs. Fields became the aggressor, not the innocent victim. *See Walker & Co.*, 81 N.W.2d at 355. In short, Mrs. Fields improperly repudiated the Agreement and is therefore guilty of total breach.[14]

### 3. Damages

Neither party has discussed damages. Mrs. Fields moved for summary judgment on the grounds that MFGPC had not established an essential element of its claim: substantial performance. And while MFGPC characterized its motion as a motion for summary judgment, the motion is more properly characterized as a motion for partial summary judgment on the first three elements of its claim: the existence of a valid contract, substantial performance, and breach. Because neither party has asked the court to rule on the issue of damages, that issue must be resolved through a subsequent motion or at trial.

### 4. MFGPC's Motion to Amend

MFGPC requested leave to amend so that it could assert counterclaims for unjust enrichment and breach of the implied covenant of good faith and fair dealing. At the hearing on these motions, however, counsel for MFGPC indicated that including these counterclaims may be unnecessary if it prevailed on its motion for partial summary judgment. Because of this,

---

[14] The court reaches this conclusion based on the plain language of the Agreement. But it is worth noting that the result is consistent with general contract principles. "Fairness ordinarily dictates that the party in breach be allowed a period of time—even if only a short one—to cure the breach if it can." Farnsworth, *supra* § 8.18. The reasoning behind this is that "[t]ermination involves a risk of forfeiture that is not present in the case of suspension because after termination, it is too late for the party in breach to avoid forfeiture by curing its breach." *Id.* Here, based on the plain language of the Agreement, Mrs. Fields terminated the Agreement before it had a right to do so, and is therefore liable for breach of contract. But even if the Agreement did not define the parties' rights and responsibilities with respect to termination, Mrs. Fields would have breached by attempting to terminate the Agreement without giving MFGPC any chance whatsoever to cure.

counsel for MFGPC is instructed to inform the court within seven days of the date of this order as to whether MFGPC still seeks leave to amend.

## IV. CONCLUSION AND ORDER

For the reasons set forth above, MFGPC has established the first three elements of its counterclaim: (1) the parties' relationship was governed by a valid contract, the Licensing Agreement; (2) MFGPC substantially performed under the Agreement; and (3) Mrs. Fields improperly repudiated the Agreement, thereby committing an actionable breach. MFGPC's Motion for Summary Judgment (ECF No. 120) is therefore GRANTED IN PART. The only issue that remains is damages. Mrs. Fields' Motion for Summary Judgment (ECF No. 99) is DENIED. MFGPC is instructed to inform the court within seven days of the date of this order whether it still seeks leave to amend. The remaining motions—MFGPC's Motion Under Rule 56(d) to Defer or Deny Consideration of Defendants' Motion for Summary Judgment (ECF No. 102) and MFGPC's Request for a Status and Scheduling Conference (ECF No. 103)—are DENIED AS MOOT. The parties are hereby ORDERED to meet and confer so that they can propose a schedule for discovery and motions related to the issue of damages. The parties shall propose a scheduling order within fourteen days of the date of this order.

Signed August 20, 2018

BY THE COURT

Jill N. Parrish
United States District Court Judge