1              IN THE UNITED STATES DISTRICT COURT

2              DISTRICT OF UTAH CENTRAL DIVISION

3

MRS. FIELDS FRANCHISING, LLC, a          )
4   Delaware limited liability company,     )
                                             )
5                 Plaintiff,                 )
                                             )
6   MFGPC, INC., a California corporation,   )
                                             )
7                 Defendant.                 )    Case No.
   ——————————————————————————————————————)
8                                            )    2:15-CV-94-DAK
   MFGPC, INC., a California corporation,   )
9                                            )
                  Counterclaimant,           )
10                                           )
   MRS. FIELDS FRANCHISING, LLC, a          )
11  Delaware limited liability company, and )
   MRS. FIELDS FAMOUS BRANDS, LLC, a        )
12  Delaware limited liability company, dba )
   Famous Brands International,             )
13                                           )
                  Counterclaim Defendants.  )
14  ——————————————————————————————————————)

15

16         BEFORE THE HONORABLE DALE A. KIMBALL

17        ---------------------------------------

18                   July 12, 2021

19                    Bench Trial

20                 Conducted via Zoom

21

22

23

24  REPORTED BY: Patti Walker, CSR, RPR, CP    801-364-5440

25  351 South West Temple, #8.431, Salt Lake City, Utah  84101

```
1                     A P P E A R A N C E S

2

3    For Plaintiff:              Rod N. Andreason
                                 KIRTON MCCONKIE
4                                50 East South Temple, #400
                                 Salt Lake City, Utah  84111
5
                                 Bijan Amini
6                                AMINI LLC
                                 131 West 35th Street, 12th Fl.
7                                New York, New York  10001

8
     For Defendant:             Brian M. Rothschild
9                                Juliette P. White
                                 PARSONS BEHLE & LATIMER
10                               201 S. Main Street, #1800
                                 Salt Lake City, Utah  84111
11
                                 Alexandra L. Hodson
12                               PARSONS BEHLE & LATIMER
                                 800 W. Main Street, #1300
13                               Boise, Idaho  83702

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2   Witness                Examination by              PAGE

3   Christopher Lindley     Mr. Rothschild  (Direct)      23

4                           Mr. Amini  (Cross)            97

5                           Mr. Rothschild  (Redirect)   161

6                           Mr. Amini  (Recross)         166

7   Betsy Schmandt          Mr. Rothschild  (Direct)     170

8                           Mr. Amini  (Cross)           211

9
    Exhibits Received into Evidence:
10  3                                                     32
    4                                                     34
11  H                                                     57
    49                                                    58
12  S                                                     60
    4 and S                                               64
13  55                                                    64
    74                                                    68
14  51-A and 51-B                                         74
    51-C                                                  75
15  51-D                                                  76
    11                                                    80
16  10                                                    82
    13                                                    83
17  46                                                    84
    14                                                    87
18  15                                                    89
    56                                                    91
19  12                                                    98
    47                                                   113
20  48                                                   115
    19                                                   175
21  20                                                   186
    21                                                   188
22  22                                                   190
    AA                                                   196
23  BB                                                   207
    18                                                   213
24

25
```

1          SALT LAKE CITY, UTAH; MONDAY, JULY 12, 2021; 8:30 A.M.

2                              PROCEEDINGS

3               THE COURT:  We're here this morning on Zoom in the

4     matter of Mrs. Fields vs. MFGPC, 2:15-CV-94.  Plaintiff is

5     represented by Bijan Amini, Mr. Rod Andreason, and MFGPC by

6     Juliette White, Mr. Brian Rothschild, and Ms. Alexandra

7     Hodson.  Is that all correct?

8               MR. ROTHSCHILD:  Yes, Your Honor.

9               MS. WHITE:  Correct, Your Honor.

10              THE COURT:  Now this is a bench trial and the

11    issue is damages, right?  And so MFGPC is the moving party

12    here, correct?

13              MS. WHITE:  That's correct, Your Honor.

14              THE COURT:  Do you want to make opening

15    statements?

16              MS. WHITE:  We do, Your Honor.

17              THE COURT:  All right.  Who's going to make one

18    for MFGPC?

19              MS. WHITE:  Your Honor, Mr. Rothschild will be

20    doing the opening statement for MFGCP today.

21              THE COURT:  And who's going to do it for

22    Mrs. Fields Franchising?

23              MR. AMINI:  I will, Your Honor.  Bijan Amini.

24              THE COURT:  Go ahead, Mr. Rothschild.

25              MR. ROTHSCHILD:  Good morning, Your Honor, and may

1    it please the Court.  Mrs. Fields, if I say those words,

2    chances are you just thought of a warm cookie, or brownie,

3    or another sweet treat, and I can see that perhaps you and

4    maybe some of your staff are suppressing a little smile.

5    The name itself unlocks warm memories, it unlocks doors, it

6    makes you want to buy something to eat now, something to

7    take home for later, maybe some for your family and friends.

8         Everyone knows what Mrs. Fields is supposed to

9    taste like, particularly here in the State of Utah.  We know

10   its origin story.  It's a promise.  It stands for indulgence

11   and deliciousness and warmth.

12        Eighteen years ago, my client paid Mrs. Fields a

13   half million dollars up front for the worldwide, exclusive

14   right to use that name on popcorn, and then invested more

15   than three-quarters of a million dollars in its business,

16   MFGPC.  You can remember it, shorthand for Mrs. Fields

17   Gourmet Popcorn Company.  It built a business and ran it

18   successfully for more than 12 years, and MFGPC outlasted

19   every other Mrs. Fields' licensees in that time, even the

20   cookie licensees.

21        MFGPC outlasted six CEOs at Mrs. Fields, the great

22   recession, Mrs. Fields' own bankruptcy, a rotating turn of

23   instability among Mrs. Fields' employees, executives, and

24   ownership, but MFGPC survived.  MFGPC's business plan was to

25   grow slowly, in a measured way, not to overextend itself,

1    building its reputation in the industry gradually, and not

2    in a way that many food start-ups claim out early.

3    Sometimes they pay high slotting fees, or promotional, or

4    advertising dollars in order to try to increase market share

5    with no eyes for the bottom line.

6         But MFGPC, chaired by Christopher Lindley, was not

7    that.  He had seen this in the industry, with decades of

8    experience, and he knew that in order to grow and grow

9    correctly, he needed to do it slowly and carefully.  Often

10   businesses fail.  In fact so often, that 80 percent flame

11   out in the first year.

12        MFGPC and its owners, having been in the industry,

13   in fact, the snack industry specifically, understood this,

14   and they negotiated a license with a high up-front cost,

15   which they paid in full, but it had no minimum sales in the

16   years after the original guaranteed royalties were paid.

17   And this is extraordinarily important to its owners because

18   it allowed them to grow their business in an unstable market

19   in a sustainable way.

20        MFGPC successfully navigated the difficult parts,

21   the high price to buy the license and negotiate the license

22   agreement against a much larger company.  It had negotiated

23   a superior license, with very unusual provisions that you

24   just don't get.  That license agreement and provisions are

25   the subject of this trial today.

1              It had no minimum sales after the initial period,

2    as I've just mentioned.  It had no restrictions on

3    assignment.  It had no change in control provision.  The

4    license was worldwide.  And this wasn't just a nice thing.

5    Mrs. Fields actually had a worldwide presence.

6              So this was a very important aspect of the

7    license.  The license was exclusive not just of other third

8    parties, but it was even exclusive of Mrs. Fields.  If

9    Mrs. Fields wanted to make popcorn, it had to source it from

10   MFGPC.  So it was a guaranteed customer.  In fact, MFGPC

11   sold two and a half million dollars worth of popcorn to

12   Mrs. Fields as a result of the exclusive deal.

13             Second, Mrs. Fields established solid

14   relationships with best in industry co-packers, who had the

15   ability to scale production into virtually unlimited

16   amounts.  And MFGPC built its contacts with retailers and

17   grew its brand.  Its reputation was such that from the

18   manufacturer's side, they knew that if they got an order

19   from MFGPC, they would get paid for making it.  And on the

20   retailer side, the retailers knew that if they ordered

21   popcorn, it would arrive timely.

22             As I mentioned, it weathered the great recession

23   in 2008.  With Mr. Lindley at its helm, it established a

24   solid reputation as a company, and it survived those

25   difficult years and did so successfully with steady growth

1    and revenues from 2009 onward.

2         By contrast, Mrs. Fields did not.  Mrs. Fields

3    went through a full Chapter 11 case, and then a debt

4    restructuring, a tender and exchange offer where it had to

5    write down all of its debt.  It had a number of changes of

6    ownership in that time.  But again, MFGPC, this scrappy,

7    little company was doing just fine despite the struggles

8    with its licensing partner.

9         The agreement with Mrs. Fields auto renewed under

10   its own term in 2013.  This was confirmed in writing by

11   Mrs. Fields.  By this time, with a solid, well established

12   business, MFGPC was actively looking for investment capital

13   for the next phase.  It had signed investment banking

14   agreements looking for new capital.

15        You'll hear from MFGPC's co-packers, the

16   manufacturers of this product, how reliable MFGPC was as a

17   business partner, how solid the business was, how scalable

18   it was, and how well situated it was for expansion.  They'll

19   also testify about the amazing increase in the category of

20   prepackaged popcorn during the licensing period.

21        You'll hear evidence that in 2012 the prepackaged

22   popcorn industry moved 25 percent up year over year, with a

23   tremendous opportunity in the marketplace, and MFGPC was

24   poised to take advantage of that opportunity, perhaps better

25   than anyone else.  But MFGPC was hit with a one-two punch, a

1    hiccup followed by a wrecking ball.

2            In early 2013, there was a fire at one of MFGPC's

3    co-packers which disrupted MFGPC's ability to sell.  It was

4    a difficulty setback, but MFGPC had handled setbacks before

5    and knew it could come back stronger again.  MFGPC continued

6    to focus on the big picture, and by the third quarter, it

7    had sold another $300,000 in popcorn in one quarter.  That's

8    more than twice its normal yearly clip.  So the fire at its

9    co-packer did not do it in.

10           So it turned, recognizing where it was in the

11    market, and started seeking outside investment to greatly

12    expand the business.  These efforts continued in 2014.

13    Remember, MFGPC had negotiated a license agreement that

14    would allow precisely this type of strategy, enabling it to

15    creep before it leaps in order to make sure it didn't have

16    to work on just selling high volume, it didn't have to pay

17    large marketing in order to get out there in the market.

18           But then the wrecking ball.  After all the work

19    MFGPC had put into its ambitious expansion plans,

20    Mrs. Fields inexplicably terminated the agreement.  This

21    Court decided that issue on summary judgment, that that

22    termination was a breach, so we don't need to establish that

23    here.  But just to recap, Mr. Avery Samet, outside counsel

24    to MFGPC, Mr. Amini's partner, sent a letter to MFGPC

25    terminating the license agreement.

1          It's apparent from the face of the termination

2     letter that Mr. Samet didn't bother reading the license

3     agreement.  He claimed that MFGPC had failed to pay

4     guaranteed royalties, even though the last guaranteed

5     royalties had been paid seven years before and none were

6     due.

7          Mr. Samet didn't seem to care enough to properly

8     investigate the facts before he asserted them.  He asserted

9     that there was a balance owing to Mrs. Fields from MFGPC.

10    The reverse was actually true.  Mrs. Fields owed MFGPC more

11    than $70,000 for popcorn invoices that were long, long

12    overdue, but they had failed to pay them.  That, by the way,

13    also cash strapped MFGPC.  When your largest customer

14    doesn't pay you on time, you can't cash flow your business.

15         Incredibly, in that termination letter,

16    Mrs. Fields demanded payment from MFGPC and purported to

17    terminate the license agreement.  Almost every sentence of

18    that termination letter is demonstrably incorrect as ruled

19    by this Court in the summary judgment motion.

20         So in response, did Mrs. Fields sue -- did MFGPC

21    sue Mrs. Fields?  No.  MFGPC turned and said that it was

22    willing to let bygones be bygones and continue in the

23    license agreement.  It had demonstrated its strength as a

24    licensing partner, its value as a business, and its vision

25    for its growth.  So how did we end up here?

1          So accepting the error, Mr. Samet and Mrs. Fields

2    filed this lawsuit.  They had to drag a very much smaller

3    company with limited resources into court.  For six years,

4    MFGPC has been forced to defend itself and remedy the harm

5    it has experienced in a battle of resources, with a far

6    bigger adversary, in a forum far distanced from its

7    California headquarters.  Mrs. Fields' strategy has been to

8    contest every point, refuse to produce evidence, try to

9    outspend MFGPC into oblivion.

10          Remember, MFGPC had now been deprived of all of

11    its revenue.  It hadn't even been paid on invoices that it

12    owed for popcorn that it bought from my client and never

13    paid for, that it took and sold into the market at a profit.

14          Again, Mrs. Fields has never disputed that it owes

15    that money.  That was the subject of one of our motions in

16    limine, which Mrs. Fields conceded.

17          Despite the plain wording of the contract, the

18    undisputed balance of payments owing to MFGPC from

19    Mrs. Fields, Mrs. Fields had decided it wanted to wage this

20    six-year war, across nine federal judges, two trips to the

21    Tenth Circuit, depositions and experts, all because MFGPC

22    refused to take a zero and allow Mrs. Fields to breach its

23    valuable license agreement with impunity.  That's why we're

24    here.

25          So as noted at the beginning, at this juncture, we

1   have an adjudication on liability, on summary judgment, that

2   there was a balance owing to MFGPC and that Mrs. Fields is

3   liable for MFGCP's damages.  The only thing at issue in this

4   trial, therefore, is the measure of damages for

5   Mrs. Fields' behavior.  How do we arrive at damages under

6   Utah law?  MFGPC is required to establish, with evidence,

7   its damages for Mrs. Fields' breach.

8          The time frame for damages, as determined by the

9   Tenth Circuit's ruling and as noted by this Court, is the

10  remaining term of the license, December 2014 through

11  April 2018, roughly three and a half years.  You'll hear

12  testimony from MFGPC's expert witness, Mr. Patrick Kilbourne

13  of Berkeley Research Group, describing three different lost

14  profit calculations that he performed based on the available

15  evidence, which I will explain further in a moment.  But

16  first, what evidence is available to MFGPC to establish its

17  damages for breach of this license agreement?

18         Unfortunately, we don't have to search around in

19  the dark.  This Court held a hearing at which it determined

20  the scope of additional discovery and actually adjudicated

21  what was relevant.  So on February 4, 2019, at docket 250,

22  the Court entered a memorandum decision describing three

23  categories of evidence that it said were, quote, highly

24  relevant.  First, the value of the license agreement.  In

25  other words, what MFGPC had been doing with the license

1    agreement, the intrinsic value of the ability to use

2    Mrs. Fields' mark.

3              Two, the license agreement that Mrs. Fields

4    entered into with third parties that violated MFGPC's

5    exclusive rights.  In other words, successor licensees.

6              And three, Mrs. Fields' own sales of its

7    prepackaged popcorn products that violated MFGCP's exclusive

8    rights under the license agreement during the third term.

9    And all three of these categories are relevant -- in fact,

10   the Court called them highly relevant -- because they

11   provide a reasonable level of certainty regarding what

12   MFGCP's lost profits would have been had MFGPC been allowed

13   to continue performing under the license.

14             So we do have the first two categories.  One,

15   evidence of the value of the licensing agreement to MFGPC

16   based on its own sales and its own returns, and the terms

17   and price of the license that Mrs. Fields entered into.  So

18   that is what the parties assigned, in other words, the half

19   million dollars that MFGPC paid to get into the license

20   agreement back in 2002.  And then we also have the successor

21   license agreement with the company called Perfect Snax Prime

22   during the relevant period.  Again, the Court called that

23   highly relevant.

24             Unfortunately, the third category, Mrs. Fields'

25   own sales of its prepackaged popcorn, we have very little

1    useful information.  We filed a motion in limine regarding

2    this because Mrs. Fields refused to produce any useable

3    data.  What they did produce was so limited, or incomplete,

4    or jumbled, that even Mrs. Fields' own witnesses could not

5    make heads or tails of it.  So we don't have that.

6         But I point that out to say that to the extent

7    that we are required to establish with reasonable certainty,

8    and that third data point is unavailable, it's not due to

9    MFGPC's failures but rather Mrs. Fields' failures to produce

10   that evidence.

11        So under Utah law, what level of certainty is

12   required.  From Cook Associates, Inc. v. Warnick, Utah

13   Supreme Court, once a defendant has been shown to have

14   caused a loss, he should not be allowed to escape liability

15   because the amount of the loss cannot be proven with

16   precision.  Consequently, the reasonable level of certainty

17   required to establish the amount of a loss is generally

18   lower than that required to establish the facts or cause of

19   a loss, end quote.

20        So all we need to do to satisfy the reasonable

21   certainty requirement is, and I quote, sufficient evidence

22   to enable the trier of fact to make a reasonable

23   approximation.  What constitutes such an approximation will

24   vary with the circumstances.  Greater accuracy is required

25   in cases where highly probative evidence is easy to obtain

1    than in cases where such evidence is unavailable, end quote.

2          So our damages case is straightforward.  We show

3    lost profits based on past performance, expected margins,

4    and projected future growth, all using conservative

5    assumptions validated by independent third-party sources.

6    In fact, we use assumptions that are more conservative than

7    those Mrs. Fields uses for its new licensee.

8          We also present a second reference point, the

9    value of the successor agreement to the parties, which is a

10   very good proxy.  I've learned a lot about comparing the

11   value of trademark license agreements and I understand that

12   in trials we often end up comparing marks like Cadillac and

13   Craftsman tools on sometimes different products in various

14   different markets.  It's difficult, but in this case we have

15   the most spot-on comparison possible.

16         We have a successor license for the exact same

17   mark with the exact same royalty rate for a nearly identical

18   period, three years, it's a little shorter, and on a very

19   similar product, a popcorn product.  It is in many ways an

20   inferior license and there should be some adjustments for

21   that, but in terms of valuation and comparison, it's a

22   pretty spot-on way to be able to value the license

23   agreement.  And the parties, in fact, by reaching, through

24   negotiation, a price for that agreement did value that

25   agreement explicitly.

1          It's not an exaggeration to argue that MFGPC was

2     poised to hit it very big.  It had everything ready to go,

3     including easy scalability, with its production capacity, so

4     that it could have sold tens of millions of dollars of

5     popcorn and captured the huge increase in the ready-to-eat

6     popcorn market, that all sides agree occurred during that

7     damages period.  But we're not aiming for that.  We're not

8     going to try to convince you that MFGPC was holding the

9     winning lottery ticket.  We're being far more measured.

10         Mr. Kilbourne will present well reasoned, well

11    supported, solid calculations based on conservative

12    assumptions, cross-checked its multiple data points to

13    provide reasonable certainty as required by Utah law.  So

14    our categories of damages are the unpaid invoices, $70,222,

15    which, again, has never been disputed by Mrs. Fields.  And

16    as such, they're owed pre-petition interest under Utah law

17    at ten percent.

18         Then using past operational data of MFGPC itself,

19    Patrick Kilbourne calculates MFGPC's has lost profits in

20    three different ways.  Using past operational data, 465,000,

21    or using the Perfect Snax agreement as a proxy,

22    Mr. Kilbourne calculates MFGPC's has lost profits of

23    916,000.  Finally, as a minimum for the payments required by

24    the license with Perfect Snax, the successor licensee, the

25    license fee was $425,000 for a grossly inferior trademark

1   license.  So as a minimum or sort of a backstop.  But all
2   three provide sort of a similar result for the value of lost
3   profits.
4           Finally, Mrs. Fields is required to pay MFGPC's
5   attorneys' fees and costs.  The agreement has an attorneys'
6   fees cost for the prevailing party.  It's undisputed that
7   MFGPC is a prevailing party based on the grants of motion
8   for summary judgment.
9           It's also undisputed that Mrs. Fields filed this
10  lawsuit and started this fight.  Mrs. Fields asked for this,
11  forced MFGPC to defend itself at every turn.  And at the
12  conclusion of this litigation, we'll ask for our attorneys'
13  fees and expert witness costs pursuant to the agreement.
14          All told, Mrs. Fields owes MFGPC more than
15  $1.5 million for breaching this agreement, and we do look
16  forward to putting our proof before the Court.
17          Thank you, Your Honor.
18          THE COURT:  Thank you, Mr. Rothschild.
19          Mr. Amini.
20          MR. AMINI:  Thank you, Your Honor.
21          May it please the Court, let me pick up with where
22  my adversary ended.  I mean it took us a long time to get to
23  the damages in this case in that opening.  Let's go right to
24  it.
25          There's the unpaid invoices.  Yes, they have

1    $70,000 of unpaid invoices.  Yes, there's no dispute that

2    they have $70,000 of unpaid invoices.  There's also no

3    dispute that there was an offsetting amount of royalties

4    that were credited against those invoices, not by us but, in

5    fact, by MFGPC.  And that there were no communications --

6    exactly zero communications from the termination of this

7    agreement to the present, until just recently, in which

8    MFGPC asked for anything more than the $24,000 that's owed

9    to them net on those invoices.

10          We don't dispute those invoices, Your Honor.

11   We've said repeatedly we would happily pay them, including

12   the legal interest that's required under Utah law.  If we

13   could bring this case to an end with that payment, the

14   company would very much appreciate it.

15          I do need to respond to one thing about the

16   nine-year litigation.  The largest issue in that litigation,

17   from start to finish, was MFGPC's claim that it had a

18   perpetual license to this product, which required going to

19   the Tenth Circuit and getting the Tenth Circuit to rule

20   against them and saying no, Mrs. Fields had an absolute

21   right to end this license on five-year terms.  That took up

22   a large amount of expenses in this case, and that I would

23   suggest, Your Honor, Mrs. Fields was the prevailing party.

24   My understanding is we're going to leave attorneys' fees to

25   the post-trial matters, and that should not take up the time

1   with the witnesses in this trial, which takes us to the

2   trial.

3           They ran this business -- MFGPC had this business

4   from 2002 to the middle of 2015.  They have 13 and a half,

5   maybe 14 and a half years of experience, and they have a lot

6   of data points, and I didn't hear, from the opening

7   statement, any of those data points, not a single one, not

8   one reference to how much business they had done, how

9   successful they had been.  Instead, I heard stories about

10  Mrs. Fields' business and another company, PSP's business,

11  and how that should be the proper measure of their damages.

12          The termination of this contract has already been

13  determined by the Court to have been wrongful.  So the only

14  issue is what is MFGPC entitled to for that wrongful

15  termination.  And I believe there's an agreement, now having

16  listened to it, that it's entitled to the profits it would

17  have made from January of 2015 through April of 2018, three

18  years and three months.  And besides the 24,000, that's the

19  other items to which they are entitled.  And we don't

20  dispute that given the Court's decision on summary judgment.

21          Now I heard that they had a fire in 2013 that

22  caused significant damages to this business, but I also

23  heard that by the third quarter of 2013, the business had

24  recovered.  One would expect, since we didn't terminate them

25  for a year and three months after that, to have heard a

1   considerable amount about how they recovered and how they

2   did in 2014, which I suggest to Your Honor we will hear

3   nothing about from the point (inaudible).

4          They want you to rule on their damages based on,

5   you know, they read that the popcorn business was exploding

6   and they should be able to explode with it.  But the real

7   issue in this case -- and it's a little bit of a concern to

8   me given the witness list that we have.  The real issue in

9   this case is what was the condition of this business at the

10  time that we terminated it, what were its prospects, what

11  were its future prospects.  That would be the conventional

12  methodology with which to measure the future stream of

13  profits, the estimated future costs of this company, and

14  what its net would have been.

15         This was a company, the evidence will show, that

16  between 2003 -- or 2002 and 2015, it lost over $600,000, on

17  top of which it showed in its own financial statements

18  exactly one year in which it had a profit of $10,000.  Every

19  other year was shown as a loss.  And now they've come here

20  and they claim but if you hadn't terminated me in December

21  of 2014, I would have made millions.  I was on the precipice

22  of explosion.  I was deliberately not spending the money I

23  needed to do to expand this business because I was going to

24  take it slow, and if Mrs. Fields hadn't stopped me at this

25  point, the explosion was just around the corner.

1          That's what the trial is about, whether that story

2    is legitimate or not and whether it's reasonable.  I can

3    tell you how I come out on it, Your Honor, but ultimately it

4    has to wait for the evidence.

5          My concern is that we stay focused on that issue

6    in this case, that we not, please, go through every line of

7    the termination letter, which has already been ruled to have

8    been wrongfully sent and wrongfully terminated.  To revisit

9    it, that would be a waste of the Court's time.  This matter

10   should involve four or five witnesses at most.

11         That's my opening statement.

12         THE COURT:  Thank you, Mr. Amini.

13         You may call your first witness.

14         MR. ROTHSCHILD:  Your Honor, thank you.  Brian

15   Rothschild for MFGPC.

16         Just a bit of housekeeping.  We submitted a

17   witness and exhibit list to the Court, and due to some -- I

18   mistyped an e-mail.  Your clerk, Ms. Toscano, didn't receive

19   it until this morning, but there were a number of exhibits

20   that the parties have stipulated to their admission.  And

21   I'm happy to go through them so that we don't have to waste

22   time on seeking admission of the stipulated exhibits during

23   the testimony, or if the Court wants to, it can just rely on

24   the column in which we indicate stipulation on the list.

25   Whatever the Court's pleasure.

```
 1              THE COURT:  I haven't seen the list, but how many
 2    have you stipulated to?
 3              MR. ROTHSCHILD:  I haven't counted them, but we've
 4    stipulated to about, I'd say, 35 exhibits being admitted.
 5              THE COURT:  She's going to print it for me here.
 6              MR. ROTHSCHILD:  What I could do, of course with
 7    Mr. Amini's and the Court's permission, is we can just note
 8    that they have been stipulated to as we discuss them with
 9    the witnesses.
10              THE COURT:  That's all right.  Let's do that.
11              And then if you have an objection, if you don't
12    agree, Mr. Amini, you can tell us.
13              MR. AMINI:  That would be fine, Your Honor.  I
14    think the clarification that I hope Mr. Rothschild was
15    seeking, and I would too, is if we've stipulated to them,
16    are they in the record or do we need to introduce them also?
17    And we can decide that afterwards.
18              THE COURT:  Well, if I admit them, they're in the
19    record.
20              MR. AMINI:  Thank you, Your Honor.
21              THE COURT:  Go ahead, Mr. Rothschild.  You can
22    mention them as you go through them with your witness, or
23    witnesses.
24              MR. ROTHSCHILD:  Thank you.
25              Your Honor, MFGPC calls Christopher J. Lindley to
```

1    the stand.

2              THE COURT:  Mr. Lindley, there you are.  I will

3    ask my courtroom deputy to swear you in, please.

4                        CHRISTOPHER LINDLEY,

5              Having been duly sworn, was examined

6                   and testified as follows:

7              THE COURT:  Thank you.

8              You may proceed, Mr. Rothschild.

9                      DIRECT EXAMINATION

10   BY MR. ROTHSCHILD:

11   Q    Mr. Lindley, just to introduce yourself to the Court,

12   can you briefly give your educational background?

13   A    Sure.  My name is Chris Lindley, and my education

14   started at Augustana College.  I graduated in 1979 with a BA

15   in business administration.  I pursued postgraduate work at

16   University of Illinois at Chicago for approximately a year

17   and a half during the period 1985 and 1986.  And that was

18   the end of my formal education.

19   Q    What is your experience in the food industry?

20   A    Out of college, I joined Standard Brands, which is one

21   of the top ten grocery companies in the U.S. food producers,

22   and I started in sales on the street.  And they were

23   acquired by Nabisco in 1981, which part of that process was

24   terminating the national sales organization.  So I went with

25   the appointed local food broker for approximately nine

1    months, and then moved on to a position with Barrel USA,

2    which was a top writing instruments manufacturer, as a

3    national accounts manager.

4        I stayed there two years, won their national award.

5    They offered to promote me into marketing in Connecticut,

6    but at that time my family didn't want to move to

7    Connecticut so I accepted a job with Seagram Wine Company in

8    1984, and started out as their division -- central division

9    administration manager.

10        I spent a year there, and then they promoted me to the

11    Illinois state sales manager position, which was the second

12    largest wine distributor network in the U.S. for Seagram.  I

13    spent a year in that position, and then they promoted me

14    into the division brand manager position, which was

15    responsible for breaking down national brand programs at the

16    divisional level.

17    Q    Can you tell me after this what other -- when did you

18    leave Seagram and where did you go?

19    A    In 1987 I moved to Hunt-Wesson in California, and I

20    became a brand manager for Fisher snack nuts, which is the

21    second largest brand in the U.S.  I had worked previously on

22    Planter, so I knew that category very well.

23        I spent a year and a half as brand manager over

24    non-grocery, military, mass market, and club channel, and

25    private label business.

1   Q     When you say brand manager, what does that entail?

2   A     My responsibility included the P&L for the particular

3   brand, managing the profit and loss, managing all agencies,

4   managing the product development, managing the sales process

5   within the Hunt-Wesson sales organization, and developing

6   meaningful consumer programs and programs for the trades.

7   Q     Can you tell me where you went from there?

8   A     So after that I was promoted to La Choy, which was

9   still within Hunt-Wesson, and I ran their frozen La Choy

10  brand business for approximately a year to gain a different

11  perspective of a different part of the grocery business, the

12  frozen business in particular versus just dry grocery.

13  Q     From there?

14  A     From there -- Orville Redenbacher was in the process of

15  evaluating moving from just microwave popcorn and jarred

16  popcorn into the ready-to-eat popcorn segment of the popcorn

17  category, so they asked me to launch Orville Redenbacher

18  ready-to-eat popcorn in the test market.  So I spent the

19  next roughly two years on that particular project, learning

20  everything from a consumer perspective about what mattered

21  with ready-to-eat popcorn, understanding how we could apply

22  the strengths of the Orville Redenbacher brand to that

23  particular segment.  Developed formulations, developed

24  packaging, developed package design, identified co-packers

25  and repackers in different sales organizations to test

1    different methodologies in the marketplace, specifically

2    Phoenix, St. Louis, and Milwaukee.

3    Q    And can you tell me, do you have any experience with

4    licensing in the food snack -- or food and grocery business?

5    A    Yes, actually I do.  One of my jobs following the

6    Orville launch was becoming director of sales and marketing

7    for the club channel for Conagra.  Conagra had been

8    purchased by Hunt-Wesson -- or Conagra purchased Hunt-Wesson

9    in 1990.  I stayed with the company.  And in that channel I

10   wanted to launch several new Marie Callender's items that

11   had not been done.  So I was the link for new product

12   development for Marie Callender's, specifically working

13   within that license, working with the executives of Marie

14   Callender's restaurant business that owned the license, they

15   were the licensor, and spent several years launching

16   ready-to-eat soup and condensed soup under Marie

17   Callender's, and we evaluated other items that we just

18   decided not to pursue based on research that we had

19   developed.

20   Q    So help me understand, were you on the licensee side

21   for brands?

22   A    Yes.  On that particular item, I was.

23        I also -- I'm sorry.  I was also involved in licensing

24   for Knott's Berry Farm.  So in that case, I was the licensor

25   working with a new company that wanted to launch a line of

1   ready to drink fruit smoothies.

2   Q    And did you participate as either licensee or licensor

3   on any other brands?

4   A    I participated as licensee on Tony Roma's barbecue

5   sauce.  I secured that as a licensee with Roma Corp. for

6   barbecue sauce nationally.

7   Q    Let me ask about food licensing.  From your experience,

8   is it difficult to launch a new brand into the grocery

9   business or other retail business?

10  A    In general, yes.

11  Q    Tell me -- what are the odds?

12  A    Several experts in the food industry who had studied

13  this, including a gentleman from Harvard Business School,

14  indicated that 95 percent of all new products launched into

15  the food industry fail.

16  Q    And what are the causes of the difficulties?

17  A    Intense competition to start.  On average, there's

18  30,000 new items attempting to get shelf space in grocery

19  stores, where there's on average only 30,000 items stocked.

20  So it's very competitive to try to get your product on the

21  shelf, number one.

22       Number two, if you do not link your product properly to

23  satisfy consumer need, the chances are very high you'll

24  fail.  If the consumer's product is where they have no need

25  for it, that's not good launching into the marketplace.

```
 1        Then there are other things like trade relations, how
 2   do you end up -- if you've determined you have a winning
 3   product, how do you actually get the product in the grocery
 4   stores, and that can be extremely expensive and extremely
 5   risky with the trade.
 6   Q    What are the expenses?
 7   A    Well, for instance, with Orville Redenbacher
 8   ready-to-eat popcorn, we budgeted $1.5 million for one item
 9   to get launched nationally, and we had three flavors.  So we
10   had budgeted $4.5 million to gain shelf space in 30,000
11   grocery stores nationally.
12   Q    And what is the value of attaching a trademark brand to
13   a product?
14   A    Depending on the quality of the brand and the product
15   that the company is wanting to distribute, it's extremely
16   important.  It shortcuts developing a relationship, a
17   promise with the consumer, which can be very expensive in
18   marketing dollars to develop that relationship over time.
19   So licensing provides an opportunity to shortcut significant
20   expense to try and develop a relationship with consumers.
21        In the case of Mrs. Fields, there's a well established
22   brand promise and relationship of consumers that I could
23   take advantage of and not have to worry about addressing
24   that aspect of the marketing equation.
25   Q    Okay.  Let me ask -- so you were at Conagra and you
```

1    somehow ended up as a principal of MFGPC.  Tell me, what

2    paths did you take to get there?  Let me withdraw that

3    question and make it more concise.

4         At some point you left Conagra.  What did you do after

5    that?

6    A    I started my own company called LHF, which actually

7    stands for low hanging fruit.  I started that in 2002.  The

8    idea was to source available, meaningful, valuable licenses,

9    to apply those to food or beverages in the food industry,

10   and incubate those new products and brands to a level where

11   we would achieve scale, and then ultimately sell those

12   rights to a larger manufacturing operation.

13   Q    And what was the first license you acquired?

14   A    Tony Roma's was actually the first license.  Really it

15   was started at the very end of my career at Conagra and

16   finished up just as I was launching LHF.  And from there I

17   then pursued Mrs. Fields as a primary focus brand for

18   ready-to-eat popcorn, microwave popcorn, and popcorn snacks.

19   Q    What was your final compensation at Conagra when you

20   decided to leave?

21   A    $330,000, not including typical benefits.

22   Q    And you just testified you went to LHF.  I understand

23   that Mrs. Fields was not your first license.  Was it your

24   second?

25   A    Under LHF technically was my first, but I had already

1    done the groundwork for Tony Roma's license and passed that

2    off to other partners.

3    Q    Okay.  And why did you go after Mrs. Fields?

4    A    I was very familiar with the popcorn category.  I

5    understood intimately who the competitors were, what their

6    strengths and weaknesses were.

7         The one thing that I had realized was Harry & David was

8    a great premium brand, but it was generally not available

9    except seasonally in select stores.  Most of their business

10   was done through e-commerce.

11        So what I wanted to do is basically knock off

12   Harry & David, do it a little better, but I needed a really

13   premium brand name that would make sense, that would get the

14   attention of the trade, that would get the attention of

15   consumers so that I wouldn't have to worry about the brand

16   value in the eyes of the trade and the consumers.  So it

17   made sense to pursue Mrs. Fields because of their premium

18   brand positioning.

19   Q    Did they have a line of popcorn before you approached

20   them?

21   A    They did not.  In fact, I was told by Gary Talley, who

22   was the VP over sales and licensing at that time, it wasn't

23   even a top ten category consideration.

24   Q    And what does the Mrs. Fields brand stand for?

25   A    It promises at the highest level indulgence.  It's an

1    indulgent treat.  When you walk into a Mrs. Fields cookie

2    store, the consumer is expecting an indulgent treat in the

3    form of a warm, gooey chocolate chip cookie.

4    Q    So if you were to acquire the Mrs. Fields brand name

5    for your product, what would that do for your business?

6    A    It would give it instant credibility.

7    Q    With the consumer?

8    A    With the consumer and with the trade.

9    Q    When you say trade, what do you mean?

10   A    That would be the buyers that I need to talk to to

11   convince to put our product on the shelves.  It would be the

12   retailers.  It would be anywhere from Kroger, Walmart,

13   Albertson's, Safeway, to Dillard's, Macy's, Nordstrom, to

14   Sam's, Costco, BJ's, the military channels, et cetera.

15   Q    So contrast that with an unbranded product.  Is it --

16   what's the advantage vis-a-vis an unbranded product if you

17   were to try to call a retail buyer?

18   A    So with an unbranded product in a competitive category,

19   you will need substantial support to convince the trade to

20   put it on the shelf.  And if you don't have the substantial

21   marketing dollars required and you have a means of

22   communicating who you are and why you matter to the

23   consumer, it just becomes extremely difficult to get on the

24   shelf.

25   Q    I'm going to put on the screen Exhibit 3, which is a

1    stipulated exhibit.

2              THE COURT:  Any objection to its admission?

3              MR. AMINI:  No objection, Your Honor.

4              THE COURT:  Exhibit 3 is received into evidence.

5              (Exhibit 3 was received into evidence.)

6    BY MR. ROTHSCHILD:

7    Q    Can you see the screen here, Mr. Lindley?  Can you see

8    the exhibit?

9    A    I can't.  You froze on my end.  Let me see if I can

10   open this up.

11             MR. AMINI:  Your Honor, if I may, I have no

12   objection to Mr. Lindley opening up Exhibit 3 independently

13   on his computer.  We all know what it is.

14   BY MR. ROTHSCHILD:

15   Q    Mr. Lindley, do you even have the exhibit?  Do you

16   happen to have a copy of the exhibits?

17   A    I can't see it actually right now.  As soon as you made

18   a change, that's where I lost the screen.  I'm trying to get

19   that back.  Hang on.

20             THE COURT:  We can see it all right.

21             MR. ROTHSCHILD:  Just give me one moment,

22   Your Honor.

23             THE WITNESS:  There, it's back.  Okay.

24   BY MR. ROTHSCHILD:

25   Q    Now you can just see us, though.  You can't see the

1    exhibit, correct?

2    A     Right.  If you can try one more time.

3    Q     I'll try it one more time.

4    A     Okay.  I see it now.

5    Q     I'm going to look at the first page and then scroll to

6    the second here.  Do you recognize this document?

7          Mr. Lindley, do you recognize the document?

8                THE COURT:  Can you hear him, Mr. Lindley?

9                MR. ROTHSCHILD:  Chris, can you hear us?

10               THE COURT:  We've lost Mr. Lindley apparently.

11               THE WITNESS:  I'm back.  Zoom kicked me out.

12               I'm back.  You can try it again, Brian, if you

13   want.

14               MR. ROTHSCHILD:  It seems like I have either an

15   exhibit or audio.  Let's see.

16               THE WITNESS:  I can see that.

17   BY MR. ROTHSCHILD:

18   Q     I'm going to scroll through the first and second pages.

19   Do you recognize the document?

20   A     Yes.  That is the trademark licensing agreement with

21   LHF.

22   Q     And you negotiated this with Mrs. Fields?

23   A     Yes.

24   Q     And I see here that the counterparty, the licensee,

25   appears to be LHF, not the current plaintiff MFGPC.  Is that

1   right?

2   A    Yes.

3   Q    And I'm going to show you Exhibit 4, which also is

4   stipulated to.  Do you see this exhibit here?

5   A    Yes.

6   Q    What is it?

7   A    This is a transfer, an assignment of the license from

8   LHF to the new operating company MFGPC.

9         MR. ROTHSCHILD:  Your Honor, both of these are

10  stipulated to be admitted.

11        THE COURT:  Exhibit 4 is received.

12        (Exhibit 4 was received into evidence.)

13  BY MR. ROTHSCHILD:

14  Q    And, again, it was sent to whom?

15  A    Michael Turner, who is the -- oh, on that particular

16  note, he was an investment advisor that I had hired in 2007.

17  Q    But you had made this assignment with the express

18  acknowledgment here and permission of Mrs. Fields?

19  A    Yeah.  Michael Ward was the senior VP and legal general

20  counsel for Mrs. Fields.

21  Q    So I bring the Court through that only to point out

22  that wherever we see LHF in the agreement, we're actually

23  referring to MFGPC at this point because of the assignment.

24        In fact, Mrs. Fields Original Cookies, Inc. assigned

25  their right to the current plaintiffs in this case,

1    Mrs. Fields Franchising, I believe.

2         I want to ask you a few questions about this licensing

3    agreement because you negotiated it and are familiar with

4    it.  How long did it take you to negotiate this?

5    A    From the initial meeting, which I believe was in the

6    middle of March, the agreement was signed by May 1st.  So

7    the discussions from the original presentation to Larry

8    Hodges, the CEO, and Gary Talley, who's the VP coordinating

9    that, the final details probably took two weeks, from the

10   middle of April to the beginning of May.

11   Q    Okay.  I want to ask about the grant of the license.

12   We're going to spend some time on Section 2.  We can see

13   here there's a grant of a license for royalty bearing

14   products.  What's your understanding of what that means?

15   A    Royalty bearing products, from my understanding, was

16   any popcorn product available to be produced and marketed as

17   a prepackaged product in the marketplace.

18   Q    So I'm going to point you, to refresh your

19   recollection, to royalty bearing products, and it refers to

20   Exhibit B.  So I'm going to scroll to where it says high

21   quality, pre-packaged popcorn products.  Do you see that?

22   A    Yeah.

23   Q    Does that include sweet?

24   A    Yes.

25   Q    Savory?

```
 1   A     Yes.

 2   Q     Foil bags?

 3   A     Yes.

 4   Q     Boxes?

 5   A     Yes.

 6   Q     Gift packages?

 7   A     Yes.

 8   Q     Canisters?

 9   A     Yes.

10   Q     When it comes to -- microwave?

11   A     Yes.

12   Q     When it comes to popcorn, what does it not include?

13   Maybe that's easier.

14   A     Nothing.

15   Q     So let me go back to Section 2.  The grant is

16   throughout the territory.  Do you know what the territory is

17   or where that's defined?

18   A     The world.

19   Q     So I see territory, and 1.(m) is the world.  Why not

20   just North America?  Did you specifically want a worldwide

21   license?

22   A     Yes, and the reason is Mrs. Fields already had

23   franchise locations around the world.  So it was already an

24   established brand in many countries and well thought of.  In

25   fact, many foreign countries hold American brands in high
```

1    esteem.  So the belief was that we would eventually move to

2    potential certain distributors that would handle certain

3    countries, possibly sell through Mrs. Fields franchise

4    locations around the world.  So it made sense to include

5    that.

6    Q    And did you, in fact, sell to franchisees outside of

7    the United States and Canada?

8    A    Yes.  RVC at the time was Mrs. Fields largest franchise

9    group, and I believe 18 locations in Hong Kong.  They were

10   very high end, similar to what you might see in an export

11   store in an international airport.

12   Q    Okay.  And the license is for the, quote, licensed

13   names, which I'm going to.  These are a little out of order

14   for some reason.  Licensed names and marks shall mean those

15   trademarks identified in Exhibit A.  What is the mark in

16   Exhibit A here?

17   A    Mrs. Fields.

18   Q    Okay.  So in sum, is it accurate -- well, one more look

19   at the grant of the license.  This says that Mrs. Fields

20   shall not compete with LHF for the use of any trademark on

21   royalty bearing products.  What does that mean to you?

22   A    That means that my own licensor could not create their

23   own brand under Mrs. Fields brand of a line of products,

24   that would be popcorn, that would compete against MFGPC.

25   Q    Was that important?  Why did you negotiate that?

1    A    Yes, because if they decided they wanted to take the

2    Mrs. Fields brand with their own popcorn into certain

3    markets where I had no control over the quality of the

4    formula, the look of the packaging, in essence, I would be

5    losing control of a very important aspect of a licensed

6    brand back to the licensor, and I would have no say in what

7    they would be doing with that particular product in any

8    channel of business.

9    Q    So what if Mrs. Fields did, in fact, want to sell a

10   popcorn product in stores, where did it have to get that?

11   A    That would have to be sourced through MFGPC.

12   Q    So in your mind, then, did you have a right to sell --

13   does this to you mean that you have a right to sell

14   Mrs. Fields any popcorn that it wants to sell?

15   A    Yes, and Mrs. Fields had to buy Mrs. Fields branded

16   popcorn from MFGPC.

17   Q    I'm going to ask you on what terms, but I'm also going

18   to refer you to Section 3.(b) to refresh your recollection.

19   Could you charge them whatever you wanted?

20   A    No.  In fact, we gave them what's known as most favored

21   nation's pricing, which says in the marketplace they would

22   not pay any more than the lowest price for that particular

23   product sold in the marketplace.

24   Q    So just to sum up, correct me if I'm wrong, you had the

25   worldwide exclusive, even exclusive of Mrs. Fields, right to

1    use the Mrs. Fields mark on popcorn, anything that has to do

2    with popcorn based on this agreement, correct?

3    A    Correct.

4    Q    For that right, in Section 5, walk me through what you

5    had to pay.

6    A    So at the signing of the agreement, no later than

7    June 1st, which was 30 days following the signing, I needed

8    to remit $50,000, and then another $50,000 one year later as

9    the initial licensing fee.

10        And then from years two through five, there was a stair

11   stepping up of royalties that needed to be paid.  So in year

12   two, by the end of the year, I needed to remit another

13   $50,000.  In years three through five, 100,000 at the end of

14   each year, minimum.

15   Q    For a total of what?

16   A    Of $450,000.

17   Q    Did you timely make all of those payments?

18   A    Yes.

19   Q    So your initial investment on the agreement was

20   $450,000?

21   A    To Mrs. Fields, yes.

22   Q    I want to walk you through another aspect of this

23   agreement, Section 4, license transfer.  Do you see where it

24   says assignment?

25   A    Yes.

1    Q      You did, in fact, assign this to MFGPC.  Why?

2    A      So in the LHF model, that company's job is to source

3    licenses, negotiate those licenses, and then provide general

4    management to any new licensed property that LHF would

5    negotiate until such time a new operating company specific

6    to that license would be established.

7          So as soon as the license was finalized with

8    Mrs. Fields, I created Mrs. Fields Gourmet Popcorn Company,

9    a C corp, as the operating entity holding the

10   Mrs. Fields license.

11   Q      I'm going to ask you why, why didn't you just leave it

12   as LHF?

13   A      Because if I wanted to ultimately sell what I had

14   created under a licensing agreement to a larger company, I

15   didn't want any company needing to extract that from LHF,

16   which may have several other licenses, if I didn't follow

17   this particular model.  This was a very clean way to

18   disconnect a licensed business from LHF and it would be a

19   click fit into a new company.

20   Q      So I often see in these non-assignability clauses

21   what's called a change of control provision, and we'll look

22   at one in the PSD agreement later.  In your negotiation of

23   the final version of this, is there a change in control

24   prohibition?

25   A      No.

1   Q     So you could take on equity investment, correct?

2   A     Yes.

3   Q     You could even sell the entire company without voiding

4   the license?

5   A     Yes.

6   Q     You could take on debt of course, right?

7   A     Yes.

8   Q     Tell me about this 4.(b) while we're here.  What is the

9   importance of this co-pack agreement clause?

10  A     So MFGPC fundamentally is a marketing company in the

11  food business with a well known license called Mrs. Fields.

12  There was never a plan, never a desire to become a

13  manufacturer of popcorn.  There are too many manufacturers

14  available in the marketplace with excess capacity, which I

15  knew all the majors, that could easily incorporate that

16  business into their existing operations.

17        So MFGPC never needed to raise capital for plant and

18  equipment.  We didn't need to hire people.  We intentionally

19  did not have employees because the entities that we worked

20  with all had those employees on hand.  So the co-packer,

21  they had all the employees from the top down.  They had the

22  knowledge, the expertise, the equipment to produce the

23  product.

24  Q     And did you, in fact, use co-packers rather than

25  packaging and coding and selling popcorn yourself?

```
 1   A    100 percent co-packer.

 2   Q    I want to walk you through some of your -- look at the

 3   exhibit list to make sure we're stipulated here.  We are

 4   not.  So I will walk you through some of these.

 5        This is Exhibit 67.  I want to walk you through some of

 6   the products that you created and sold and just have you

 7   tell me a little bit about them.  I will share my previous

 8   screen.  Can you see the popcorn package?

 9   A    Yes.

10   Q    Is this something you sold using the license?

11   A    Yes.  So I created a formula, and the packaging and the

12   package design, and had my original co-packer, Tom Clark

13   Confections, produce this.  And this shipped to roughly 100

14   Ralphs grocery stores in the fall of 2004.

15   Q    Showing you the back of the canister now.  Tell me

16   about what this product is made of.

17   A    So the brand positioning is premium and I developed

18   formulas to support that brand position.  As a marketer, it

19   made no sense to try to go out with cheap formulations and

20   try and basically hoodwink the consumer that they are going

21   to be disappointed with the brand promise based on what

22   you're going to be eating.

23        So it was important to me to either have milk chocolate

24   or -- and real milk chocolate, or tree nuts is the number

25   one ingredient in the formulation.
```

1    And for those that don't know, when you read an

2  ingredient statement, the number one item is that which has

3  the most net weight of the product.

4    So in this particular product, I believe mixed nuts is

5  the first ingredient on the ingredient statement, which

6  included, I believe, almonds and cashews and pecans and

7  hazelnuts.  So a very indulgent product.

8  Q    Can you see the new package of popcorn I'm sharing now?

9  A    Not yet on mine.

10  Q    Do you recognize this packaging?

11  A    Yes, I do.

12  Q    Tell me about this product.

13  A    So it was designed for retail distribution.  It could

14  be in grocery stores, it could be in drug stores, it could

15  be in mass market stores, and it was identical in packaging

16  structure and look to Mrs. Fields cookies that were still in

17  distribution at that time.  And so we wanted to make sure

18  that we linked to a product line that was already

19  established in retail with consumers and that we could do

20  cross-promoting, two for $5.  They both have the same shelf

21  price.  So if you wanted an indulgent treat, you could buy

22  Mrs. Fields cookies or you could buy Mrs. Fields popcorn.

23    So here the number one ingredient is dark chocolate,

24  and there are what we call maculate or fake chocolate, or

25  confectioners coating is commonly used in this category

1    because it's much cheaper and doesn't taste anything like

2    actual chocolate.  And a couple of other things that will be

3    the indicator of that is chocolate liqueur, cocoa butter are

4    typically requirements for real chocolate as opposed to a

5    confectioners coating.

6         So we use real chocolate as the number one ingredient.

7    And you can see we move down and we have -- pecans is the

8    number four ingredient after sugar and corn syrup.  And

9    pecans are one of the most expensive tree nuts in the

10   marketplace.

11   Q    I want to share with you one other gourmet -- what are

12   we looking at here?

13   A    So on the left is the same gable box but using seasonal

14   graphics for milk chocolate lovers, which was a milk

15   chocolate drizzled toffee buttered popcorn that was sold

16   into CVS nationally.

17        In the middle was a combination gift box that was sold

18   to Dillard's.  So you can see on the left, they have white

19   chunk macadamia nut popcorn, and then milk chocolate in

20   premium nut popcorn.  And then the other two items parallel

21   the same chocolate flavor as cookies, so Mrs. Fields white

22   chunk macadamia cookies, Mrs. Fields milk chocolate chip

23   cookies.  It was sold into Dillard's.

24        And then we have the milk chocolate decadence, which is

25   milk chocolate grahams.  So this is where Mrs. Fields was

1    collaborative.  At that time they had no problem with me

2    taking, for instance, milk chocolate grahams, it was clearly

3    outside of the popcorn category, and running with it.

4         The same with reselling their cookies in the mixed gift

5    baskets and packs that we sold.  It helped the brand.  It

6    helped move chocolate cookies, it helped move milk chocolate

7    grahams.  So that was just the way we collaborated together

8    at that time.

9    Q    All right.  I want to talk about who your customers

10   were.  You've mentioned a few of them.  Where were your

11   primary customers that you sold your products to?

12   A    So Mrs. Fields was the primary customer.  However,

13   probably 50 percent of what they purchased from me actually

14   was resold to Quill and Staples, who were two large

15   customers that Mrs. Fields was the -- gifting was the vendor

16   of record with them.  So they would simply buy my product

17   and I would drop ship it to the Quill DCs or the Staples

18   DCs.  So a good part of it for Mrs. Fields went there, the

19   2.4 million.

20   Q    I'm sorry.  I want to stop you for just a second.

21        Do you recognize this document here?

22   A    Yes.

23   Q    What is this?

24   A    So this is a listing of wholesale revenue or net

25   royalty revenue generated by MFGPC from its start in 2003

1    until it was terminated at the end of 2014.

2            MR. AMINI:  May I just ask what exhibit this is?

3            MR. ROTHSCHILD:  Mr. Amini, this is not an

4    exhibit.  I'm showing this to the witness and asking him to

5    identify it, and we're not going to seek to admit it.  I

6    just want him to refresh his recollection about the numbers.

7            MR. AMINI:  Can I ask when it was produced in this

8    case?

9            MR. ROTHSCHILD:  I don't know whether it was

10   produced.  I think it's an amalgam from the royalty

11   spreadsheet, which is the spreadsheet exhibit with the

12   royalty reports.  Rather than have the witness do math in

13   front of you, I figured I'd just have him look at it ahead

14   of time.

15           MR. AMINI:  I understand that.

16           Your Honor, this exhibit is something that has

17   been created.  I don't know when, by whom.  Subject to that,

18   I want to just book the objection and reserve it.  We can go

19   forward.  If these refresh his recollection, we'll try to

20   check them later.

21           THE COURT:  Apparently it's a demonstrative

22   exhibit.  He's not seeking to have it admitted.

23           MR. AMINI:  But he's seeking to show it to the

24   witness, that he would like the Court to take note of, and I

25   have no idea what the source of that is.  It may be

 1    accurate.  I've just never seen it before.  It has never

 2    been shared with us.  And it wasn't on the exhibit list.

 3              THE COURT:  Let's see where it goes.

 4              Mr. Rothschild, go ahead.

 5    BY MR. ROTHSCHILD:

 6    Q    All I really want you to answer from this, Mr. Lindley,

 7    is who your major customers were.

 8    A    Right.  So you can see from the top down, Mrs. Fields

 9    Gifts.  Rite Aid when we had distribution there nearly three

10    years in 700 stores.  Dillard's, we had three holidays that

11    we did business with them.  Big Lots, we had several in and

12    outs with them.  Costco Canada West, we had one in and out

13    of 220,000.  Costco East, we had a northeast and southeast.

14    We had Bed Bath & Beyond.  We had the Navy Exchange.  We had

15    the franchise group in Hong Kong.  We had Menards, which is

16    a vast marketer, Christmas tree shops.

17         You can see from here that what we've done is we've

18    gone in to certain customers in each of the primary channels

19    to gain learnings, what worked and what didn't work.  So we

20    had grocery, drug, mass, gift, department store, military,

21    et cetera.

22    Q    Okay.  And is this an accurate representation derived

23    from your royalty reports, which is an admitted exhibit?

24    A    Yes.

25              MR. AMINI:  May I ask that it be marked and that

1    we be given a copy.  All I have is what I just saw on Zoom.

2    So now I don't have any record.

3             MR. ROTHSCHILD:  I didn't intend to submit it as

4    an exhibit.  I'm happy to, if it's important.  I don't think

5    it's actually admissible because it's not an ordinary

6    business record.  But I'm happy to mark it if Mr. Amini

7    wants to do that.

8             THE COURT:  You can mark it and give him a copy.

9    You're not seeking to admit it, as I understand.

10            MR. ROTHSCHILD:  I'll ask Ms. Hodson to send it to

11   the group -- trial group, that demonstrative.

12   BY MR. ROTHSCHILD:

13   Q    So you said that your largest client was Mrs. Fields.

14   Is that accurate?

15   A    Yes.

16   Q    Approximately how much did you sell to Mrs. Fields over

17   the period that you had the license?

18   A    $2.4 million.

19   Q    I want to take you back to the license agreement itself

20   and go over a few more aspects of it.

21        I want to call your intention to Section 16.

22   A    Uh-huh.  (Affirmative)

23   Q    This regards the term of the agreement, the

24   termination.  What was your understanding of the initial

25   term.

```
 1   A    The initial term was a period of five years, 60 months.

 2   So long as LHF was not in material default, that it would be

 3   automatically renewed in successive five-year option

 4   periods.

 5   Q    And was the agreement automatically renewed at the end

 6   of the initial term?

 7   A    Yes.

 8   Q    And was the agreement automatically renewed at the end

 9   of the successive term?

10   A    Yes.

11   Q    What was your understanding of part (b) in terms of the

12   ability to terminate LHF?

13   A    These were the only conditions by which the agreement

14   could be terminated.

15   Q    And there follows a list of breaches and the procedure

16   for terminating, almost all of which include a 30-day notice

17   and opportunity to cure?

18   A    Correct.

19   Q    Okay.  And this Court on summary judgment, what is your

20   understanding of its ruling as to whether MFGPC was properly

21   terminated?

22            MR. AMINI:  Objection, Your Honor.

23            MR. ROTHSCHILD:  Can I understand what the

24   objection is?

25            THE COURT:  What is the objection?
```

```
 1            MR. AMINI:  The objection, in part, I don't know
 2   what the relevance of his understanding of the Court's
 3   ruling on summary judgment is.
 4            THE COURT:  Well, I guess you can give us his
 5   understanding.  But the courts have already ruled on this,
 6   haven't they, Mr. Rothschild?
 7            MR. ROTHSCHILD:  They have.  I'm trying to
 8   understand why he paid so much for this agreement, and at
 9   the time his understanding of the terms were a little
10   different.
11            THE COURT:  Well, proceed briefly on that.
12            MR. AMINI:  If I may be heard briefly, Your Honor.
13   I don't know what that has to do with this case.
14            THE COURT:  Well, I'm not sure either, but I will
15   let him go on for a minute.  Go ahead.
16   BY MR. ROTHSCHILD:
17   Q    I want to ask you, Mr. Lindley, at the time you signed
18   this agreement, did you believe that you couldn't be
19   terminated unless you were in default?
20   A    Correct.
21   Q    The Tenth Circuit has subsequently ruled against that
22   position.  You understand that?
23   A    Yes.
24   Q    So you're not seeking damages for eternity on this
25   agreement.  You're only seeking damages for the three and a
```

```
 1   half years, approximately, that were remaining on your final

 2   term; is that correct?

 3   A    As the Court ruled, yes.

 4   Q    Okay.

 5        MR. ROTHSCHILD:  That, Your Honor, is the

 6   relevance.  I'm just establishing the damages period.

 7        THE COURT:  Thank you.

 8   BY MR. ROTHSCHILD:

 9   Q    So, Mr. Lindley, we've gone through the licensee and

10   the guaranteed royalties.  You paid approximately $450,000

11   right to Mrs. Fields for the license; is that correct?

12   A    Yes.

13   Q    What other start-up costs did you incur in launching

14   your business?

15   A    Well, paying for attorneys to draft the contracts.

16   Paying for -- and that would be the licensing contract.

17   Paying for contracts between co-packers that I was

18   selecting.  Paying for formulation development.  Buying

19   packaging.  Printing plates.  Packaging inventory

20   ingredients in advance of production.  There were a number

21   of things related to that.

22        And then consumer research.  We did quite a bit of

23   consumer research on the brand to make sure that we were

24   addressing what the consumers' needs were, and making sure

25   that what we thought would resonate under the Mrs. Fields
```

 1    brand would resonate with consumers as well.

 2    Q    Did you remain employed by Conagra while you did this?

 3    A    No.  I was out on my own at that point.

 4    Q    So did you forgo your salary that you could have

 5    earned?

 6    A    Absolutely.

 7    Q    I heard some reference in the opening argument by

 8    Mr. Amini to the fact that this company showed losses during

 9    its first years.  Let me ask you a little bit about that.

10         In the first year, did the company put these large

11    licensing fees on its books as an expense it had to pay?

12    A    Yes.

13    Q    So it started out each year where it had to pay

14    $100,000 in guaranteed royalties, $100,000 in the hole; is

15    that right?

16    A    Uh-huh.  (Affirmative)

17    Q    What was MFGPC's business strategy for this company,

18    from a high level?

19    A    So starting with LHF, it was to find a well established

20    brand name that did not take advantage of the opportunities

21    available to it in the food business.  And so by doing that

22    with Mrs. Fields, I would be able to shortcut, as we've

23    talked about earlier, certain marketing expenses to

24    introduce what these products are, who the brand is, and

25    begin to establish that relationship with consumers.

1    So in the start-up period, I don't know of any
2    established food company that would ever believe that they
3    would break even or make money in the first two to three
4    years, minimum, of launching new products.  It's just not
5    reasonable to assume that.
6    Q    And so you are not looking to hit big profits in the
7    first two years.  Is that accurate, what you just said?
8    A    Right.  In fact, the way I set this up before I jumped
9    out is my wife made a very good living at Capital Group for
10    29 years as a VP.  We relied on her income as a primary
11    source of income.  So because of that, we cut our expenses
12    way down.  We were basically in this for the long haul, and
13    our payout would be developing and scaling this business and
14    selling it off at a higher multiple to a well established
15    popcorn company.
16        In the food industry, it's not uncommon with a well
17    known brand name that these companies are sold ten to 13
18    times EBITDA, or one and a half to two times revenue.  So we
19    wanted to get to scale so we could take advantage of those
20    multiples in partnering and/or selling it outright to a
21    larger popcorn manufacturer, where all the work had been
22    done, all the risk had been taken, and it was pretty much
23    something they could click fit into their operations and
24    build from there.
25    Q    So why not instead push for large volume sales, market

1    presence, top line?

2    A    Well, that would absolutely be wonderful if you could

3    and you didn't care about whether or not the company

4    survived.

5        If you look at the first three primary Mrs. Fields

6    licensees, they all went bankrupt.  Shadwell Grove built to

7    $50 million on their packaged cookie business, and imploded,

8    and was out of business by 2006, actually owing Mrs. Fields

9    quite a lot of royalty money.

10       Maxwell -- Maxfield, rather, cookies went bankrupt in

11   2014, which is when Mrs. Fields bought them out.  They would

12   do ten to $13 million a year in Mrs. Fields chocolate

13   licensed revenue.  Legacy Brands, same thing.

14       So there's a history of just bad management of money

15   versus the opportunity.  And in this business, if you don't

16   understand that, you will get way over your skis and you are

17   going to tumble badly, and I didn't want to do that.  But

18   that didn't mean the opportunity wasn't there.

19       So looking at the revenue is no indicator of what the

20   opportunity was at all.  It's an indicator that I refused to

21   put my company in harm's way of appealing to somebody else's

22   decision of what success looks like.

23   Q    Your strategy, let me see if I understand here, is you,

24   number one, acquire the trademark on favorable terms, as

25   we've gone through.  Number two, you are building the

 1  business for what?  You said stability.  I'm just
 2  summarizing that.  Is that accurate?
 3  A    Yeah.  To creep before we leap, to be careful and not
 4  reckless in getting ahead of yourselves with opportunity in
 5  the marketplace.
 6  Q    Then what's the step three, what are you looking for?
 7  A    So once we found the license and then we've done the
 8  proof of concept that it actually is something of value to
 9  the consumers, then we begin to scale.  Then it would be
10  seeking funding to properly fund the entity so you could
11  springboard quickly to chase more sales without putting the
12  company financially at risk.
13  Q    Where were you in this process when you were terminated
14  in December of 2014?
15  A    So we had gone through discussions with different
16  investment advisors, different co-packers.  There were a
17  number of circumstances why certain things didn't happen in
18  a given time.  Largely around the great recession, we had
19  the largest SBA district in the country, which is the
20  southwest division out of LA, agreed to support us for a
21  $2 million loan.  Unfortunately, every bank they sent us to,
22  which I was speaking with the presidents of every one of the
23  banks, they had no money to lend at that point because of
24  the recession and the serious financial crunch the banking
25  industry was in.

1    Then you move to Peakstone advisors in 2012.  They are

2    a middle market investment banking firm out of Chicago.

3    They seek to invest, at a minimum, 15 million, and then they

4    go up to 50, 60 million.

5        We had an agreement.  We were very close to a letter of

6    intent, and then two things happened.

7        The weekend leading into January 14th, there was a

8    fire -- smoke damage and fire to an adjacent building next

9    to my co-packer that immediately stopped production.  And I

10   also found out my lead investment banker had a heart attack

11   and died on the same day of the fire.  So it was rather a

12   double shotgun blast of unbelievable circumstances.  But,

13   regardless, I kept moving forward.

14   Q    Let me call your attention to Exhibit H, which is a

15   stipulated exhibit.

16           THE COURT:  What is it?

17           MR. ROTHSCHILD:  H.

18           THE COURT:  H.

19           MR. ROTHSCHILD:  H as in Harry.

20   BY MR. ROTHSCHILD:

21   Q    Do you recognize this document?

22   A    Yes.

23   Q    So when you said you went out and hired an investment

24   banking group and you said Peakstone, is this what you mean?

25   A    Yes.

```
 1   Q     What does this agreement do?

 2   A     That we are agreeing to work together to source funding

 3   for a specific transaction over a period of time.  They

 4   would put their best efforts against it, I would put my best

 5   efforts against it to raise capital for MFGPC.

 6   Q     I'm showing you Exhibit 49.

 7             THE COURT:  Were you going to get H admitted?  You

 8   said it was stipulated to.

 9             MR. ROTHSCHILD:  Yes.  It was stipulated,

10   Your Honor.

11             THE COURT:  H is received.

12             (Exhibit H was received into evidence.)

13   BY MR. ROTHSCHILD:

14   Q     Now looking at Exhibit 49, which is also stipulated, do

15   you recognize this PowerPoint presentation?

16   A     Yes.

17   Q     And within this PowerPoint presentation, who is it to,

18   do you recall?

19   A     The audience was Neal Courtney at that time.  He was

20   the CEO of Mrs. Fields Famous Brands.

21   Q     And what were you pitching?

22   A     We were pitching participating jointly in -- basically

23   in investing in moving the brand and the business forward,

24   ultimately to the benefit of both MFGPC and Mrs. Fields from

25   a royalty perspective.
```

 1  Q    And I'm looking at the third page of this PowerPoint

 2  here.  This includes sort of a series of unfortunate events

 3  here.  Do you see all these?

 4  A    Yes.

 5  Q    Is that what you were referring to when you talked

 6  about the co-packer fire and your investment banker passed

 7  away, a couple of other unfortunate things?

 8  A    Yes.  There was just a significant cash drain at the

 9  time.  I was appealing to Mrs. Fields to see if they were

10  willing to work with me.

11  Q    Nevertheless -- okay.

12          MR. ROTHSCHILD:  Your Honor, this was stipulated,

13  but I think I just want to be formal about it to move to

14  admit it.

15          MR. AMINI:  No objection.

16          THE COURT:  Forty-nine is received into evidence.

17          MR. ROTHSCHILD:  Thank you, Your Honor.

18          (Exhibit 49 was received into evidence.)

19  BY MR. ROTHSCHILD:

20  Q    So as you testified, you were in the sort of shopping

21  for investment banking stage.

22          Let me ask you this.  Your company at that point,

23  because of the unfortunate events that it had experienced,

24  was it operating?

25  A    Well, it had ceased operations for several months from

1    a transactional perspective with customers and shipping

2    product, yes.

3    Q    Did it ever get back up and running?

4    A    Yes.  Yeah, six months later.

5         And just to be clear, we ceased transactions.  As a

6    company, we did not cease operating.

7    Q    Okay.  And did you, in fact, sell popcorn to retailers

8    and to Mrs. Fields after the fire?

9    A    Yes.

10   Q    You said that, you know, your goal here was not to jump

11   short-term profits, but isn't it easier to sell a company or

12   to seek investment capital if the company is profitable?

13   A    That's a loaded question.  The answer could be yes and

14   it could be no.  So even if a company is profitable, if it's

15   in a category or an industry that is in rapid decline,

16   you're not going to find many people interested in

17   investing.  Try and find someone interested in investing in

18   Block Buster Video.  They were profitable, but they were

19   imploded.

20   Q    Tell me, have you ever successfully, either through LHF

21   or anywhere else, raised capital for a company?

22   A    Yes.

23   Q    When?

24   A    So for Farm Stand Fresh Foods, when we launched that in

25   2014, with my partner Jose Romero, we were able to raise in

1    excess of $500,000 in capital from BJOCs to fund a number of

2    initiatives we were working on at that time.  Again, this is

3    completely outside of the retail CPG food business.  This is

4    produce.

5        And then again with Flavorful Brands, which was

6    developed in 2018, we raised five million in roughly a year.

7    Q    And was Farm Stand Fresh Foods profitable when you

8    raised the $500,000?

9    A    Not at all.

10   Q    Was Flavorful Brands profitable when you raised the

11   five million?

12   A    Not at all.

13   Q    Is it profitable today?

14   A    No.

15   Q    I'm sharing with the Court Exhibit S, as in Sierra.

16   This is a stipulated exhibit, the royalty report.  I'd like

17   to ask it be admitted.

18            THE COURT:  S is received into evidence.

19            (Exhibit S was received into evidence.)

20   BY MR. ROTHSCHILD:

21   Q    Calling your attention to tab 2013 Q2.

22        So the plant fire that we referenced occurred in

23   January 2013; is that correct?

24   A    Correct.

25   Q    And so I'm looking at quarter two.  Things don't look

1    very good, right?

2    A    Right.

3    Q    Here, what is this explanation?

4    A    This was part of the pitch to Neal Courtney that Bed

5    Bath & Beyond, they took our products as part of a

6    Mrs. Fields module, but I actually helped sell in other

7    products besides popcorn.  They took massive deductions that

8    they never indicated they would take.  There was never an

9    agreement about that.  I had to go back to the vice

10   president of Bed Bath & Beyond and demand additional payment

11   back.  But it was a substantial financial hit on my cash

12   flow because they were not -- they had made a huge deduction

13   against the invoices that were due.

14   Q    I want to point you to the third quarter.  This is

15   pretty still dismal, isn't it?

16   A    Yeah.  So we were able to get the Popcorn Factory,

17   which is the largest ready-to-eat popcorn plant in the U.S.,

18   owned by 1-800-Flowers, just outside of Chicago.  We had

19   sold them a trial size test with Target, and because they

20   did business with Target, they were able to go ahead and

21   produce our formulation.

22       And then RVC was another -- a typical order for them

23   that we were able to get processed quickly before we moved

24   on to other retailers.

25   Q    Again, RVC was the Hong Kong franchisee?

1    A    Correct.

2    Q    If I understand, just to summarize, you were able to

3    pivot to a different manufacturer in order to restart your

4    business?

5    A    So I had been in conversation with the Popcorn Factory

6    for production since really 2012 and had a signed agreement

7    with them, a co-packer agreement, and then they were able to

8    begin production because they already had my formulas, they

9    understood the ingredients they needed, the packaging was

10   sent in.  They were able to begin to scale up rather quickly

11   at that time.

12   Q    And I'm looking now at the third quarter.  How does

13   this look?

14   A    So that was the turnaround at that point.  I was able

15   to approach customers like Menards, and Big Lots, and Bed

16   Bath & Beyond again, including Mrs. Fields Gifts, to turn on

17   some quick business with them, which it came out to $300,000

18   roughly.

19   Q    Had you ever recovered from, you know, a co-packer

20   disaster or other type of disaster before?

21   A    Yes.  Actually, in 2004, I was just turning on Snak

22   King, which is the largest west coast snack manufacturer in

23   the U.S.  They are about a 200,000-square-foot plant.  They

24   were my Orville Redenbacher co-packer for a number of years.

25   I knew the owner very well.  And because of some failures by

1    Tim Clark Confections, I moved over to Snak King, and within

2    three months from when I went over there, in the fall of

3    2004, heavy rains in southern California, they had clogged

4    drains, and the roof -- a portion of their roof caved in

5    over their production area.  So it immediately stopped

6    popcorn production at that time.

7    Q    And you survived that, though?

8    A    I did survive that.

9    Q    And also the fire in 2013?

10   A    Correct.  And I can say in my 25 years prior to going

11   off on my own, I'd never seen these types of events happen

12   in any other co-packers.  It was truly bewildering.

13   Q    You survived the great recession in 2008?

14   A    Correct.

15           THE COURT:  Mr. Rothschild, we started the

16   proceeding about nine, but we've all been sitting here since

17   8:30.  Let's take a 15-minute break.

18           MR. ROTHSCHILD:  Absolutely.  Thank you,

19   Your Honor.

20           THE COURT:  We'll be in recess for about 15

21   minutes.  Thank you.

22           (Recess)

23           THE COURT:  Ready to proceed?

24           MR. ROTHSCHILD:  Yes, Your Honor.

25           THE COURT:  Go ahead, Mr. Rothschild.

1          MR. ROTHSCHILD:  Your Honor, just a bit of

2    housekeeping.  I was previously showing Exhibit S, as in

3    Sierra.  I believe we moved to admit that.  We also showed

4    stipulated Exhibit 4.  I don't believe that I formally moved

5    to admit that, so I would like to formally move to admit

6    that.

7          THE COURT:  Four and S are received into evidence.

8          (Exhibits 4 and S were received into evidence.)

9          THE COURT:  Sixty-seven I don't think you moved

10   for.

11         MR. ROTHSCHILD:  No.  And, Your Honor, 67 was the

12   series of pictures of these products here.  I just wanted

13   the Court to see them.  I don't think they are -- you know,

14   prompted the witness to talk about his ingredients and what

15   he produced.  They're not really admissible, I don't think,

16   and we don't have a stipulation on them.  So I'm not going

17   to move to admit them.

18         THE COURT:  Go ahead.

19   BY MR. ROTHSCHILD:

20   Q   Mr. Lindley, I'm showing you Exhibit 55.

21         MR. ROTHSCHILD:  Which is, again, a stipulated

22   exhibit, which I would like to move to admit now.

23         THE COURT:  Fifty-five is received.

24         (Exhibit 55 was received into evidence.)

25   //

```
 1              MR. AMINI:  No objection.
 2              MR. ROTHSCHILD:  Thank you.
 3   BY MR. ROTHSCHILD:
 4   Q    Mr. Lindley, do you recognize this document?
 5   A    Yes.
 6   Q    And starting at the top is 2009.  It looks like income
 7   statements and balance sheets for MFGPC.  Is that accurate?
 8   A    Yes.
 9   Q    Scrolling down through the bottom, it goes all the way
10   through -- well, much longer after the termination even,
11   through 2017.  What's the source of these numbers?
12   A    It was the QuickBooks for the company.
13   Q    And you submitted the QuickBooks to both sides and
14   their experts in this case; is that correct?
15   A    Correct.
16   Q    It's the same QuickBooks file from which this document
17   is derived?
18   A    Yes.
19   Q    And to your knowledge the QuickBooks file and this
20   document reflect MFGPC returns for the entirety of the
21   company?
22   A    Yes.
23              MR. ROTHSCHILD:  Your Honor, I'm just going
24   through a few items to explain -- to make sure we have an
25   evidentiary support for our expert witness.
```

1              THE COURT:  All right.

2              MR. ROTHSCHILD:  And that includes the financials

3   on which you will rely, which we just shared.

4              I'm going to share Exhibit 65, another stipulated

5   exhibit, which I would like to move to admit now.

6              MR. AMINI:  65, did you say, Brian?

7              MR. ROTHSCHILD:  Yes.

8              MR. AMINI:  We didn't stipulate to 65.

9              MR. ROTHSCHILD:  Well, I'll lay some foundation.

10             MR. AMINI:  Sixty-five, Your Honor, was not shared

11  with us prior to the pretrial exhibits.  This is the first

12  time we've seen this.

13             These are the tax returns.  Are we on the same

14  thing?

15             MR. ROTHSCHILD:  Yes.  These are the tax returns.

16             MR. AMINI:  I don't believe these were ever

17  produced in this case.

18             MR. ROTHSCHILD:  You've had them for a good while,

19  the moment you asked for them, I believe.

20             MR. AMINI:  You gave them to us with your exhibit

21  list in preparation for this trial after discovery had

22  closed.  That was our objection, not produced in discovery,

23  hearsay and lack of foundation.  I don't believe we have

24  ever seen these.  In fact, I didn't even get them before the

25  motions in limine.  I recall that maybe I should have made a

1    motion in limine about them, but they came after.

2              THE COURT:  Mr. Rothschild.

3              MR. ROTHSCHILD:  You did receive them when we put

4    the pretrial order together.

5              Your Honor, I believe I can easily lay a

6    foundation for these ordinary business records.  The

7    question is whether the Court is concerned about any alleged

8    prejudice for the other side not having received them.  So

9    I'll wait on the Court to rule on that.

10             THE COURT:  You say you've never received them

11   before?

12             MR. AMINI:  Your Honor, you're on mute.

13             THE COURT:  You've never received these before,

14   you say?

15             MR. AMINI:  Your Honor, we got these after the

16   motions in limine had to be filed.  In May I recall looking

17   at them and thinking maybe I should have made a motion, but

18   my time for making a motion in limine had passed.  So I

19   filed an objection on the exhibit list that they had not

20   been produced in discovery.  We have not had a chance to

21   analyze them.

22             The numbers are different than the financial

23   statements.  We figured we would just go with the financial

24   statements, which is what everybody was working with up to

25   this point.

1          THE COURT:  If they weren't produced in discovery,

2    seems to me there would be some prejudice to admitting them

3    now, wouldn't there, Mr. Rothschild?

4          MR. ROTHSCHILD:  If there was a document request

5    that asked for them, but I will withdraw them at this point.

6    I will go through my productions and see because I'm very

7    certain that we produced them, but they're also not

8    something relied upon.  I think they are just corroboration

9    of the financial statements from which they're derived.  For

10   the moment, I will withdraw it.

11         MR. AMINI:  You can correct me.  I don't profess

12   to be absolutely certain of everything in this case, but we

13   couldn't find them.

14         MR. ROTHSCHILD:  I have pulled up Exhibit 74,

15   which I believe is stipulated, just to verify that.

16         And yes, I would like to seek to have this

17   admitted as well.

18         THE COURT:  Seventy-four is received.

19         (Exhibit 74 was received into evidence.)

20   BY MR. ROTHSCHILD:

21   Q    Mr. Lindley, what is this document that we're looking

22   at here?

23   A    This is an agreement with Investment Advisory Group, a

24   gentlemen named Bill Fisher.

25   Q    And this is prior to your relationship with Peakstone.

1    I see the date of this is 2011; is that right?

2    A    Correct.

3    Q    What was the purpose of this agreement?

4    A    This was for him to help facilitate bringing people who

5    may be interested in investing in the company.

6    Q    Okay.  Peakstone was a little later, 2014, correct?

7    A    No, 2012.

8    Q    2012.  So at this point you had -- 2011, 2012, you had

9    started working with investment bankers and you were looking

10   to take that company on the next step.  What made you think

11   that this was a good time?

12   A    Because of the position of the company, and we pretty

13   much had everything we needed to know in terms of what it

14   would take to scale up quickly.  So there was no mystery

15   about whether or not this brand would succeed in retail and

16   in gifting and in department stores.

17   Q    I am going to share with you Exhibit 51.

18          MR. ROTHSCHILD:  This exhibit is a little clumsily

19   put together.  It is not stipulated to, and I understand

20   why, because there are some pieces of it that are different

21   than others.  I'd like to, with the Court's permission,

22   sever these first two pages because they are not the same as

23   the rest of the pages.  It just happened to be sequentially

24   in our production numbers here.  But I'm going to have the

25   Court identify -- I'm sorry, I'm going to have the witness

1   identify, beginning on this third page, what this document

2   is, and then I'll seek to admit it on that basis.

3                THE COURT:  All right.

4                MR. AMINI:  No objection.

5                MR. ROTHSCHILD:  The Bates range 294 through 296.

6   So these three pages here.

7   BY MR. ROTHSCHILD:

8   Q    Mr. Lindley, can you identify what this is?

9   A    So this was a business meeting with Jen Jobin, the VP

10  of gifting for Mrs. Fields, and Rob Hanson, who is the

11  licensing director for Mrs. Fields.

12  Q    When you say this was a meeting, what is the document?

13  A    This was a discussion guide for our discussions on how

14  we could build popcorn into a bigger entity within the

15  gifting side of business as well as just as a licensed

16  product line.

17  Q    Who are the attendees here?

18  A    Jen Jobin was the VP of gifting for Mrs. Fields for

19  years.  Rob Hanson was the Mrs. Fields licensing director.

20  Q    So you were having a meeting with Mrs. Fields and you

21  were seeking to make some changes or differences in the

22  business.  What exactly were you hoping to accomplish?

23  A    It was a business review of where the business was to

24  date and what we -- what plans we were putting in place, and

25  activities that were in process in building the business.

1    Q    What was the result of this meeting?

2    A    It was fine.  They were very collaborative with my

3    company and they appreciated all the insights that I was

4    providing.  And of course if I was launching new products,

5    new brands, I would need to get their approvals.  So this is

6    an opportunity to give them a heads-up on marketing activity

7    I was working on to make sure that there were no knockouts,

8    from their perspective, on activity that I might be

9    undertaking to the benefit of the brand and the licensor.

10   Q    When you say knockouts, what do you mean?

11   A    Things that they would look at and say no, we're not

12   going to do that, like they did with kettle corn.

13   Q    Explain that, with kettle corn.

14   A    So kettle corn just suddenly caught on with consumers.

15   There were some small brands that hit the market early.  The

16   consumer acceptance was very high.  So I wanted to pursue

17   that because you could see the trajectory of kettle corn as

18   a segment within the ready-to-eat popcorn category was

19   substantial.  So that's where I went to Mrs. Fields and said

20   can we launch kettle corn.

21   Q    And their answer?

22   A    They did not want to do it.  They felt that it did not

23   represent a premium positioned product, and therefore they

24   said for retail, in general, the answer would be no.

25   However, they allowed me and actually requested me to

1    manufacture what I call a knockoff of kettle corn for the

2    Mrs. Fields gift business, for Quill and Staples to take

3    advantage of because it was a fast emerging segment of the

4    popcorn business.

5    Q    Do you have any other examples of Mrs. Fields saying no

6    and preventing you from engaging in some -- let me back up.

7         Was the kettle corn opportunity big?

8    A    Yes.

9    Q    Can you give me the order of magnitude or some sense?

10   A    When I first got involved with the Mrs. Fields

11   business, the ready-to-eat popcorn business was roughly

12   $300 million.  And by the time kettle corn came in, it

13   jumped up to roughly 750 million within about a five-year

14   period of time.  So it was dramatic profit.

15   Q    Do you have any other examples of Mrs. Fields vetoing

16   or preventing you from engaging in business practices that

17   you believed would have helped?

18   A    Yes.  So one of the big stumbling blocks with the

19   Mrs. Fields organization is how to take advantage of

20   e-commerce sales.  If you evaluated where Harry & David was

21   with Moose Munch, with the majority of their business

22   through e-commerce, projected at roughly $40 million,

23   without ever going on a grocery store shelf.  If you looked

24   at where new emerging brands were going, Acropolis, Angie's,

25   they all have a significant e-commerce Web business.

1        When I approached -- every time I approached

2   Mrs. Fields, it was flat-out no, we can't do it.  Everything

3   would have to go through Mrs. Fields.

4        So in the December 2012 licensing summit with all

5   licensees, I pitched to them a solution, which they were

6   very excited about and then did nothing about it, and that

7   was the end of it.  So I was never able to take advantage of

8   the e-commerce business with my brand, which was a major

9   deficit.

10  Q    I'm just going to scroll down.  We have a presentation.

11  This starts at MFGPC000297.  It's rather long.  The range of

12  this presentation ends at 314.  Can you identify for me what

13  this is?

14  A    So I believe that was the presentation that I pitched a

15  group of family office investors in Greenwich, Connecticut

16  in June of 2012.

17  Q    Seeking what?

18  A    Funding.

19  Q    Okay.  You prepared these yourself?

20  A    Yes.

21  Q    Okay.

22        MR. ROTHSCHILD:  Your Honor, I move to admit this

23  as 51-A and 51-B, if that's okay, those two Bates number

24  ranges that I specified.

25        THE COURT:  You say 61 or 51?

1          MR. ROTHSCHILD:  51-A, 51-B, to the extent they

2   need to be separated.

3          MR. AMINI:  Brian, can I ask that we get the Bates

4   ranges again for the record?  I'm not going to object.  Just

5   so I have them.

6          MR. ROTHSCHILD:  The first is 294 to 296.  The

7   second is 297-314.

8          THE COURT:  51-A and 51-B are received into

9   evidence.

10         (Exhibits 51-A and 51-B were received into

11   evidence.)

12   BY MR. ROTHSCHILD:

13   Q    What was the result of your pitching to those

14   investors?

15   A    We had a couple of family office investment advisors

16   interested.

17   Q    But 2012, here it looks like September, you weren't

18   able to close on those at that time?

19   A    No, because we instead decided to go down a path with

20   Peakstone on a much larger raise, a far more encompassing

21   business opportunity than what we were originally pitching

22   to the family office advisors.

23   Q    Clumsily, I'm looking at Bates range 377 through 381.

24   Can you identify what this document is?

25   A    That's the co-packing agreement with the Popcorn

1    Factory, a division of 1-800-Flowers.

2    Q    What was the purpose of it?

3    A    For co-packing support.

4    Q    So I noticed that this is in the fall of 2012, before

5    you had the fire.  You were looking for other co-packers

6    before you even had a disaster that required a switch?

7    A    Yeah, and the reason was they were centrally located in

8    the U.S.  As you're building out your business, you want to

9    try and source your manufacturing as close to the customer

10   as you possibly can.  So we had east coast production.  We

11   had west coast production.  We were looking for midwest

12   production.  But also they represented potentially to become

13   the primary co-packer because of their scale and the

14   vastness of their particular business.

15             MR. ROTHSCHILD:  Move to admit this agreement,

16   this Bates range as 51-C.

17             MR. AMINI:  That Bates range again is 377 --

18             MR. ROTHSCHILD:  377 through 381.

19             MR. AMINI:  No objection.

20             THE COURT:  51-C is received into evidence.

21             (Exhibit 51-C was received into evidence.)

22   BY MR. ROTHSCHILD:

23   Q    And I'm looking now at Bates range 382 to 406.  Can you

24   tell me what this document is?

25   A    I'm not sure.  It's jumping around quite a bit.

1    Q    How about now?

2    A    So that's the signed co-packing agreement with Popcorn

3    Factory.

4    Q    I notice it has a number of addenda --

5    A    Yes.

6    Q    -- that look like product specifications here.  Do you

7    see these?

8    A    Correct.

9    Q    But this is the actual signed agreement of the one we

10   were looking up just a moment ago?

11   A    Yes.

12   Q    Okay.

13          MR. ROTHSCHILD:  I move to admit this one as 51-D.

14          MR. AMINI:  No objection.

15          THE COURT:  51-D is received.

16          (Exhibit 51-D was received into evidence.)

17   BY MR. ROTHSCHILD:

18   Q    Tell me about your co-packers.  Who were your

19   co-packers at the time, 2012 to 2014?

20   A    So Popcorn Factory -- I'm sorry.  Popcorn Alley was the

21   principal popcorn manufacturer, and Gabe's was a principal

22   chocolate stringer and re-bagging finished product producer.

23   Q    Tell me about their capabilities, please.  Were they

24   able to produce everything you wanted to sell in the market?

25   A    Yes, and did.

1  Q    And if you had ordered more, would they have been able

2  to produce it?

3  A    Yes.

4  Q    How much more, do you know?

5          MR. AMINI:  Objection.

6          THE COURT:  Well, does he know?

7          MR. ROTHSCHILD:  Was there an objection?

8          THE COURT:  Yes, there was an objection.

9          MR. ROTHSCHILD:  Can I understand what it is?

10         THE COURT:  How does he know.

11         MR. ROTHSCHILD:  Oh, foundation.

12  BY MR. ROTHSCHILD:

13  Q    Mr. Lindley, do you know, and if you do, tell me how

14  you know, whether the co-packers had the ability to scale up

15  production?

16  A    I knew the owner of both companies very well.  We had

17  talked at length and worked together for years.  I

18  understood their capabilities and their capacity and their

19  scale.  I have been around plants a good part of my work

20  life and understand what it takes to produce food products.

21  So yes, they both were capable of scaling up.

22         MR. AMINI:  I still object.  But given it's a

23  bench trial, Your Honor, he can answer the question.

24         THE COURT:  I will let him testify as to his

25  understanding about that.

1          MR. ROTHSCHILD:  Your Honor, we're looking at

2    Exhibit L.  I know it says Exhibit A because it was attached

3    to a different document in this case.  I apologize.  I

4    pulled up the wrong document.

5          THE COURT:  You said L and the exhibit said A.

6          MR. ROTHSCHILD:  Your Honor, it was attached to a

7    previous motion by Mrs. Fields in this case and they used it

8    as their exhibit, and they've just attached it with the same

9    document header on it.

10   BY MR. ROTHSCHILD:

11   Q    Do you recall that in the licensing agreement that

12   Mrs. Fields had to purchase popcorn from you if they wanted

13   to make popcorn with the Mrs. Fields trademark on it?  Do

14   you recall that?

15   A    Yes.

16   Q    And they did, in fact, purchase two and a half million

17   dollars, or so, of popcorn from you during your license

18   tenure?

19   A    At a minimum, yes.

20   Q    And did they always collect royalties from you on the

21   popcorn by you paying them and then separately pay you, or

22   did you ever set off those mutual obligations?

23   A    Most of the time they purchased product and remitted

24   payment, and then I would turn around and remit a royalty on

25   that royalty revenue.

1  Q    Did you ever engage in the practice of just setting

2  off?

3  A    There were two times that that happened.

4  Q    When?

5  A    Roughly 2007 or '08.  Again in 2014.

6  Q    I'm sharing with you a document, Exhibit 11.  Do you

7  see that in front of you?

8  A    Yes.

9  Q    What is this?

10 A    If you could make it slightly bigger, that would be

11 great.  Thank you.

12      So this was a PL from Mrs. Fields Gifts to MFGPC.

13 Q    So this is how they sent you an order with a purchase

14 order?

15 A    Yes.

16 Q    And I mean the date here, the order date, do you

17 recognize this particular order?

18 A    Yes.

19 Q    And let me just ask you, is this the last order you

20 ever received from them?

21 A    Yes.

22 Q    Okay.  Did you fill this order?

23 A    Yes.

24      MR. ROTHSCHILD:  Your Honor, I move to admit this.

25 I think this is stipulated Exhibit 11.

```
 1              THE COURT:  Eleven is received.

 2              (Exhibit 11 was received into evidence.)

 3              MR. AMINI:  It's not, but no objection.

 4              MR. ROTHSCHILD:  Okay.  Thank you, Your Honor.

 5   BY MR. ROTHSCHILD:

 6   Q    I'm pulling up and sharing Exhibit 10 now.  This is a

 7   chain of e-mails.  So I'm going to scroll to the first

 8   e-mail in the chain, which is at the bottom.

 9        Do you recognize these, Mr. Lindley?

10   A    So that was for that order we just looked at.

11   Q    What is it, though?

12   A    That's a purchase order from Mrs. Fields and

13   Mrs. Fields Gifts.

14   Q    So that purchase order, is this the invoice that

15   matches up these purchase orders?

16   A    Yes.

17   Q    Okay.  So your practice was that you would receive a

18   purchase order, fulfill it, and then send an invoice; is

19   that accurate?

20   A    Yes.

21   Q    Okay.  And you sent these invoices attached -- I'm

22   asking, what is the purpose of these e-mails here to

23   Mrs. Fields?

24   A    So sending the invoice related to the orders, and I'm

25   not sure who to forward it to because there was so much
```

 1  turnover at Mrs. Fields at that time.

 2  Q    Okay.  So you're asking where to send it.  You are

 3  instructed to send them to accounts payable.

 4  A    Right.

 5  Q    Let's look at the date of this first purchase order.

 6  This is April, right?

 7  A    Uh-huh.  (Affirmative)

 8  Q    And your terms are -- how long should you normally

 9  expect payment on an invoice?

10  A    Net 30.

11  Q    Okay.  And so this time we're looking at November, and

12  had you been paid on these invoices?

13  A    No.

14  Q    And so you're reminding again here -- now we're up at

15  November 19th.  You're saying here is an invoice from a

16  shipment last April.  Please advise regarding timing.  Did

17  you get paid at that time?

18  A    No.

19  Q    Scrolling up to December 15th, what was the purpose of

20  this e-mail to Mrs. Fields?

21  A    It was about a month later, it still hadn't been paid,

22  asking for status on the invoice.

23  Q    So you checked in a month later and you still hadn't

24  been paid?

25  A    Correct.

1   Q    Did you ever get paid on these invoices?

2   A    No.

3   Q    Did anyone at Mrs. Fields ever dispute that they had

4   received the popcorn?

5   A    No.

6   Q    Did you ever get paid interest on these overdue

7   invoices?

8   A    No.

9        MR. ROTHSCHILD:  Your Honor, I move to admit that

10  exhibit, Exhibit 10, with the invoices.

11       MR. AMINI:  No objection.

12       THE COURT:  Ten is received.

13       (Exhibit 10 was received into evidence.)

14       MR. ROTHSCHILD:  I don't recall.  Did I move to

15  admit Exhibit 11?  I apologize.

16       THE COURT:  Yes, you did.

17       MR. ROTHSCHILD:  Okay.  Good.

18  BY MR. ROTHSCHILD:

19  Q    Notice that the last e-mail that you had sent there was

20  dated December 15th.  What happened shortly thereafter?

21  A    I was sent a notice of termination by Avery Samet dated

22  three days before Christmas, December 22nd.

23  Q    We're looking at Exhibit 13.  Do you recognize this

24  document?  Is that the termination letter?

25  A    Yes.

1          MR. ROTHSCHILD:  Your Honor, we've stipulated, I

2    believe, to this -- yes, we have.

3          THE COURT:  Thirteen is received into evidence.

4          (Exhibit 13 was received into evidence.)

5    BY MR. ROTHSCHILD:

6    Q    The Court previously ruled on summary judgment, so we

7    don't need to belabor this, but let me just ask you a few

8    questions so we can establish amounts that were owed and

9    whether this is correct or incorrect.

10         Let's look at the first paragraph of this letter.  Can

11   you describe what is being demanded here?

12   A    The second statement is indicating that MFGPC was

13   required to pay Mrs. Fields a guaranteed royalty of $100,000

14   per year.

15   Q    Is that accurate?

16   A    No.

17   Q    Why not?

18   A    Because there was a limit of guaranteed royalties in

19   the first year term -- five-year term, that it concluded in

20   2008, and it had been fully paid.

21   Q    By this time you hadn't owed guaranteed royalties for

22   how long?

23   A    It would have been six years minimum.

24   Q    What about the second paragraph here, the agreement

25   would not automatically renew?  Do you -- I'm sorry.  The

1    agreement did not automatically renew in 2012 is what they

2    are claiming.  Is that accurate?

3    A    No.

4    Q    Why not?

5    A    Well, there was no default, and I had been given no

6    notice of default as required in the contract.  And number

7    two, their details are just factually wrong.

8    Q    I'm showing you Exhibit 46.  Do you recognize this

9    document?

10   A    Yes.

11          MR. ROTHSCHILD:  And this is stipulated for

12   admission.  I'd like to move it be admitted.

13          THE COURT:  Forty-six is received.

14          MR. AMINI:  No objection.

15          (Exhibit 46 was received into evidence.)

16   BY MR. ROTHSCHILD:

17   Q    Do you recognize the sender here at the top,

18   Mr. Robinson?

19   A    Yes.  He was involved in licensing for Mrs. Fields.

20   Q    Okay.  And what did you understand by his communication

21   here?

22   A    He understood the challenges the business had in the

23   past six months with the fire and the death of the investor,

24   advisor, and just trying to get back into business.  The

25   deductions from Bed Bath & Beyond were substantial.  He

1    understood those things, but at the same time he also

2    notified me that the agreement just auto-renewed for another

3    five years.

4    Q    Okay.  So based on that communication, you believe the

5    second paragraph here, disputing that the automatic renewal

6    happened, is inaccurate?

7    A    Completely.

8    Q    Okay.  And then the third paragraph here, we already

9    discussed the fact that there were no guaranteed royalties

10   due.  Let me ask you -- this letter says the agreement is

11   hereby terminated.  Was there a prior notice -- 30 days'

12   notice or anything else giving you notice and opportunity to

13   cure as required by the agreement?

14   A    No.

15   Q    Had you ever heard from any person at Mrs. Fields that

16   they felt that you were in default?

17   A    Never.

18   Q    Had anyone at Mrs. Fields ever expressed to you that

19   you were underperforming or not meeting their expectations?

20   A    Never.

21   Q    So you received this letter.  Was it the cause of your

22   business ceasing to do business or was it something else?

23   A    Say that again.  It broke up just a little on my end.

24   Q    Open-ended.  What caused you to stop selling

25   Mrs. Fields popcorn?

1   A    The termination letter sent by Mrs. Fields' counsel.

2   Q    Just to be clear, it wasn't because you had a fire a

3   year and a half before?

4   A    No.

5   Q    It wasn't because you -- was it for any other financial

6   reason?

7   A    No.

8   Q    What action did you take in response to having received

9   the termination letter from Mrs. Fields?

10  A    My initial reaction was complete bewilderment, stunned,

11  particularly that it would come from outside counsel and no

12  one within Mrs. Fields.  I had had great relations up to

13  this point with people within Mrs. Fields, all the CEOs, all

14  the licensing people, and to suddenly get this letter was

15  just a shotgun blast to my heart, and also told me I'm now

16  needing to fight my own licensor after everything I

17  overcame, conditions well beyond my control, and now my

18  licensor is here to finish me off.  That's exactly how it

19  felt.

20  Q    So did you take action and sue Mrs. Fields?

21  A    No.  I actually immediately contacted my attorney.  She

22  was equally in disbelief because assertions were patently

23  false.  And so we drafted a letter to send back to Avery

24  Samet -- and I think it was received sometime in the middle

25  of January -- providing intimate details of things that

 1  either he didn't understand or hadn't read about to clarify

 2  they had made a mistake and let's just kind of put this

 3  behind us and keep moving forward.  It was a mistake,

 4  everybody makes them, let's move on.

 5  Q    Okay.  So we're looking at Exhibit 14, which is

 6  stipulated.

 7            MR. ROTHSCHILD:  I would like to move for its

 8  admission.

 9            THE COURT:  Fourteen is received.

10            (Exhibit 14 was received into evidence.)

11  BY MR. ROTHSCHILD:

12  Q    Is this that letter?

13  A    Yes.

14  Q    Sent from your attorney, you just mentioned,

15  Ms. Carolyn Dye?

16  A    Yes.

17  Q    And in it you apparently -- you said that you explained

18  the agreement, and looks to me here that you've got sort of

19  chapter and verse of the agreement.  This Court essentially

20  looked at the two party submissions, which are largely along

21  the lines of the Samet letter and this letter, the Carolyn

22  Dye letter.  What is your understanding of how the Court

23  came out on that?

24  A    As far as the Carolyn Dye letter?

25  Q    No.  As far as whether -- withdrawn.  The Court knows

```
 1   its own ruling.
 2        I'm just going to scroll to the bottom here and call
 3   your attention to the addendum which talks about the running
 4   royalties and the invoices.  Do you see this section here?
 5   A    Yes.
 6   Q    Okay.  This line right here, which has the 70,222.60,
 7   what is that?
 8   A    Those were the sum total of the two invoices from 2014
 9   that remained unpaid.
10   Q    At that time you owed Mrs. Fields some royalties as
11   well which, when set off or netted against each other, they
12   still owed you this amount right here?
13   A    Correct.
14   Q    Okay.  So you don't dispute that 26,660 is the net owed
15   between Mrs. Fields and MFGPC for these invoices; is that
16   correct?
17   A    At that time, no.
18   Q    Okay.  What was Mrs. Fields' reaction to this letter?
19   A    I actually don't know what Mrs. Fields' reaction was.
20   The reaction we got from Avery Samet, according to my
21   attorney, was I'll talk with my client and I'll get back to
22   you shortly.
23             MR. AMINI:  Objection, Your Honor.  Now he's
24   discussing a conversation with his attorney and it's
25   hearsay.
```

1          THE COURT:  Mr. Rothschild.

2     BY MR. ROTHSCHILD:

3     Q    Well, Mr. Lindley, without discussing what other people

4     told you, can you tell me what Mrs. Fields did?

5     A    They filed a suit against MFGPC in February.

6     Q    So they filed this lawsuit?

7     A    Yes.

8     Q    Do you know what relief they sought in that case?

9     A    I think at that time legal fees and court costs.

10    Q    And did they seek anything with respect to the license

11    agreement?

12    A    Yes.  The expectation was the licensing agreement was

13    theirs.  It was no longer mine.

14    Q    I'm sharing with you Exhibit 15.  I believe that --

15         MR. ROTHSCHILD:  Yes, this is also a stipulated

16    court admission exhibit.  I'd like to move for it to be

17    admitted.

18         THE COURT:  Fifteen is received.

19         (Exhibit 15 was received into evidence.)

20    BY MR. ROTHSCHILD:

21    Q    What are we looking at, Mr. Lindley?

22    A    So this is a PR release announcing Mrs. Fields

23    Confections acquired Maxfield Candy Company.

24    Q    What do you know about Maxfield and its operations,

25    what it could do?

1  A    Maxfield was the licensee for Mrs. Fields for the

2  chocolate category.  So they made chocolate candy, just like

3  you would see from Russell Stover.  That was their primary

4  business.  They did have other business beyond that that

5  they sold locally, but Mrs. Fields Chocolates was a

6  significant part of their business.

7  Q    And it says in the first paragraph here, last sentence,

8  that the acquisition -- that Mrs. Fields has acquired this

9  and that included Maxfield Candy and Nutty Guys.  What do

10  you know about Nutty Guys?

11  A    Nutty Guys, to my knowledge, was a small Salt Lake City

12  popcorn manufacturer with limited distribution.  I believe

13  at one time they had a couple of stores that had since gone

14  out of business.  Fundamentally I understood them to be

15  insolvent and not doing any business.

16  Q    Right.  But could they make -- was it a manufacturing

17  facility?

18  A    Yes.

19  Q    Could they make -- what could they make?

20  A    According to these documents, they could produce

21  popcorn and replace MFGPC's popcorn with in-house production

22  by using Nutty Guys' equipment and employees.

23  Q    What is the date of this press release in relation to

24  your termination?

25  A    It was two days following my termination,

```
 1   December 24th, 2014.
 2            MR. ROTHSCHILD:  Your Honor, I'm sharing Exhibit
 3   56, which is the report of Grant Lyon, the expert report for
 4   the other side, and we stipulate to the admission of this.
 5            THE COURT:  I assume you have no objection to
 6   that?
 7            Fifty-six is received.
 8            (Exhibit 56 was received into evidence.)
 9   BY MR. ROTHSCHILD:
10   Q    Have you reviewed this document, Mr. Lindley?
11   A    Yes.
12   Q    Starting on page ten, Mr. Lyon goes through some key
13   excerpts from deposition testimony of Mr. Lindley.  I want
14   to walk you through what he says about your position on
15   things.
16   A    If you could make it bigger, please, Brian, that would
17   be great.
18   Q    Certainly.
19        First of all, he says the company, based on your
20   testimony, couldn't grow without an infusion of capital.  Do
21   you question that or do you kind of concede that?
22   A    No.  That's simply not true.
23   Q    Tell me why that's not true.
24   A    I had enough cash reserves to grow.  The question is
25   could I grow and double my business in the next three
```

1    months, triple it, quadruple it, or just grow it by five,

2    ten, 15 percent.  I was well able to cover moderate growth.

3    Q    So here in a question and answer you talk about big

4    opportunities for the brand, but you say you don't want to

5    get ahead of our skis on the business and potentially put it

6    out of business.  What do you mean by that sort of

7    colloquialism?

8    A    Right.  It's accepting too many orders that you cannot

9    pay for before you get paid by your customers.  So in the

10   food industry, it is not unusual for the trade customers to

11   take 45 to 60 days to pay any invoice.  It's just the

12   reality of this channel of business.  Whereas my co-packers

13   would need to be paid in 30 days.  I was not willing to risk

14   creating consternation with the primary source of my product

15   by not paying them timely.

16   Q    And what would happen if you took an order and then

17   couldn't fulfill it?

18   A    The trade would not accept my calls in the future.  I'd

19   pretty much be considered dead to them.

20   Q    The next key point here is that the January 2013 fire

21   severely impacted the business.  I don't think you question

22   that, do you?

23   A    No.

24   Q    He then goes on to say that it was a catastrophic

25   effect and that the company could not recover from the fire.

1    Do you agree with that?

2    A    No.

3    Q    Tell me why.

4    A    The only thing that I said is I missed the selling

5    season for 2013, which with major retailers for seasonal

6    holiday Christmas production, you need to present usually

7    between January and at the latest April.  Because I had no

8    idea where I was going to be able to produce, I did not go

9    and pitch my products to the major retailers because I

10    didn't know if I would actually be able to ship in the fall.

11    Q    Okay.  Were you able to actually recover from the fire

12    contrary to what he says here?

13    A    Right.  If you looked at the fourth quarter revenue,

14    $300,000, which is half of what my typical year was.

15    Q    In just one quarter?

16    A    Right.

17    Q    After the fire?

18    A    Yeah, nine months after the fire.

19    Q    Okay.  Here Mr. Lyon says by July of 2014, the company

20    had no full-time employees.  That's correct, right?

21    A    Yes.  The company never had full-time employees.  The

22    company never had employees.

23    Q    So were you full-time at the company?

24    A    Yes, as an owner.

25    Q    Did you continue working there full-time

1    notwithstanding that you had other businesses?

2    A    Yes, absolutely, I continued working full-time.

3    Q    So where he says the company had no full-time

4    management or employees to run the business by July 2014, is

5    that accurate?

6    A    False.

7    Q    Okay.  I want to ask you, you mentioned briefly how you

8    felt when you received the Samet letter, but then the result

9    of the termination, what has been the impact on your

10   business?

11        Let me make it a more concise question.  Could MFGPC

12   continue without the trademark license agreement?

13   A    No.

14   Q    Could you salvage any part of the business, for

15   instance, your research?

16   A    Only to the extent if I chose to begin developing a

17   brand new brand that nobody had ever heard of and invest in

18   that, certainly some of that research could be salvageable,

19   but it would be impossibly expensive to start over and do

20   this, and would be of no interest to me to start over.  I

21   could have done that from day one if I wanted to do that.

22   Q    Could you salvage your relationship with the trade, the

23   buyers, retailers, if you were not the Mrs. Fields licensee

24   anymore?

25   A    It would be extremely challenging.  The benefit of the

1   Mrs. Fields brand was, number one, got me a line with the

2   best co-packers and packaging suppliers, but also with the

3   trade.

4   Q      Could you salvage or operate the company in any way

5   without the Mrs. Fields license?

6   A      No.

7   Q      What has been the impact on you personally of the

8   termination?

9              MR. AMINI:  Objection, relevance.

10             THE COURT:  You are objecting why?  I didn't hear

11  you.

12             MR. AMINI:  Him personally, there's no relevance.

13  This is MFGPC's claim for lost profits for '15, '16, '17,

14  and part of 2018.  I don't know the impact on him

15  personally.  Mrs. Lindley is planning to come testify

16  presumably about that too.

17             THE COURT:  What are you asking for,

18  Mr. Rothschild?

19             MR. ROTHSCHILD:  This is a small, family owned

20  business.  I want to know -- he had invested in this

21  business.  It was his retirement, it was his livelihood, and

22  he is personally impacted by that.  I want to know the

23  effect on him.

24             THE COURT:  You mean the financial effect?

25             MR. ROTHSCHILD:  Yes.

1          THE COURT:  You can answer.

2          THE WITNESS:  The financial impact was

3     substantial.  We had invested over a million dollars in an

4     11-year period of time, that if I would have stayed at

5     Conagra making three to $400 a year, that million dollars

6     probably would have tripled by then.  The plan was we'll

7     take that risk, and the equity purchase and the gain of the

8     equity value will be the thing that will pay us against our

9     investment.  That was simply stripped away from us for no

10    good reason, for no cause.  So that devastated our plans as

11    I'm nearing retirement.

12         MR. ROTHSCHILD:  Your Honor, we've been -- I guess

13    we're pretty close.  I'm not sure whether it's productive to

14    turn over to cross --

15         THE COURT:  To do what?

16         MR. ROTHSCHILD:  -- with only 20 minutes left.

17         THE COURT:  Well, 20 minutes until when?

18         MR. ROTHSCHILD:  I guess what I'm saying is that

19    I'm done with Mr. Lindley as a witness on direct.  And I'm

20    supposing we could -- I can tender the witness to the

21    defense here.

22         THE COURT:  Very well.  Good.

23         You may cross-examine, Mr. Amini.

24         MR. AMINI:  Thank you, Your Honor.

25    //

```
 1                      CROSS-EXAMINATION

 2  BY MR. AMINI:

 3  Q    Good -- it's still morning, I believe.  Good morning.

 4  You're in California, if I'm not mistaken, correct?

 5  A    Yes, I am.  Good morning.

 6  Q    Good afternoon.

 7       Let me start by asking you, are you claiming now that

 8  the royalties that you owed Mrs. Fields you don't owe them

 9  anymore?

10  A    No, I don't.  They were offset.

11  Q    You're not claiming that you didn't have to pay them,

12  are you?

13  A    No.

14  Q    I'm confused here.  On the amount that you're claiming

15  you're owed for your invoices, are you claiming that net

16  $24,000 amount that you showed the company in July of 2015

17  or are you claiming something more?

18  A    I would add interest to that six and a half years

19  later, yes.

20  Q    The only claim you have for the unpaid invoice is the

21  amount -- we can get it out of -- in fact, I will get it out

22  of one of the exhibits.  I believe it's Exhibit 12, if I'm

23  not mistaken.

24            MR. AMINI:  Can you put 12 up for me.

25            Is there a cover letter that goes with it?
```

```
 1                 Yes.  There it is.
 2    BY MR. AMINI:
 3    Q    Do you see that e-mail?
 4               MR. AMINI:  I believe Exhibit 12 has already
 5    been -- I'm not sure now.
 6               It has not been received.  Okay.
 7               It's been stipulated to, Your Honor.  I ask it be
 8    admitted.
 9               THE COURT:  Twelve is received into evidence.
10               (Exhibit 12 was received into evidence.)
11               THE COURT:  You need to speak up a little,
12    Mr. Amini.  We sometimes have trouble hearing you.
13               MR. AMINI:  Yes, Your Honor.
14    BY MR. AMINI:
15    Q    Mr. Lindley, if you'll look at Exhibit 12, specifically
16    your e-mail, Saturday, January 11th, 2015, to Becky
17    Hamilton.  Do you see that?
18    A    Correct.  That's July 11th.
19    Q    July 11th.  I apologize.
20         And Ms. Hamilton was at Mrs. Fields, correct?
21    A    I didn't know her, but that's who I was directed to.
22    Q    And this was the last time you made a demand upon them
23    for payment of an invoice?
24    A    Correct.
25    Q    That 24,656.43, that's the amount you're seeking in
```

1    this case plus legal interest?

2    A    That's correct.

3    Q    Let's talk about interest for a moment.  Will you agree

4    with me that you didn't pay your royalties that were due to

5    Mrs. Fields from the end of 2012 until at least this period

6    of time up until sometime in 2014?

7    A    Do you have specifics on those that you're speaking

8    about?

9    Q    Yes.  You did not report or pay fourth quarter 2012

10   royalties or any 2013 royalties until the beginning of 2015.

11   Is that not correct?

12   A    I actually reported them.  I did not pay, with the

13   agreement of Neal Courtney.

14   Q    When you say you reported them, the agreement required

15   that you give Mrs. Fields a quarterly written report of your

16   sales, did it not?

17   A    And Neal told me not to do that, so I didn't do that.

18   Q    And you kind of answered my question, but I would like

19   to clear it up.  You didn't follow the agreement.  You

20   squirrelly transmitted some average number to Neal?

21   A    I think I've seen e-mails as well to Neal.

22   Q    Did you email him an actual royalty report with how

23   much your sales had been and exactly how much you owed?

24   A    No, because he didn't want to see that.

25        So you're correct, I didn't submit it from a technical,

1    contractual perspective.

2    Q    We're talking Neal Courtney, who was the CEO for a

3    short period of time of Mrs. Fields?

4    A    Correct.

5    Q    Until the beginning of 2014.

6    A    No.  He actually was there through -- he was terminated

7    at the end of June of 2014.

8    Q    Okay.  So now by July of 2015, he's been gone for more

9    than a year?

10   A    A year, yes.

11   Q    Let's get that out of the way.

12        Did he just give you carte blanche, don't bother

13   reporting your royalties, we'll figure it out someday in the

14   future, or was there some time period or something else?

15   A    He basically said let's not talk about it now, because

16   he understood the cash pressure I was under for all the

17   things that we've covered earlier today.  However, he was

18   saying if you submit it to accounting, then that will

19   trigger them to invoice you back for royalties, and I'm

20   going to work with you on doing that.  So that was his

21   workaround.

22   Q    That was 2013 you had these conversations?

23   A    That's correct.

24   Q    And you told him you would pay him by 2014, didn't you?

25            MR. ROTHSCHILD:  Your Honor, can I object to this

1    entire line of questioning as to what possible relevance

2    here?  Given that we've already decided on summary judgment

3    about the breach, we don't need to delve into forbearance or

4    any of those other arguments.

5               THE COURT:  What are you getting at, Mr. Amini?

6               MR. AMINI:  Well, Mr. Lindley had indicated on

7    direct that he wasn't in breach of the agreement until well

8    into 2014 at the time that he was terminated.  And in point

9    of fact, he hadn't given any royalty statements at all, even

10   subsequent to Mr. Courtney's departure, and I'm trying to

11   figure out under what agreement he wasn't doing that when

12   the company determined to terminate him.

13              MR. ROTHSCHILD:  Your Honor, again, liability is

14   determined at this point.  He's scratching at -- I don't

15   know, trying to assign breach to my client.  We've already

16   been through this on summary judgment.

17              THE COURT:  I don't -- is that what you're trying

18   to do, Mr. Amini?  I'm not going to let you do that if

19   that's what you're trying to do.

20              MR. AMINI:  No.  The Court has already ruled that

21   the termination was improper.

22              I'll rephrase the question.

23   BY MR. AMINI:

24   Q    Your claim in this case is for that -- you've

25   established the 24,000.  Besides the 24,656.43 plus legal

1    interest that you are entitled to, the remainder of your

2    claim is, is it not, for the profits that you would have

3    made had you not been terminated between January of 2015 and

4    April of 2018?

5    A    And also for inventory I was forced to destroy,

6    finished goods, work in process, packaging, because of the

7    termination, and legal fees, and expert fees that I had to

8    pay, accounting fees that I had to pay.

9    Q    I want to take you back to your royalty report for a

10   moment.  That was -- let me hold off on that.

11        Let's go back to the fire, the 2013 fire.  At that time

12   you lost a substantial amount of inventory; is that correct?

13   A    Yes.

14   Q    And I have that you had lost nine months of production.

15   Is that your recollection?

16   A    No.  That would have been probably closer to seven

17   months just based on when I was able to get the Popcorn

18   Factory up and producing again.

19   Q    Let me ask you to take a look at Exhibit J, if you

20   would.

21   A    Okay.

22   Q    Exhibit J, I'm interested in paragraph 15.  It's

23   objected to.

24        Let me start off by asking you -- start by putting up

25   the first paragraph, if you would.

1          Is Exhibit J the declaration that you gave to this

2     Court on or about February 27th, 2015?

3          I can scroll down to the end and you'll see your

4     signature at the end of it.  And we can go slowly if there's

5     any part of it you want to see, Mr. Lindley.

6     A    Okay.

7     Q    Is that a declaration you made on the 26th of February

8     of 2015 for this Court?

9     A    Yes.

10    Q    And you can see at the top from the header that it was

11    filed with the Court on February 27th, 2015, this document

12    14.  Do you see that?

13    A    Yes.

14    Q    Go with me, if you would --

15          MR. AMINI:  John, can you take us to paragraph 15?

16    BY MR. AMINI:

17    Q    I want to ask you, Mr. Lindley, was that statement

18    accurate when you made it?

19    A    Yes.  And for the most part of the first nine months

20    before shipments from that plant, being Gabe's only, began

21    again in early September.

22    Q    So you started shipments from other plants about six

23    months after the fire?

24    A    Seven months.

25    Q    And that other plant would have been Popcorn Alley?

1    A    No.   Popcorn Factory for chocolate drizzling, but

2    Popcorn Alley was not impacted by the fire at Gabe's, but I

3    was not selling plain popcorn, which is the only thing

4    Popcorn Alley could actually produce.

5    Q    And it's a fact, is it not, that you lost about

6    41 percent of your sales between 2012 and 2013?

7    A    That was the projection, yes.

8    Q    And there's a reference there to an expense of $77,000

9    investment in a new sales executive, and that would have

10   been -- I think it's Mr. Boyd?

11   A    Yes, Chris Boyd.

12   Q    Chris Boyd was somebody who had worked with you

13   previously at Conagra and had come to help you with

14   marketing and sales at this point at MFGPC?

15   A    Correct.

16   Q    And you had paid him as a consultant?

17   A    Yes.

18   Q    And you had paid him approximately $77,000?

19   A    Yes.

20   Q    As a result of this fire, you had to let him go?

21   A    Yes.

22   Q    At this point, once again, you were the only person

23   working at the business?

24   A    In terms of running the marketing and sales aspect of

25   it, yes.

1    Q    In 2013, after Mr. Boyd left, was there anybody else in

2    the business running any aspect?

3    A    I don't know exactly when Cameron Broadbent started

4    inserting himself in the business, but, again, even prior to

5    Chris Boyd helping out, I did all the sales and marketing on

6    my own.

7    Q    I was just trying to establish that once Chris left,

8    but for a period of time when Cameron was there, you were

9    the only person remaining?

10   A    Correct.

11   Q    That's true throughout '13 and '14 before the

12   termination?

13   A    Actually going back to 2003.

14   Q    You sued on account of that fire, did you not?  You

15   sued the plant next door on account of that fire?

16   A    Yes.

17   Q    For what you lost in that fire as a result of that

18   fire?

19   A    Yes.

20   Q    And you resolved that lawsuit at some point?

21   A    Yes.

22   Q    Between then and now, correct?

23   A    Uh-huh.  (Affirmative)

24   Q    And you were paid out in settlement?

25   A    Yes.

1    Q    Now go with me, if you would, to Exhibit 46.  This has

2    already been entered I believe.

3          This was the e-mail -- this was the e-mail in which

4    Trevor Robinson -- one of the e-mails in which Trevor

5    Robinson told you that you were behind in payment, correct?

6    A    Yes.

7    Q    If you go down to the e-mail just below that, the

8    June 20th, 2013 e-mail from you to Mr. Robinson, 4:20 p.m.

9              MR. AMINI:  Can you show that page?

10             It's further up.  We're still on the first page of

11   this exhibit.  Right there.

12   BY MR. AMINI:

13   Q    We have two massive deductions.  Do you see that?

14   A    Yes.

15   Q    Those also impacted your sales in 2013, did they not?

16   A    The Rite Aid did, not Bed Bath & Beyond.

17   Q    And Rite Aid was a national account?

18   A    Yes.

19   Q    At that point it was your only national account?

20   A    Yes.

21   Q    So losing that was a big deal?

22   A    Yes.

23   Q    And you also told -- I mean you told Mrs. Fields that

24   you were also financially harmed by the Bed Bath & Beyond

25   situation.  Do you see that?  What was that?

1   A    That was their unauthorized deductions, paying after

2   the holiday orders that shipped.

3   Q    And you describe your circumstances at this point in

4   June of 2013 as having been -- you yourself said bloodied.

5   A    Yes.

6   Q    Go with me, if you would, now to Exhibit 47.

7   Exhibit 47 is a series of e-mails, I think between -- yes,

8   you and Mr. Courtney in that same time frame, July of 2013.

9   A    Okay.

10  Q    Do you see that?

11  A    Yes.

12  Q    And you were at that time trying to engage

13  Mr. Courtney's help as a result of the fire?

14  A    I can't see the rest of the e-mail, so I don't

15  understand the context per se.

16  Q    I'm showing the next e-mail, but slowly go to the first

17  e-mail, and do you see there where you say -- there are

18  critical issues and then you give a bunch of topics,

19  including number one and number three?

20  A    Yes.

21        MR. AMINI:  Let's scroll down so Mr. Lindley can

22  see what those topics are.  First go slowly and let him see

23  the bottom.

24  BY MR. AMINI:

25  Q    One is gifting.

```
 1    A    Right.  So on gifting A/P, he got accounting to release
 2    $17,000 in payable invoices, that you can see.
 3    Q    Even though you owed him royalties at that point?
 4    A    Yes.
 5    Q    Even though you hadn't given him a 2012 -- even a final
 6    2012 statement?
 7    A    Yes.  It was a constructive workaround by the CEO.
 8    Q    And you don't have that in writing, the constructive
 9    workaround.  You didn't have to give him your royalty
10    statement, did you?
11    A    No, but what I was asking him to do is right here in
12    writing.
13    Q    And then you see number two, that's the one we were
14    just talking about.
15    A    Uh-huh.  (Affirmative)
16    Q    Then go down, there's the fire.
17         And then three, you have your gifting meeting with
18    Cassie.  Do you see that?
19    A    Right.
20    Q    And that's one of the critical issues at the time?
21    A    Uh-huh.  (Affirmative)
22    Q    Why is that a critical issue?
23    A    Because she was an important part of the business.  She
24    was a big supporter of what I was doing.  They had customers
25    that gifting called on that MFGPC benefited from.  So, in
```

1    other words, selling to Costco, selling to Walmart, selling

2    to Target for gifting products that I just didn't have those

3    relationships.  We ran it through her and she was happy with

4    that.

5    Q    So the more gifting baskets they could sell to those

6    customers that included your popcorn, the better that was

7    for you?

8    A    It's a win for me.  It's a win for Mrs. Fields.

9    Q    Did I describe it correctly?  They're selling gift

10   baskets to the entities that you talked about and you're

11   selling them popcorn?

12   A    Correct.

13   Q    And under your agreement, they had a right to sell

14   those gift baskets, correct?

15   A    They could sell any gift basket they wanted to.  If

16   they wanted to include Mrs. Fields popcorn, it had to come

17   through me.

18   Q    If it had a Mrs. Fields label on it?

19   A    It didn't even have to have a label on it.  As long as

20   it was sold as a branded Mrs. Fields Tower of Treats, as an

21   example, it had to do that.  Popcorn I believe was the

22   number two most important item to the gift basket business

23   for Mrs. Fields outside of their baked goods, being cookies.

24   Q    Let me ask you what the foundation is for that

25   statement.

1  A    Cassie Alvey.

2  Q    This is a statement that she made to you?

3  A    Yes.

4          MR. AMINI:  I move to strike it, Your Honor.

5  She's on the list.  If she wants to come and say that was

6  the second most.  I move to strike it as hearsay.

7          THE COURT:  I'll grant that.

8  BY MR. AMINI:

9  Q    They didn't have any obligation to put your popcorn in

10 their gift baskets.  They could sell gift baskets with just

11 chocolates, and cookies, and other things, could they not?

12 A    Correct.

13 Q    And you're not suing them for not buying enough popcorn

14 from you, are you?

15 A    Not at all.

16 Q    Then if you go down, there's a fourth item there,

17 business acquisition project staff.  Do you see that?

18 A    Uh-huh.  (Affirmative)

19 Q    That's what you were talking to Peakstone about, if I'm

20 not mistaken.

21 A    With Neal, right.

22 Q    And then go with me, if you would, further to number

23 five, other licenses.  Another thing you were talking to

24 Mr. Courtney about at the time was trying to get some of the

25 other licenses; is that not correct?

1    A    That's correct.

2    Q    One of the principal reasons you had to do that is

3    because without them you're, yourself described, a one-trick

4    pony with popcorn, and that had its challenges?

5              THE COURT:  Is that a question?

6              MR. AMINI:  Yes.

7              THE WITNESS:  Okay.  If I could broaden the

8    offering for Mrs. Fields in snacks beyond popcorn in certain

9    categories, it would be beneficial to the brand, it would be

10   beneficial to MFGPC, and the brand was doing none of that at

11   that time, which is why I brought it up.

12   BY MR. AMINI:

13   Q    At this point you were pushing for salty snacks and

14   frozen cookie dough.  Do you see that?

15   A    Uh-huh.  (Affirmative)

16   Q    And you pushed for other products over time, did you

17   not?

18   A    Well, frozen cookie dough was probably ten years

19   earlier at that time, and I really hadn't made a significant

20   attempt to broaden the category offering until really we

21   started to work with Peakstone and looked at other

22   opportunities for the brand.

23   Q    Under your existing license agreement, you would have

24   needed an amendment to be able to sell these other products,

25   correct?

1    A    I simply would have added a new exhibit extending

2    whatever new items would be involved.

3    Q    And Mrs. Fields had no obligation to give that to you,

4    did they?

5    A    None.

6    Q    And you're not suing them for not giving those to you?

7    A    Not at all.

8    Q    Go with me again under salty snacks in the second

9    paragraph there.  You make the statement that you don't have

10   enough scale and leverage from that one category to make a

11   big impact on retailers.  Was that true?

12   A    You have to read the balance of that statement, in

13   gaining a meaningful brand block within snacks.

14   Q    Which means what?

15   A    A better shelf control.  If you have other items within

16   snacks, you become more important to the trade.  You are

17   seen and it's more visible to the consumer.

18   Q    The investors you were talking to, in the next

19   sentence, they were interested in Mrs. Fields, but lukewarm

20   when it came to popcorn?

21   A    I'm not sure where you are seeing that.

22   Q    The next sentence in that paragraph.

23   A    Investors are interested in a brand, but lukewarm

24   discussing only popcorn.  Those were just the VC investors I

25   spoke with at that round-robin event in New York City.

1    Q    That had been the year before, in 2012?

2    A    Right.  And I really hadn't chased anybody else because

3    my business was put out of business for a period of time.

4    That is not the time to go raise money.

5    Q    In fact, you hadn't chased anybody else up to this

6    point?

7    A    No, because I had been put out of business and it made

8    no sense to seek investment when you can't even ship a

9    product.

10   Q    So the third quarter of 2013, you start chasing

11   investors again?

12   A    I had more conversations with my co-packer, Popcorn

13   Alley, about that.

14   Q    Other than conversations, did you do anything else?

15   A    At that time, no.

16   Q    Let me just show you one last item on this Exhibit 47.

17          MR. AMINI:  Did I move 47 into evidence?  Is it in

18   evidence?

19          I move 47 into evidence.

20          THE COURT:  Any objection?

21          MR. ROTHSCHILD:  No.

22          THE COURT:  Forty-seven is received.

23          (Exhibit 47 was received into evidence.)

24          MR. AMINI:  Go to the very end of 47, the last

25   paragraph.

1          Yes, right there.

2    BY MR. AMINI:

3    Q    You see in this paragraph you state this was giving you

4    the ability to bundle this business opportunity along with

5    others?

6    A    Yes.

7    Q    You're now talking about wanting these other products,

8    correct?

9    A    Correct.

10   Q    And then you make a reference to your cash-starved, yet

11   proven, business.  Do you see that?

12   A    Right.

13   Q    And your business was cash starved at that point in

14   2013?

15   A    Relative to a small business, no.  Relative to where I

16   wanted the company to go to, yes.

17   Q    So you had -- well, I'm trying to understand that.  You

18   had sufficient cash at that time to maintain your business

19   at the levels you had grown to already?

20   A    Absolutely.  And, in fact, continue growing at a

21   moderate rate.

22   Q    So go with me, if you would, to Exhibit 48.

23          MR. AMINI:  Forty-eight is stipulated to,

24   Your Honor.  I move it into evidence.

25          THE COURT:  Forty-eight is received.

1            (Exhibit 48 was received into evidence.)

2    BY MR. AMINI:

3    Q    Go with me to the second page of that, the royalty

4    payment.  But first let's set the table.  I'm sorry.

5         This is a July 26th, 2013 e-mail, starting on the first

6    page, from you to Mr. Courtney?

7    A    Uh-huh.  (Affirmative)

8    Q    It's in that same series of conversations you were

9    having with him about how to deal with the crises that you

10   had encountered in this period in 2013?

11   A    Right.

12   Q    And if you go with me now to paragraph -- to the second

13   page of that, the royalty payment delay, you were expecting,

14   from the way you could bring your business back, that you

15   would be back to business as usual by 2014.  That's why I'm

16   showing paragraph four.  Correct?

17   A    That was the intent.

18   Q    Right.  You have told us that you had sufficient cash,

19   certainly could sell product at will to a certain number of

20   customers.  That's my understanding.

21   A    Correct.

22   Q    And so you are saying to him help me get to the next

23   level, but, you know, I will get back on my feet and

24   business will be business as usual in 2014, at this point in

25   the summer of 2013, were you not?

```
 1   A     That was the intent, yes.

 2   Q     Go with me to 49.  This one I believe is in evidence.

 3         Yes.

 4         I believe you went over this with your counsel.  This

 5   is your January 2014 presentation to Mrs. Fields?

 6   A     That was the pitch that Cameron Broadbent created.

 7   Q     And you were aware of the pitch.  You were in on that

 8   pitch, were you not?

 9   A     Generally yes, but it was his to lead as he wanted this

10   more than Neal and I wanted it.

11   Q     Let's put Mr. Broadbent in perspective.  He had been

12   working at Mrs. Fields, correct, to your understanding?

13   A     Yes.

14   Q     You had known him because he had been a product license

15   manager in your early years and worked with you when you

16   first started business?

17   A     That's correct.

18   Q     And the two of you had a good relationship?

19   A     Correct.

20   Q     And then he had gone on, in 2005 I believe, to start

21   off and run Mrs. Fields' packaged cookie business, its

22   retail cookie business?

23   A     Thereabouts, yeah.

24   Q     You hadn't dealt with him in that connection.  He had

25   been replaced and he ran that for half a dozen years, to
```

1    your knowledge?

2    A    I still stayed in touch with him.

3    Q    And then that cookie business, as you understood it,

4    got sold to a Canadian company, as I recall?

5    A    Their American division, Interbake, but it's owned by

6    George Weston.

7    Q    So he was going to lose his job at Mrs. Fields near the

8    end of 2013, beginning of 2014.

9    A    My understanding is is he was losing his job because he

10   didn't want to relocate to Denver when the company was

11   moving, not because they didn't have a job for him.  He

12   really wanted to stay in Salt Lake City.

13   Q    You have a better understanding than I do.  But that's

14   fine.  I accept it.

15        So you were talking to him and he was talking to you

16   and to Mrs. Fields about taking this MFGPC, your company,

17   and growing it as an opportunity?

18   A    As a consultant, yes.

19   Q    For him, for his interest?

20   A    Right.

21   Q    And you had offered him a deal at that point where he

22   would get 75 percent of the new business going forward and

23   25 of the old that you had established and you would keep 75

24   of the old business and would get 25 percent of the new?

25   A    Not at all.

1    Q    You had not made that deal?

2    A    No.  No.  Why would I give away 75 of my new business

3    for consulting?  That makes no sense.

4    Q    I thought he was going to come in and run the company?

5    A     No.  He was a consultant and he was going to support

6    getting new business, but there is no way on God's earth I

7    would have offered him 75 percent of new business to be his,

8    never.

9    Q    All right.  I'll see if we can find those numbers in

10   here somewhere.

11        Take a look with me at the second page of this

12   presentation.  You have in there that you had delivered a

13   certain amount of revenue and you've gotten to a high in

14   sales of 573,000 in 2012?

15   A    Yes.

16   Q    Is that correct?

17   A    Uh-huh.  (Affirmative)

18   Q    All right.  And then there's a bullet point down there

19   that one person runs the entire business today and it's

20   earned no income from it in ten years.

21   A    Absolutely consistent with the model.

22   Q    That was you -- the model is not of interest.  I was

23   more interested in identifying that one person.  That one

24   person was you who ran the business completely, right?

25   A    You are correct, sir.

1   Q    And you earned no income from it for ten years?

2   A    That is correct.

3   Q    And you had invested approximately $950,000?

4   A    That's correct.

5   Q    You and your wife?

6   A    That's correct.

7   Q    And there was a Mr. Spivey, I believe, who had given

8   you $100,000 of that 950?

9   A    That is correct.

10  Q    Then the next bullet point is in order to survive the

11  implosion of business in 2013.  What did you understand by

12  the implosion?

13  A    I don't know the source of that statement.  That simply

14  is not true.

15  Q    Then it goes on to say the CEO recently became engaged

16  in another business.  Do you see that?

17  A    Yeah.  I don't know where that came from.

18  Q    You had become engaged at that point in Farm Stand

19  Fresh Foods?

20  A    That was July of 2014.

21  Q    You became the president and CEO at that time?

22  A    Yeah, on paper.  It was an absolute start-up, and I had

23  a partner that was doing the majority of the work on that.

24  Q    Is it your understanding that that's what is being

25  referred to or you have no understanding what's being

1    referred to here?

2    A    You would have to ask Cameron that.  I have no idea

3    what that statement means.

4    Q    Did you ever correct it?

5    A    No, obviously.

6    Q    Then it goes on to say the business needs an

7    experienced CPG general manager and a reasonable cash

8    infusion to move it to the next level.  Do you see that?

9    A    Yes.

10   Q    The bottom of that first page.

11   A    Sure.

12   Q    In order to move it beyond a lifestyle, I think you've

13   told me, you say that's in reference to your -- it's a

14   self-owned business?

15   A    Correct.

16   Q    So now you need an outside general manager and a

17   reasonable cash infusion.  That's what you're saying, isn't

18   it?

19   A    I was going to make that big move, yes.

20   Q    You were going to engage a general manager and find a

21   reasonable cash infusion?

22   A    If you go back to Chris Boyd, he would have been a

23   perfect example of someone I would have brought in.  That

24   ECPG sales and marketing background would have been perfect

25   for this.

1    Q      CPG stands for what?

2    A      I'm sorry.  Consumer packaged goods in the food

3    industry.

4    Q      So what you just said to me, you were going to go to

5    that model, you were going to get yourself a general

6    manager, right?

7    A      That was the intent.

8    Q      Cameron Broadbent was one of the people you were

9    considering for that?

10   A      He was positioning himself that way to Neal.  As far as

11   skill set and knowledge and experience relative to Chris

12   Boyd, Chris Boyd was substantially senior to Cameron.  But

13   Cameron was out of a job and he was trying to work out a

14   program between Neal and myself.

15   Q      At this point Chris Boyd was gone?

16   A      That's correct.

17   Q      He had to go make a living doing something else?

18   A      He couldn't do what I was doing.

19   Q      And between that time and when you were terminated in

20   the summer of December 2014, the only other person I

21   understood you were talking about taking this job was

22   Cameron Broadbent?

23   A      That was it.

24   Q      Then if you go with me -- at this point, you want

25   Mrs. Fields to forgive -- this is the next page.

1          Go back to the page before.  Now I see where I saw it.

2          Here, this page, critical needs.  So that's the senior

3    management we were talking about?

4    A     Uh-huh.  (Affirmative)

5    Q     That was one of your critical needs at that point, was

6    it not?

7    A     To expand at the rate I would like to.  As you see in

8    the second statement, it says skills to springboard this

9    business beyond the current revenue threshold of 300,000.

10   Q     So you wanted to overcome the present cash hurdle by

11   finding somebody who would work on something other than the

12   standard salary?

13   A     Similar to hiring a broker, you pay them on performance

14   only.  They are not W-2 employees of your company.

15   Q     And then it says in the second bullet point under that,

16   as compensation, MFGPC is willing to pay an accelerated

17   commission or offer a high profit share split on all new

18   business.

19         You can't really make that out because of the screen

20   with all the pictures.  I think it says -- hold on.  I'll

21   find it on a hard copy.  I'm sorry.

22         I think it says -- yes, split on all new business, open

23   paren, 75/25, close paren, and current business, open paren,

24   25/75, close paren.  That's where I got the 25/75 split.

25   That wasn't something -- was that something you had

1    discussed with Mr. Broadbent?

2    A    From a commission perspective only, not equity

3    ownership, no.

4    Q    Go with me to the next page.  You were looking for them

5    to forgive an estimated 50,000 in accrued royalty

6    liabilities for 2012 and 2013, were you not?

7    A    Yes.

8    Q    And you were telling them at that point, July of 2013,

9    that you were expected to grow to revenue of a million in

10    2014 alone?

11    A    That was Cameron's projection, yeah.

12    Q    That was not your projection?

13    A    That was Cameron's.

14    Q    Did you have a projection at that point of what you

15    were going to grow to in 2014?

16    A    No.  All I wanted to do is get back to where we were,

17    $600,000.  That was my goal for 2014.

18    Q    And then if you go with me to the recommendation to

19    deliver these opportunities, two pages later, that first

20    heading there, avoid drifting, jump-start the business.

21        Let me read all of it because, again, the screen cuts

22    it off.  Without a cash infusion, the popcorn business will

23    continue -- I'm sorry -- yes, continue to drift at current

24    levels.  Rather than just letting sales trickle in, let's

25    jump-start the business in partnership for the greater good.

1    Do you see that?

2    A    Yes.

3    Q    Did you have an understanding that you needed a cash

4    infusion to grow the business beyond the $600,000?

5    A    This is an attempt to sell Neal on investing back into

6    MFGPC, much the same way that Mrs. Fields invested royalties

7    earned back into their franchise operation.  So that's what

8    the pitch of this was.

9    Q    So you were looking for Mrs. Fields to invest in you at

10   that point?

11   A    Absolutely.

12   Q    You also wanted the royalty to be reduced -- cut in

13   half from five percent to two and a half?

14   A    I'm sorry.  That was Cameron's recommendation as a way

15   to find his -- the MFGPC portion of the job sharing split

16   between Mrs. Fields and MFGPC.

17   Q    And in any event, you never got any agreement on either

18   of those requests, did you?

19   A    None.

20   Q    Let me ask you about the capital raising you said you

21   did.  We looked at, I believe, a 2011 -- December 2011

22   agreement with Mr. Fisher.  Exhibit 74 I think it was.

23        This was an agreement that you entered into with Bill

24   Fisher on or about the 19th of December 2011, correct?

25   A    Yes.

1    Q    And you hired Mr. Fisher to find people who will be

2    willing to invest in MFGPC?

3    A    That's correct.

4    Q    And Mr. Fisher arranged that meeting with 40 VCs in

5    Manhattan?

6    A    Actually, no.  I arranged that.  He joined me in that.

7    Q    And then while he was still representing you, you also

8    met with the family offices in Greenwich?

9    A    He didn't attend that particular presentation.

10   Q    And do you have any writing from anybody at either one

11   of those meetings that indicates any interest in your

12   company?

13   A    Peakstone Advisory.

14   Q    You met Peakstone at one of those meetings?

15   A    In March in New York City.

16   Q    You met them at the VC meeting?

17   A    Correct.  In fact, there were three others that were

18   very interested in what we were doing.

19   Q    So other than Peakstone, anybody else?

20   A    We chose not to go with anybody else because the deal

21   with Peakstone was right in the target of where we wanted to

22   be.

23   Q    This is still the period in which you yourself referred

24   to as throttling the business, kind of keeping it warm at

25   that $600,000 level to see if you could get people

1    interested to invest money to go to a different level?

2    A    Correct.

3    Q    And you're not prepared to invest just your own money

4    at that point.  You want outside investors to get above the

5    $600,000 level.

6    A    I had invested as much as I wanted to in scaling this

7    business and now it was time to find other investors.  I had

8    set the table with a new product line that had already shown

9    success in retail.  The infrastructure was completely in

10   place.  It was time to move it to the next level.

11   Q    I want to go back to Exhibit 51.  I kind of lost track

12   of what parts of 51 are labeled what, but we'll muddle our

13   way through it.

14        I see two pitches in Exhibit 51.  You identified one, I

15   believe, for the family offices.  There's a family office

16   pitch, and that one I believe was identified --

17             MR. AMINI:  Do you have the Bates numbers on 51-A,

18   or whatever it is?

19   BY MR. AMINI:

20   Q    Let's take a look at 51-B.  It starts at 297.  It's

21   dated June 27th, 2012?

22   A    Yes.

23   Q    It went -- you know, we've got this going through 314,

24   but let's go to 306 for a minute because I don't want to

25   confuse you.

```
 1              On 306 there's another one of these pitches that starts
 2     on 306.  Do you see that?  And it starts on September 4th,
 3     2012.  It's dated September 4th.  And I had understood from
 4     your deposition testimony that these were two different
 5     pitches to two groups.  I thought the VC Group and the
 6     family offices, but that's my question.
 7     A    I believe this pitch was to Peakstone because we
 8     decided the deal at the end of August.  The first one that
 9     you showed me was the pitch to the family office in
10     Connecticut in June.
11     Q    Okay.  Let's go back to the first one for a moment.
12          You were trying to get -- if I'm not mistaken, you were
13     looking for a million dollars in immediate equity?
14     A    I would have to review it again.  I think it was a
15     million potentially in equity and some additional debt as
16     well.
17     Q    Go down to 302.  Look at 302.  See the page, what we
18     need, a million dollars?
19     A    Right.
20     Q    Does that refresh your recollection you were looking
21     for a million dollars?
22     A    On the equity side with these guys, yes.
23     Q    You wanted $500,000 of it just to pay people to do the
24     work?
25     A    Right.
```

1    Q    Talent is human resources, correct?

2    A    Correct.

3    Q    And then you indicate the other 500, and break it out

4    into economic order quantities, and trade spending for

5    slotting and promotions.  A million dollars to get the

6    business to another level, as you say.

7    A    Right.

8    Q    Then go with me to the next page.  You anticipated you

9    would get another four million in funding over the two years

10   after that to achieve orbit potential.  Do you see that?

11   A    Right.

12   Q    Explain to me what those two levels are, a million and

13   then the four million, how you understood those.

14   A    Yeah.  So the million five is to fund immediate

15   expansion, to cash flow that for the next 12 months.  And

16   then two and a half million in the next 24 months to fund

17   accelerated growth and begin new product expansion in the

18   microwave cakes and bars.

19   Q    Then the next projection right below it, there's your

20   projects for sales.  You are going to go from that 573 in

21   2012 to three million in '13, and then ten million in '14,

22   25 in '15, 35 in '16, and 50 in '17.

23   A    Right.

24   Q    We already know that for 2013 you have the double

25   disasters, so you didn't hit that number.

1    A    We never got the funding to even pursue that.

2    Q    Without the funding, you were never going to even hit

3    the three million.

4    A    No.

5    Q    Then go back with me.  I need to establish -- this is

6    at the beginning of the second page of this document, of

7    this particular one.  Go back up to 298.

8         In this pitch you told them, as part of your pitch,

9    that you had evergreen licensing rights to create, market,

10   and distribute any approved popcorn products.  Do you see

11   that?

12   A    Yep.

13   Q    This was before the litigation, and at that point you

14   were selling them on a promotion that you had a perpetual

15   license of this product as long as you weren't in default?

16   A    There was no indication of anything other than that.

17   Q    I understand that.  And that's the assumption you were

18   proceeding on.

19   A    Correct.

20   Q    And then at the bottom you told them that their

21   revenues are nearing a million a year.

22   A    Uh-huh.  (Affirmative)

23   Q    Then go with me -- let's go to the pitch, to what you

24   call the pitch to -- I think the pitch to Peakstone.  It

25   starts on page -- the bottom of page 306.  That's the

1   September 4, 2012 one.

2   A    Okay.

3   Q    Then this one -- just go with me to the revenue

4   forecast.

5        Now your revenue forecast, also in July and September,

6   have gone -- you went from three million in '13 to four

7   million?

8   A    It's a rounding error in the scheme of things.

9   Irrelevant.

10  Q    Again, that was reliance -- so that I'm clear on this,

11  getting that target number, you were reliant on getting the

12  money first, getting the investors to put up with the money?

13  A    So it could have gone one of two ways.  It could have

14  been an acceptance by my popcorn co-packer to work with me

15  and agree to rapidly expand production, understanding they

16  would have to cash flow the gap between when they typically

17  would accept payment and when the retailer would pay, and it

18  was too big of an ask for me to really get.  But if Popcorn

19  Alley turned around or the Popcorn Factory were all in on

20  this, that was another option to try and begin expanding at

21  a greater rate than I could cash flow on my own.

22            THE COURT:  Mr. Amini, we better take another

23  break.  We've been going for what, an hour and

24  three-quarters since the last one.  We'll be in recess for

25  30 minutes, and we'll resume.  Thank you.

```
 1              MR. AMINI:  Thank you, Your Honor.
 2              (Recess)
 3              THE COURT:  You may proceed.
 4    BY MR. AMINI:
 5    Q    Mr. Lindley, I want to go back to Exhibit 49 for a
 6    moment.  That was the presentation in front of -- this was
 7    the presentation that you sent Mr. Broadbent to -- the
 8    presentation that Mr. Broadbent made to Mr. Courtney,
 9    correct?
10    A    Correct.
11    Q    And I had understood in our last back-and-forth that
12    you stated that he did this on his own and without your
13    knowledge or input?
14    A    I did not say the latter.  He did it as the primary
15    architect of the document.  He had input from me.
16    Q    Okay.  So you had seen it at the time that it went in?
17    A    I don't recall if I actually saw the final, final
18    before he sent it to Neal.  I can't honestly remember that.
19    Q    But you had seen the part where he said that you had
20    left and gone off to work at another company at that point?
21    A    That's what I'm saying.  I don't recall that.  I would
22    have taken that out.  It absolutely made no sense.
23         Neal and Cameron had a very deep relationship inside
24    and outside of work.  And there were plenty of times Cameron
25    and Neal were talking on things related to this, I had no
```

1   idea.

2   Q    I asked you whether you had discussed the 75/25 profit

3   split with him in this business, the 75/25 on new business,

4   25/75 on old business, and you said no, that's not what the

5   conversation had been.

6   A    No.  That needs to be corrected.  What I said is he

7   would not get 75 percent of new business as if it was in his

8   entire piece of the puzzle.  He was to get a commission

9   against 75 percent of the new business coming in.

10  Q    You remember I deposed you in this case, correct, back

11  in September of 2020 -- September 17th, 2020.

12  A    Right.

13  Q    Page 108, starting at line two and going to line 11.

14  This was again in the context of Exhibit 49.

15  A    Okay.

16  Q    And I was referring to the fact that Exhibit 29 -- let

17  me ask you just standard, if I asked you these questions at

18  that time and did you give me these answers.

19       This is, again, Exhibit 29.  Question:  It says here

20  you were talking about a profit-sharing split of 75/25 on

21  the new business and 25/75 on the old business.  Answer:

22  That is what it says, yes.  Question:  So if he came on

23  board, he was going to get three-quarters of the profits of

24  the new business and a quarter of the existing business, and

25  you were going to get the flip side?  Answer:  That was the

1    concept.  I don't know that we actually ever finalized that.

2         Did I ask you those questions and did you give me those

3    answers?

4    A    Yes.

5    Q    You didn't finalize that; is that correct?

6    A    That's correct.  And if you go back to the other

7    exhibit and you reference your first line three, talking

8    about a profit sharing split of 75/25, that's only one of

9    two concepts that were put on that page.  The other is

10   commissions or a profit-sharing split.  Neither were

11   finalized.  Nothing was ever paid.  No agreement was ever

12   made.

13   Q    On the other -- and Mr. Broadbent left shortly after

14   this, did he not?

15   A    He wasn't working directly for me at that point anyway.

16   He started his own business in real estate.

17   Q    By the middle of -- beginning of 2014, he was no longer

18   involved.

19   A    I'm not saying by the beginning of 2014.  I don't have

20   all the documentation of exactly when.  We never

21   corresponded on this again.  But it was during 2014.

22   Q    In 2014, you ran the business all by yourself.

23   A    I had been before, to be clear.  So there wasn't like I

24   was leaning on Cameron to help at all in my business.

25        Cameron was trying to figure out a way to make himself

1    valuable between Mrs. Fields and MFGPC.  I was open to that.

2    Neal was open to that.  Cameron still was exchanging e-mails

3    with Neal until January of 2014.

4    Q    And still on Exhibit 49, on the part about -- the one

5    ending in page 247.  The Bates stamp number is 247.

6         The one person that runs it -- oh, this part about in

7    another business that is not compensating him at levels.

8    That whole thing about Farm Stand Fresh Foods.  I can never

9    get that name right.  I'm sorry.  Farm Stand Fresh Foods,

10   that whole business.  Is it your indication that you just

11   continued working, you know -- what was the circumstance

12   that you became president and CEO of Farm Stand Fresh Foods?

13   A    A couple of points.  On that comment down below about

14   engaged in another business that is not compensating him,

15   that is patently false.  I did not say that.  If Cameron put

16   that in there, I didn't catch it.  But that just simply is

17   not true.

18        Number two, I was approached by a longtime friend and

19   business associate.  We worked together for years at

20   Conagra, where he was at a new company and they needed help

21   with the number one brand of round field tomatoes in America

22   to expand it.  He asked if I would get involved as a

23   consultant.  I said let me take a look at it.  We talked

24   about it.

25        And then I reached out to a guy who had been VP,

1    general manager of the snacks business for Conagra.  It was

2    a billion dollar division.  He had been consulting with

3    chief outsiders, which is the largest consultancy for

4    marketing executives in the food industry, and he agreed to

5    jump on board, and he did most of the heavy lifting on that.

6    We had meetings, but relative to actual work versus anything

7    I was doing on Mrs. Fields was infinitesimal for the

8    first -- through 2014.  I jumped into it in a much bigger

9    way after I was terminated by Mrs. Fields.

10   Q    I'm sorry.  I thought you had told your counsel earlier

11   this morning you raised a substantial amount of money for

12   this farm, $500,000.

13   A    $500,000 is what Bejo Seeds put into it in 2015 and

14   2016.

15   Q    I understood that you had become the president and CEO

16   to look at it as an alternative to MFGPC.

17   A    I looked at a number of things.  That's what LHF did.

18   Like Z Capital does, they look at a number of opportunities.

19   They make a decision where they are going to put their money

20   and their efforts.  That was not unusual for LHF during the

21   entire 11 years I was involved with Mrs. Fields.

22   Q    You were at that point trying to hedge your bets

23   because MFGPC might go under.

24   A    Just as Zenni would do with his company.

25   Q    So it's fair to state that you went off to become the

 1    president and CEO of Farm Stand Fresh Foods as an

 2    alternative to MFGPC?

 3    A    No, that would not be correct.

 4            MR. ROTHSCHILD:  Can I object as the question is

 5    vague as to when?

 6    BY MR. AMINI:

 7    Q    At the time of this presentation to Mrs. Fields.

 8    A    No.  I did not go off to Farm Stand Fresh Foods at this

 9    time.

10    Q    All right.  Let me take you to your deposition again,

11    on pages 40 and 41.  Again, this is your deposition of

12    September 17th, 2021.

13            THE COURT:  September 17th, 2021 did you say?

14            MR. AMINI:  2020.  I'm sorry, Your Honor.

15    September 17th, 2020.

16    BY MR. AMINI:

17    Q    I asked you a series of questions about this starting

18    on page 40, at line 16, and going through page 41, line 13.

19        Starting at 40 -- and the same question.  I'm going to

20    ask you the question and answer and ask you if I asked you

21    these questions and you gave me these answers.

22        Starting on line 16, on page 40.  Question:  Let me ask

23    you.  We're going to follow up on something you said to me.

24    You said that in 2014 -- I think it was 2014, July of '14,

25    that's what I have written down -- you became the CEO of

1    Farm Stand Fresh Foods?  Answer:  Correct.  Question:  All

2    right.  Up to that point were you full-time with MFGPC?

3    Answer:  Yes.  And my question was, so why did you make the

4    switch at that point in July of 2014?  And your answer was,

5    I was getting to the point where I was evaluating the brand

6    from licensor as a partner and beginning to say, listen,

7    I've been doing this for quite some time.  I need to start

8    potentially charting a path in a different direction in case

9    this thing just ultimately goes under because of poor

10   support from the brand and the company.  The question,

11   anything else?  You were looking basically for an

12   alternative?  Is it fair to state you were looking for an

13   alternative business if MFGPC didn't work out?  The answer

14   was yes.

15        Did I ask you those questions at that time and did you

16   give me those answers?

17   A    Yes, I did.

18   Q    Let's go through -- Mr. Kemper, he died in January of

19   2013, correct?

20   A    Correct.

21   Q    And after that you didn't have any other substantive

22   relations with Peakstone.  Isn't that correct?

23   A    I stayed in contact with the owner, and they replaced

24   him a couple of months later, but there was no point in

25   moving forward until I could get production back up and

1    running.

2    Q    So the answer to my question is you had no further

3    substantive conversations with him about investments.

4    A    I did have substantive.  I made a decision to hold off.

5    Q    Between the time you signed up for Peakstone -- and we

6    saw the exhibit.  I think it's Exhibit 74.

7            MR. AMINI:  Why don't you actually pull it up.

8    BY MR. AMINI:

9    Q    Between the time you signed up for Peakstone and when

10   you weren't going forward anymore, do you have any other

11   documents other than the agreement itself that indicates --

12   no, it's not this one.  I'm sorry -- that indicates any

13   interest by any investor from any source in your business?

14   A    At that time I didn't pursue it, no.

15   Q    Well, let me find the agreement.  I'm sorry.  I believe

16   it's Exhibit H.

17       August 29th, 2012 is when you signed up with Peakstone,

18   correct?

19   A    Correct.

20   Q    Mr. Kemper died in January of 2003, correct?

21   A    2013.

22   Q    And between this letter of August 29, 2012 and today,

23   the present date, do you have any other writing of any kind

24   that indicates any interest, besides Peakstone, by any

25   investor for your business?

```
 1   A     I would have to go back and look.

 2         Besides Peakstone are you saying?

 3   Q     Let's start with Peakstone.

 4   A     I would have to go to back to e-mails and look.

 5   Q     Well, did you produce those e-mails in this case?

 6   A     I don't think I was asked to, but I could look.

 7   Q     As you sit here today, do you recall a single e-mail of

 8   that sort -- anybody?

 9   A     It's been seven years.  I couldn't give you an honest

10   answer on that.

11   Q     Go down a little bit on this advisory agreement form,

12   right there where it says definitions.  Do you see the

13   definition of this transaction?

14   A     Uh-huh.  (Affirmative)

15   Q     This transaction didn't involve MFGPC, did it?

16   A     No.  It was LHF.

17   Q     That's right.

18         With Peakstone, you weren't even trying to raise money

19   for MFGPC.  You were trying to raise money to buy a

20   different part of Mrs. Fields' business?

21   A     That's simply not true.

22   Q     It references a transaction.  Do you see that?

23   A     Yeah.

24   Q     And the transaction is the acquisition, license

25   agreement, joint venture, or funding of a transaction
```

1    involving Mrs. Fields Famous Brands through -- again, I'm

2    having a hard time reading this -- one transaction or series

3    of transactions, in an asset or stock transaction, through

4    an existing or newly formed entity excluding the Mrs. Fields

5    Gourmet Popcorn, pretzels, or the licenses which you

6    formerly had.

7    A    Right.  And the reason behind that was if I wanted to

8    source my own funding for Mrs. Fields Gourmet Popcorn

9    outside of Peakstone, that gave me the opportunity to do

10   that.  If I wanted to allow them to then do it -- in fact,

11   that was the general agreement and understanding with

12   Peakstone is they were forming a newco, that they would drop

13   Mrs. Fields Gourmet Popcorn into that along with other

14   available unlicensed categories from Mrs. Fields.  That was

15   the whole strategy.  That's why they were setting aside

16   $22 million.

17   Q    I'm sorry.  All I have is the document, and this

18   document says that they are funding everything -- they're

19   seeking funding for everything but Mrs. Fields Gourmet

20   Popcorn; isn't that right?

21   A    Yes.  That's exactly what it says.

22   Q    So is it fair to state that as of August 2013, you no

23   longer had anybody that was working for you to get funding

24   for MFGPC?

25   A    Yeah.  I was putting basically my relationship with

1    Peakstone into the mix by signing this agreement with LHF.

2    MFGPC was allowed to go chase down anything they wanted to.

3    This was a deal with LHF, not MFGPC.  If LHF decided at a

4    certain point to not carve out gourmet popcorn and enrobed

5    pretzels, which is what I requested, I was simply able to

6    just revise this if I wanted to and they would be happy with

7    it.

8    Q    So -- I'm sorry if I interrupted you.

9    A    That's okay.

10   Q    So you had nobody engaged to try to get financing,

11   after you went to the VC meetings and the family office

12   meeting, until you were terminated, for Mrs. Fields Gourmet

13   Popcorn?

14   A    Yeah.  After Peakstone and after the fire, you're

15   right, I didn't.  I chose -- that was not the right time to

16   go and raise money.  Until I got my legs back underneath me,

17   until everything was stabilized, having dealt with the fire

18   and the loss of business, there would be a better time.

19        It's like what Mrs. Fields has gone through since 2015

20   trying to find a buyer of their company.  They can't do it.

21        So there's better times to trade, or share, or buy out

22   equity than other times, and Z Capital certainly knows that

23   and so do I.

24   Q    So is it fair to state that you ceased trying to raise

25   capital from August of 2013 for MFGPC going forward?

```
 1  A    No.  No.  That's not an accurate statement.

 2  Q    What efforts did you make to seek capital after that?

 3  A    Talking with Popcorn Alley about making new investment,

 4  having discussions about that.

 5  Q    That was one of your co-packers.

 6  A    Correct.

 7  Q    As I understand it, you don't have a single piece of

 8  paper from them that indicates an investment in MFGPC?

 9  A    They chose not to make an investment at that time.

10  Q    So as of 2014, you had no investors and no prospects

11  for any investment in MFGPC?

12  A    Yes.  I limited myself to talking to people until the

13  business was ready to be reviewed by potential investors.

14       As you know, it's a lengthy process to raise money.

15  Z Capital has spent six years trying to sell off

16  Mrs. Fields, unsuccessfully.  It's very difficult.

17       I just read yesterday, Pandora, they had 300 meetings

18  with investors before they got their first investor.

19       Investing is not something that is easy.  So because I

20  had, from my perspective, an evergreen license and I was

21  doing five to $600,000 a year, and I was paying bills, I

22  could pick and choose the right time when I wanted to go

23  after investors again.  There's no requirement by anybody to

24  do that.

25  Q    All I'm trying to establish is that -- so following the
```

1    fire in 2013, there was never again a right time before

2    Mrs. Fields terminated you to go after an investor again?

3    A    That's not true.

4    Q    When was the right time, after a buyer, before you were

5    terminated?

6    A    Like I said, I was talking with Popcorn Alley about

7    that.  So I don't understand how you define talking to

8    investors.  Could you give me a definition and maybe I can

9    give you a better answer?

10   Q    No.  I'm not asking you about talking to investors.

11   I'm asking about showing some writing in which some investor

12   someplace shows even a modicum of interest in investing.

13   You can start with just an e-mail.  I like your product.  I

14   would like to come visit your facilities.  Something,

15   anything, other than your Peakstone agreement as of August

16   of 2013.

17   A    So there were a number of people from the VC party and

18   a couple from the office party that were interested in the

19   company.  I just went silent on them.  I said we've found

20   somebody else to work with.  I never went back to them

21   because it wasn't appropriate at that time.  I was out of

22   business.

23        And you don't sell, as Zenni knows, with Mrs. Fields

24   when you're down and out.  You're not going to get the money

25   for it.  That's just axiomatic.  When you're trying to sell

1    a company, don't sell it when it's struggling.  That's a bad

2    time to sell.

3    Q    I had understood that as of the end of 2013 you were

4    back in business?

5    A    Not at full speed.  I'd just lost nine months of

6    revenue and potential business.  It doesn't all just come

7    roaring back like that.  You would have to be familiar with

8    the food industry to really understand that.

9    Q    Explain it to me.  What would be involved in bringing

10   it back around?

11   A    Yeah.  First of all, I would have to go and make

12   presentations again to the core group for the holiday

13   period.  So that would have been January through March of

14   2014, to begin shipping for the fall of 2014.  That would

15   have been the first thing I would have done if I had felt

16   that all of my manufacturing was up to speed again and

17   everything was kosher and ready to go.

18        You have one chance.  You don't have nine lives with

19   retailers today.  There's ten retailers that account for

20   70 percent of total business in the U.S.  If you choke,

21   you're done, and you're not coming back any time soon.

22        So I, being a long-term player in this, took my time.

23   I was not under any annual requirement with Mrs. Fields with

24   this agreement that I needed to deliver a certain amount of

25   cases, royalty revenue, or revenue, none.  And I played it

1    cautiously, because if you look at Legacy brands, you look

2    at Shadwell Grove, you look at Maxfield, all three of the

3    largest licensees of Mrs. Fields all went bankrupt because

4    they didn't pay attention.  They were so worried about top

5    line growth that they didn't pay attention to the money on

6    the bottom line, and they ran out of money.  I didn't run

7    out of money.

8    Q    I was focused on the 2013 through 2014 period.

9         So in 2013 -- I had understood you to say that you were

10   back in business in 2013, you were spending your full time

11   on MFGPC from the end of 2013 going forward, and you were

12   doing all these things to expand the business.  Am I

13   mistaken?

14   A    Yeah.  I ran -- I was still running it full-time,

15   absolutely.

16   Q    And you were running it as you ordinarily would to sell

17   as much product as you could?

18   A    No, because I had already had my financial legs cut out

19   from underneath me from the Bed Bath & Beyond issue and from

20   me being out of business for six months, Mrs. Fields owing

21   me money.  So there's a number of things, and we've covered

22   this.  We don't need to keep going over this.

23   Q    Mrs. Fields didn't owe you money in September 2014, did

24   it?

25   A    No.  They actually did owe me money, and Neal Courtney

1    paid it in advance of the royalty being paid from 2012.

2    Q    I'm sorry.

3    A    Listen, it feels like you're looking for a textbook

4    answer, and this is not a textbook company.

5    Q    I want to go back to something you said and then I will

6    come back to the finances of the company.

7        You said that you didn't -- Mrs. Fields owed you money.

8    That $62,000 invoice we looked at, that was in September of

9    '14, correct?  Up until that point, you owed Mrs. Fields

10   royalties that you had deferred.

11   A    Because they had actually paid me in 2013 before the

12   royalties were paid.

13   Q    That's fine.  Mr. Lindley, I'm just trying to

14   establish, that you hadn't paid the end of 2012 or 2013, and

15   Mrs. Fields didn't owe you any money until at least

16   September of 2014.

17   A    That is correct.

18   Q    All right.  So in the year 2014, at least up until

19   September of 2014, what efforts were you making to get this

20   business back in shape?

21   A    The same efforts I would make any year, evaluate the

22   customers, evaluate the competition, evaluate the pricing.

23   Look at things like what are my cost of goods.  Look at my

24   manufacturing opportunities.

25        This is not bottles of ketchup.  This is a very

1    complicated product to make and there's very few in the

2    country that can actually make it.  So it's not like you can

3    go to liquid co-packers, which there's hundreds of them

4    around the country, and pack mustard or pack ketchup.  It's

5    not the same thing at all.  It's complicated.

6    Q    Go with me, if you would, to Exhibit 12.  Let me show

7    you one.

8         This was your last royalty report.  Do you recall that?

9    A    Yes.

10   Q    Let's go, if you can, to the 2013 revenue.

11        Actually go back for a moment.  I'm sorry.  Let's set

12   the stage.  2012 was your good year.  You had $573,742.80 in

13   sales of Mrs. Fields product.  Is that fair?

14   A    That's what the paper says, yes.

15   Q    You kept these royalty reports yourself, did you not?

16   A    It wasn't in this form, but yes.

17   Q    I mean I think you testified -- I can go find it, but

18   you testified that you were very good about keeping track of

19   every invoice of Mrs. Fields goods that you sold, you kept

20   them on a sheet, and prepared the quarterly reports yourself

21   and they were done contemporaneously.

22   A    Just to be clear, not this format.  In the royalty

23   report Excel spreadsheet you're talking about, yes.

24   Q    This is taken from that Excel spreadsheet directly?

25   A    Right.

1    Q    As far as you understand, it's an accurate reflection

2    of what is in that Excel spreadsheet?

3    A    Yeah.

4    Q    It's just the summary of what you -- the information

5    you kept contemporaneously, right?

6    A    Uh-huh.  (Affirmative)

7    Q    So this number, 573,742, that was your high point in

8    2012?

9    A    Yeah.  I don't know if that was the final high point

10   throughout the entire '11 year period.  I don't have that in

11   front of me.

12   Q    And then we have 2013 next to it, and that's where

13   gross revenue, at least with respect to Mrs. Fields

14   products, fell to 382,557.

15   A    Right.  You see the big variance in Q2.

16   Q    And my understanding is that it was Q1 -- Q2 and Q3 was

17   where you got killed, but by sometime in Q3, you were in a

18   position to make sales again as demonstrated by the fact

19   that you had a strong Q4 and you sold $307,399.50 worth of

20   Mrs. Fields product in the fourth quarter.

21   A    And a lot of that was new customers we hadn't shipped

22   to before.  Not at that level for Q4, as an example.  It was

23   more holiday related shipments that went out in Q4.

24   Regardless, you can see the recovery and you can see the big

25   gap in Q2 and Q3.

```
 1   Q    And the fire is the reason for the loss in revenue in
 2   Q1 and Q2?
 3   A    Correct.
 4   Q    Now let's go to 2014.
 5        So now, in 2014, your sales go from 382,550.70 to
 6   186,629.80?
 7   A    Right.
 8   Q    That becomes your total sales for the whole of 2014?
 9   A    Absolutely.
10   Q    That had nothing to do with the termination.  They
11   hadn't terminated you yet in 2014.
12   A    That's correct.
13   Q    So you managed to lose yet another almost half of your
14   sales -- in fact more, in 2014.
15   A    And you'll recall why that was.
16   Q    I want to break that out for a minute.  70,000 of that
17   186,629.80 is the sales to Mrs. Fields?
18   A    Okay.
19   Q    So you had $116,000 of sales in 2014?
20   A    Right.
21   Q    You had been in business since 2003, correct?
22   A    What was the requirement that Mrs. Fields had of me to
23   do any better?  None.
24   Q    Mr. Lindley, I don't disagree with you.
25        You understand you could have shut the business down if
```

1    you wanted, correct?

2    A    That's correct.

3    Q    That's kind of what you were doing by the time you

4    had --

5    A    That is simply false.

6    Q    But you've told me that you could create sales, but for

7    the fact that you didn't want to fund them, almost at will,

8    didn't you?

9    A    No.  What I said is because I lost a fair amount of

10   profit in 2013, I was going to go easy and slowly ramp back

11   up in 2014.  That's exactly what I did.  I was not going to

12   put my company in risk or jeopardy.  I didn't want to go

13   deep into my 401(k) to dig out even more money to please

14   someone that I don't even know had a problem with this.

15        I managed my business.  I stayed within my comfort zone

16   coming back out of a terrible event in 2013.

17        Listen, Mrs. Fields went bankrupt in 2008.  How did

18   2009 look?  Was it amazing?  I don't think so.  It's a

19   question of whether you can stay in the game and recover,

20   and I did that.  You made a decision to terminate me and it

21   had nothing to do with any of this.

22   Q    And that's an interesting question.  You hadn't given

23   them a royalty report in almost two years, and the staff

24   that was there knew nothing of any oral agreements you had

25   to just put it off.

1  A    No, but the CEO agreed to that.  He has some weight in

2  that decision, doesn't he?

3  Q    Well, you knew the CEO was gone at that point.

4  A    No, I didn't until September.  September 2014 is when I

5  found out he had been fired.

6          THE COURT:  Try not to talk over each other.  You

7  ask questions, Mr. Amini, and you answer them, Mr. Lindley.

8          MR. ROTHSCHILD:  Your Honor, I hate to add a third

9  voice to this, but we are now treading the third time on the

10  question of whether there was forbearance or breach, and it

11  was irrelevant the first and second times.

12          THE COURT:  It is irrelevant.

13          But what do you want to ask him, Mr. Amini?

14          MR. AMINI:  I'm solely focused on the performance

15  in 2014, Your Honor.

16          Let's go take a look at, if we can, Exhibit 55.

17          The expert report, which is Exhibit 60.

18  Specifically Exhibit 5.1 of Exhibit 60.

19          Exhibit 60 is the plaintiff's expert report.

20          That's it.

21  BY MR. AMINI:

22  Q    We have here your expert, Mr. Kilbourne, summarize your

23  numbers in Exhibit 5. -- his Exhibit 5.1, and I thought it

24  would be easier to read it this way.  If there's a problem,

25  I can take you directly to Exhibit 55, I believe, which is

 1   in evidence, that has the same numbers on it.  I just

 2   thought it might be easier to see the comparisons here.

 3        I'd like to go through your history with you,

 4   Mr. Lindley.  You started the business in 2003.  So that's

 5   the first year, correct?

 6   A    Yes.

 7   Q    And is this -- these are the numbers taken, if I'm not

 8   mistaken, directly from your -- for lack of a better --

 9   financial statements, your income statements.

10   A    Okay.

11   Q    Do you understand that?

12   A    Right.

13   Q    You had testified earlier, I believe, in terms of the

14   net on these numbers, that the license fee had been part of

15   the expenses.  Do you recall that?

16   A    That was my general understanding.

17   Q    All right.  And are you able to tell me where -- and I

18   can take you back.  Maybe it would be better if I take you

19   to the 2003 income statement, Exhibit 55.  Let's look at

20   that.

21   A    Patrick would have to answer that because I don't know

22   where he has it in this particular document.  I didn't

23   create this.

24   Q    Well, let's go to Exhibit 55 for a moment.  Let's do

25   that.

1          MR. AMINI:  You're going to have to scroll down

2    for him so he can see it.  You'll have to go slowly, John.

3          Go back up to the top.

4          THE COURT:  Mr. Amini, are we supposed to

5    understand when you're talking about scrolling?

6          MR. AMINI:  No, Your Honor, and I just realized

7    Exhibit 55 doesn't go back to 2003.  My error.

8          So let's go back to -- let's go back to 51-A.  I

9    don't have the financial statements going back to 2003.

10   BY MR. AMINI:

11   Q    In 51-A, you are unable to identify any of the minimums

12   you paid in '03, '04, '05; is that right?

13        Mr. Kilbourne would have to do that for me.

14   A    I'm not sure.  I'm not familiar with what his layout is

15   of the cost of goods.  He has a statement there.  It says

16   guaranteed royalty payments.  I'm not sure how that relates

17   to everything on this page.

18   Q    All right.

19        MR. AMINI:  Go with me to his net income, which is

20   on the second page.  Go to 51.

21        That's it.

22   BY MR. AMINI:

23   Q    That is Mr. Kilbourne's summary of your financial

24   statements.  Do you see it?

25   A    Yes.

1    Q    And does that comport generally -- I don't want to go

2    through and compare the two.  I've looked at them and I

3    think it's accurate.  Do those numbers comport with your

4    financial statements that you maintain?

5    A    I'm assuming they do.  You're asking me to check them

6    and I haven't checked it in the way you're asking me to do

7    it.  I will go along with your understanding the same.

8    Q    And as we have discussed in this case, the net income

9    you had, except perhaps in 2003, and all the other years on

10    your own financial statements, you had a loss for every year

11    except 2011?

12    A    Actually -- and he will get into this.  There's a

13    $40,000 LHF management fee that's baked into this.  If you

14    take out the 40,000, that LHF was never paid -- MFGPC, there

15    was no need for MFGPC to borrow money to pay me since LHF

16    was 100 percent the owner of MFGPC.  You would have to

17    extract $40,000, add 40,000 back to most of those lines to

18    get the true net income.

19    Q    And so if you take that $40,000 out, then you simply

20    get no pay whatsoever?

21    A    I didn't pay anyone.  That was a placeholder.  If an

22    investor came in, for all the start-up work that LHF

23    provided MFGPC as a management consultant, that we would go

24    ahead and delay payment on that.  If an investor came in and

25    they were willing to pay it, great.  If not, it's not the

1    end of the world.  It ultimately got rolled in.  It should

2    have been rolled in to pay it in capital.

3    Q    What you're saying is in some of these years, maybe

4    2004, 2008, years where you have less than a $40,000 loss,

5    if you take that 40,000 out, you might be able to show a

6    profit.

7    A    Clearly, if you look at 2004, 2008, 2010, 2011, 2012,

8    all would have showed net income.

9    Q    And in terms of labor cost, the labor costs at that

10   point would just simply be zero?

11   A    And that's the model.  That's exactly the model.

12   Q    So the business runs by itself at that point?

13   A    It runs on my willingness to not take a salary because

14   I have enough money behind me.  Otherwise why would I pay

15   the IRS W-2 wages on borrowed money?  It makes absolutely no

16   sense.

17   Q    And Mr. Kilbourne excludes from his analysis 2013 and

18   2014?

19   A    That's a question for him.

20   Q    Yes.  But you understood that, right?

21   A    Right.

22   Q    Let's look at 2013 and '14.

23        MR. AMINI:  You are going to have to pull up

24   Exhibit 55 to do that.

25        Go to 2013.  Now scroll down so we can see the

1    whole thing.

2    BY MR. AMINI:

3    Q    So 2013 actually says you had $375,000 -- $420,000 in

4    sales.  Do you see that?

5    A    This is for '13?

6    Q    Right.

7    A    I think the other income is tied to the insurance.

8    Q    Insurance from the loss of the --

9    A    Right.

10   Q    I noticed on the royalty report had shown sales of

11   382,550.  Do you have an understanding of what the

12   divergence is there?

13   A    I have no idea.  I mean you look at total costs of

14   goods at 382.  I don't know -- if you added in the 45, which

15   I think is the insurance settlement, versus 375, I don't

16   know what the difference is there.

17   Q    And your gross profit in this particular year, 2013,

18   was less than ten percent.  It was 38,580.

19   A    In the premium popcorn space where you're using

20   expensive tree nuts and real chocolate, in any given year

21   the commodity prices can run very wildly.  The cost can be

22   8.50 a pound in a horrible year.  It can be $4 a pound in a

23   better year.  Almonds can be at a buck fifty a pound.  It

24   could be at $4 a pound.  These things change frequently, but

25   what you don't get is forgiveness with the retail trade to

1    go in and say, hey, listen, my cost of goods just jumped up

2    20 percent this year, are you okay if we take a price

3    advance, because the answer is always no.  Eat it.

4        So you have to absorb it, which is why in certain years

5    you'll see at the gross profit line with cost of goods,

6    certain years where costing on a per pound basis is more

7    expensive than in other years due to commodity pricing on

8    chocolate, vanilla, sugar.  Corn syrup in one year went

9    nuts.  And then the tree nuts.

10       Aside from that, then you get a mix shift potentially.

11   If one customer buys a high volume of very expensive or high

12   revenue items in one year and the next year they don't come

13   back, but another customer picks up very low revenue of high

14   volume items, you can get a mix shift in the business as

15   well.

16   Q    On Exhibit 55, you have sales in 2014 of 207,443.  Do

17   you see that?

18   A    Yep.

19   Q    What's your explanation for the drop between '13 and

20   '14?

21   A    I scaled back.  I throttled my own company, because of

22   the financial hits we were taking in 2013, to make sure

23   things were stabilized again before I went to try and get

24   back to where we had been in the prior year.

25   Q    So what was it going to take to get back to where you

1    had been in the prior year?

2    A    Doing exactly what I just did.  Not risking a lot of

3    money and playing within my game based on where I was

4    financially at that time.

5         I know it's a different concept for what big business

6    lives by, but you can also look at Maxfield, gone.  Shadwell

7    Grove.  Hey, Shadwell Grove did $50 million of Mrs. Fields

8    cookies in year two, amazing, and were bankrupt two years

9    later because they ran out of money and there was no solve.

10   In fact, Mrs. Fields got burned for like $2 million in

11   royalties because they went BK.  That's what happened, and I

12   just refused to do it.

13   Q    In this particular year, your cost of goods sold

14   skyrocketed to the point where you're at ten percent.

15   A    Right.  Welcome to the popcorn world.  It can happen.

16        You look at that bottom line of net income of losing

17   22, take that by three -- multiply that times three.  If my

18   top line would have been 600, which is where I was pretty

19   much trending, my bottom line would have been $66,000 in the

20   hole.  I didn't need any more of that back then.  That's why

21   I throttled it back.

22        I was saving my business from default with my

23   co-packers and potentially forcing them into bankruptcy.  I

24   didn't have a requirement like the other licensees did.

25   Every year they had either a case, a revenue, or a minimum

1   royalty due every year.  Mine did not have that.  For this

2   reason, it's complicated.

3   Q    What's it going to take in this point in time, December

4   '14, before they terminated you, for you to throttle -- if

5   that's the right word -- this business back up?

6   A    I don't know, because 2015 was taken away from me when

7   I would have started producing or at least pitching again

8   the major retailers in January, February, and March for

9   October, November, December shipments, which is probably

10  where 70 percent of my business landed.  Like with

11  Mrs. Fields Gifts, 70 percent of their business happened in

12  eight weeks every year.

13  Q    But it's fair to state that you don't know what would

14  happen to your business in 2015?

15  A    Any more than it's fair to state that the sun is going

16  to rise tomorrow.  We don't know the future and the crystal

17  ball was pretty broken for even Mrs. Fields consistently.

18  Q    What were your business plans at the end of 2014 for

19  2015?

20          MR. ROTHSCHILD:  Your Honor, I'm just going to

21  object, asked and answered.  He's asked the question three

22  times now, what were you going to do, what were your

23  business plans.  We've already asked this.  He's not going

24  to get a different answer.

25          THE COURT:  What else do you need to ask him,

 1   Mr. Amini?

 2            MR. AMINI:  I'm not sure I need to ask him much

 3   more.  Let me look at my notes to make sure that I got all

 4   of the exhibits I need to get in, Your Honor.  But for the

 5   most part, I think I'm near the end of this.  I would like a

 6   break, though, again, just to check the exhibit list and

 7   make sure that we got in all the exhibits that we need to,

 8   given the procedure we are following.

 9            THE COURT:  Well, how long will that take you?  I

10   don't want to take a break when we're going as slow as it

11   is.

12            MR. AMINI:  Five or ten minutes.

13            THE COURT:  Can you do it while you're listening

14   to redirect?

15            MR. AMINI:  I could as long as Your Honor gives me

16   the leeway on the redirect.

17            THE COURT:  I will.  I will.

18            MR. AMINI:  Thank you, Your Honor.

19            THE COURT:  Mr. Rothschild, is there anything else

20   you want to ask him?

21            MR. ROTHSCHILD:  Yes, Your Honor.  I have some

22   redirect.

23            THE COURT:  It won't be too long, will it?

24            MR. ROTHSCHILD:  No.

25   //

```
 1                    REDIRECT EXAMINATION

 2   BY MR. ROTHSCHILD:

 3   Q    Mr. Lindley, I would like you to look again at the

 4   trademark license agreement.

 5            MR. ROTHSCHILD:  Mr. Kohan, can you un-share your

 6   screen?  Thank you.

 7   BY MR. ROTHSCHILD:

 8   Q    We're again looking at the trademark license agreement,

 9   and I would like to call your attention to Section 17 of the

10   trademark license agreement.  Mr. Amini asked you about

11   damages that you were claiming in this case and you

12   mentioned disposal of inventory, and I want you to talk

13   about -- what was your understanding of Section 17?  What

14   does that give you a right to do?

15            MR. AMINI:  Your Honor, can I raise an objection

16   here?

17            THE COURT:  Sure.

18            MR. AMINI:  I didn't ask him about inventory.  He

19   volunteered it.  But I didn't go down and ask him any

20   questions about that, how much inventory he lost or anything

21   of that sort, and was not on the original direct.

22            MR. ROTHSCHILD:  Your Honor, Mr. Amini asked what

23   are you claiming.  He responded the inventory I had to

24   dispose of.  So I'm asking him to clarify what that means.

25            THE COURT:  I'll let him do that.
```

1    BY MR. ROTHSCHILD:

2    Q    Mr. Lindley, again, with the question that was pending,

3    what, in your understanding, did Section 17 give you a right

4    to do?

5    A    Allows me to sell off any royalty bearing products in

6    inventory which had been packaged in packages bearing the

7    licensed names, et cetera, or Mrs. Fields could purchase

8    that fully allocated -- at LHF's fully allocated cost, any

9    packaging materials using the licensed names.  That would be

10   for a period of six months following notice of termination.

11   Q    Okay.  So I want you to keep that in mind for a second.

12        We had looked at Exhibit 12.  I'm going to share that

13   with you.  Exhibit 12 caught my eye in that this is

14   July 2015, seven months after termination, and you're

15   corresponding with Mrs. Fields, correct, in giving them

16   royalty reports and such, correct?

17   A    Correct.

18   Q    And there's a slightly reduced amount of inventory --

19   or of net amount owed because there's additional royalties

20   due.  Why do you have additional royalties due after

21   termination?

22   A    Because I sold off two orders of inventory to RVC,

23   which is Mrs. Fields' largest franchising group in Hong

24   Kong.  So I accounted for the royalties due on that as the

25   final true-up of where things were.

```
 1    Q    So what was Mrs. Fields' reaction to this?

 2    A    None.

 3    Q    Mrs. Fields didn't contact you or have any problem with

 4    you sharing -- selling off your inventory?

 5    A    They didn't contact me.  However, my attorney was

 6    noticed in a phone call by Mr. Samet in about --

 7              MR. AMINI:  Again, my objection, Your Honor.  He's

 8    now testifying to what Mr. Samet told his attorney.

 9    BY MR. ROTHSCHILD:

10    Q    What is your understanding of Mrs. Fields' position on

11    you being able to sell your remaining inventory?

12              MR. AMINI:  Again, my objection, Your Honor.

13              THE COURT:  He can answer as to his understanding.

14              THE WITNESS:  My understanding was it was not

15    allowed.

16    BY MR. ROTHSCHILD:

17    Q    As a result, did you have to dispose of inventory and

18    packaging because you couldn't sell in accordance with

19    Section 17 of the agreement?

20    A    Yes.

21    Q    How much packaging and inventory did you have to

22    dispose of?

23    A    If it's related only to the six-month period that I

24    couldn't sell, it's a little hard to project because I ended

25    up dumping $106,000 worth of inventory.
```

1    Q    And packaging?

2    A    Right.

3    Q    That's all included?

4    A    Right.  So it's difficult to say I could have sold all

5    of that in that six-month period of time because I had such

6    short notice.  But the reality is I was not planning on

7    trying to sell off everything.  Instead, I was planning on

8    trying to save the license during that first three-month

9    period of time, until Mrs. Fields decided to sue me.

10   Q    But to be clear, you were in the process of making

11   actual sales when you got threatened by Mrs. Fields?

12   A    Correct.

13   Q    We spent a lot of time on Exhibit 49, the presentation

14   that was put together by Cameron Broadbent.  Do you recall

15   that?

16   A    Yes.

17   Q    Did any of that go anywhere?

18   A    No.

19   Q    And, again, tell me what the purpose is of -- what was

20   Cameron pitching?

21   A    Cameron was pitching, first for himself, an opportunity

22   to gain consulting income between Mrs. Fields and MFGPC as a

23   connector and an opportunity to go out and begin selling to

24   other customers, which actually he did some of that for me

25   in 2014.

1   Q    But the presentation was essentially pitching

2   Mrs. Fields to job share or pay part of his income?

3   A    It was to job share, but it was also to reinvest

4   royalties due into paying Cameron to participate in selling

5   Mrs. Fields' products.

6   Q    There was some confusion about dates regarding when you

7   went to Farm Stand Fresh.  I understand that you took a

8   position at Farm Stand Fresh in 2014.  That's correct?

9   A    I founded the company, and when you found a company in

10  California, somebody has to be the president and CEO, and

11  that was me.

12  Q    Were you full-time at MFGPC throughout 2014?

13  A    Yes.

14  Q    You said in response to a question from Mr. Amini that

15  you owed Mrs. Fields royalties and that Mrs. Fields didn't

16  owe you any money, but were you during that time period also

17  selling popcorn to Mrs. Fields, for which they had to pay

18  you?

19  A    If you can give me a date range, I can better answer

20  that.

21  Q    I was a little confused as to Mr. Amini's question

22  there.  I believe we've made the observation with the Court

23  that I think -- we've already decided this on summary

24  judgment, we know where it ended, so I'm not going to dive

25  into that, but I just want you to confirm with me that there

```
 1   was an ongoing trade back and forth, royalties, invoices,
 2   generally throughout each quarter given that Mrs. Fields was
 3   your largest customer.
 4   A    Yes.
 5           MR. ROTHSCHILD:  I have nothing further on
 6   redirect, Your Honor.
 7           THE COURT:  Thank you.
 8           Mr. Amini.
 9                        RECROSS-EXAMINATION
10   BY MR. AMINI:
11   Q    I want to go back to the inventory.  I asked you in the
12   deposition for the documentation relative to your inventory
13   status.
14           THE COURT:  I can't hear you.
15   BY MR. AMINI:
16   Q    I asked you at your deposition to produce the
17   documentation relevant to those inventory sales that you
18   were just testifying to earlier, did I not?
19           MR. ROTHSCHILD:  Your Honor, scope.
20           THE COURT:  What did you say, Mr. Rothschild?
21           MR. ROTHSCHILD:  Your Honor, his recross, which
22   I'm not sure why he gets, has to be within the scope of my
23   redirect, and he's asking about something that I didn't ask
24   about on my redirect.
25           THE COURT:  I don't think he did, did he?
```

```
 1              MR. AMINI:  The inventory that he says he had to
 2   sell off on his redirect at the beginning.  I'm asking --
 3              MR. ROTHSCHILD:  I did not understand your
 4   question.
 5   BY MR. AMINI:
 6   Q    I had asked him in his deposition, did I not, for any
 7   documentation relevant to that?  Did I not ask you for that?
 8   A    I believe you did.
 9   Q    And you didn't produce anything, did you?
10   A    I don't know if it ever got to you.
11              THE COURT:  Mr. Amini, anything else?
12              MR. AMINI:  No.  I have some declarations that he
13   gave in to the court that I would want to make sure got in.
14   If he filed them with the court, Your Honor, I would think
15   I'm free to use them post-trial.  If not, then I will take
16   him through them and just have him identify his
17   declarations.
18              THE COURT:  I didn't hear what you said, the last
19   several words.
20              MR. AMINI:  I'm sorry, Your Honor.  He submitted a
21   number of declarations in this case to the Court that I
22   would like to be able to refer to in post-trial submissions,
23   and so I'm asking the Court do I need to ask him now to
24   identify them and put them in as exhibits formally, or since
25   they're on file in the ECF system as his declarations, can I
```

 1    rely on that.

 2              THE COURT:  He signed them, right?

 3              MR. AMINI:  Yes, he did.

 4              THE COURT:  Under oath.

 5              MR. AMINI:  Yes, he did.

 6              THE COURT:  You can use them.

 7              MR. AMINI:  Okay.  Then I won't need to mark them.

 8              MR. ROTHSCHILD:  Your Honor, we would object to

 9    marking them as any kind of exhibit.  He's free to use them,

10    but for them to be in front of the Court, Your Honor, he

11    needs to question the witness about them, and he's welcome

12    to use them under the rules of evidence for impeachment.

13    They are not just open exhibits to be submitted to the

14    Court.

15              THE COURT:  Doesn't the Court already have them in

16    prior submissions?

17              MR. ROTHSCHILD:  You can look at them in -- you

18    have a live witness, and that is how testimony comes in from

19    a witness.  If he contradicts something in a prior

20    declaration, you can ask about it.  You can't just wholesale

21    admit a hearsay declaration in a subsequent proceeding.

22              THE COURT:  A hearsay declaration that he signed

23    under oath?

24              MR. ROTHSCHILD:  It is perfectly valid for the

25    purpose of impeachment, Your Honor, but I don't see any

1    basis to admit it.  If he has a question and he wants to

2    impeach him using those, that's fine.

3                THE COURT:  Mr. Amini.

4                MR. AMINI:  Your Honor, he signed declarations and

5    he gave them to the Court.  I think I can use them for any

6    purpose.  I'm happy to sit here and walk him through two or

7    three declarations with him now, but I think I can use them

8    for any purpose.  They are a statement of the party.  He's

9    the CEO and executive of the only party in this case -- an

10   individual of that party.

11               MR. ROTHSCHILD:  Can you identify an 804

12   exception?

13               MR. AMINI:  It's the witness's own statement.

14               MR. ROTHSCHILD:  That's called hearsay.

15               MR. AMINI:  I don't think so.

16               THE COURT:  I'll take that under advisement.

17               MR. ROTHSCHILD:  Thank you, Your Honor.

18               THE COURT:  What post-trial submissions do you

19   have in mind, Mr. Amini?

20               MR. AMINI:  I know we're going to give you

21   conclusions of law and findings of fact today, but I assume

22   after all of the witnesses, then Your Honor will probably

23   give us an opportunity to supplement it, especially given

24   the testimony.

25               THE COURT:  Well, you can supplement with those if

1    you decide to, and then I will decide whether to use them or

2    not.

3                   You may call your next witness, Mr. Rothschild.

4                   MR. ROTHSCHILD:  Thank you, Your Honor.  I'd like

5    to call Betsy Schmandt, please.

6                   THE COURT:  I'll ask the clerk to swear the

7    witness, please.

8                              BETSY SCHMANDT,

9                   Having been duly sworn, was examined

10                        and testified as follows:

11                  THE COURT:  You may proceed.

12                          DIRECT EXAMINATION

13   BY MR. ROTHSCHILD:

14   Q    Ms. Schmandt, thank you for being here today.

15        Can you tell me your basic educational background for

16   the Court's benefit, please.

17   A    Sure.  I have a bachelor of arts from Indiana {sic}

18   University in communications, and a master of business

19   administration from New York University.

20   Q    And what is your position with Mrs. Fields?

21   A    My current position is president of Franchising for

22   Mrs. Fields and TCBY.

23   Q    And how long have you been employed by Mrs. Fields?

24   A    Since February of 2016.

25   Q    And I understand you were designated by Mrs. Fields

1    during discovery as their 30(b)(6) witness.  Is that

2    accurate?

3    A    That's correct.

4    Q    I'm going to refer to Mrs. Fields -- I know there are

5    two parties to this -- two Mrs. Fields entities, but unless

6    there's a distinction, I'm going to refer to them as

7    Mrs. Fields.  Do you understand that?

8    A    Yes.

9    Q    Prior to your current position as director of

10   Franchising, where did you start at Mrs. Fields?

11   A    My first position was as senior manager of licensing

12   and innovation.  I was then promoted to director of

13   licensing and innovation.  And then senior director of

14   franchise marketing and innovation.  And then in January,

15   president of Franchising.

16   Q    And in your positions, it's apparent by those titles

17   that you had a lot to do with licensing.  Is that accurate?

18   A    That's correct.

19   Q    And so you managed Mrs. Fields licensees in some

20   capacity?

21   A    That's correct.

22   Q    What does that entail for Mrs. Fields, managing its

23   licensees?

24   A    Sure.  So initially, of course, it means managing the

25   roster of franchisees that we were under contract with.

1    That could mean working with new product, packaging,

2    ensuring royalty reports were submitted, payments were made,

3    reviewing marketing.  Anything to do with managing the

4    existing business.

5         It also entails developing strategies for potentially

6    new categories of business, identifying additional

7    licensees, doing any of the negotiations for those

8    contracts, and bringing those to market.

9    Q    So, again, tell me the date that you started with

10   Mrs. Fields.

11   A    February of 2016.

12   Q    So a year, a little more than, before MFGPC was

13   terminated by Mrs. Fields -- I'm sorry.  A year after the

14   termination, right?

15   A    That's correct.

16   Q    So you have no personal knowledge of MFGPC as a

17   franchise -- as a licensee.  Is that accurate?

18   A    That is correct.

19   Q    Being in trademark licensing and franchising, you have

20   some familiarity with the Mrs. Fields brand, don't you?

21   A    Yes, I do.

22   Q    What does the Mrs. Fields brand stand for?

23   A    So the Mrs. Fields brand is considered a premium baked

24   good company.  Probably most people think about us first as

25   a cookie company, a cookie brand.  We have a pretty

```
 1   extensive gifting business that is sold primarily through
 2   e-commerce.  We also have --
 3   Q    I don't mean to cut you off, but my question is a
 4   little narrower, which is what does Mrs. Fields as a brand
 5   stand for.  What does it mean to the consumer.
 6   A    It's a premium, fresh-from-the-oven cookie.
 7   Q    Okay.  But does that include other products as well,
 8   that you have some sort of cachet by adding the
 9   Mrs. Fields brand?
10   A    Yes.  We do offer brownies, and cookie cakes, and a
11   number of other confection items added to our offering.
12   Q    Does it have the Mrs. Fields name?  Does it have high
13   recognition in North America?
14   A    It does.  It tends to be one of the leading brands in
15   cookies and other baked goods.
16   Q    Do you have an idea of what percentage recognition it
17   has among the general public?
18   A    Sure.  It's approximately an 80 percent brand
19   awareness.
20   Q    Has that gone up or down, do you have any idea?
21   A    The last time we measured, it was 2013, I believe, so I
22   don't have any recent research to say it's gone up or down.
23   Q    And do you understand whether it's high positivity?
24   A    I would assume so.  Again, I haven't reviewed the
25   research to give you a number of how to measure positivity,
```

1   but I think, in general, it is considered with high regard.

2   Q    Okay.  Does having the name associated with your

3   product assist the licensees in unlocking retailer channels?

4   A    We believe so.

5   Q    Isn't, in fact, that one of the ways that you pitch

6   licensees on paying for licenses?

7   A    I don't know about specifically that's what we pitch

8   them, but certainly we do rely on the high brand awareness

9   and the premium nature of the brand, that it does assist

10  licensees in getting placement and interest from retailers

11  as well as consumers.

12  Q    So not just the retailer side, but the consumer side.

13  You're telling me that the consumers have high awareness and

14  they expect something from the brand, and so therefore you

15  can get your licensees to pay you for the license, right?

16  A    That's correct.

17  Q    So when Mrs. Fields and the licensee agree on a value,

18  the amount that Mrs. Fields -- that the licensee has to pay

19  in order to get the right to use the license, is that

20  Mrs. Fields and that party agreeing on a transaction in an

21  arm's-length way the value of that license?

22  A    I guess in a manner of speaking it is, does have the

23  value of the license.  The way we think about it is, you

24  know, the licensee has an opportunity to use our brand to

25  sell products.  They tend to come to us and say we think we

1    can sell this much in the marketplace.  And they obviously,

2    through this agreement, are paying us royalties rate for

3    putting our name on it.

4    Q    In your time at Mrs. Fields, how many CEOs have there

5    been?  2016 to 2021, five years.

6    A    Sure.  We've had two full-time CEOs.  Three, I guess,

7    full-time in about two interims.  So about five CEOs.

8    Q    About five.

9            MR. ROTHSCHILD:  I'm pulling up Exhibit 19, which

10   has been previously stipulated to.  I would like to have

11   this admitted.

12           THE COURT:  Nineteen is received.

13           (Exhibit 19 was received into evidence.)

14   BY MR. ROTHSCHILD:

15   Q    Do you recognize this document?

16   A    I do.  It's the license agreement between Mrs. Fields

17   Famous Brands and Perfect Snax brand.

18   Q    Broadly speaking, what is the license for?

19   A    The license is for co-branded popcorn for distribution

20   in mass channels primarily, although I can't remember all of

21   the channels.  There's a number of distribution channels

22   for, I think, about three years' time.

23   Q    So let's break that all apart.  A license for the use

24   of what brand name?

25   A    Mrs. Fields.

1    Q    So is that the same as the license for MFGPC in terms

2    of the mark?

3    A    Yes.

4    Q    So exactly the same trademark, no difference?

5    A    I believe so.

6         Mrs. Fields was what you called out on the LHF

7    agreement?

8    Q    Yes.

9    A    Mrs. Fields is the brand here.

10   Q    Okay.  And I'm just scrolling through the agreement.  I

11   want to hit one more provision of it first.

12        6.3, do you see this here?

13   A    Yes.

14   Q    What's the royalty rate for the royalty bearing

15   products in this agreement?

16   A    It's five percent of net sales.

17   Q    Is that the same as the agreement with MFGPC?

18   A    I believe so.

19   Q    So, again, five percent.  So thus far it's a comparable

20   agreement.

21        Do you know what the term of this particular agreement

22   is?

23   A    From execution through what should have been the end of

24   2020.

25   Q    Do you know how many years that was?

1    A    Approximately three, '18, '19, and '20.

2    Q    So a little bit shorter than the remaining term on

3    MFGPC's agreement?

4    A    Correct.

5    Q    Okay.  You said royalty bearing products.

6         Oh, here we have the license names and mark,

7    Mrs. Fields, same thing, right?

8         Royalty bearing products.  You said Cookie Pop,

9    co-branded.  This?

10   A    That is correct.

11   Q    And these two products?

12   A    That's right.

13   Q    So PSP is the licensee in this case.  Could they go and

14   just make another popcorn and put Mrs. Fields on it?

15   A    You mean without the Cookie Pop name?

16   Q    Yeah.

17   A    No.  It had to be co-branded with Cookie Pop.

18   Q    And it was this specific product only, right?

19   A    Those two flavors are the same product essentially,

20   were the only products that were produced.

21              MR. ROTHSCHILD:  Sorry.  I didn't really hold this

22   up well enough for the Court because I was sharing.  But

23   this product here.

24              So let me ask and maybe I'll share --

25              THE COURT:  I thought maybe you were hiding it and

```
 1    eating some of it, but go ahead.

 2              MR. ROTHSCHILD:  Not that product, Your Honor.

 3              I'm going to share this.  This product right here,

 4    for everybody's benefit.  (Indicating)

 5    BY MR. ROTHSCHILD:

 6    Q    I want to share the other one too and just ask a few

 7    questions about this.

 8         Before I do that, just to be clear, Cookie Pop, PSP

 9    couldn't go and make this product and sell it to Costco,

10    right?

11    A    There was no stipulation on the type of packaging that

12    they used or the flavors of product that they created.  The

13    only stipulation was that it had to be co-branded, it had to

14    be ready-to-eat popcorn, and it had to be sold within the

15    designated channels that we had agreed to.

16         So they could have gone to Costco, and they went to a

17    bunch of mass retailers.  It just so happened the first

18    offering was in that flow rack bag that you showed earlier.

19    Q    But let me just be clear about this.  You said it had

20    to be co-branded.  You used that several times.  What does

21    that mean?

22    A    That means it had to have the Cookie Pop name on it in

23    addition to the Mrs. Fields brand name.

24    Q    So Mrs. Fields is a sub-brand?

25    A    Well, I mean sub-brand tends to imply something like if
```

1    it was Mrs. Fields Gourmet Cookies, or Gourmet Popcorn, or

2    if you had a fancier name for it, indulgence perhaps, that I

3    would consider a sub-brand.  These are more equally weighted

4    brands.  They're not intended to be linked in any sort of

5    ownership way aside from them posting on this package.

6    Q    But just to be clear, the PSP agreement had one

7    specific product on it whereas the MFGPC agreement was all

8    popcorn.  Is that fair or not?

9    A    I think if you look back at their exhibit of what their

10   royalty bearing products were, they are very similarly

11   written.

12   Q    They are.  Let's look.

13        This is the Exhibit B, which contains the definition of

14   royalty bearing products.  Does that look like all popcorn

15   to you?

16   A    It looks like ready-to-eat popcorn.

17   Q    So you're excluding the Cookie Pop, hyphen, Mrs. Fields

18   co-branded ready-to-eat popcorn as approved by licensor?

19   A    That is correct.  That's what it says.

20   Q    So you think this is unrestricted.  They can make

21   anything they want with this?

22   A    What I'm asserting is that I think the LHF is written

23   very similarly to this.  It's not co-branded, but it's

24   ready-to-eat popcorn.

25   Q    You think that's ready-to-eat popcorn.  Take a look at

1    that agreement, then.

2         Go back to Exhibit 4 -- or 3, the trademark license

3    agreement with MFGPC.  Take a look.  Is this limited to

4    ready-to-eat popcorn on the MFGPC side?

5    A    It says prepackaged popcorn.  I guess I read that the

6    same way as ready-to-eat.

7    Q    Microwaveable popcorn.  Is microwaveable ready-to-eat?

8    A    No, it is not ready-to-eat.

9    Q    But it's prepackaged, right?

10   A    I guess so, yeah.

11   Q    I mean other than throwing popcorn at people, can you

12   think of any popcorn product that is not prepackaged?

13   A    In fact, I can.  I believe Garricks, through their

14   retail, does something that is not prepackaged.  You can

15   walk up and get scoops of popcorn.

16   Q    That was certainly pre-pandemic.  Okay.

17        Let me ask a few more questions about this --

18             THE COURT:  Mr. Rothschild, what difference does

19   this other licensing agreement make to this case?

20             MR. ROTHSCHILD:  Well, I'm glad you asked,

21   Your Honor.  In this case, the Court decided that there were

22   potentially three relevant measures of damages, or at least

23   discoverable information that the Court said was, quote,

24   highly relevant.  The first was the innate characteristics

25   and money that the MFGPC agreement had in it, what was that

1    worth.  Two, any subsequent license agreements that would

2    have infringed on MFGPC.  That's this.  This agreement would

3    have violated MFGPC's exclusivity because it is a

4    Mrs. Fields branded popcorn.

5              So our expert uses this agreement as a proxy

6    measure.  And so in order to understand how good a proxy

7    this is, I'm comparing the two agreements.  And at the end

8    of the day the expert will explain why this agreement and

9    the value the parties placed on it is a useful proxy to

10    compare the value of the agreement that Mrs. Fields

11    breached.

12              THE COURT:  Thank you.

13    BY MR. ROTHSCHILD:

14    Q    So let me just compare a few other terms here of this

15    particular agreement.  In the grant of the license here --

16    I'm going to show it to you.  Again, we're on Exhibit 19.

17    The grant of the license here is, as we've discussed, for

18    the royalty bearing products, which is Cookie Pop.  Is this

19    an exclusive license for any product?

20    A    Yes.  It was written as an exclusive for the particular

21    royalty bearing products, the distribution channels within

22    the territory.

23    Q    So Mrs. Fields couldn't make Cookie Pop branded

24    popcorn, right?

25    A    That's correct.

1    Q    But Mrs. Fields could make all the Mrs. Fields branded

2    popcorn it wanted, right?

3    A    Correct.

4    Q    In fact, it did; is that correct?

5    A    Well, we did for a certain amount of time.  I think it

6    was through 2016 I want to say, and then we sourced it from

7    other places.

8    Q    But either way, you either bought or manufactured, one

9    way or the other, and Cookie Pop didn't have any exclusive

10   rights to do that for you?

11   A    That's correct.

12   Q    In contrast to MFGPC's agreement, right?

13   A    Correct.

14   Q    So is it better or worse for the licensees than PSP's

15   agreement?

16   A    It was more restrictive.

17   Q    I want to call your attention to a few other things.

18   Take a look at the guaranteed royalties here.  And correct

19   me if I'm wrong, but there's three sales here in 6.2,

20   correct?

21   A    That's correct.

22   Q    And all years have a minimum running royalty, correct?

23   A    Correct.

24   Q    So at no time could -- if Cookie Pop experienced a

25   hiccup, or wanted to slow down, or had some other priority,

1   or anything else, it didn't have a choice, it had to meet

2   those guaranteed minimums, correct?

3   A    That's correct.  I do believe that is similar to the

4   first five years of the MFGPC agreement.

5   Q    Let's actually ask about that.

6        So at the end of the three years of this agreement,

7   would this agreement automatically renew?

8   A    No, it would not automatically renew.

9        If you'll allow me, the expectation was that if it was

10  a successful business and both parties wanted to move

11  forward, we would negotiate all the terms actually for any

12  renewal.  It isn't to say that it would expire and go away

13  if it was -- you know, if there was a reason to continue,

14  both parties would have to agree and reset those numbers at

15  that time.

16  Q    Sure.  If Mrs. Fields, however, decided that it liked

17  making this particular product itself or had a better

18  licensee partner, it could just go with someone else or make

19  it itself, though, right?

20  A    That's true.

21  Q    So Cookie Pop could just develop this business into a

22  multimillion dollar business and Mrs. Fields could just run

23  away with it at the end of the three years if it wanted to?

24  A    It would be difficult, to use your term, to run away

25  with it, if they had felt it at that point, particularly

1    given it was a co-branded product line.  We didn't have the

2    rights to use their line.  So it would have to be different

3    in at least that respect.

4    Q    I'm going to take a look here at the termination

5    provisions.  You are familiar with the termination rights

6    under this agreement?

7    A    Yes.

8    Q    Did Mrs. Fields terminate PSP's rights under this

9    agreement before the end of the term?

10   A    No.  We did not officially terminate this agreement.

11        It is defunct, however.  Neither party is pursuing this

12   agreement any longer.

13   Q    One more question about that agreement.  I'm happy to

14   put it back up if you want, but was there a change of

15   control provision?

16   A    If you would kindly put that back up.  I believe that

17   there is one.

18   Q    Get you to the right spot.

19        There's a definition of change of control, and we want

20   to find out -- I need to pull up my -- 21.2 apparently has

21   that provision.

22        The 21.2 contains restrictions on assignment of the

23   agreement.  So Cookie Pop couldn't assign the agreement to

24   another party?

25   A    They could if they had licensor's prior written

1    consent.

2    Q    But they couldn't force Mrs. Fields to accept another

3    licensee.

4    A    They couldn't force us, no.  We had to agree to that in

5    writing.

6    Q    Given the change in control provision -- which I can

7    scroll you back up to the definition -- was any change in

8    equity of 20 percent or more, right?

9    A    Licensor I believe it specifically said.

10   Q    You're telling me it was licensor?

11   A    It does appear that that's the way it's written.

12   Q    That's got to be a language error.

13        But my request, then, is your understanding of whether

14   the licensee could take on -- you know, just sell its whole

15   company and continue to hold this license without

16   Mrs. Fields' permission, void the license?

17   A    They would need to have our approval for that.

18   Q    So unlike MFGPC's agreement, it couldn't take this and

19   take on a large equity investment, or something else, in

20   order to scale?

21   A    They could if we agreed to it.

22   Q    Sure.  So was PSP a good licensing partner?

23   A    Well, they were able to very quickly develop product,

24   you know, under the co-branded arrangement that we had and

25   get into market.  I believe we signed the agreement in

1    September of 2017, and by February we were in market.  And

2    so in that regard, they were a good licensee.

3    Q    Okay.  I want to ask you about your definition of a

4    good licensee here given some of the history.  I'm looking

5    at Exhibit 20.

6           MR. ROTHSCHILD:  This is a stipulated exhibit.

7    I'd like to move for its admission, Your Honor.

8           THE COURT:  Twenty is received.

9           (Exhibit 20 was received into evidence.)

10   BY MR. ROTHSCHILD:

11   Q    So I have here an e-mail from you.  Do you recognize

12   this?

13   A    I do.

14   Q    So starting at the bottom, you're asking Frank -- who's

15   Frank?

16   A    Frank was the CEO of Perfect Snax Prime at the time.

17   Q    Okay.  So you're reminding Frank of what?

18   A    That he needs to fill out a royalty report and submit

19   that by 30 days after the end of the quarter.

20   Q    And based on the date of this --

21   A    Based on the date --

22   Q    -- is it on time or is it already late?

23   A    Let's see.  Thirty days after the end of the quarter Q3

24   would have ended -- July, August, September.  So it was due

25   October 30th, and so at this point he's 13 days late

1    approximately.

2    Q    Is that a condition of default under the agreement?

3    A    I believe it is, a late royalty payment.

4    Q    You remind him again in an e-mail November 15th.  Still

5    no response?

6    A    Correct.

7    Q    Then you forwarded this to -- who's Jaimee Patterson?

8    A    Jaimee Patterson was our controller at that time.

9    Q    Okay.  And then I see this e-mail at the top from Josh

10   Kirschbaum.  Who's he?

11   A    Josh Kirschbaum, as you can see, was an operating

12   partner at Z Capital Partners, or ownership group, and our

13   interim CEO in this time period.

14   Q    So what was the purpose of Josh?

15   A    About this time, we were transitioning CEOs at this

16   time.  So around that time Josh transitioned into that role.

17   Q    Was Josh a big food business guy?

18   A    No, I don't believe so.  I think he -- operations duty

19   business and supply chain background.

20   Q    Okay.  So you have some more internal chatter here from

21   Josh to you and Dustin and others.  What's being asked here?

22   A    So I think at this time period, honestly he's about two

23   weeks late on a payment.  We had already, frankly, put him

24   in default for not paying back in July.  Our expectation was

25   that he needed to be in compliance with this agreement.  At

```
 1   this time period he wasn't, obviously.  Josh is trying to
 2   get up to speed on the background here and, you know, what
 3   exactly is he in default of at this time period, payment or
 4   reporting, or both.
 5   Q    I want to look at one last little thing on there.
 6   There was a word there that I was curious about.  Again, the
 7   top e-mail, the final e-mail here is from you.  And you say
 8   here, we had a default letter 7-3-18, then termination,
 9   which was then cured and reinstated.  So do you want to
10   change your testimony where you said that they were never
11   terminated?
12   A    Well, the current agreement was reinstated.  They had
13   been terminated, you're absolutely right, and we reinstated
14   that.  As of today, I don't think there was a final
15   termination letter.
16   Q    Let me see if I can't find that for you.
17        I'm looking at Exhibit 21.
18        MR. ROTHSCHILD:  I'd like to move again for this
19   one's admission given that it is stipulated.
20        THE COURT:  Twenty-one is received.
21        (Exhibit 21 was received into evidence.)
22   BY MR. ROTHSCHILD:
23   Q    Do you recall this letter?
24   A    I do.
25   Q    What is this letter about?
```

1   A    So this letter dated July 3rd from outside counsel

2   basically is enumerating a number of defaults under the

3   agreement and requesting that they become current within the

4   time period, which I think was very short, five days

5   perhaps.  And they were required to pay the advance along

6   with a number of other things to become compliant with the

7   agreement.

8   Q    Okay.  So I see an enumeration of six defaults or

9   breaches of the agreement here.  Again, I'm a little

10  quizzical as to your characterization of PSP as a good

11  licensee.  Do you still stand by that?

12  A    If you'll recall, Mr. Rothschild, I said that there was

13  merit to this license in that they very quickly got us on

14  the shelf within, I think, six months of the agreement.  We

15  didn't get to this part of it.  Certainly it was not a

16  perfect relationship, a perfect licensee.

17  Q    In fact, you terminated this licensee shortly

18  thereafter, correct, because they never paid their initial

19  licensing fee under the agreement?

20  A    In fact, they did pay their advance.  So I believe what

21  happened was in July, they were issued this default letter.

22  They didn't pay it within a month.  We did terminate them at

23  that point in early August.  By the end of August, they paid

24  and we reinstated the license.  There were some stipulations

25  to that, requiring no more cures and some other items.

1   Q    Okay.  So I'm looking at Exhibit 22.  I'd like to have

2   this admitted and I'll ask you a question or two.

3              THE COURT:  Twenty-two is received.

4              (Exhibit 22 was received into evidence.)

5              MR. ROTHSCHILD:  Thank you.

6   BY MR. ROTHSCHILD:

7   Q    Again, this is the termination.  So at this point tell

8   me what happened.  PSP has defaulted, correct?

9   A    That's correct.

10  Q    And you were exercising your rights to terminate them,

11  correct?

12  A    That is correct.

13  Q    And then you're saying shortly thereafter Mrs. Fields

14  reinstated PSP as a licensee?

15  A    That's correct.

16  Q    So would you suggest that PSP's sales -- because you

17  were telling me that they got on the shelf quickly -- are a

18  good indication of the opportunity, the value of the popcorn

19  licensing opportunity?

20  A    Well, I guess that's difficult to really gauge because

21  they weren't on shelf for much longer, honestly, because of

22  the litigation we're here today to discuss.  So from

23  February of -- I guess it was 2018 when they were on shelf,

24  to the end of that year, the first year they were on shelf,

25  they sold about $500,000 worth of product.

1          This litigation picked up again, and I think by the end

2     of first quarter of 2019 -- I don't know, we made about five

3     grand off of that.  I think it was maybe 25,000 in sales

4     that they did -- or maybe 100,000.  Excuse me.  I think in

5     total they sold $600,000 in wholesale sales.  And then it

6     was cut short.  So they had just over a year in market.

7     Q    But my question is do you think that PSP had an

8     uninterrupted opportunity to exploit the popcorn license?

9     A    I'd have to disagree with that.  It was absolutely

10    interrupted because of this.

11    Q    So the litigation, in your mind, is the reason that PSP

12    failed to perform well on the second part of its license?

13    A    Correct.

14    Q    So if my expert were, for instance, to say -- hold up

15    PSP sales and say I think that we could have done exactly as

16    much as PSP, or more, or less, do you think that would be a

17    pretty useless comparison because the litigation was

18    interrupting it, right?

19              MR. AMINI:  Objection, Your Honor, foundation.

20              THE COURT:  I'll let her answer, if she is able

21    to.

22              THE WITNESS:  So you're asking do I think that

23    it's a good proxy for what MFGPC could have done?

24    BY MR. ROTHSCHILD:

25    Q    Sure.  Is it a useful proxy.

1  A    Is it a useful proxy.  I think it is a proxy.  I think

2  two different companies can always have two very different

3  results in the market given on how they're staffed, how they

4  market, how they price.  I mean there's a lot of factors to

5  really take into account.

6  Q    Yeah.  But I'm specifically pointing out the fact that

7  your testimony was that the litigation is what caused PSP to

8  drop out of this arrangement, right?

9  A    That's correct.

10 Q    So given that PSP -- PSP's sales just went straight

11 down, right, after this litigation ramped up?  Isn't that

12 accurate?

13 A    It dropped off a cliff, yes.  There was a court order

14 to stop selling.  So there was a restraining order just for

15 them to stop producing, and at one point they thought they

16 were going to have to pull everything off the shelves.  So

17 yes, this litigation put a full stop to that agreement.

18 Q    So, in other words, you know, starting when they became

19 part of the litigation, the rest of those numbers would be

20 pretty useful in terms of the market value of that

21 opportunity.  Is that accurate?

22         MR. AMINI:  Objection.

23         THE COURT:  I'll let her answer, if she's able to.

24         THE WITNESS:  Yeah.  I mean it's difficult to say.

25 Certainly they weren't living up to the numbers that they

1    had promised from a run rate.  However, it's hard to say,

2    you know, after first quarter what would have happened

3    towards the end of the second year of that term.

4                MR. ROTHSCHILD:  Okay.

5    BY MR. ROTHSCHILD:

6    Q    How much was the popcorn category growing from 2012 to

7    2015.

8         I'm sorry.  Let me give those dates again.  From 2015

9    forward.

10                MR. AMINI:  Objection.  I don't know what he means

11    by a popcorn category.

12                THE COURT:  Pardon me?

13                MR. AMINI:  I don't know what he means by a

14    popcorn category.

15                THE COURT:  What do you mean by a popcorn

16    category?

17                MR. ROTHSCHILD:  The witness doesn't understand

18    that.

19    BY MR. ROTHSCHILD:

20    Q    Repackaged popcorn is a category.  Do you understand

21    what I mean when I say that?

22    A    I think you're talking about the ready-to-eat, although

23    you could also be including microwave popcorn as well in the

24    broader definition of that.

25         I don't know offhand.  I'm sorry.  I believe that

1    research was done when we were contemplating the PSP

2    agreement that would have those numbers based on third

3    party.  We didn't measure it internally.  We didn't have

4    access to that information ourselves.

5    Q    But you say when research was done, do you recall

6    having been a part of having done research to determine

7    whether that category was valuable and increasing?

8    A    I believe PSP provided some numbers.  I believe I also

9    did some Internet searching on the size of the business and

10   the growth rate at that time.

11   Q    Do you recall what the results of that research were?

12   A    I don't.  I'm sorry.

13   Q    Let me refresh your recollection.

14        Do you recognize this document?

15   A    I do.  This looks like a document that I created, and

16   the timing I don't remember exactly, but it was most likely

17   prepared for our CEO at the time to get him up to speed

18   on -- the category and this potential licensee.

19   Q    In here you're talking about this potential licensee,

20   Perfect Snax Prime?

21   A    Correct.

22   Q    And you want to talk about capturing this category, and

23   here's some information.  It looks like a draft because

24   there are numbers to be filled in.  But this is what was

25   provided to us.

```
 1   A     Yes.
 2           MR. AMINI:  What exhibit is this, Brian?
 3           MR. ROTHSCHILD:  This is not an exhibit.  This is
 4   my rebuttal of Betsy not knowing anything about this
 5   category growth.
 6           It's your Exhibit 38 from the TRO hearing.
 7           THE COURT:  He's trying to refresh her
 8   recollection about something that she apparently at least
 9   participated in.  Is that right?
10           MR. ROTHSCHILD:  Yes.
11           THE WITNESS:  I'm sorry.  Do you want me to jump
12   in?
13   BY MR. ROTHSCHILD:
14   Q     No.  I just want to make sure we're okay to proceed.  I
15   will seek to admit this in a moment after you have
16   authenticated it.
17         But you testified just a second ago that you prepared
18   this document?
19   A     That's correct.
20   Q     And you prepared this document in the ordinary course
21   of your job for the purpose of presenting to the CEO?
22   A     That's correct.
23           MR. ROTHSCHILD:  Your Honor, this was produced to
24   us, and just authenticated by Ms. Schmandt.  I'd move to
25   admit it, and we would assign it Exhibit AA.
```

```
 1              THE COURT:  I don't see any reason not to admit
 2    it.  She prepared it.  She worked on it.  AA is received.
 3              (Exhibit AA was received into evidence.)
 4              MR. AMINI:  Could we have a copy of the exhibit?
 5    It wasn't on any exhibit list.  Obviously it was used in the
 6    case at some point.  I'm just asking counsel to send us a
 7    copy of this exhibit.
 8              THE COURT:  Send him a copy, Mr. Rothschild.
 9              MR. ROTHSCHILD:  I will do so immediately.
10    BY MR. ROTHSCHILD:
11    Q    Ms. Schmandt, do you see the research there and the
12    little arrow?
13    A    Yes, I do.
14              THE COURT:  The Court needs one as well, of
15    course, a copy.
16              MR. ROTHSCHILD:  I will send this to the Court.
17    BY MR. ROTHSCHILD:
18    Q    Do you see the arrow there, 2012 to 2014, and some --
19    especially this 25 percent.  You know, when I say popcorn
20    category, it looks like I've got ready-to-eat and I've got
21    microwave, right?
22    A    Yes.
23    Q    So, again, that's what I mean when I say popcorn
24    category.  This is a measurement that you seem to have of
25    both.  Can you tell me what is the growth line here?
```

1  A    The growth line is -- it appears to be the ready-to-eat
2  popcorn growing plus 25 per year.
3  Q    I mean based on your research, is that a reasonable
4  assumption for this category in this time period?
5  A    Yes.  That would be for the overall category in
6  ready-to-eat popcorn.
7  Q    Do you believe it's reasonable that your licensees
8  could grow at this rate during this period?
9  A    We didn't think about it, particularly in lieu of a
10  25 percent growth rate, although that certainly was
11  attractive about being in the category.  The numbers do grow
12  pretty aggressively in the first three years really because
13  of the cadence of getting authorization to be in more and
14  more retailers.  So the number was at a pretty strong clip
15  from the first year to the second to the third, but, you
16  know, as a very fast ramp-up into the category.  So it was
17  more about how quickly they could gain distribution and then
18  technically the growth rate of the category.
19  Q    Sure.  I'm asking is it unreasonable that the licensee
20  for Mrs. Fields popcorn could grow at that rate with the
21  rest of the industry?
22  A    It's hard to say.  I don't know what all the numbers
23  were that were going to that.  If a lot of brands were
24  jumping into the market, that certainly could have helped
25  with that growth rate being so high.

1         That's a very high growth rate, frankly, for any CPG

2    type of product.  So certainly there was interest in

3    consumers.  So I don't know if most of that growth rate was

4    coming from existing brands or new brands going into the

5    market.

6    Q    Do you recall testifying at a hearing on this matter on

7    October 29th, 2015 -- I'm sorry.  I actually have the wrong

8    transcript here -- on January 14th, 2019, testimony

9    regarding our motion for preliminary injunction?

10   A    I do recall that testimony.

11   Q    Let's take a look at this transcript.  I just want to

12   share this with you, your testimony.  This is a motion for

13   preliminary injunction hearing held on January 14th, 2019,

14   and it indicates that you, right here, Betsy Schmandt, was

15   called to the witness stand in this case.  I'm going to look

16   at page 143 of this.

17        So we looked at the targets and the guaranteed minimum

18   amount.  We talked about -- and this is Rod Andreason's

19   question, your counsel's question, is this the most that you

20   expected them to achieve.  Remember, you just said that this

21   was an aggressive growth rate in the license.  Do you see

22   your answer here?  It says, no.  Actually it's the least we

23   expect them to achieve.  That's why it's called a minimum.

24   And then you say, they should be able to achieve these.  We

25   hope that they outperform this, and there's no doubt that

1    they will be able to earn the five percent on their sales.

2    Do you recall testifying that way?

3    A    I do recall that actually.

4    Q    And was there any doubt in your mind that the popcorn

5    licensee could achieve year-over-year growth of 25 percent,

6    or even more aggressive the amount in your license agreement

7    required to cover the minimum guarantees?

8    A    So I think we're answering it two different ways.

9    Obviously the expectation was -- I think if you do the

10   numbers, and I don't have them, you know, right in front of

11   me, but I think it's almost a 50 percent growth, or a

12   100 percent growth.  So it definitely exceeds the 25

13   percent.  So we absolutely had very high expectations that

14   they would be growing year over year over 25 percent.

15        As I just said, the reason for that was based on

16   distribution, not because of the growth rate of the

17   category.  It was gaining distribution.

18   Q    Okay.  But you expected -- okay.

19        In short, you did agree that that sort of level of

20   growth was achievable in this time period, in part because

21   the category was moving rather quickly upward.  Is that

22   fair?

23   A    Again, it wasn't because of the category growth.  It

24   was because it was a new licensee entering the market and

25   gaining distribution very quickly.  It really wasn't because

1    of the growth rate of the overall category.  It was because

2    of the expertise we felt that this licensee had in gaining

3    distribution and growing sales very quickly because they

4    would be able to get the product line into grocery stores,

5    club channels, all kinds of different retailers for the

6    expectation.  So the growth is going to come from that

7    continued build of retailer acceptance.

8    Q    I'm going to share with you what we marked as

9    Exhibit 8.  Let me see if this is stipulated.

10        This is not stipulated today, but we'll talk about

11   this.  And I don't think I'm actually going to even want to

12   admit this, but we'll talk about it.

13        Do you recognize this document?

14   A    Yes, I do.

15   Q    What is this document?

16   A    So this was a document that we provided -- I don't know

17   when exactly, I'm sorry, but we did discuss this in my

18   deposition back in August of 2020.  It is meant to capture

19   the purchase orders that we had for popcorn during the time

20   period and a description.

21   Q    And at the time I asked you whether you had produced

22   this under penalty of perjury that this was true, complete,

23   and accurate, and you verified that you had, correct?

24   A    That's true, I did.  And I think -- you know, through

25   the deposition process, we noted a number of discrepancies,

```
 1    although you had the source files for POs that weren't
 2    captured on this summary sheet.  But we did provide --
 3    obviously through our discussion, I went back and scrubbed
 4    this pretty significantly to try to capture absolutely
 5    everything and make sure I fully understood, you know, what
 6    we had provided to you under POs and invoices and what was
 7    captured on these summary sheets, and we found it to be off
 8    quite a bit, actually.  So we replaced that in September
 9    2020.
10    Q    So I'll get to that replacement sheet in a second, but
11    suffice it to say when you get down to the bottom here, this
12    turns out to have been missing all kinds of sales, right?
13    A    Approximately $100,000 in sales, correct.
14    Q    Almost half of the sales weren't even in there?
15    A    That's right.  I think it's over just a couple of POs.
16    So what was left out from a PO standpoint added up to
17    $100,000 approximately.
18    Q    So I'm looking at a spreadsheet now, which I'm going to
19    call Exhibit 8 replacement, but you provided this later on;
20    is that correct?
21    A    That's correct.
22    Q    And do you recognize this spreadsheet?
23    A    I do.
24    Q    This is what you provided to us after we pointed out
25    that the numbers you provided us had a whole lot of stuff
```

1    missing, right?

2    A    That's correct.

3            MR. AMINI:  What exhibit is this?

4            MR. ROTHSCHILD:  This is the replacement for

5    Exhibit 8 after -- I haven't sought to admit this one.  I'm

6    showing her and asking her about it.

7            MR. AMINI:  On our exhibit list, which exhibit is

8    this?

9            MR. ROTHSCHILD:  This is not one of those

10   exhibits, Mr. Amini.  This is the subsequently provided

11   spreadsheet you gave to us.

12           MR. AMINI:  I'm not understanding why, under the

13   Court's procedures, this wasn't in the pretrial exhibits.

14           MR. ROTHSCHILD:  Well, if I go and seek to admit

15   this, then that would make sense.

16           MR. AMINI:  Could you send us a copy?

17           And I assume the Court would need one too.

18           THE COURT:  We don't have this?

19           MR. AMINI:  Apparently not, Your Honor.

20   Apparently this was not on the exhibit list.

21           THE COURT:  But you're not going to request its

22   admission, correct?

23           MR. ROTHSCHILD:  No, and I'll tell you why as we

24   go through this.

25   //

```
 1   BY MR. ROTHSCHILD:

 2   Q    Looking at the gifting purchases tab -- and I recall

 3   during the deposition, in our subsequent conversations,

 4   Ms. Schmandt, that we talked about the numbers here, the

 5   total, the cost, the amount, and you couldn't tell me what

 6   these dollar amounts meant other than to say they couldn't

 7   be the retail price.  Is that accurate?

 8             MR. AMINI:  Your Honor, I object.  This is part of

 9   his direct and he's using it substantively.  He isn't

10   refreshing her recollection about anything.

11             MR. ROTHSCHILD:  Okay.  Let me back up and ask

12   this a different way.

13   BY MR. ROTHSCHILD:

14   Q    Ms. Schmandt, you did provide a remedial exhibit.  We

15   just established that, correct?

16   A    Correct.

17   Q    Do you recall whether in that remedial data you

18   provided us useful information as to whether we could

19   determine the total amount of sales of Mrs. Fields popcorn

20   during the damages period?

21             MR. AMINI:  I object to the question.

22             THE COURT:  Overruled.

23             THE WITNESS:  So I believe the document that you

24   just had up is substantive and does give you the information

25   you would need to understand what Mrs. Fields purchased
```

1    during that time period.

2    BY MR. ROTHSCHILD:

3    Q    Again, you think that you provided information about

4    what Mrs. Fields purchased, but you couldn't -- again, I

5    just want to make sure your recollection is accurate.  You

6    couldn't, from that information, tell me what the retail

7    sales, the profits for -- you know, profits versus cost

8    information on Mrs. Fields popcorn sales in the damages

9    period.

10   A    So I believe what I was able to provide you with was a

11   full recap of the amount of popcorn that gifting purchased,

12   whether it was made at Confections, Mrs. Fields Confections,

13   or Sir Walter, as a secondary source.  There is a recap of

14   all the items that were sold by gifting at that time period.

15   However, we didn't go into the details of what that ultimate

16   retail revenue was.  But certainly I was able to provide how

17   much popcorn was procured, just as if it had been procured

18   by MFGPC, and what the costs of those were.  And I believe

19   there's secondary documentation that tells you what the

20   profit margin was from Mrs. Fields Confections on those

21   items.

22       Obviously I can't speak to the profit margin of what

23   Sir Walter would have been providing to us as an outside

24   company.

25   Q    You believe that what you provided was -- you said you

1   did not provide us the amount of profits -- I guess you said

2   retail sales.  You did not provide that.  Why did you not

3   provide that?

4   A    So that wasn't provided because those sales are items

5   sold out of Mrs. Fields gifting to consumers.  And

6   ultimately, to be frank, that has nothing to do with --

7   anything to do with MFGPC's potential sales.  The only thing

8   MFGPC would have had access to would have been selling us

9   popcorn, for us to then put into baskets and sell out the

10  door.  They wouldn't enjoy any of that markup.  So it seems

11  completely irrelevant to this case.

12  Q    I'm sorry.  You made the decision that Mrs. Fields

13  sales of popcorn was irrelevant and decided not to provide

14  the information?

15  A    At the consumer level?

16  Q    Yeah.

17  A    That was not in the scope of this.

18  Q    You're telling me that you believe that the retail

19  price for popcorn sold was not discoverable and you decided

20  to exclude that on your own?

21  A    That is the advice we were given.  There was no reason

22  for us to provide that information to your client.

23  Q    So you don't think, for instance, if Mrs. Fields sold

24  to a retail customer, that that information -- that that

25  account would have been something that MFGPC was entitled to

```
 1   sell -- in fact, had an exclusive right to sell under its
 2   agreement?
 3   A    They never did.  And I think your client testified that
 4   we were doing those sales.  So if there were any sales on
 5   that behalf, we were making that, is what I heard him say.
 6            THE COURT:  It's not the answer you want, but
 7   you've had your answer about four times, haven't you,
 8   Mr. Rothschild?
 9            MR. ROTHSCHILD:  Yes, I think so.
10   BY MR. ROTHSCHILD:
11   Q    Do you recall the trend of sales of Mrs. Fields branded
12   popcorn, even if you won't tell us the retail price of
13   sales, whether it was going up or down during the damages
14   period?
15   A    If you're speaking directly about the popcorn business,
16   I believe we procured about the same amount of popcorn every
17   year under the time period we're discussing.
18   Q    I'd like to refresh your recollection.  This is the
19   gifting purchases tab of your final report of popcorn sales
20   of Mrs. Fields branded popcorn.  Do you recognize this?
21   A    I do.
22   Q    You provided this information?
23   A    Yes.
24   Q    So you just testified that you think it was essentially
25   flat during these three years?
```

1   A    I believe so.  Honestly, I didn't roll it up that way.

2   I believe it was pretty even.

3   Q    I'm just going to do a rough sum here and I want you to

4   say -- I mean this formula right here captures all of the --

5   we can't tell in absolute numbers because we don't know what

6   any of these numbers mean.

7   A    I can tell you what all these numbers mean.  I'm sorry.

8   I'm happy to answer that question for you.

9            MR. AMINI:  In which case I really do think that

10  the exhibit should be marked.

11           MR. ROTHSCHILD:  Your Honor, I move to admit this

12  as a rebuttal exhibit to her testimony.  She created this

13  exhibit and sent it to us.

14           MR. AMINI:  As long as it's the exhibit -- I don't

15  have it because you didn't give it to us in advance.  As

16  long as it's the exhibit we sent to you after her

17  deposition, I'm okay with it, Mr. Rothschild.

18           MR. ROTHSCHILD:  It is, and I'd like to have it

19  marked as BB.

20           THE COURT:  BB did you say?

21           MR. ROTHSCHILD:  Yes.

22           THE COURT:  BB is received.

23           (Exhibit BB was received into evidence.)

24           MR. AMINI:  Send us a copy.

25           MR. ROTHSCHILD:  I've sent it to you, Bijan.

1   BY MR. ROTHSCHILD:

2   Q    I'm just looking at the sum.  This is all the 2016

3   sales.  We don't have a full 2015 year.  Well, we should.

4        I'm looking at 2015 because you terminated in

5   January -- or December.

6   A    I think you captured some 2016 numbers in there.

7   Q    You're right.  They are not consecutive.

8   A    I'm sorry.  Are you going off the date received or date

9   ordered?

10  Q    I'm just trying to get a rough approximation.  I'll

11  take out all of those 2016 ones, and add in that last one

12  that was nonconsecutive right there.

13       I'm just trying to get a sense here, you said it was

14  flat.  I've got, for 2015, 54,000; for 2016, 81,800; for

15  2017, 104,359.  Again, not retail.  These are costs,

16  correct?

17  A    These are costs.

18  Q    Does that look flat to you?

19  A    No.  But I would also put in there the first purchase

20  order in 2015.  It came in May.  You're not all the way at

21  the top of the document -- but May.  So we're looking at

22  about seven months as well.

23       So regardless, the numbers do go up.  Certainly you

24  don't see exponential growth here.

25  Q    This is 30 percent.  This is about a 22 percent

1    increase, second year.

2    A    Okay.

3    Q    Is it your understanding that Mrs. Fields terminated

4    MFGPC so that it could take the business back for itself?

5    A    No.  I don't understand that to be true.

6    Q    Do you know what the coincidence of acquiring Nutty

7    Guys on virtually the same date as terminating the popcorn

8    license is?  Why does that happen at the same time?

9    A    Well, I wasn't there so it's very difficult for me to

10   speak with authority on that.

11   Q    I won't ask you to speculate, then.

12            THE COURT:  How much longer do you have with this

13   witness, Mr. Rothschild?

14            MR. ROTHSCHILD:  About five minutes, Your Honor.

15            THE COURT:  Good.

16   BY MR. ROTHSCHILD:

17   Q    So I asked you earlier whether you agreed that when two

18   parties, Mrs. Fields and a licensee, sit down together at

19   arm's length and agree to a price on the license agreement,

20   whether that's implicitly them agreeing to the value of that

21   license agreement.  Do you recall me asking you that?

22   A    Yeah.

23   Q    Let me ask you again.  Do you agree that when two

24   parties, Mrs. Fields and a licensee, sit down and agree to

25   the licensing fee and minimum guarantees, that that reflects

1    the parties' opinion of the value in the market of that

2    license?

3    A    Roughly speaking, I would agree with that, yes.

4    Q    Okay.  Given that, what is your view of the value of

5    the PSP license agreement that the parties agreed upon?  And

6    I can put it in front of you, if you want.

7    A    So the value to Mrs. Fields was essentially the value

8    of the minimum guarantees, 375,000 during the course of that

9    roughly three years.

10        As you're displaying, there were sales targets

11   associated with that.  So depending on how you are valuing

12   it, you can throw in the value of -- you know, what the

13   expectation was they were going to make on the business.

14   Q    You say 375.  You didn't include the initial advance

15   payment.  Wouldn't that bring it to 425?

16   A    No.  Actually they advance, and the minimum that you

17   see for the first contract year are one and the same in this

18   instance.

19   Q    Where is that in the agreement?

20   A    So I believe if you look at 6.1, on execution, licensee

21   shall pay licensor 50,000, which amount will be credited

22   against the running royalties owed during the first year as

23   described in 6.2 below.

24   Q    Then MFGPC had a payment for its license agreement,

25   which we've established has some differences, of 450,000 way

1   back in 2002.  Do you agree that that's what those parties

2   agreed that licensing opportunity was worth at that time?

3   A    You know, I wasn't there at that time, so I don't know

4   what their expectation was or the value of it, but

5   clearly -- again, I would interpret that 450,000 is the

6   value that they had agreed to to receive at that point in

7   time.

8            MR. ROTHSCHILD:  I have nothing further for

9   Ms. Schmandt at this time.

10           THE COURT:  Thank you.

11           Mr. Amini, any cross-examine?

12           MR. AMINI:  Yes, Your Honor.

13                      CROSS-EXAMINATION

14   BY MR. AMINI:

15   Q    I'm going to ask you about the PSP agreement for a

16   minute.  How much did Mrs. Fields ultimately collect from

17   PSP?

18   A    We ultimately collected $50,000, the advance, and no

19   more.

20   Q    And to your knowledge did they ever sell any more

21   product under that agreement?  Did they sell more -- did

22   they ever sell any more product under that agreement that

23   would increase that $50,000 royalty that was due?  In other

24   words, it would have required a million dollars in sales,

25   correct?

```
 1   A    That sounds about right.  No, they didn't come close to
 2   selling enough to cover the $50,000, on anything actually.
 3   Q    Describe to me Cookie Pop when you first looked at it.
 4   Was it already in the market?
 5   A    Yes, it was.  It had been in the market for about a
 6   year.
 7   Q    And what kind of sales did they have at that point, do
 8   you recall?
 9   A    I'm not sure that I have that information of what they
10   were selling prior to our license.  I believe that they
11   provided projections of what they could do for that calendar
12   year, but not prior to our agreement.
13   Q    Let me see if I can find those projections.
14        Now take a look with me at Exhibit 18.
15        Is that an e-mail -- Exhibit 18, is that an e-mail that
16   you received?
17             MR. AMINI:  I move that 18 -- it's a housekeeping
18   matter.  I move 18 in.
19             THE COURT:  I'm having trouble hearing you,
20   Mr. Amini.
21             MR. AMINI:  I move admission of 18, Your Honor.  I
22   believe it's been agreed to.
23             THE COURT:  Mr. Rothschild?
24             MR. ROTHSCHILD:  No objection, Your Honor.
25             THE COURT:  Eighteen is received.
```

```
 1              (Exhibit 18 was received into evidence.)

 2    BY MR. AMINI:

 3    Q    Ms. Schmandt, are these the projections that Mr. Florio

 4    at PSP provided you with on or about July 2017?

 5    A    Yes, he provided this.  I believe it's in reference to

 6    how much their company was going to be making as a

 7    projection, not just for our business but for his entire

 8    business.

 9    Q    And you talked during your deposition about

10    distribution and how distribution had been important in that

11    relationship.  Do you recall?

12    A    That's right.

13    Q    Can you expand on that?  What did you mean by that?

14    A    So one of the things that made PSP very attractive was

15    that they had already been in market.  They were selling to

16    Walmart, a bunch of other retailers prior to our involvement

17    with them.  So they were essentially a proven entity in the

18    mass retail market, which gave us confidence that, first of

19    all, they were a going concern, that they would equally be

20    able to go into production for us and, because of those

21    trade relationships, should be able to very quickly ramp up

22    our business with them.

23    Q    And did you have any understanding of how they were

24    financed?

25    A    Only from the information provided here by Frank.  I
```

1    believe he did provide some subsequent information from

2    another gentleman named Fellow, who was investing as well.

3    So we did ask for a bit of information about their funding.

4    Q    And was it your understanding that they had funding?

5    A    As you can read in this particular e-mail, it was

6    closing in 90 days.  So at this particular time, July 2017,

7    it didn't look like it, but it looked like it was imminent.

8    So we felt confident that they were fully funded.

9    Q    And did you have any understanding about their

10    manufacturing capabilities?

11    A    Yes.  They used co-packers.

12              MR. AMINI:  Your Honor, I don't think I have

13    anything further.

14              THE COURT:  Thank you.

15              Any redirect?

16              MR. ROTHSCHILD:  Nothing from me, Your Honor.

17    Thank you.

18              THE COURT:  Thank you, then, Ms. Schmandt.  Is

19    that the way you pronounce it?

20              THE WITNESS:  That's correct.  Thank you.

21              THE COURT:  You are excused.

22              We'll conclude for the day now.

23              Talk to me about -- let's see.  Tomorrow,

24    Elizabeth, I have a 2:30 starting, right?

25              MS. TOSCANO:  Yes.

```
 1              THE COURT:  And then Wednesday, we can go all day
 2    if we have to, right?
 3              MS. TOSCANO:  Yes.
 4              THE COURT:  Thursday and Friday I have a whole
 5    bunch of sentencings.  Can we get this done on that
 6    schedule?
 7              MR. ROTHSCHILD:  I believe so, Your Honor.
 8              MR. AMINI:  We're starting tomorrow, Your Honor,
 9    at?
10              THE COURT:  8:30 my time, Mountain time.
11              MR. AMINI:  10:30 here.
12              THE COURT:  I don't know where you all are.
13              MR. AMINI:  Are we going tomorrow again until
14    3:00, 10:30 to 3:00?
15              THE COURT:  No.  I have a hearing starting at
16    2:30.
17              MR. AMINI:  I would defer to Mr. Rothschild.  I
18    don't know who he plans to call for the remaining witnesses,
19    other than the two experts.
20              MR. ROTHSCHILD:  I submitted a witness list to you
21    and to the Court.
22              MR. AMINI:  I know you had Ms. Lindley going next,
23    you were going in that order.  She didn't get on.  So am I
24    to assume -- I'd like to know who you are going to put on
25    tomorrow.  Let's start with that.
```

```
 1              THE COURT:  Are some of them not going to take
 2    very long?
 3              MS. WHITE:  If I could just interrupt.  If we
 4    could just take down the exhibit so that I could see
 5    everyone.
 6              THE COURT:  What do you want to know?  Who's
 7    asking?
 8              Ms. White, is that you?
 9              MS. WHITE:  That was me just simply asking for the
10    exhibit to be taken down so I could see everyone.
11              THE COURT:  Oh.  I was asking Mr. Rothschild if
12    any of the witnesses would not take very long.
13              MR. ROTHSCHILD:  Yeah.  I neglected to call
14    Ms. Lindley.  I wouldn't have a whole lot for her anyway.
15    But I think we'll proceed down the witness list, not
16    necessarily in the order that we provided them only because
17    I understand that Ms. Cassie Alvey is not available until a
18    little bit later.  But aside from that, I'd like to just
19    continue right down the witness list as it is.
20              THE COURT:  That's fine.  You didn't answer my
21    question, except for Ms. Lindley, about how long people
22    might take.
23              MR. ROTHSCHILD:  Right.  I imagine that we will
24    conclude the fact witnesses at the end of the morning and
25    then be able by the afternoon to go to the expert witnesses,
```

```
 1   though I need to confer about availability on that with our
 2   expert.
 3              THE COURT:  All right.  Keep in mind -- I mean I
 4   hate to go into next week.
 5              MR. ROTHSCHILD:  I don't think that will be
 6   necessary, Your Honor.
 7              THE COURT:  All right.  We'll be in recess, and
 8   we'll be on again tomorrow morning at 8:30.
 9              Thank you.
10              MR. AMINI:  Thank you, Your Honor.
11              MR. ROTHSCHILD:  Thank you.
12              (Whereupon, the trial was continued to Tuesday,
13   July 13, 2021 at 8:30 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25
```

1              C E R T I F I C A T E

2

3

4         I hereby certify that the foregoing matter is

5    transcribed from the stenographic notes taken by me and is a

6    true and accurate transcription of the same.

7

8

9

10

11

12

13

14

15

16   PATTI WALKER, CSR-RPR-CP     DATED: 8-2-2021
     Official Court Reporter
17   351 South West Temple, #8.431
     Salt Lake City, Utah  84101
18   801-364-5440

19

20

21

22

23

24

25