1             IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3    _____
     MRS. FIELDS FRANCHISING, LLC, a      )
4    Deleware limited liability company, )
                                           )
5                  Plaintiff,              )
                                           )
6           vs.                            )
                                           )
7    MFGPC, INC., A California             )
     corporation,                          )
8                                          )
                    Defendants.            )
9                                          )
     _____)Case No. 2:15-CV-94 DAK
10   MFGPC, INC., a California             )
     corporation,                          )
11                                         )
        Counterclaim-Plaintiff,            )
12                                         )
           vs.                             )
13                                         )
     MRS. FIELDS FRANCHISING, LLC a        )
14   Delaware limited liability company, )
     and MRS. FIELDS FAMOUS BRANDS, LLC, )
15   a Delaware limited liability          )
     company, d.b.a. Famous Brands         )
16   International,                         )
                                           )
17      Counterclaim-Defendants.           )
     _____)

18

19          BEFORE THE HONORABLE DALE A. KIMBALL

20              DATE:  JULY 13, 2021

21          REPORTER'S TRANSCRIPT OF PROCEEDINGS

22              BENCH TRIAL VOLUME II

23              PAGES 218 - 413

24

25              Reporter:  REBECCA JANKE, CSR, RMR
                           (801) 521-7238

```
 1

 2                          A P P E A R A N C E S

 3

 4    FOR THE PLAINTIFF:     KIRTON, MC CONKIE

 5                           BY:  ROD N. ANDREASON, ESQ.

 6                           50 EAST SOUTH TEMPLE, SUITE 400

 7                           SALT LAKE CITY, UTAH 84145

 8

 9                           AMINI, LLC

10                           BY:  BIJAN AMINI, ESQ.

11                           131 WEST 35TH STREET, 12TH FLOOR

12                           NEW YORK, NEW YORK 10001

13

14

15

16    FOR THE DEFENDANT:     PARSONS, BEHLE & LATIMER

17                           BY:  JULIETTE P. WHITE, ESQ.

18                               BRIAN M. ROTHSCHILD, ESQ.

19                           201 SOUTH MAIN STREET, SUITE 1800

20                           SALT LAKE CITY, UTAH 84111

21

22

23

24

25
```

220

INDEX

| WITNESSES | EXAMINATION | PAGE |
|---|---|---|
| CAMERON BROADBENT | Direct by Rothschild | 221 |
| | Cross by Amini | 246 |
| JOE SCAVITTO | Direct by Rothschild | 252 |
| JUSTIN HORNICK | Direct by Rothschild | 260 |
| | Cross by Amini | 275 |
| | Redirect by Rothschild | 279 |
| | Recross by Amini | 281 |
| PATRICK KILBOURNE | Direct by White | 283 |
| | Cross by Amini | 323 |
| | Redirect by White | 400 |
| | Recross by Amini | 411 |

| | |
|---|---|
| | JULY 13, 2021                        SALT LAKE CITY, UTAH |
| 1 | |
| 2 | P R O C E E D I N G S |
| 3 | * * * |
| 16:00:26   4 | THE COURT:  I think everyone's on.  We have |
| 5 | basically the same lawyers as yesterday. |
| 6 | Mr. Rothschild, you may call your next witness. |
| 16:00:59   7 | MR. ROTHSCHILD:  Thank you, Your Honor.  Your |
| 8 | Honor, MFGPC calls Cameron Broadbent to the stand. |
| 9 | CAMERON BROADBENT, |
| 10 | the witness hereinbefore named, being first duly cautioned |
| 11 | and sworn or affirmed to tell the truth, the whole truth, |
| 12 | and nothing but the truth, was examined and testified as |
| 13 | follows: |
| 16:03:23   14 | THE COURT:  Thank you. |
| 15 | You may proceed, Mr. Rothschild. |
| 16 | MR. ROTHSCHILD:  Thank you. |
| 17 | DIRECT EXAMINATION |
| 18 | BY MR. ROTHSCHILD: |
| 16:03:28   19 | Good morning Mr. Broadbent.  Thank you for being |
| 16:03:32   20 | here.  I want to ask -- your name has been mentioned a few |
| 16:05:30   21 | times in this proceeding, can you tell me what your |
| 22 | relationship has been to Mrs. Fields.  I understand you |
| 23 | worked for the company.  Can you tell us when you first |
| 24 | began to work for the company? |
| 25 | A.      Yeah.  I was employee number 2 for the Brandon |

222

1    retail division, started in about mid-2000 and was part of a

2    two-man team that functioned there until 2006 as two people,

16:21:57    3    and then we expanded probably to two dozen.  I continued

4    work until about, oh, I'd say, oh, mid-2013-ish.  That was

5    kind of the time frame for my time there.

6    Q.       And so you were at the organization before

7    Mr. Lindley and MFGPC became a licensee for popcorn; is that

8    correct?

16:22:28    9    A.       That's right.  I was literally like started at

10    ground zero where, you know, we didn't have any sales.

11    Mrs. Fields had just acquired TCBY and with that came the

12    first employee that was selling direct to grocery stores,

13    mass market, club stores, with the TCBY acquisition and then

14    I joined as, like I said, number 2.  And, yeah, at the time

16:22:56    15    when I started there were just Mrs. Fields ready to eat

16    cookie license that was just beginning as well as the

17    chocolate license in the year 2000.

18    Q.       Okay, what education do you have?

19    A.       Yeah.  My background is in -- my undergraduate

20    university in food science and nutrition.  I did a master's

16:23:24    21    degree both in, just a custom one, Brigham Young University,

22    both in business and food science.  Probably the best

23    education I got, though, was the first two years of growing

24    the business at Mrs. Fields, though, where, you know, I was

25    responsible for product, packaging, worked alongside some --

223

1   you know, two brand new start ups and then I got to be

2   involved with each start-up that went to work.

16:23:55   3   Q.      Okay.  Tell me, what was your position again at

4   Mrs. Fields when you first started?

5   A.      Yeah.  So, beginning -- I had just come off of

6   joining Kraft Foods and there I worked on product and

7   packaging, consumer research, and Mrs. Fields I went right

8   into a role as brand manager and worked in that role, having

9   responsibility for direct sales, product development,

16:24:29   10   package development, and then monthly calls with each of the

11   licensees talking about each channel of sale, each, you

12   know, specific customer and in some cases buyers even,

13   challenges with the business, successes with the business.

14           I continued until 2006 as the brand manager at

16:25:23   15   which time *Kimble Grove was in some financial trouble.  We

16   acquired the ready-to-eat cookie business.  We went from two

17   people to about two dozen.  Our goal at that time was to

16:25:59   18   stabilize the business, turn it around and grow it, and

19   that's in essence what we did.  The first couple of years, I

20   was responsible for every -- was the net sales manager as

21   well as having key accounts myself across different channels

22   of sale.  Ultimately I was responsible -- as the years went

23   on, I was responsible for half the C-Stores in the U.S., all

16:26:27   24   international business development outside of Canada, club

25   business worldwide, and then the alternative channel, Dollar

224

1    Stores, 99 Cent Only, Big Lots, places like that and I

2    continued until the sale in 2006.

3    Q.      Mr. Broadbent, I'm asking if you would do a little

4    bit of a favor just to have mercy on the court reporter and

16:26:58  5   talk a little bit slower so she can take your speech down.

6    A.      You bet.  And I'm sorry.

7    Q.      Thank you.

8    A.      Would you like me to repeat anything or would you

9    like maybe a clarification of anything?

10   Q.      No.  I think that's fine.  And help me understand,

11   when did you first run into MFGPC or Chris Lindley?

16:27:28  12  A.      So, I believe it was around, boy, 2001, 2002 was

13   our first interaction with Chris and the idea of licensing a

14   category that we weren't really pursuing heavily at the

15   time, and that was popcorn.

16           THE COURT:  You're starting to trail off a little,

17   Mr. Broadbent, at the end of your testimony.

18           MR. BROADBENT:  Oh, okay.  Sorry about that.  Yeah.

16:27:59  19  So, about 2001, 2002 was when, you know, I came in contact

20   with Chris Lindley, and I believe he approached Mrs. Fields

21   about doing the popcorn business, and we began to evaluate

22   the opportunity together at that time.

23   Q.      BY MR. ROTHSCHILD:  And who negotiated the

16:28:28  24  trademark license agreement?  And when I say trademark

25   license agreement, are you familiar with MFGPC's license?

225

A.        Yeah.  I do recall it.  I mean, it was almost 20
years ago, but I recall it pretty well, actually, the -- I
think we started as -- the license may have originated with
LHF and then that changed over to MFGPC.  We never used the
16:28:58  term really, but in essence I knew that that was kind of
code name for Mrs. Fields gourmet popcorn clusters.

Q.        I am showing you a license agreement.  This is
Exhibit 3.  Is this the license agreement you were just
referring to?

A.        Yeah.  You can see it was LHF that started and then
we transitioned to MFGPC later, but that's the one it looks
16:30:22  like.

Q.        And who at Mrs. Fields negotiated the terms of this
agreement?

16:30:26  A.        So -- so my role was to put together the package,
evaluate the package, make a recommendation, evaluate it
among my peers in marketing as well as the senior
vice-president of marketing for, you know, Mrs. Fields
overall.  And then I believe it was Michael Ward who was the
legal counsel at the time would negotiate the final points
of it.  But, you know, it was certainly something across my
16:30:57  desk in the process.

Q.        I'm looking at section 2 of the license, and in the
license grant here, it grants the right to use the license
16:31:12  names and marks, to manufacture and market royalty bearing

1  products.  And, again, the license -- the license names and

2  marks are -- it's just Mrs. Fields.  You see that?

3  A.       I do.  Yeah.

4  Q.       And do you -- what is Mrs. Fields?  What's the

5  value of that?

16:32:28  6  A.       So, and, you know, at this time -- so, I loved the

7  brand.  I mean, the brand in the year 2000, Mrs. Fields was

8  literally just leaving herself.  She had just finished --

9  you know, she was on television.  She had started 19

10  Mrs. Fields bake shops, and in the year 2000, we were just

11  starting retail products at grocery stores and mass

16:33:30  12  marketers.  The brand, in essence, stood for all things that

13  were good and indulgent and really the goodness of a snack.

14  I think as we look back, that's kind of the essence of the

15  brand, I would say, would be like a sweet indulgent moment,

16:33:57  16  with all the goodness of the homemade snack.

17  Q.       Okay.  And what -- do you have any metrics on the

18  trademark; for instance, trademark awareness of Mrs. Fields

19  at that time?

20       MR. AMANI:  Objection.

21       THE COURT:  Was that an objection?

22       MR. AMANI:  It is an objection, Your Honor, yes.

23  We're talking about the metrics of the trademark in the

16:34:30  24  years 2000 to 2006.  Now we're 15 years into the history of

25  this company back.  And, you know, I would just appreciate

227

1    it, with these witnesses in particular, since none of them

2    have anything to do with this case, that we try to get to

16:34:47  3    something that links it to what we're doing here.  That's my

4    opinion.

5            THE COURT:  Well, I think it's background.  Go

6    ahead, Mr. Rothschild.

7            MR. ROTHSCHILD:  Your Honor, I actually think it's

8    more than that, and the answer that I would give to why it's

9    relevant is, the agreement was for the license of a mark.

16:35:24  10   What was the value of that mark?  This Court ruled the

11   core relevant issue, of the value of the trademark license

12   agreement, and we just established that it was for the

13   license for the use of Mrs. Fields, and now I'm asking,

14   well, what is the awareness among consumers for that mark?

15           THE COURT:  Well, and I said you could go ahead.

16   Go ahead.

17           MR. ROTHSCHILD:  Thank you.  And I want Mr. Amini

18   to understand that as well.

16:35:53  19           MR. BROADBENT:  Yeah.  I'll just go ahead and

16:36:10  20   answer that question, then, if it's all right.  So, when we

16:37:29  21   started in the early years of 2000, we used a number that

22   represented research where people went out and actually

23   asked inside of malls, back in 2000, early 2000 -- up

24   through 2006 we were still using this number, but when they

25   asked people that were stopped in a mall:  Hey, do you

228

1    recognize Mrs. Fields?

2          Well, Mrs. Fields had such a presence that 94

16:37:57    3    percent of respondents said:  Yeah, I recognize Mrs. Fields.

4    Those are cookies and we are familiar with them as we come

5    to the mall.

6    Q.      BY MR. ROTHSCHILD:  And do you have any idea about

7    positivity perception of that mark?

8    A.      Yeah.  I mean, one of the very reasons I joined was

9    because of the -- just who she was.  She was still relevant

10    to the brand in 2000.  Everyone was really pretty positive.

16:38:29    11    Even when we took the product to the trade, people were

12    excited about seeing a Mrs. Fields product.  Whether it was

13    a buyer or consumer, people were pretty positive and excited

14    about seeing the product and eager to taste it, kind of

15    excited to see what she's come up with.

16    Q.      I want to look again at this license agreement.

17    And you said you were generally familiar with it, even after

16:38:59    18    all these years?

19    A.      Yeah.

20    Q.      Did you have to refer to it occasionally as you did

21    business with MFGPC?

22    A.      I did.  So, while I was brand manager, it was my

23    responsibility to interact with all the licenses, and we

24    would review -- like, when a new prospect would come in, I

25    would take a look back occasionally and read through it and

229

16:39:27   1   confirm because the terms of each one were slightly

           2   different.

           3   Q.       Do you recall whether -- I'm looking at Section 16

           4   of this agreement right here, and I'm highlighting this area

           5   of the agreement, and it provides on the fifth line here for

           6   automatic renewal for successive five-year terms.  Do you

           7   recall that term?

           8   A.       Yes.

16:39:56   9   Q.       And do you recall Chris's agreement, whether it

          10   auto renewed in 2013 and -- I'm sorry -- yeah.  Yes, 2013,

          11   were you still at the company?

          12   A.       I was still at the company, yeah.

          13   Q.       And do you recall any -- do you recall whether, at

          14   that time, the agreement auto renewed?

          15   A.       Well, figure back in time, I was leaving mid-2013.

16:40:30  16   I believe it renewed the year prior.  After I left, I

          17   suspect it renewed or at some point something happened, or

16:40:39  18   we wouldn't be here, but I don't recall at the end of the

          19   year specifically if it renewed, but I suspect that it did.

16:41:14  20   Q.       Okay.  Do you also recall the termination

          21   provisions here at all?

          22   A.       Yeah.

          23           MR. AMANI:  Objection, Your Honor.

          24           THE COURT:  I'm not sure what you're getting at

          25   here, Mr. Rothschild.  We've got this in evidence, and there

16:55:57    1    have been rulings on it by prior Courts.

2    Q.      BY MR. ROTHSCHILD:  Okay.  The only thing I want to

3    ask then, Mr. Broadbent, is whether, at Mrs. Fields at the

4    time, did Mrs. Fields believe that this agreement could not

5    be terminated absent a breach by MFGPC?

6            MR. AMANI:  Objection, Your Honor.

7            THE COURT:  What are you objecting to, a legal

8    conclusion or?

16:56:29    9            MR. AMANI:  Legal conclusion.  Mrs. Fields'

10    opinion -- what was Mrs. Fields' opinion?  Foundation.  You

11    know, it's not clear to me this man has authority of any,

12     -- what his authority was.  And, again, as Your Honor said,

13    there have been multiple rulings on this.  Whether they

14    believed it was terminable or not is irrelevant to why we're

15    here.  It was determined that it was wrongly terminated.

16:56:59    16            THE COURT:  What was the last thing you said?

17            MR. AMANI:  Whether they believed -- whatever the

18    beliefs were at Mrs. Fields are irrelevant to why we are

19    here today.  The Court has already ruled on the termination

20    and liability in the case.

21            THE COURT:  Well, they have.  That objection is

22    sustained.

23            MR. ROTHSCHILD:  All right, Your Honor, I'll move

24    on.

25    Q.      BY MR. ROTHSCHILD:  Relative to other licenses at

231

| | |
|---|---|
| 16:57:28 | 1 |

Mrs. Fields -- you said you managed all of them -- was this
an advantageous license or average?

        MR. AMANI:  Objection, Your Honor.  Again, relative
to licenses at Mrs. Fields?  I don't know why we're having
that conversation.

        THE COURT:  Well, if he has an understanding about
it, I'll let him ask a question about it.

        MR. BROADBENT:  Yeah.  Just to finish the answer to
that question, yes, this was probably the most advantageous
license that we did, so there's not specific -- he had --
from memory, it was like he had to pay a hundred-thousand
dollars every year for five years, and then basically he had
to pay royalties ongoing.  The category wasn't the core of
Mrs. Fields' business, so we saw the product and packaging
was great, so we moved forward with it under the terms that
you see and can read about.

Q.      BY MR. ROTHSCHILD:  Was there anything else about
it that was advantageous or, you know, from a licensee
perspective?

A.      Yeah, as the worldwide rights.  You know, it wasn't
specific to just like the United States.  Worldwide rights
were, you know, advantageous, I'd say, you know, and create
value in a way that might be unique with licenses.

Q.      Tell me about MFGPC's performance as a licensee.
Was MFGPC a good partner?

232

```
         1   A.        Yeah.  Most certainly.

17:03:28 2             MR. AMANI:  Can -- objection, Your Honor.  Can we

         3   establish a time frame for his testimony on this?  I

         4   understood he left this part of the business in 2006.

17:03:38 5   That's why I'm asking.

         6             THE COURT:  Establish a time frame, Mr. Rothschild.

         7   Q.        BY MR. ROTHSCHILD:  Okay.  Let's start with that,

         8   when MFGPC began and up until you left as brand manager,

17:04:25 9   which I'm guessing, based on Mr. Amani's testimony, was

        10   2006?

        11   A.        That's right.

        12   Q.        How was MFGPC as a partner?

        13   A.        Yeah.  They were great.  I mean at every level.

        14   From a product standpoint, we sold the same product at

        15   Mrs. Fields' catalog, mrsfields.com that we took to actual

        16   retailers.  He embraced everything that was the essence of

17:04:56 17  Mrs. Fields.  In fact, it was almost like an aspirational

        18   license because he was going all natural at a time we

        19   weren't yet all natural.  And then he went to retailers like

        20   Dillards.  And so we saw it -- like he had packaging and

        21   product that was designed for every channel, from high end

        22   places like Dillards to club stores, to mass marketers like

        23   Wal-Mart and target.

17:05:27 24  Q.        Tell me about MFGPC's growth.  The fact that MFGPC

        25   wasn't selling huge amounts of popcorn, wasn't that
```

233

1    concerning to Mrs. Fields?

2    A.      You know, his business model was similar to the

3    chocolate business, if you looked at the year 2000, when the

4    chocolate company came in, and for a couple years, their

17:05:57   5    core business consisted basically of selling Christmas and

6    Valentine's chocolates, and they didn't pay slot.  And that

17:06:25   7    was similar to the model of MFGPC.  They come in.  They

8    bring quality product and quality packaging.  We try and get

9    a foothold in a market and use that foothold as leverage to

10   expand in the marketplace.  We understood that initially.

11   We committed MFGPC with several years of guaranteed minimums

12   and then he went to work at it.  And, you know, and then I

17:06:58   13   would check up on him on a monthly basis as like -- as I did

14   with other licensees.

15   Q.      You left the brand liaison spot in 2006, correct?

16   A.      That's right.  Yeah, with the acquisition of the

17   ready-to-eat cookie business, I moved over to that.

18   Q.      And did you still have any interaction with

17:07:29   19   Mr. Lindley or MFGPC after that?

20   A.      Yeah.  It was still important because all licensees

21   include -- and the direct business that we did and the core

22   of the Mrs. Fields products basically having the cookie, we

23   were the bulk of the product sales going to market.  So it

24   was important to us to have a common front to all the

17:07:58   25   retailers, so we talked.  You know, we tried to meet

234

1    annually during the six years I was brand manager, but then

2    we would talk about key accounts.  Occasionally I would call

3    and just check in to see what he was presenting to Target,

4    what he might be doing at BJ's Wholesale Club.  Those are

5    the kinds of discussions, so that we had the same front to

17:08:30    6    the trade and appeared like we were a cohesive group the

7    best we could.

8    Q.      Tell me about MFGPC's packaging.  Was it -- I'm

9    sorry, let me withdraw that.  Co-packers, tell me about

10    MFGPC's co-packers.  Were you familiar with them?

17:08:53    11    A.      Yeah.  I'd say that was one of the strengths, and

12    similar to our own business, we ran direct sales for TCBY,

13    and we would present TCBY product and then we also owned an

14    ice cream plant that made all the TCBY product, and we

15    presented private label business to places like Sam's Club

17:09:26    16    and obtained that business on the TCBY side.

17            And his business model was similar in a way.  He

18    had a co-packer.  When he pitched to retailers, the pitch

19    could include, and sometimes did, the idea that he would

20    actually do like a Target, for instance.  At the time, they

21    would do some private label business.  And so part of the

22    pitch was:  Hey, we have the Mrs. Fields high-end product.

23    We can also provide a lower-end product through our

24    co-packer.

25            And so it was -- it was attractive.  I mean, it was

1    very similar to the business we were running, so it seemed

2    natural and attractive to us, and it seemed like a quality

3    way to go to, you know, the trade, to provide multiple

4    solutions for the trade and presenting to the customer.

5    Q.      I want to go back to something.  You said that, you

6    know, it wasn't concerning to you that MFGPC wasn't going

7    gang busters in early years.  I mean, is that a legitimate

8    business model in your mind?  Do you use that?

9    A.      Yeah.  I mean, whether it was chocolates or whether

10   it was TCBY product or the direct sale we picked up, even

11   after leaving Mrs. Fields, my first thing that I did was

12   actually team up with a distributor that we were pitching

13   product in Paris, France and hopeful to expand that business

14   into France.  And the business model was similar.  It's

15   develop product that's of the highest quality, establish it

16   in the eye of the consumer as like the indulgent treat that

17   one would enjoy.  After you get a foothold with the product

18   quality and the level of packaging at the highest level,

19   then you can slide into other, like mass marketers, like a

20   Target.

21         So it's a very simple -- or it's not simple, but

22   the idea is start in a company like Dillards, start in a

23   place like Costco, where you can establish just a super

24   premium product and then try and push it out into the mass

25   market  And Chris Lindley did that, you know, effectively

236

1    with a high-quality product, high-quality packaging.  And

2    that business model, like I said, was one that we used and

3    were familiar with.  And even at the end, it was the same

4    model.  I would go out -- if I were to start in another

5    company I would probably follow a similar model.

6    Q.      And when you -- when you say that, you know, you

7    start off slow and establish a foothold, is it concerning to

8    you that you don't earn profits in the first, second, you

9    know, maybe, you know, many years, given -- given the slow

10   growth?  Is that a concern to you?

11   A.      You know, the idea -- like when we picked up the

12   ready-to-eat cookie business, a good example, our goal was

13   not to -- we were just trying not to lose money first as we

14   established ourselves.  We worked to make every deal

15   positive.  And every year, with each account, we tried to

16   stay at least slightly positive and not negative.  We

17   recognized that investment has to be made one way or the

18   other.

19           From memory, the ready-to-eat cookie business, the

20   very core of the brand, was the only business that just came

21   out and put slotting dollars down all across the grocery

22   channel to push distribution to go from, you know, zero to,

23   what, 40, 50?  If you're going to put buckets and go zero to

24   50 million, a hundred million; you know, the goal, the first

25   bucket is 50 million, and, you know, you can -- you can work

237

1    towards that if you have a lot of slotting dollars.  If you

2    don't, then it's going to be a slow burn.

3    Q.        And when you -- you say the ready-to-eat cookie

4    business did that.  Did the ready-to-eat cookie business,

5    you know, since you said it paid slotting dollars, did it

6    real boost it's sales?

7    A.        You know, I think just looking back from memory, we

8    went from zero to like 40 million, 50 million, that kind of

9    first bucket within two years because of that.  And the

10   challenge --

11   Q.        And did it -- - did the licensee continue

12   successfully, after having pushed sales that high?

13   A.        I think they continued successful for several

14   years.  It was owned by -- the license was owned by a

15   Nonni's at the time, and Nonni's ran their own biscotti

16   business and they ran the Mrs. Fields ready-to-eat cookie

17   business.  They ended up selling their own Nonni's business,

18   and the remaining business was just Mrs. Fields ready-to-eat

19   cookies, and they began under the name Shadewell Grove.  And

20   they ran under that with basically the same overhead but ran

21   into, I think, challenges meeting their own overhead.  And

22   by 2006, they were looking for a partner to sell the

23   business to, but in 2006, Mrs. Fields Corporate ended up

24   acquiring it.

25   Q.        At some point, you left Mrs. Fields.  About, again,

238

1    what year was that?

2    A.        2013, I believe.

3    Q.        And you maintained some relationship with MFGPC; is

4    that right?

5    A.        Yeah.  Yeah.  I think, you know, I worked the

6    entire time and knew Chris, and we were still in contact.

7    At the end of 2013, I was also -- I still loved the brand.

8    I loved start-ups as well, you know, and I looked to work

9    with Neal Courtney.  Neal Courtney, at the time, was

10   becoming the CEO of Mrs. Fields.  He had been the general

11   manager of our little business, and he was becoming the CEO

12   or was the CEO about 2013.

13         And, you know, towards the end of it, I was trying

14   to figure out a way that I could work on -- continue to work

15   on Mrs. Fields' business, and if I had the opportunity to,

16   in essence, work on another start-up, you know, I saw value

17   in Chris' business, enough so that I would tell my wife and

18   family that I think it's time we do another start-up, just

19   like 2000 or 2006 when we saved a business from bankruptcy.

20   It was time to do another one.  And I believed there was

21   value in it and wanted to try.

22         So I tried to work out something with Neal Courtney

23   to see if there was a way that we could -- that I could get

24   paid, even if I took a pay cut the first year, that if I

25   could work for maybe a split or some way in which I worked

1    partly for Mrs. Fields and partly for MFGPC, we could find a

2    way forward and then grow the business similar to -- and

3    using the same model we had already used and, you know, I'd

4    run from zero to, you know, the first two years, start up

5    and then turn the business around in 2006, just trying to

6    apply the same business principles we used there, try and do

7    it again with Chris Lindley, his business, focusing on it

8    full time.  That was kind of the idea.

9    Q.      Take a look at Exhibit 49, which we have admitted

10   in this case.  Do you recognize this?

11   A.      I do.  I've seen this before and last time we were

12   talking in court.

13   Q.      Do you -- do you know who created this?

14   A.      You know, to admit, the first time I saw it, I

15   wasn't sure, but then as we went on, I was clear that I

16   created that.  It had been a little while, but I could tell

17   and even now I can tell the way in which it's put together,

18   it's put together with talking points that I could actually

19   approach the CEO, and in an environment where we were maybe

20   down-sizing, I was asking to be coming on as -- you know, as

21   a new hire.  So these were kind of talking points from

22   memory that I put together, you know, to discuss with him.

23   Q.      And did you -- what was the purpose of this pitch,

24   as you called it?

25   A.      Yeah.  This was -- I apologize.  I mentioned it.

1    Just the purpose was primarily for me to find an opportunity

2    to work on the MFGPC business as an employee of Mrs. Fields

3    and as an employee of MFGPC.  That was kind of the idea

4    that -- in our discussions that we kicked around.

5    Q.      Take a look at the second to the last bullet point

6    here.  Are you referring to Chris Lindley there?

7    A.      When I say Chris or -- oh, the CEO.  Let's see, in

8    order to survive the implosion -- yeah.  That's referencing

9    his own business, some of the challenges he faced in 2013,

10   at that time.

11   Q.      And did you have knowledge of whether he was, as

12   you say here, being compensated by another business?

13   A.      You know, it's -- I wouldn't put it in there if I

14   didn't think either in the past, in the present or in the

15   future he was doing something that might generate an income.

16   I consider Chris to be almost like a serial entrepreneur.

17   Literally similar to how a CEO runs Mrs. Fields, TCBY, Great

18   American Cookie, Hot Sam, Pretzel Time, Pretzel Maker, they

19   stretched their expertise over several businesses, and I

20   likely thought he might have been doing the same, while also

21   focusing on MFGPC.

22   Q.      So, but you didn't then have a foundation to say

23   that he was then being paid.  You used the word "now."

24   A.      Let's see:  The CEO recently became engaged in

25   another business that is now compensating him at levels

1    equal to an income.

2          Yeah.  Excuse me.  I have to read it again.  So, it

3    looks like I had a belief, at that time, that he was being

4    compensated for his marketing efforts, what he was doing in

5    some business.

6    Q.      Do you know whether he was still working full time

7    at MFGPC, though?

8    A.      Oh, he certainly was, yeah.  I mean, just

9    because -- I mean, he had the whole license.  He wasn't in

10   the process of selling it.  He was -- he still was managing

11   that and the challenges he faced with that.

12   Q.      And I'm looking here at this, this page 4 of the

13   presentation.  You're pitching your potential job here; is

14   that correct?

15   A.      That's right.  You know, and Neal Courtney knew me

16   pretty well from the time, you know, we did the start-up or

17   basically picked up the ready-to-eat cookie business from --

18   I'm not sure when he actually started at Mrs. Fields.  He

19   didn't become the general manager for a couple years because

20   we started with some other folks in place when we grew from

21   two to two dozen people, roughly.  I think he came into it a

22   couple years into it, and then he knew me from that time all

23   the way up until 2013, where he asked if I would basically

24   shut down the business with a smooth transition to the new

25   buyers, so I literally became the last man standing and last

242

1    full-time employee at Salt Lake City, resolving every issue

2    with, you know, every client, every issue that came up to

3    just make a smooth transition.

4    Q.      Okay.  I want to focus on the second bullet point

5    here about your compensation.  You've kind of given an "or"

6    here, salary commission or a high-profit sharing split on

7    new business.  And then potential for equity.  Do you see

8    that?

9    A.      Yeah.  And I recall the equity thing.  Having just

10   finished with the sale or being in the process of selling

11   the Mrs. Fields cookie business, I didn't have equity at

12   that time, so I think that was on my mind and part of the

13   idea or the attractiveness really of what kind of was,

14   still, a slow burning, growing business, you know, something

15   we were trying to get off the ground in a bigger way.

16   Q.      Okay.  And -- but did you actually have an

17   agreement that you finalized with these numbers?

18   A.      No.  We did not.  We never came to a final

19   agreement.

20   Q.      Okay.  And you're asking here for, you know, a good

21   bit of money from Mrs. Fields, forgive his royalties, some

22   significant additional investments.  Did you get that from

23   Mrs. Fields?  Did they agree and give you all these things?

24   A.      No.  You know, that wasn't -- we couldn't really

25   move the whole deal forward, actually, and that was --

1    Q.      So this never actually happened, and the

2    projections that you put in this presentation never came to

3    be?

4    A.      That's correct.

5    Q.      Was Chris' business alive and well in 2014?

6    A.      You know, I still recall having left Mrs. Fields

7    and focusing then on the start-up in France.  I don't

8    remember regular conversations with Chris in 2014.  I

9    remember the challenges in 2013 going into '14.  It was

10   probably a challenge.  Yeah.

11   Q.      What -- what, in your mind, killed Chris' business?

12   A.      You know, I think overall the product was fantastic

13   and great for the time we started, but I would say that the

14   appetite of consumers kind of shifted, and you can see it

15   today actually if you walked into a Sam's Club where you see

16   ready-to-eat popcorn.  You see Skinny Pop.  You see

17   pickled -- in Sam's Club you see pickled flavored popcorn.

18   You see Popcorn Indiana's kettle corn with drizzled white

19   and dark on it.  It seemed like --

20   Q.      I'm going to ask you --

21   A.      I was going to say, it seemed like --

22           MR. AMANI:  I'd like to hear the answer, Your

23   Honor.

24           MR. ROTHSCHILD:  I'm sorry, I thought he was done.

25   I thought he was at a stop there.

244

```
1              THE COURT:  Go ahead and finish your answer,

2    Mr. Broadbent?

3              MR. BROADBENT:  Yeah.  Sorry about that.  It felt

4    like one of the challenges seemed like there was a consumer

5    shift in appetite for a lighter product, and so that was

6    probably a direction that, you know, the market is kind of

7    going.  And I'd say kind of the challenge with it, the other

8    challenge core to the business was, he lost his co-packer to

9    a fire.  His investment banker died.  Those things took down

10   investment and took down his production in 2013.  Those are

11   significant business challenges.

12             There is also -- like Mrs. Fields had certain

13   requirements, packaging changes that had to be made.  I had

14   to meet those as well.  That trifecta of challenges, I'd

15   say, was significant then and material and would require,

16   similar to how we did it in 2006, when we face a business

17   challenge or when we have to turn the business around and

18   keep going to survive or when we got into 2009 in the

19   financial crisis and the Mrs. Fields ready-to-eat cookie

20   business was struggling as well.  We had to find a way to

21   survive, change, and continue to adapt.

22   Q.        So, in January, 2014, though, you -- at the end of

23   2013, now it's 2014, you went and pitched this to

24   Mrs. Fields.  I'm just looking at the date of this

25   presentation; is that right?
```

245

1    A.       I'm sorry.  I didn't see that.  Okay.  I see it

2    now.

3    Q.       But despite these challenges you just went through,

4    the investment banker and the co-packer, by this time was

5    Chris back up and running?

6    A.       Yes.  Yes.  He had a co-packer up and running and

7    capable of doing this.  And boy, and I didn't put that

8    timing, January, 2014 to it actually.  I was still kind of

9    stuck in mid-2013.  I apologize.  So, yeah, he had the

10   license.  He had a co-packer.  I saw potential in it.  I

11   wanted to work on it, and that's the reality of it and the

12   basis for this.

13   Q.       And so you understand that Mrs. Fields wrongfully

14   terminated MFGPC at the end of 2014, right?

15   A.       I did understand it.  I didn't know the exact date

16   and timing, but I understood that he was terminated.

17   Q.       And when that happened, was his business alive?

18   A.       It was.

19            MR. ROTHSCHILD:  I have nothing else for

20   Mr. Broadbent.

21            THE COURT:  Thank you, Mr. Rothschild.

22            Mr. Amani, you may cross examine.

23            MR. AMANI:  Thank you, Your Honor.

24

25

246

CROSS EXAMINATION

BY MR. AMANI:

1

2

3      Q.       Good morning Mr. Broadbent.  What do you do now?

4      A.       Today I manage a portfolio of assets similar to

5      what I did before, but I do properties instead of brands.

6      Q.       Real estate?

7      A.       I'm a real estate broker.

8      Q.       And you mentioned some start-up in France.  How

9      long did you work on that?

10     A.       About a year and a half.

11     Q.       And what happened to that?

12     A.       Well, I was -- I was paid on an hourly basis to

13     help them start up and got to a certain point where they had

14     all the products that they wanted for what was basically an

15     American portfolio of brands, and after about a year and a

16     half, they didn't need my services to acquire more brands.

17     They just took off with the brands that they had.

18     Q.       You have a lot of experience, it sounds like, in

19     licensing and brands from your experience at Mrs. Fields; is

20     that correct?

21     A.       Yeah, working -- I'd say most of the experience is

22     working with accounts and channels of sale, and then six

23     years of experience with licensing.

24     Q.       You mentioned the investment that had to be made

25     when you start -- when you start up one of these companies.

1   Do you recall that?

2   A.      Yeah.  I would believe any -- I mean, I still

3   believe any company that is going to start up is going to

4   require investment with time, energy, some type of financial

5   resource and a commitment to packaging, product development.

6   Q.      Packaging, product development.  What other

7   investments?  From your experience in starting these

8   businesses up, what other investments does a company have to

9   make?

10  A.      Yeah.  Depending on which direction one's going to

11  go, like if you're going to go like an MFGPC or a

12  Mrs. Fields chocolate company, we're going to try and

13  penetrate the market.  Without any slotting dollars, one has

14  to adjust their business model some.  So you kind of have to

15  make that -- it feels like you have to make that decision up

16  front, whether you're going to take investment dollars or

17  not, because that can be quite significant.

18  Q.      What else?  The packaging.  You mentioned

19  packaging.  What kind of investment do you have to make in

20  packaging?

21  A.      It depends on the -- you know, you could be doing

22  anything from custom film to folding cartons to cases.  I

23  mean, every step of the way, like from where the package

24  goes, where it's going to be inventoried, how it's going to

25  ship, how you're going to handle customer service when that

248

1    package reaches the consumer when they have a response to

2    it, how you're going to manage that response.

3    Q.       And do you do packaging once and then it's fixed in

4    time and it never changes, or do you have to continually

5    invest in it or something else?

6    A.       Yeah.  At Mrs. Fields typically we ran for, I'd

7    say, maybe several years, maybe three years.  We'd start up.

8    We'd run for -- on start up would be your first year.

9    Second year you'd push it out.  Third year, you would

10   continue with it, and maybe fourth year you would be

11   transitioning to something new.

12   Q.       You're talking about packaging now, right?

13   A.       I'm referring to -- yeah.  I'd say that's kind of

14   just a life cycle, if you would, of product over time --

15   Q.       What about marketing?

16   A.       And then --

17   Q.       I'm sorry.

18   A.       Packaging updates consist of -- you don't -- you

19   don't change -- the brand I worked on, the Jell-O brand, you

20   don't change necessarily.  And it was there for 60 years.

21   We wouldn't change exactly, you know, what it would look

22   like.  We would make small tweaks to it and adjustments to

23   refine it to the taste and the pallet of the consumer to

24   make it relevant.

25   Q.       Do you need to invest in marketing?

1    A.      We would.  In some cases, we would use any type of

2    gorilla marketing.  We'd start with gorilla warfare

3    marketing, really, and in some cases, one of the -- you

4    know, I just recall, for instance, sitting across the desk

5    from the Chicago -- like in Chicago at the Costco midwest

6    buyer's office.  That's one way we literally build the

7    product with the buyer at Costco.  They take pride in the

8    product that they created with the manufacturer, and then

9    we'd launch.  And that's one way to enter the market.

10           That's one way that, like a gorilla warfare method

11   for -- for starting out.  Once we get into that market, then

12   we go around to the different retailers in that region and

13   try and push into -- further into the market, and that's

14   just an example of the way we would market without

15   investment dollars.  If we have investment dollars, we're

16   going to go, you know, a different path.  We're going to tie

17   into the brand overall and what they are doing at

18   Mrs. Fields Corporate and look for synergies there and then

19   we're going to use a number of different vehicles to market

20   the product.

21   Q.      I want to take you back to Exhibit 49, which is a

22   document that Mr. Rothschild showed you.

23   A.      Yeah.

24   Q.      This was your presentation to Neal Courtney in

25   January, 2014?

1    A.        Yes.

2    Q.        Do you recall that?

3    A.        Right.  Yes.

4    Q.        Did you work on this alone and send it to him

5    without sharing it with Mr. Lindley?

6    A.        You know, parts of this I'm sure I discussed with

7    Chris Lindley.  I didn't come up with every -- like every

8    idea here myself, but this is my presentation, and, you

9    know, it came from me as a proposal I wanted.

10   Q.        You had this page that I have up here, called

11   critical needs.  Do you see that?

12   A.        Uh-huh.

13   Q.        Was that your own assessment of what the needs of

14   the company were at the time?

15   A.        You know, I believe that to include -- you know, I

16   probably had discussion with Chris Lindley about the

17   critical need as well, you know, and specifically the need

18   to hire someone and bring someone on who's  already familiar

19   with the trade, familiar with the Mrs. Fields brand and

20   familiar with launching the Mrs. Fields brand in a bigger

21   way.

22   Q.        And why was there a need for that at this time, in

23   2014?

24   A.        You know, coming off of a year where the co-packer

25   literally went down due to a fire, you take sales down that

251

1   low, you're almost like a new start-up, having to adapt to

2   the business.

3   Q.        That was going to be another question I had for

4   you.  You mentioned when you spoke to your wife about making

5   this transition, you talked about I think the excitement

6   that goes with it's time to go to another start-up; is that

7   correct?

8   A.        Yeah.  That was kind of like the sales were lower

9   at the time and, you know, that was kind of the -- the

10  excitement around the potential and, you know, looking

11  forward to another challenge.

12  Q.        If you --

13  A.        -- and I was excited try again.

14  Q.        I'm sorry.

15  A.        Oh, no.

16  Q.        I just wanted to say, from your perspective, you

17  viewed this opportunity as a opportunity to get on board

18  with a start-up?

19  A.        Yeah.  It was something still in a small state at

20  that time, in, you know, in 2013, beginning 2014.

21            MR. AMANI:  I don't have anything further, Your

22  Honor.

23            THE COURT:  Thank you, Mr. Amani.

24            Mr. Rothschild, any redirect?

25            MR. ROTHSCHILD:  No, Your Honor.  Thank you.

```
1              And thank you, Mr. Broadbent.

2              THE COURT:  Thank you, Mr. Broadbent, and you can

3    be excused.

4              And, Mr. Rothschild, you may call your next

5    witness.

6              MR. BROADBENT:  Thank you.

7              MR. ROTHSCHILD:  Your Honor, I would like to call

8    Mr. Joe Scavitto to the stand, please.

9              THE COURT:  I'll ask my clerk to swear in the

10   witness.

11                         JOE SCAVITTO,

12   the witness hereinbefore named, being first duly cautioned

13   and sworn or affirmed to tell the truth, the whole truth,

14   and nothing but the truth, was examined and testified as

15   follows:

16             THE COURT:  You're muted.

17             MR. SCAVITTO:  Can you hear me now?

18             THE COURT:  Yes.  Thank you.

19             MR. SCAVITTO:  Sorry about that.

20             THE COURT:  Thank you.

21             You may proceed, Mr. Rothschild.

22                       DIRECT EXAMINATION

23   BY MR. ROTHSCHILD:

24   Q.    Mr. Scavitto, can you briefly tell me what your

25   business is?
```

253

1    A.        My business at the time was Gabe's Candy and Nut

2    House.  We were the co-packer for Christopher Lindley and

3    Mrs. Fields popcorn.

4    Q.        And where are you located?

5    A.        At that time, it was in Bensalem, Pennsylvania, a

6    suburb of Philadelphia.

7    Q.        And what products did you make for Mrs. Fields

8    popcorn?

9    A.        We drizzled the chocolate popcorn and packaged off

10   the popcorn that was not even chocolate covered.

11   Q.        Okay.  And what is your experience and background

12   generally?  What do you do?

13   A.        Well, I do chocolate.  I've been doing that for

14   30-something years.  And we co-packed -- I believe we

15   started with Chris somewhere in the 2009 time frame.

16   Q.        And you did business under the name Gabe's?

17   A.        Gabe's candy.  It was a partnership.

18   Q.        Who were your other customers -- oh, sorry.  Who

19   were your other customers?

20   A.        Well, we also had a retail shop, so we did a lot of

21   our own packaging and stuff for ourselves.  We had also done

22   some co-packing for Darlette Jenkins, which was Toad-Ally.

23   We would do their overflow work.  And we actually did some

24   co-packing for Cargill Chocolates.  They're a Siglent brand.

25   We were also doing some stuff for -- pharmaceutical stuff

254

1   for Cargill, too.

2   Q.       Is the production for MFGPC, the Mrs. Fields

3   popcorn, was it a simple preparation or was it a difficult,

4   complex product?

5   A.       It was simple.

6   Q.       Did you have any involvement in putting together

7   packaging or packaging the product as well?

8   A.       Yes.  I was in charge of production.

9   Q.       And is that -- is that difficult?  I mean, is it

10  ornate?  I mean, tell me about that.

11  A.       Not really.  I mean, most of it is logistics like

12  getting all the materials and stuff in and, you know,

13  planning time to make sure that, you know, you don't run out

14  of something.  That would be pretty much the hardest part is

15  the logistics in making sure that you have all the supplies,

16  and then once you had that all straightened out, then you

17  had to make sure that you had the staff to be able to, you

18  know, do the specific run or whatever was required by the

19  customer.

20  Q.       Was MFGPC a good customer for you?

21  A.       Yes.

22  Q.       Did you have capacity, excess capacity to produce

23  additional popcorn if he had ordered it?

24  A.       Yes.

25  Q.       And how much?  Can you give me a scale?

255

1    A.        Well, when we first started, we were pretty limited

2    with the equipment, and we were actually upgrading the

3    equipment as we were going along.  I think at the time we

4    were probably doing somewhere around 3 to 600 pounds of

5    popcorn an hour, and just before the fire, we had extended

6    the line to produce almost up to -- I want to say around 900

7    to a thousand pounds an hour.

8    Q.        And, I mean, relative to MFGPC's orders, does that

9    give you the capacity to, you know, to produce 50 percent

10   more than he ordered or a hundred percent more or multiples

11   more than what he ordered from you?

12   A.        I'd say a good 50 to 70 percent, somewhere in that

13   range.

14   Q.        So you could have scaled up your popcorn production

15   for him by at least half?

16   A.        Yes.

17   Q.        As you produce more, do your margins go up or down?

18   A.        The margins, they -- I'd say our margins go up

19   because the cost of doing business goes down.

20   Q.        Why is that?

21   A.        Just because you get more efficiency as you're

22   going and you don't waste the clean up time, the shut down

23   and all the starting and stopping issues that you would

24   normally associate with running a business.

25   Q.        And tell me about the popcorn category.  I mean,

256

1    you're still in the popcorn category, correct?

2    A.        No, I'm not.  My business partner passed away, so

3    the business is actually closed.  I'm actually working for

4    somebody right now.

5    Q.        What is your -- what time frame did you exit the

6    popcorn category?

7    A.        Well, we pretty much stopped doing the popcorn

8    pretty much as soon as Chris had stopped doing business with

9    us, but, I mean, the business kept going on with the

10   packaging and co-packing up 'til 2019.

11   Q.        And did you observe any increase or decreases in

12   the popcorn category during that time?

13   A.        I really couldn't say, I mean, because we were

14   pretty much exclusively doing the popcorn for Chris as we

15   were going on.  I felt that we were doing more and more

16   business, up until the 2013 time frame when our next door

17   neighbor had the fire, which shut our place down.

18   Q.        Tell me about that, that fire.  What happened and

19   how did it impact you?

20   A.        Well, basically it started in a space heater.  We

21   were told that the person was cold and they must have left

22   it on over the weekend, and we were actually all away at a

23   trade show, and the fire had smoldered for three days, and

24   nobody noticed it because there were issues with the fire

25   alarm system in the entire complex and then that was pretty

1  much it.  You know, your world was turned upside down or at

2  least my world was.

3  Q.        Did you have direct interaction with Mrs. Fields,

4  as opposed to Mrs. Fields popcorn?

5  A.        No.

6  Q.        Do you have any relationship or touches with the

7  stores or delivery of popcorn to customers?

8  A.        Well, through Chris.  I mean, whatever he would --

9  we would ship out, you know, direct to whatever customers

10 that Chris had supplied in the purchase orders and stuff

11 like that.  I mean, the only other contact that we had was

12 at the trade show.  For our own business, we would actually,

13 like the stuff that is behind you, we actually had it on

14 display as, you know, trying to get more co-packing

15 business.  These are things that we had done.

16         And we actually had Mrs. Fields' actual store, the

17 Mrs. Fields Store brand customers would come up to us, and

18 they would ask us, how could they actually purchase the

19 stuff that is behind you on your desk.  But we would forward

20 the information to Chris, but apparently there was -- there

21 didn't seem to be anything that Chris could do to get

22 Mrs. Fields to carry it in their stores, and even though the

23 store managers had wanted it.

24 Q.        Thank you.  Would you -- I mean, aside -- setting

25 aside the fire, did you eventually get the plant up and

1   running again?

2   A.       Yeah.  It took about six months and then we started

3   producing again.  I believe we did, like, maybe one or two

4   more orders for Chris, but then he was also using another

5   co-packer, too, so everything was kind of like in half, I

6   guess.

7   Q.       And if you had been given large additional orders,

8   would you have been ready and willing to make additional

9   orders for hi?

10  A.       Yes.

11  Q.       And tell me about trade credit.  When you -- when

12  MFGPC sends you an order for popcorn, when does it have to

13  pay for it?

14  A.       Typically, at the time, I think we were on 30 days.

15  Again, he supplied all the materials so there was no cost

16  that way.  It was basically 30 days, at least for the

17  chocolate portion.  Any chocolate that we used had to be

18  paid in 30 days at the time.

19  Q.       So, let me just back up a little bit.  He

20  supplied -- did he supply candy-coated popcorn already or

21  did you pop the popcorn?

22  A.       No.  He supplied the candy popcorn.

23  Q.       Okay.  So you --

24  A.       We just did the chocolate and the did the

25  packaging.

259

1  Q.      Okay, so you drizzled and packed it, but it had

2  already been popped and candy coated, right?

3  A.      That is correct, yes.

4  Q.      And did you ever have a discussion with Chris about

5  potentially extending him trade credit or perhaps other ways

6  of sort of expanding or capitalizing the business?

7  A.      Not -- we really didn't.  I didn't have any

8  conversations directly with Chris about that.  That would

9  have been my business partner, but I don't see any reason

10  why we probably couldn't have gone to, like, 60, 90 days

11  because our -- our portion of it was really a minor

12  investment.  It was mostly labor.

13  Q.      Okay.  Thank you, and I have nothing else for you,

14  and I appreciate you being here today.

15          THE COURT:  Thank you, Mr. Rothschild.

16          Mr. Amani, you may cross examine.

17          MR. AMANI:  I have no questions, Your Honor.

18          THE COURT:  Thank you.  Mr. Scavitto -- am I saying

19  that correctly?  You're excused.  Thank you?

20          MR. SCAVITTO:  Okay.  Thank you.

21          THE COURT:  You may call your next witness,

22  Mr. Rothschild.

23          MR. ROTHSCHILD:  I'd like to call Justin Hornick,

24  please.

25          THE COURT:  Mr. Hornick.

260

```
1              There he is.
2                      JUSTIN HORNICK,
3   the witness hereinbefore named, being first duly cautioned
4   and sworn or affirmed to tell the truth, the whole truth,
5   and nothing but the truth, was examined and testified as
6   follows:
7              THE COURT:  We can't hear you for some reason,
8   Mr. Hornick.  You're not muted according to my screen, but
9   we can't hear you.  Now it says you're muted.  Now it says
10  you're unmuted.
11             MR. HORNICK:  Can you hear me now?
12             THE COURT:  Yes.  Thank you.
13             MR. HORNICK:  Okay.  Sorry about that.
14             THE COURT:  You may proceed, Mr. Rothschild.
15             MR. ROTHSCHILD:  Thank you.
16                     DIRECT EXAMINATION
17  BY MR. ROTHSCHILD:
18  Q.     Mr. Hornick, what is your experience or educational
19  background, please?
20  A.     My education, I have a degree in biology and
21  biochemistry from St. Francis University in Loretto,
22  Pennsylvania.
23             THE COURT:  Mr. Hornick.  Excuse me.  Speak up as
24  well as you can.  You're a little difficult to hear for some
25  reason?
```

261

```
 1              MR. HORNICK:  I got a new computer.  I'm sorry.
 2    Can you hear me now?
 3              THE COURT:  That's better?
 4              MR. HORNICK:  Okay, I'll get close to the monitor.
 5    Yeah.  I have a science background and, out of school -- I
 6    graduated St. Francis in '94 and started doing medical
 7    sales, pharmaceutical and working for neurologists and then
 8    I came into the business.  My father had been 25 years in
 9    the snack food industry, and he had bought this company with
10    some partners in '97 and, you know, the family business was
11    supposed to be a great opportunity, so I actually quit a
12    pretty lucrative job to come down here and work with my
13    father and his partners.  And when I started in there,
14    because they had grown really rapidly with ConAgra but they
15    needed a quality control person full time, and I kind of
16    took that role over because of my science background.
17              And I was involved in production and sales and
18    marketing and everything with the company, everything in
19    regards to running the company, from operations to quality
20    control, new product development, basically everything
21    within the company.  And I have been here now, it will be 24
22    years in February.
23    Q.       Thank you, you say the company.  Tell me, what is
24    your company?
25    A.       The company is -- our branded name is Stonehedge
```

262

1    Farms, business name is Popcorn Alley Snacks.  We operate as

2    Stonehedge Farms, and we are a ready-to-eat carmel corn

3    manufacturer in Delaware, Pennsylvania.  We do all --

4          THE COURT REPORTER:  Excuse me, sir.

5          MR. HORNICK:  Yes.

6          THE COURT REPORTER:  Could you speak maybe a little

7    bit more slowly and also more clearly.  I'm having a hard

8    time understanding you.

9          THE COURT:  That's the reporter, Mr. Hornick.  So

10   the reporter needs to hear you and understand you.

11         MR. HORNICK:  I talk fast, so --

12         THE COURT:  Slow down a bit and speak up.

13         MR. HORNICK:  Okay.

14   Q.    BY MR. ROTHSCHILD:  Again, where are you located?

15   A.    We are in Dover, Pennsylvania.

16   Q.    And what are your products at Popcorn Alley?

17   A.    We do all ready-to-eat candy-coated popcorn, carmel

18   corn, kettle corn, butter toffees, with inclusions, without

19   inclusions, nuts and all different degrees of quality, you

20   know, from real lightly coated product do very heavily

21   coated product.

22   Q.    And who are your major customers?

23   A.    At the moment, we sell direct to retail trades, Big

24   Lots, Wegmans, Weis Markets, Shoprite in Jersey.  We do a

25   lot of in-and-out sales, so I sell grocery stores and retail

1    trade stores all over the United States.  We do some export

2    business and then we also -- I do a lot of co-packing and

3    private label.  So I'll co-pack for -- right now, Utz is a

4    huge co-packer of mine, Herr's potato chips, Brimhall Foods

5    in Tennessee and a lot of chocolate companies and corporate

6    gift giving type people, we will do stuff for them and their

7    brands.

8    Q.     How did you first come to know Christopher Lindley?

9    A.     I can't remember how we actually met.  It might

10   have been at a trade show or a referral.  We were --

11   probably ConAgra.  Actually, we were a ConAgra co-packer for

12   many years, we did the Orville Redenbacher brand nationally,

13   and we did the Act II Golden Valley brand nationally, and I

14   know Chris was affiliated with that.  So we might have -- if

15   I had known him at that time, that's how we -- we were their

16   co-packers, their east coast provider for all their

17   manufacturing.

18         THE COURT:  Be sure and don't speak too rapidly.

19   Q.     BY MR. ROTHSCHILD:  And do you do chocolate

20   drizzling in your plant?

21   A.     We do not.

22   Q.     Do you do compound or real chocolate or both?

23   A.     We do neither.  We have done like a cocoa flavored,

24   but I work with a lot of chocolate companies ourselves that

25   we partner with.  Joe was one of those for a long period of

264

1    time.  And he had mentioned Toad-Ally Snacks.  That was

2    another partner of mine that does a lot of chocolate robing

3    and chocolate drizzling, and I work with another probably 20

4    chocolate companies in the immediate area of Pennsylvania.

5    Q.        And when you made orders for MFGPC -- at some point

6    you came to be a co-packer for MFGPC; is that right?

7    A.        Yes.

8    Q.        And do you know what percentage of your business

9    was MFGPC at any one time?  Do you have any idea?

10   A.        Chris was a pretty large -- I couldn't say a

11   percentage.  He was probably pretty low.  We are a pretty

12   large producer, and I have a hard time putting a percentage

13   on it.  Ten percent, maybe, 5 percent.

14   Q.        And did you have excess capacity so that if he gave

15   you additional orders, jumped his volume significantly over

16   the years, that you would have the capacity to make more for

17   him?

18   A.        Yes.

19   Q.        On a grand scale, like, you know, you could have

20   jumped 10 percent more or 20 times more or just give me a

21   ball park.

22   A.        A hundred times more.  I mean, we're a very large

23   producer, a co-packer.  It really just came down to

24   planning.  I couldn't, you know, turn the light switch on

25   tomorrow and run, you know, $20 million for Wal-Mart in a

265

1    week, but we filled the pipelines for the Wal-Marts,

2    Targets, Sam's Clubs, Costcos, BJ, Krogers of the world

3    several time, for other people as well.

4    Q.      So adding, say, 25 or 30 percent on the business

5    that you did for Chris before would not have been a problem

6    at all?

7    A.      No.  We would need a little bit of planning and

8    lead time, but it's more of a labor component than it was,

9    you know, capacity with the plant.  It was more just running

10   more shifts, extra shifts, things like that.

11   Q.      And I want to ask you about margins.  You said it's

12   more of a labor thing, so if you do a larger run, does the

13   margin go up or down?

14   A.      Yeah.  There's definitely savings, obviously, with

15   long runs.  Obviously there's a clean up, so when you're

16   doing consistent product for a long period of time, the

17   margin gets a little better.  There's efficiencies

18   obviously, packaging changeovers.  Clean up's a big one for

19   our business because carmel corn popcorn is really messy, so

20   running for, you know, 15 hours straight and having to clean

21   up is a lot bitter than running two hours and having to

22   clean up.

23   Q.      I understand.  How was your relationship with

24   MFGPC?  When did you first start doing Mrs. Fields popcorn?

25   A.      It was good.  As far as the relationship, I have to

266

1   see when we first started with Chris.  I can't recollect off

2   the top of my head.  It was awhile though.  I mean, we have

3   been a packer for him for quite some time.

4   Q.      Did he pay his invoices on time?

5   A.      Always, yes.

6   Q.      And what would you do if you had a customer that

7   didn't pay your invoice on time next time you got an order

8   from him?

9   A.      We'd make them -- that's our policy now if someone

10  didn't pay us or was really late, we would probably make

11  them pay in advance.

12  Q.      Did you ever have any discussions regarding

13  partnering with MFGPC or owning part of MFGPC or credit with

14  MFGPC to expand the business?

15  A.      Yeah.  We had discussions about that.

16  Q.      What were they?

17  A.      Partnering up for a number of reasons; just for

18  opportunity, to work with the brand, to grow it.  We were

19  kind of -- you know, the brand had gone really well with

20  ours.  I mean our brand is -- we were disgorge kind of plain

21  carmel corns, peanut butter toffee, so Mrs. Fields was kind

22  of that brand name and that indulgent -- was kind of -- was

23  something that we didn't really have so, you know, and the

24  export business, you know,  we were -- we are a pretty large

25  exporter, so there was a huge interest in the export

1    business.  We export -- we have exported to probably about

2    21 countries, and we still export to this day.  We were

3    exporter of the year, for (unintelligible) Pennsylvania

4    twice, and we won their Agro 2000 award as well, so there

5    was some really interest in the export component for the

6    Mrs. Fields brand.

7    Q.      And you -- so what happened to those discussions?

8    And I'm assuming that they never actually resulted in

9    anything?

10   A.      No.  I mean we never -- it was always kind of on

11   the table.  We were always -- you know, we were always kind

12   of looking at the next step ahead which was mainly just the

13   promotional and in-and-out sales and, you know, I was really

14   heavily involved with Chris on the packaging and product

15   development side.

16   Q.      Tell me about that.  What did you do?

17   A.      I mean, Chris had the formulation, but there was

18   constantly -- I mean, the market had changed a lot, too.

19   Costing is always a factor, I mean, with everything in the

20   food business, from packaging changes to, during that time

21   period I remember like ethanol went crazy that one year, I

22   can't remember what year that was.  I want to say, like,

23   2008 or '9, like the ethanol went really crazy in our corn,

24   and corn syrup costs really skyrocketed, so there was always

25   looking at, like, new sizes, new inclusions, holiday items.

1           So that was the kind of things we'd throw together

2    as far as samples, different packaging sizes.  One of our

3    strengths, we had a lot of flexibility, so we were in, we

4    did several items for Chris.  We did a lot of bag items for

5    him, full bags that went into boxes that we repacked.  For

6    some of the mass markets, we were looking at doing bigger

7    bags and boxes and barrels, and I actually found one here

8    that we did, like Mrs. Fields, like, barrels like these.

9    This was in my archive.  I clean my office out probably

10   like, you know, once a quarter, and this is some stuff I

11   still had.

12          And we did several sizes of barrels for Mrs. Fields

13   because every concentrate is kind of different, so we would

14   experiment and try different things depending on what the

15   buyer wanted, was looking for, you know.  There was always

16   inclusions, cranberries, nuts, and that doesn't even include

17   what he did on the chocolate side with (unintelligible).

18          THE COURT REPORTER:  Excuse me, sir.  I didn't

19   understand what you just said.

20          MR. HORNICK:  I said:  That didn't include like

21   with the chocolate side of the business.  I was just -- I

22   supplied product for him to send to the chocolate companies,

23   and we would do inclusions, so a lot of our products for

24   Chris were from the butter toffee base formula, so we would

25   add inclusions, whether it be specific nuts.  We did a

269

1    macadamia product.  We did a cashew almond product.  I would

2    develop those with Chris, you know, that he would, then

3    market and whatever case pack was appropriate for the

4    specific retailer.

5    Q.        BY MR. ROTHSCHILD:  You mentioned buyers, what the

6    buyers wanted.  Did you have a sense of MFGPC's relationship

7    with the buyers in the trade?

8    A.        Yeah.  Yes.  I mean -- I mean, we ran in similar

9    circles with customers.  Chris had, from his experience with

10   ConAgra and his other one, Fisher, had had contact with a

11   lot of club industry, the drug trade, specific retailers.

12   Yeah.  Even some Dollar business.  But, I mean, it seemed

13   like he was doing more like kind of the drug trade and a lot

14   of the club business.

15   Q.        When you say drug trade, do you mean drug stores,

16   just to be clear?

17   A.        Yeah.  Sorry, yeah, like CVS, Walgreens, Rite Aid,

18   all those.

19   Q.        Is it -- could MFGPC, if it had wanted to, gone to

20   its buyer relations and sold a lot more popcorn?

21   A.        Yes.

22   Q.        Tell me about the category generally.  Do a lot of

23   new entrants come into the market each year?

24   A.        Yes.

25   Q.        And do they have a high success rate?

1    A.        No.

2    Q.        What's the success rate, in your experience?

3    A.        I hate to say it's pretty low.  I see -- I do the

4    trade shows, some major trade shows every year, and every

5    show I'll see hurting popcorn companies, and most of them

6    won't be there the next year.  The category has been

7    growing, so you're seeing a lot more even recently.  The

8    category has been growing for several years.

9    Q.        I mean, give me a time frame of that growth.  I

10   mean, how long has the growth been going in the category?

11   A.        I would say the category has been growing, I mean,

12   nonstop since -- it was still growing when I first got into

13   the business in '98, but it got really crazy in the last

14   probably, you know, 2008 on, I think.  And the category is

15   really unique.  I mean, I was listening to the other

16   testimony.  I mean, you did see -- the market got flooded

17   had with the skinny pop type items.  Kettle corn got really

18   big over that period.  But you still see a large demand for

19   indulgent products, there's no doubt.  I mean, I feel like

20   it's gone were one way or the other.  In the popcorn

21   category, it's either gotten very plain and simple or it's

22   gotten really, really indulgent, which, you know, chocolate,

23   inclusions.

24           I mean, we've just -- we've been really lucky.  We

25   make a really good quality product as far as our own brand,

271

1    and we do, you know, plain barrels, very competitive pricing

2    on in-and-out.  So I think we're one of the -- one of the

3    few companies that really stay steady with really kind of

4    the simple value-added product, but most of the category is

5    really light and healthy or crazy indulgent.

6    Q.      So -- and MFGPC's products were by and large on

7    which part of the spectrum?

8    A.      Indulgent.

9    Q.      And was MFGPC positioned well to take advantage of

10   that growth?

11   A.      Yes.

12   Q.      Why?

13   A.      The brand name.  The brand name.  The quality of

14   the product.  The packaging was -- I felt was pretty

15   innovative.  He -- I mean, I thought they had a good

16   marketplace with multiple items for, you know, multiple

17   channels.

18   Q.      And, I mean, in your estimation, was MFGPC's

19   business alive and well at the time that he was terminated

20   in 2014?

21   A.      Yeah.  It was growing.  It was consistent.

22   Q.      What are the trade terms when MFGPC gives you an

23   order?  When does it have to pay for it?

24   A.      We normally will -- you know, we would fluctuate

25   that if need be, but for the most part our terms are 30 --

272

1    net 30 days from time of shipment, 2 percent ten, cash

2    payment or, you know, net 30.

3    Q.        And he couldn't just buy popcorn from you and then

4    say:  I'll pay you when I get paid from my retailers.

5    A.        We normally didn't do that.  We normally wanted

6    terms.  We would have -- I'm trying to think in broad how we

7    have dealt with other customers.  We are pretty -- we are

8    pretty strict on that.  I mean, we have extended terms with

9    customers for 45 or 60, even 90 with some customers.  We try

10   to avoid that at all costs.  But Chris paid for a lot of his

11   packaging, too, so that's a -- you know, we were just

12   charging basically for the product itself and labor and that

13   aspect.  So packaging, the fact that Chris paid for his own

14   packaging was a pretty big factor, I mean, for us at least.

15   Q.        And if a customer over extended itself and makes a

16   big order, doesn't pay for it on time, when it comes to you

17   again the next time, what happens?

18   A.        We would make them pay in advance on the next

19   order.

20   Q.        Have you seen many businesses that lasted as long

21   as MFGPC, which, just for your reference, was 2003 all the

22   way until it was terminated at the end of 2014.  Have you

23   seen any other popcorn companies last that long?

24   A.        There's been a lot that have failed.  I mean, most

25   of the ones that have -- have been that long or longer.  And

1    I work with a lot of popcorn companies as well.  I mean, I

2    hate to say, it's kind of a small world.  Even some of my

3    competitors I've co-packed for over the years in certain

4    times.  But it's -- there has been a lot of turn over in the

5    popcorn industry, absolutely.

6    Q.        And, you know, there's been some discussion in this

7    case about sort of slow and steady versus, you know, trying

8    to grow quickly.  I mean, what's your judgment of whether

9    just sort of being in the market is a -- without pushing for

10   huge profits, is that a legitimate strategy that you see

11   your customers engaging in?

12   A.        Absolutely.

13   Q.        Or you, yourself engaging in?

14   A.        Myself, and I mean, I say that a lot about popcorn

15   companies that have come and go over the years.  Slow and

16   steady is the rate.  You know, it's tough with growth, from

17   manufacturing to the marketing perspective, and, I mean, go

18   to your brand.  Unless you're throwing -- you know, if you

19   go into every store immediately, I mean you'd have to throw

20   so many millions of dollars, and it's risky.  I mean, these

21   retailers can discontinue your brand as fast as anything,

22   but I think it's -- you know, the ones that last the

23   longest, even like small guys to medium size co-packers that

24   I personally know in the popcorn industry, it's slow steady

25   growth.

274

1       You kind of have to go that way to be safe.  It's

2  like a snowball effect.  One account helps you get another

3  account helps you get another account, so it's just the

4  class of the trade.

5  Q.      And is there anything in your mind that would have

6  prevented MFGPC from taking advantage of the growth in the

7  market in the years after it was terminated, 2014, '15, '16?

8  A.      No.  I think it actually would have been better, to

9  be honest, because I think the market has gotten really -- I

10 mean from 2000 -- I mean from 2016, to now, the ready-to-eat

11 category has really grown, I mean dramatically grown.  I

12 mean even, through Covid this last two years, we have still

13 had record sales.

14 Q.      And you would have continued doing business with

15 Lindley on those terms or perhaps, if he had asked, maybe

16 done some accommodation with him?

17 A.      Yes.

18 Q.      Okay.

19         I have nothing further for Mr. Hornick.

20         I appreciate you.

21         THE COURT:  Thank you, Mr. Rothschild.

22         Mr. Amani, you may cross examine.

23         MR. AMANI:  Very few questions, Your Honor.

24

25

```
1                        CROSS EXAMINATION

2    BY MR. AMANI:

3    Q.        Mr. Hornick describe if you would your

4    understanding of why it's so difficult to survive in this

5    business.

6    A.        I'm sorry?

7    Q.        Describe if you would your understanding of why

8    it's so difficult to succeed in this business.

9    A.        I think -- I guess the basis I would say is slow

10   and steady.  I think a lot of the new customers that come

11   out don't have a -- they may have something new and

12   different, but new and different doesn't always translate

13   into longevity.  That's why I say, a lot of these new

14   popcorn companies have some, you know, I hate to say it's a

15   gimmick, but they're pushing, like, fire popcorn or some

16   kind of flavor.  And, again, some of these people are not

17   marketing people.  There's a lot of start-up kind of

18   operations that don't have any experience in the category,

19   which I think is probably one of these factors.

20            I mean, most of these popcorn companies starting

21   up, they are not -- they haven't been in the category long

22   enough.  I don't think they really realize the commitment,

23   you know, and having the contacts and, you know, that kind

24   of aspect of it.  The costing.  You have to be competitive

25   manufacturing-wise as well as, you know, having the wares
```

```
 1    for marketing and sales.
 2    Q.       You mentioned costing.  Packaging is part of that
 3    costing, right?
 4    A.       Yes.
 5    Q.       And what did you -- and you -- and it's -- it
 6    sounds like you worked very interactively with Mr. Lindley
 7    on packaging?
 8    A.       Yes.
 9    Q.       You mentioned that he had multiple items in
10    multiple channels.  Do you remember that?
11    A.       Yes.
12    Q.       What were you referring to?  The multiple channels
13    is reference to what?
14    A.       Multiple -- when I say channels, you could have
15    club business, retail, which would be grocery stores, the
16    grocery store trade, which is huge, the drug trade, which is
17    like Walgreens, CVS, Rite Aid.  And then you can break down
18    to C-Store, and within that, that can be broken down into
19    wholesale markets with C-Stores as well.  That's basically
20    the biggest group that we kind of dabble in, Chris did and
21    myself.
22    Q.       So he was in several groups?
23    A.       Yeah.  I mean --
24    Q.       When you say channels?
25    A.       I mean, a lot of our business, you know, there's
```

277

1    just two ways, there's either on the shelf, slotted into

2    these marketplaces.  Kind of sometimes the easiest, most

3    cost competitive is just try to do promotion sales.  So

4    that's a safer bet.  It's a nice volume.  It's not as

5    consistent always.  You get the ups and the downs.  We still

6    do that way because the slotting game is really dangerous.

7    It's a lot of money for what you might get out of it, so we

8    tend to do more promotion type sales, which is really good.

9    I mean, you get your nice shots in the arm with different

10   chains, you get orders, and it can be big, very big.

11   Q.      Did you work with MFGPC on promotional items?

12   A.      From what I remember, I think that's a little bit

13   more what we were doing was kind of like in and out with

14   CVS, in and out with certain chains.  I think Chris was big

15   with Kroger.  I can't remember.  But the drug trade -- I'm

16   sorry, the drug trades -- the club business is always, you

17   know, one we tried to pursue.

18   Q.      And you would help him out in those efforts with

19   what, with product development and packaging?

20   A.      Yeah.  I mean -- I mean, Chris had a base formula

21   already put together that we, you know, we tested run, so a

22   lot of it really came down to more inclusions, things we

23   added into it to make it, you know, something like -- I

24   remember we did cranberry.  Like for Christmas in-and-out

25   promotions, we did like a Peppermint bark that was mixed in.

1    We did a cinnamon, I believe.  It was more about inclusions.

2         But then he took it, you know, past that, where I

3    would just supply bulk and then the gentleman who was just

4    testifying or they would do chocolate and, you know, add to

5    it.  The chocolate was a pretty big piece, from what I

6    remember.

7    Q.      That was the product formulation side.  What about

8    these promotions on the packaging?  Was there efforts that

9    had to be made with respect to the packaging?

10   A.      There's always -- like I said, I can't remember off

11   the top of my head how often we needed to change things.  I

12   know now packaging changes with the FDA, it's a never ending

13   cycle.  We have changed all our packaging here internally

14   with our own stuff probably four times in the last three

15   years, just because you have to add sugars and then you have

16   to add, you know, some other disclaimers, so packaging

17   changes are never ending in the food industry, which is part

18   of the business.

19   Q.      And that's the labeling that you're referring to,

20   right?

21   A.      Yes, labeling which could be -- so, like we would

22   label barrels would be one component.  Film is a pretty big

23   investment, you know, and plate changes, things like that,

24   so, you know, I would say any new flavor you do or any

25   change, if there's art and plate change costs film costs and

1    all that.

2            MR. AMANI:  I don't think I have anything further,

3    Your Honor.

4            THE COURT:  Thank you.

5            Mr. Rothschild, anything else?

6            MR. ROTHSCHILD:  Yes.  Just briefly.

7                        REDIRECT EXAMINATION

8    BY MR. ROTHSCHILD:

9    Q.      You were talking about packaging.  Do you include

10   the cost of, for instance, like making the packaging, the

11   plastic or the box or paper, or whatever in part of your

12   cost of goods sold?

13   A.      Yes.  Yes.  So like with our stuff personally --

14   and there were some items we had done for Chris like the

15   barrels, it would vary by project to be honest with you.  I

16   mean, if it was something that we were already buying, that

17   we were buying in big volume and there was a savings there,

18   then we would include it.  I do it for my customers now.  I

19   would include the packaging already.  But if it was

20   something custom or something that's not -- out of my scope,

21   if I don't feel like I can buy efficiently enough doing it,

22   then I just have the customer buy it.

23   Q.      But let me ask you about that, versus a packaging

24   redesign, like every five or six years, you're going with a

25   different type of look or program.  That's something that

280

1    gets amortized over a much longer period.  It's not part of

2    cost of goods sold, or is it?

3    A.       That's something like a cost we fix right there.

4    The film and everything is cost of goods, but obviously,

5    like plate changes, that's kind of like an initial cost.  We

6    don't really amortize it.  It's just kind of -- it's just an

7    up front cost you have to pay like changes or something you

8    have to deal with for labels or bags.

9    Q.       So, you know, making a minor, you know, FDA

10   ingredient label change versus an entire packaging program

11   change, is that sort of a distinction there that you'd make?

12   A.       Yeah, like a formula.  Yeah.  I mean I don't

13   think -- it's not really changing the whole brand or

14   something like that.  It's just -- it's like -- it's plate

15   changes, you know, on a label or on a bag.  It's not like

16   redesigning the entire package.  It's just things you might

17   have to change on it, like the sugar.

18   Q.       And is that -- is that, you know, a really

19   significant cost when you make a smaller change like that,

20   or is it -- I mean, is it equivalent to, you know, like a

21   redesigned package program?

22   A.       No.  I mean, it's a minor cost.  I mean, plates

23   aren't super expensive crazy, I mean, especially when you're

24   going after some pretty large volume.

25   Q.       Okay.  Thank you, Mr. Hornick.

281

1           I have nothing further.

2           MR. AMANI:  One follow up?

3           THE COURT:  Yeah.  Go ahead.

4                     RECROSS EXAMINATION,

5   BY MR. AMINI:

6   Q.      I just need you to clarify something for me,

7   Mr. Hornick.  These packaging costs, those are in the costs

8   of goods sold you were talking about.  Those are your --

9   these are for your products or for Mrs. Fields' products?

10  A.      It's definitely my products.  The stuff we did for

11  Mrs. Fields, like I said, I remember Chris purchasing almost

12  all of his own packaging unless -- like I said, unless there

13  was something -- I remember we went to a barrel program, and

14  it was a barrel that I bought a lot of, so it made more

15  sense -- I mean, the packaging was still included in it, but

16  it was like that was one piece where I would say, okay, the

17  cost is going to include the barrel, the product, the lid,

18  but you would pay for the label.  Like we would do -- we did

19  that on a couple of things, so it would vary by the item.

20  So Chris would do a lot of bags and stuff, too, so he pretty

21  much bought all the packaging as I remember.

22          MR. AMANI:  Thank you.

23          THE COURT:  Do you want to ask anything about that,

24  Mr. Rothschild?

25          MR. ROTHSCHILD:  No.  Thank you, Your Honor.

282

1          Thank you, Mr. Hornick.

2          THE COURT:  Thank you, Mr. Hornick.  You may be

3     excused.

4          MR. HORNICK:  Thank you, Your Honor.

5          THE COURT:  Okay, rather than start a new witness

6     right now, we'll take a recess until about 10:20 mountain

7     time.  For today we will go from there 'til about noon and

8     take a 30-minute or so and then go 'til two.  All right?

9     We'll be in recess until 10:20 mountain time.

10                    (Short break.)

11                        *  *  *

12          (Proceedings without the court reporter)

13                        *  *  *

14          THE COURT:  Mr. Rothschild, you may call your next

15     witness.

16          MS. WHITE:  Your Honor, I will be calling the next

17     witness, and we will be calling Mr. Patrick Kilbourne to the

18     stand.

19          THE COURT:  I'll ask him to be sworn.

20          Thank you, Ms. white.

21                    PATRICK KILBOURNE,

22     the witness hereinbefore named, being first duly cautioned

23     and sworn or affirmed to tell the truth, the whole truth,

24     and nothing but the truth, was examined and testified as

25     follows:

1           THE COURT:  Thank you.

2           You may proceed, Ms. white.

3                        DIRECT EXAMINATION

4    BY MS. WHITE:

5    Q.      Mr. Kilbourne, would you please describe for us

6    your educational background.

7    A.      Sure.  I have an MBA from the University of

8    Pennsylvania, Wharton School of Business.  I have a master's

9    degree in accounting from Brigham Young University, and I

10   have a bachelor's degree in accounting also from Brigham

11   Young University.

12   Q.      Okay.  And where do you currently work?

13   A.      Berkeley Research Group.

14   Q.      Okay.  How long have you been with Berkeley

15   Research Group?

16   A.      About ten years.

17   Q.      And what is your role there?

18   A.      I'm a managing director.

19   Q.      How would you characterize your professional work?

20   A.      My professional work I do damage analyses, lost

21   profit calculations, forensic accounting investigations and

22   some consulting work as well.

23   Q.      About how long have you been in this profession?

24   A.      About 26 years.

25   Q.      Would you tell us a little bit about your

1  professional credentials, please.

2  A.       Yes.  I'm a CPA, certified public accountants, I'm

3  a certified management accountants, a certified fraud

4  examiner.  I'm certified in financial forensics.  I'm a

5  chartered global management accountants and I am accredited

6  in business valuation.

7  Q.       Have you previously provided expert testimony in

8  litigation or arbitrations?

9  A.       Yes.  Many times.

10 Q.       Okay. How often have you performed a damages

11 analysis?

12 A.       Many, many times, probably several hundred.

13 Q.       Okay.  And did any of those damage analyses ever

14 involve the calculation of lost profits?

15 A.       Yes, frequently.

16 Q.       And do you have a sense of how many times you have

17 done that type of calculation?

18 A.       I've probably done lost profit calculations, again,

19 in the hundreds of times.

20 Q.       How often have you been retained to provide a

21 damage analysis in a case involving a license agreement?

22 A.       Quite a few times.  That's very common in my work

23 is that my lost profits or damage analyses are based on

24 license agreements.

25          THE COURT:  Just a second.  We're having trouble

1    finding the court reporter on the attendees, and that's a

2    problem.

3            MS. WHITE:  Oh.

4            THE COURT:  Becky, are you on?  Can you hear us?

5    She's also working remotely right now.

6            MS. WHITE:  She is an essential part of this.

7            THE COURT:  Yes.

8            MS. WHITE:  I don't see her on line.

9            THE COURT:  There she is.  Becky?

10                            * * *

11                  (Court reporter present.)

12                            * * *

13            THE COURT REPORTER:  Sorry, Judge, my internet just

14    went out, so --

15            THE COURT:  Did you hear any of this witness'

16    testimony?

17            THE COURT REPORTER:  I did not.  I'm so sorry.

18            THE COURT:  Well, once again, the old gizmo adage

19    prevails.  If anything can go wrong with it, it will.

20            I'm sorry, Ms. white.  Well, we swore the witness,

21    Becky.  Did you hear that?

22            THE COURT REPORTER:  I did not, but --

23            THE COURT:  He was given the oath and he said he

24    would tell the truth.

25            I'm sorry, Ms. White.  You better quickly go over

286

1   again what you have just gone over.

2          MS. WHITE:  That's fine, Your Honor.  We don't

3   mind.

4   Q.     BY MS. WHITE:  All right.  Mr. Kilbourne, would you

5   please describe for us your educational background?

6   A.     Yes.  I have an MBA from the University of

7   Pennsylvania, Wharton School of Business.  I have a master's

8   degree in accounting from Brigham Young University and a

9   bachelor's degree in accounting also from Brigham Young

10  University.

11  Q.     Okay.  And tell us, where do you currently work?

12  A.     Berkeley Research Group.

13  Q.     Okay.  And how long have you been with them?

14  A.     About ten years.

15  Q.     All right.  And what is your -- what is your role

16  there?

17  A.     I'm a managing director.

18  Q.     How would you characterize your professional work?

19  A.     My work is, I do damage analyses, lost profits

20  calculations, forensic accounting work and some consulting

21  work.

22  Q.     How long have you been working in this profession?

23  A.     About 26 years.

24  Q.     Could you tell us a little bit about your

25  professional credentials?

287

1    A.        Yes.  I'm a CPA, certified public accountants.  I'm

2    also a certified management accountants, a certified fraud

3    examiner.  I'm certified in financial forensics.  I'm a

4    chartered global management accountants, and I'm accredited

5    in business valuation.

6    Q.        Okay.  How many times, previously, have you

7    provided expert testimony in litigation or in arbitration?

8    A.        I have probably testified around a hundred times.

9    Q.        Okay.  And how often have you performed a damages

10   analysis as an expert?

11   A.        Many more than that, probably a couple hundred

12   times.

13   Q.        Okay.  And did any of those damage analyses ever

14   involve the calculation of lost profits?

15   A.        Yes.  I would say a significant portion of them.

16   Q.        Okay.  And with those same damages analyses, how

17   many of them involved, you know, a license agreement?

18   A.        A significant portion.  Often my lost profit or

19   damage calculations are related to license agreements, so I

20   don't have a number, but many of them.

21   Q.        And how often did they involve intellectual

22   property, like a trademark?

23   A.        Similar number.  I mean, usually if you've got a

24   license, you have some sort of intellectual property

25   underlying that.

1   Q.       Now, you were asked to provide testimony in this

2   case (unintelligible).  Tell us more specifically what you

3   were asked to do in this matter.

4            THE COURT:  We lost part of that question somehow,

5   Ms. White.

6            MS. WHITE:  All right.  I will shorten it.

7   Q.       By MS. WHITE:  Mr. Kilbourne, would you please tell

8   us what you were asked to do in this matter?

9   A.       Yes.  I was asked to calculate MFGPC's lost profits

10  for the time that was set by the Court, which was December,

11  2014 through April of 2018.

12  Q.       And those were lost profits as a result of the

13  termination of the trademark license with Mrs. Fields?

14  A.       Yes.

15  Q.       Let's talk a little bit about the data that you

16  relied on for purposes of your opinion.  Are you aware that

17  the District Court, at one point in this case, made a

18  determination regarding the type of evidence that would be

19  relevant for purposes of calculating damages?

20  A.       Yes.

21  Q.       Okay.  And that, among other things, the District

22  Court stated that MFGPC'S sales data, it's own financial

23  data, excluding the period of the great recession, and the

24  period affected by their co-packer's fire, is highly

25  relevant to calculating MFGPC'S damages; is that correct?

1    A.        Yes.

2    Q.        Do you agree with this?

3    A.        I do.  Yes.

4    Q.        Okay, could you tell us why?

5    A.        Well, oftentimes when we're doing lost profit

6    analyses we're trying to forecast, and I use the historical

7    data of the company as a -- as a -- to provide information

8    of what would happen in the future.

9    Q.        Okay.  And so did you end up relying on this data

10   in your analysis?

11   A.        Yes, I did.

12   Q.        Now, are you aware that the district Court also

13   determined that another license, involving a third party

14   named Perfect Snacks, may also be relevant to the

15   determination of damages in this case?

16   A.        Yes.

17   Q.        Okay.  And do you agree with that?

18   A.        I do agree with that.  Yes.

19   Q.        Okay, and could you tell us why?

20   A.        Yes.  So, one of the central things we're doing in

21   looking at markets or valuation or lost profits is trying to

22   find comparable situations, so I think that having another

23   license, the Perfect Snacks' license, is highly probative

24   because it's a license for the same product, and not just

25   the same product, but the exact same branded product of

1    using Mrs. Fields' name, so it's a -- really it's a

2    remarkably good comparison point to use to predict what

3    MFGPC would have done.

4    Q.      Okay.  I should ask, just by way of background, you

5    looked at the Perfect Snacks' license; is that correct?

6    A.      Yes.

7    Q.      Okay.  And are there differences between the

8    license that MFGPC had and the Perfect Snacks' license?

9    A.      Yes, there are.

10   Q.      Okay.  And did you have to compensate for those

11   differences?

12   A.      Yeah.  So I considered them.  I mean, I didn't make

13   an adjustment, but generally speaking, in my view, the

14   Perfect Snacks' license agreement is less valuable than

15   MFGPC'S for a number of reasons, so I didn't make any

16   downward adjustments, but I noted that the Perfect Snacks'

17   license agreement was less valuable than MFGPC'S.

18   Q.      Okay.  Now, was the Perfect Snacks -- was the

19   period of time for the Perfect Snacks' license, was that

20   similar to the damages period that you were asked to

21   calculate?

22   A.      Almost exactly.  The Perfect Snacks' license

23   agreement was for three years and three months, and the

24   damage period set by the Court was three years and four

25   months.

291

1  Q.       Are there any other reasons you found it to be a

2  helpful data point for you in your analysis?

3  A.       Just the fact that it's, again, you know, same

4  product.  Both are for -- both are for Mrs. Fields' branded

5  name, a similar period.  It's just -- again, you rarely see

6  a -- when you're looking at comparable license agreements,

7  comparable license agreements in my work, you rarely see a

8  comparison point as spot on as this one.

9  Q.       And in your mind, did it help -- did it help you

10 understand what Mrs. Fields -- how Mrs. Fields valued the

11 license or how Perfect Snacks valued the license?

12 A.       Sure, because you have two parties, one of them --

13 two independent parties, an arm's length transaction, one of

14 them involved in this litigation, who are -- who are

15 agreeing to value the Perfect Snacks' license agreement

16 which, again, could then be compared to the MFGPC license

17 agreement.

18 Q.       So, did you end up using this data in your

19 analysis?

20 A.       Yes, I did.

21 Q.       Are you aware that the District Court also

22 determined that Mrs. Fields' sales of its own popcorn using

23 the Mrs. Fields trademark during the damages period might be

24 relevant to the analysis?

25 A.       Yes.

1   Q.       And did you find that -- and do you agree with

2   that?

3   A.       I do, yes.

4   Q.       Okay.  Did you end up using data regarding

5   Mrs. Fields' own popcorn sales during the damages period?

6   A.       I did not.

7   Q.       Okay.  And why not?

8   A.       Well, Mrs. Fields produced some data around their

9   sales, and I spent a considerable amount of time looking at

10  it, but frankly it was either incomplete or incomprehensible

11  or just wasn't reliable enough for me to be able to make any

12  assessment of what they had provided.

13  Q.       Were you able to glean anything from it?  Was

14  there -- was there -- were you able to use it in any way,

15  shape or form?

16  A.       I mean, I guess the extent of how I could use it is

17  that it -- what was in there did show, I think it was the

18  period of '15, '16 and '17, and during that period showed

19  increasing sales by Mrs. Fields of popcorn.  So, you

20  could -- you could use that to say there was increasing

21  volume, but the incomplete nature of it didn't allow me to

22  really incorporate it fully into my analysis.

23  Q.       What other documents or information did you rely on

24  in preparing your report and your opinion?

25  A.       Well, I looked at MFGPC'S company financial

1    statements, I looked at their QuickBooks file, which is an

2    electronic file of all the transactions, so it has all the

3    detail of everything over the period that we are dealing

4    with.  I looked at their tax returns.  I looked at the

5    Courts' rulings in this matter.  We conducted market

6    research on the ready-to-eat popcorn industry.  I looked at

7    royalty rate data for the industry.  There were board of

8    director reports that were produced by Mrs. Fields, and

9    there were hundreds, maybe thousands of pages of business

10   documents of both MFGPC and Mrs. Fields -- yeah, Mrs. Fields

11   that I reviewed.

12   Q.      All right.  Let's take a moment now.  I'd like to

13   show you a demonstrative that you prepared, a little bit

14   about -- a summary of your opinions at this point.  And can

15   you see that?

16   A.      Yes.

17   Q.      Okay.  Could you tell us what is summarized here in

18   this slide?

19   A.      Yes.  So I did three separate calculations of

20   MFGPC'S lost profits, and those are summarized on this page,

21   and they were included in my report.  And the first row is,

22   is my calculation of lost profits based on MFGPC'S

23   historical sales.  And, as a result of that, I calculated

24   the lost profits were about $464,000.  On the second row I

25   did a second calculation of lost profits based on Perfect

1    Snacks' minimum sales and the license agreement between

2    Perfect Snacks and Mrs. Fields, and that led me to a

3    conclusion of lost profits for MFGPC of about $916,000.

4    Then finally, based on the Perfect Snacks' license fee, I

5    determined what I would call a minimum value of MFGPC'S

6    license or lost profits was $425,000.

7         And then, in the next row over, which is titled

8    Unpaid Invoices and Interest, there were two invoices that

9    Mrs. Fields owed to MFGPC.  I was asked to sum up those and

10   to calculate interest through the date of my report, and

11   obviously, as you can see, those amounts are the same for

12   each of the three scenarios, so you combine those two

13   totals, the lost profits in the total column are 577,000, a

14   million 28 or 537,000.

15   Q.    Let's start by talking a little bit about your

16   determination of MFGPC'S lost profits based on its

17   historical sales.  Would you first explain to us your

18   process for calculating lost profits using historical sales

19   data?

20   A.    Yes.  There are really three fundamental inputs you

21   need to calculate lost profits.  One of those is the

22   incremental profit margin during the damage period.  Another

23   is what the revenue is, and that has really two components,

24   which is looking at the revenue as a baseline prior to the

25   damage period and then the third is what you expect the

1  revenue growth to be during the damage period.  So you would

2  take the baseline, grow it during the damage period, get a

3  total revenue during the damage period, multiply that by the

4  incremental profit margin and that would lead you to the

5  lost profits.

6  Q.       Now, in estimating the incremental profit margin,

7  do you use all costs when you do that?

8  A.       You evaluate all costs, but you don't use all of

9  them.  And I can sort of walk through that process.  I think

10  we have a demonstrative if we could perhaps do that.

11  Q.       Yes.  The one that shows your conclusions.  I was

12  wondering, before you do that, can you tell me a little bit

13  about why you wouldn't just use all costs to determine lost

14  profits?

15  A.       So, if you -- if you just think about a simplified

16  income statement, you've got revenue is the top line and

17  then the second, the line below revenue, is what's called

18  cost of goods sold, and cost of goods sold are typically

19  considered to be variable costs.  What that means is that

20  for each extra unit that you sell, what was the cost to

21  produce or generate that?  And in MFGPC'S case that, the

22  cost of goods sold, was 25 percent.  So their gross margin,

23  which is revenue less cost of goods sold, was 25 percent.

24          Then below that you have overhead costs, and

25  generally speaking overhead costs are considered to be fixed

1   costs in nature.  And so a simplified way of calculating

2   lost profits would be to take the revenue less the variable

3   costs of goods sold.  In this case you get to 25 percent.

4   And then 25 percent was your incremental profits, and that

5   would be how you calculate lost profits.  But sometimes

6   there are operating costs or at least overhead costs that

7   can be variable in nature and so you look at each one of

8   those, and you determine which of those may be variable,

9   which are fixed and then get to the bottom, which is the

10  incremental profit margin.

11  Q.      And would you use the fixed costs in determining

12  lost profits at the end of the day or the one-time costs?

13  A.      No, you would not, because the fixed costs are

14  incurred by the company regardless of whether or not an

15  additional unit is sold and so it wouldn't be appropriate to

16  include fixed costs when you're calculating lost profits.

17  Q.      And the same goes for one-time or intermittent

18  costs as well?

19  A.      Yeah, which I would characterize those as broadly I

20  would call all those fixed costs.

21  Q.      So you've identified the core assumptions that you

22  relied on, and that was the incremental profit percentage,

23  baseline revenue, and the revenue growth, or the growth

24  rate.  Is that -- is that right?

25  A.      Yes.

297

1    Q.        And so what was the first step that you took after

2    identifying those foundational assumptions?

3    A.        So, again, the first step was to take revenue, so

4    we're looking back historically for MFGPC, and I looked at

5    2003 through 2012, before the fire occurred, and you look at

6    their revenue, any cost of goods sold, the variable costs

7    and that led to a 25 percent gross margin percentage.  Then

8    I went through and looked at all of the overhead costs to

9    determine which of those may be variable in nature.  Again,

10   generally speaking, you would expect those to be fixed in

11   nature, but I went through all those and removed the -- the

12   ones that were intermittent or fixed costs.

13         And first of all, I removed depreciation,

14   amortization because those are -- those are not cash costs

15   anyway, they are just accounting expenses that don't

16   actually reflect an expenditure, reflect cash going out the

17   door.  I also removed interest.  Most of the interest was

18   paid to the owners of MFGPC, and those are not considered an

19   operating cost so that's not part of their reduction you

20   would make to get to your incremental cost percentage.

21   There were also a number of small intermittent expenses and

22   so you'd see a few hundred dollars in 2004 and then a few

23   hundred dollars in 2010, several years later, so I removed

24   those intermittent or one-time fixed costs.

25         I also removed -- there was -- there were

1    management fees that were accrued but not paid to

2    Mr. Lindley or actually to Mr. Lindley's operating company,

3    LHF I think is the acronym, which he's the full owner of, so

4    it went to him.  So, these were never paid to him, they were

5    accrued.  So there were an expense on the income statement,

6    but, one, they weren't paid; and, two, it wouldn't be

7    appropriate to have those because those are expenses that

8    are going to Mr. Lindley.

9         And so, by way of example, let's just suppose we

10   said that the incremental profit or the lost profit in a

11   given period was -- or a given year was a hundred-thousand

12   dollars, and we also had an expense, the payments to

13   Lindley, a hundred-thousand dollars.  If you include that

14   full expense, then the lost profit would be zero, but

15   Mr. Lindley was not -- that means he would not be paid that

16   hundred-thousand dollars for his work and effort.  It's more

17   or less like an inter-company transfer.  So, those were also

18   removed.

19        And then, finally, there were a number of fixed or

20   intermittent marketing expenses or kind of one-time

21   packaging expenses, and I removed those as well.  And after

22   all -- after all was said and done, I had included 75

23   percent of the -- all of the cost of goods sold, the 75

24   percent, and an additional also 15 percent of overhead costs

25   which I treated as variable.  So the net amount was a 10

1    percent incremental profit margin as you're showing on the

2    sheet that you've just pulled up.

3    Q.      I was going to ask you, is this a summary of

4    what -- of essentially what you have just described to us?

5    A.      Yes.  So this is a summary of MFGPC'S historical

6    financial statements from 2003 to 2012, along with my

7    adjustment for what I considered to be the -- the fixed

8    costs which you wouldn't include.  So revenue is a hundred

9    percent, cost of goods sold, variable costs, is 75 percent,

10   gets us to a gross profit of 25 percent.  As I looked

11   through all of the overhead costs, I determined that another

12   15 percent of those were -- were fixed in nature and so the

13   incremental profit margin was 10 percent.

14   Q.      Okay.  I haven't asked you this yet, but you state

15   you went through 2003 through 2012; is that correct?  Is

16   that the date range that you relied on?

17   A.      Yes.

18   Q.      And why did you stop at 2012?

19   A.      Well, the fire at MFGPC'S packer occurred in 2013

20   and, as the Court in my estimation accurately observed, that

21   data was not relevant because of that significant event.  So

22   I didn't use data that was affected by the fire, and in

23   2014, late 2014, Mrs. Fields terminated the license

24   agreement, so obviously any data beyond that would be not

25   relevant as well.

300

1    Q.        And you took into account as well the 5 percent

2    royalty that was owed to Mrs. Fields in all of this?

3    A.        Yes.  In all of this I assumed that part of the

4    expense that MFGPC would incur would be paying 5 percent to

5    Mrs. Fields.

6    Q.        Okay.  So that's taken care of in your analysis?

7    A.        Yes.

8    Q.        Okay.  Did you have anything to turn to as a sort

9    of reasonableness check for your 10 percent incremental

10   profit margin?

11   A.        Yes.

12   Q.        And what was that?

13   A.        Mrs. Fields' own data.  Mrs. Fields prepared a

14   report to their board directors in which they determined --

15   and this was contemporaneous.  I believe it was in 2015.

16   Maybe it was 2014 -- but a contemporaneous report where they

17   projected that their incremental profit margin for

18   confection sales, which includes, ready-to-eat popcorn,

19   would be 9 percent.  And so Mrs. Fields themselves

20   determined that the incremental profit margin was 9 percent.

21   My analysis was 10 percent.  I thought that was a very good

22   comparison when I see that Mrs. Fields is essentially

23   agreeing with my conclusions.

24   Q.        And so, just -- just -- I think this is evident,

25   but I just want to be clear you didn't assume that all costs

301

1    were variable or all costs were fixed, right?  You actually

2    went in and determined what would most appropriately qualify

3    as an incremental or fixed cost; is that right?

4    A.      That's correct.  I reviewed the expenses in detail,

5    both in their financial statements, in the detail in the

6    QuickBooks files and through conversations with Mr. Lindley

7    about the operations and the nature of the expenses.

8    Q.      And at the end of the day, in essence, you assumed

9    that 90 percent of MFGPC'S overall costs were variable,

10   right, and only 10 percent fixed?

11   A.      Correct.  And so what that means is that for every

12   hundred dollars of revenue I assumed that MFGPC would have

13   incurred $90 in costs, so $10 were their lost profits.

14   Q.      Now, as part of that, as part of your analysis, you

15   calculated sort of an average gross margin; is that right?

16   A.      Yes.

17   Q.      Okay.  And was that a simple average or a weighted

18   average?

19   A.      It was a weighted average over all the years of

20   MFGPC from 2003 through 2012.

21   Q.      And would you help me understand, what is a

22   weighted average and what is the difference between that and

23   a simple average?

24   A.      So, maybe an extreme but an illustrative example

25   would be to say if you had -- in year 1, your revenue was

302

1    one dollar and your gross margin was 20 percent and then in

2    year 2 your revenue was a million dollars and your gross

3    margin was 30 percent, the simple average of those two years

4    of 25 percent and 30 percent would be 25 percent.  Obviously

5    that would be wrong, not reflective of what happened because

6    you only had -- you're counting the year -- a dollar and a

7    million dollars as equal, so a weighted average takes the

8    weight or amount of that one dollar and a million dollars.

9         And in my example the weighted average gross margin

10   would be 30 percent or 2.999 something because the year with

11   one dollar revenue would not have weight.  If we apply to

12   MFGPC, their revenue in the earlier years, 2003, their first

13   year, was less than what it was in the later years, 2012,

14   and so those early years would not have as much weight in

15   that calculation.

16   Q.     Okay.  Now, you're familiar with the expert report

17   that was submitted by Mrs. Fields' expert Grant Lyon in this

18   case?

19   A.     Yes.

20   Q.     You had an opportunity to review that?

21   A.     Yes.

22   Q.     Okay.  And do you recall in that report that

23   Mr. Lyon opined that you had used a simple average to

24   explain the average gross margins?

25   A.     Yes.

1    Q.        And was that wrong?

2    A.        Yes.  He was incorrect.  I used a weighted average.

3    Q.        All right.  Mr. Lyon also noted in his report, he

4    critiqued your use of MFGPC'S historical gross profits in

5    your calculations, and he opined that you should have only

6    used the gross profits one year, 2012, which was 17.5

7    percent.  Do you recall that?

8    A.        Yes.

9    Q.        Okay.  Do you agree with that?

10   A.        I don't.

11   Q.        And why wouldn't it be appropriate to use the gross

12   profits from a single year?

13   A.        Well, if we look at MFGPC'S gross profit margin

14   over -- over the history of time, it's not consistent.

15   There's quite a bit of variability.  And Mr. Lyon's

16   assumption is you can use one year of gross profits to

17   predict all other future years, and if we look at their

18   historical profits, the gross margin percentage, that's just

19   not the case.

20   Q.        I was going to ask if you want me to put this up?

21   A.        Yes.  So, let's look at this.  You can see in 2012

22   the gross profit margin was 17.5 percent.  That's the rate

23   Mr. Lyon said he was going use.  But, again, no one year

24   here predicts all the other years.  If we go back to 2003,

25   the 35 percent profit margin in 2003 did not predict the

304

1   2004 margin of 29 percent.  The 2005 profit margin of 44

2   percent did not predict that it would be only 7 percent in

3   2006 or any other year.

4        And so, if you -- Mr. Lyon's underlying assumption

5   is you can pick one year and that will project the accurate

6   forecast of all of the other years, and that's just simply

7   never the case for MFGPC because their profit margin was up

8   and down.  And, given the fact of that inconsistency, in my

9   view the best course of action is to use as much data as

10  possible or to use all of the data.  And using all these

11  years, the weighted average gross profit rate was 25

12  percent.

13  Q.     Let me ask you now about the information of the

14  revenue during the damage period.  How did you go about

15  determining the appropriate revenue for the damages period?

16  A.     So, as I mentioned before, the revenue has two

17  components.  One is the base period that you use to project

18  into the projection period, and secondly, what's the growth

19  rate?  What's the expected growth of revenue year over year?

20  And so I used -- as a base, I used the three years before

21  the fire, 2010, 2011 and 2012, and the revenue during those

22  periods was fairly similar, and the average of those three

23  years was 590,000.  So that was the base I used.

24       So then the question is, how much is that revenue

25  going to grow year over year?  And to make that

1    determination, I had two data sources.  First of all,

2    Mrs. Fields had contemporaneously made projections of what

3    their confectionary, which includes ready-to-eat popcorn,

4    what their revenue growth rates would be over that period of

5    time, over the same period that I was trying to project.  So

6    they made the projections contemporaneously and their

7    numbers were -- was 18.5 percent on average.  And secondly,

8    and probably even more importantly, we had historical data.

9    So we found that historical research or research reports

10   that showed that the actual revenue growth rate during the

11   period that I was forecasting was 23.6 percent per year.

12        So this is really -- I mean, honestly, I was

13   surprised to find data on such a narrow space as

14   ready-to-eat popcorn, but we did.  And so it was specific to

15   ready-to-eat popcorn.  And the actual historical growth was

16   23.5 -- 23.6 percent during the forecast period that I was

17   making.  And so, normally, when you're doing these types of

18   analyses, you're usually forecasting in the future, but in

19   this case we have the luxury that we're looking backwards

20   and then forecasting during a historical period, and we have

21   the actual revenue growth rate for the industry of

22   ready-to-eat popcorn.  Frankly, it's a remarkable and very

23   valuable data point.

24        So what I did is I took the average of the actual

25   historical growth rate of ready-to-eat popcorn and

1    Mrs. Fields' contemporaneous projections, and the average of

2    those two was 21 percent.  And so I increased revenue each

3    year for MFGPC by 21 percent.

4    Q.      Now I want to ask you a little bit about Mr. Lyon's

5    report again.  He criticized you for using Mrs. Fields' own

6    forecasts and the actual industry growth rate for

7    ready-to-eat popcorn during the damage period and instead

8    used the U.S. inflation rate, which he opined was comparable

9    to MFGPC'S growth rate from 2010 to 2012.  Do you recall

10    that?

11    A.      Yes.

12    Q.      And do you agree with that criticism?

13    A.      No.

14    Q.      Can you tell us why?

15    A.      Multiple problems with what Mr. Lyon did.  First of

16    all, to get the historical data that he used of MFGPC was

17    just two years of growth rates.  And if he had used even one

18    more year or if he had used all the years of data, his --

19    his growth rate would have been more than three times

20    higher.  But, more importantly, using the inflation rate

21    here, he's saying:  Here's the historical inflation rate.

22         Well, what we have is the actual growth in

23    ready-to-eat popcorn sales and so there's really no reason

24    to use a broad market inflation rate when you have the

25    actual growth rate in revenue for ready-to-eat popcorn.  It

1    really just doesn't make any sense at all.

2    Q.       Now, Mr. Lyon also critiqued your decision to start

3    at -- what was it, 590,000 as the baseline rate for your

4    calculations instead of starting with MFGPC'S actual

5    revenues from 2014.  Do you agree with that?

6    A.       No.

7    Q.       Okay.  Can you tell us why?

8    A.       Well, again, the Court had said not to use the

9    fire-impacted periods, and I agree with that.  I mean,

10   there's really no reason to use data from a period that's

11   been impacted by some sort of significant event like that.

12   And so, one, it doesn't comport with what the Court ruled,

13   but also I think it's just wrong economically.  And I agree

14   with the Courts's assessment here.  You wouldn't use a

15   period that's been impacted by some sort of significant

16   events, and you know, we see from the historical data of

17   MFGPC that their sales are pretty scalable.  And so they,

18   based on, you know, their history, I would expect they would

19   be able to recover from the fire and so there's no need to

20   use those reduced sales.

21           I mean, we have a current kind of something current

22   for all of us in the pandemic.  You know, we all know that

23   restaurant sales have been awful during the pandemic.  There

24   would be no basis to use restaurant sales for 2020 to

25   project forward into what restaurants would do in the future

308

1  because of the significant event of the pandemic.  Likewise,

2  I don't think it's appropriate to use fire-impacted sales.

3  Q.      So, using the actual industry growth rates and

4  Mrs. Fields' own data, what were your conclusions with

5  regard to MFGPC'S lost profits based on its historical data,

6  sales data?

7  A.      Yeah.  So, again, we start with the base revenue of

8  590,000, project forward using the growth rate of actual

9  industry sales, 21 percent.  That gives you a revenue

10 figure, and then I multiply that revenue figure during the

11 damage period by 10 percent, which is what was MFGPC'S

12 incremental profit margin, and that gives you lost profits

13 of about $464,000.

14 Q.      I'd like to ask you a few questions now about your

15 calculation of MFGPC'S lost profits based on the information

16 available in the Perfect Snacks' license agreement, if you

17 recall that.  Now, as we discussed before, the District

18 Court, you know, concluded that this Perfect Snacks' license

19 agreement may be highly relevant to calculating MFGPC'S

20 damages.  Why do you think that's the case?

21 A.      Well, we talked about this a little bit before.

22 It's a -- it's a license that is for the same product,

23 ready-to-eat popcorn; the exact same branded product,

24 Mrs. Fields' ready-to-eat popcorn.  The license agreement

25 for Perfect Snacks is for a similar period.  There's a lot

1    of other similarities.  As I mentioned before, there are

2    some reasons why the Perfect Snacks' license agreement is

3    not as valuable as the MFGPC license, but it's nonetheless

4    very, very comparable.

5    Q.      Now, was the Perfect Snacks' license a worldwide

6    license?

7    A.      No.  The Perfect Snacks was U.S. only.  MFGPC was a

8    worldwide license.  That's what makes the Perfect Snacks'

9    license agreement less valuable.

10   Q.      And was there anything else that stood out to you

11   with regard to what made the Perfect Snacks' license less

12   valuable?

13   A.      Yeah.  There were a number of other factors.  The

14   Perfect Snacks' license agreement was not exclusive.

15   MFGPC'S was exclusive.  The Perfect Snacks had limitations

16   to certain retailers.  MFGPC did not.  The MFGPC license

17   agreement automatically renewed.  The Perfect Snacks'

18   license agreement was for one period.  Those are the ones

19   that come to mind right away, those differences.  And all of

20   them, all those differences indicate that the Perfect

21   Snacks' license agreement is less valuable than MFGPC's.

22   Q.      Now, what data did you use from that Perfect

23   Snacks' license to -- for the purposes of this calculation?

24   A.      Well, the first analysis that I did was using the

25   minimum sales that -- that Mrs. Fields and Perfect Snacks

310

1    had agreed to in the Perfect Snacks' license agreement.

2    Q.      And how did you use those minimum sales in that

3    agreement to estimate MFGPC'S lost profits?

4    A.      So, here you have Mrs. Fields and Perfect Snacks

5    saying -- and, by the way, the minimum sales for the license

6    agreement was $8.5 million.  So, they say during this

7    three-year and three-month license agreement, they both

8    expect that Perfect Snacks will sell at least $8.5 million

9    in ready-to-eat popcorn.  And so the way I used that is kind

10   of the market comparison.

11           For Perfect Snacks, if both those parties expected

12   Perfect Snacks could have done that, then MFGPC also could

13   have done that.  And so, in that second analysis that I did,

14   I used that $8.5 million, adjusted it for the damage period,

15   which was just a month longer, so 8 -- or just about $8.8

16   million and then multiplied that by the 10 percent

17   incremental profit margin, which led me to a conclusion of

18   about $916,000 in lost profits for MFGPC.

19   Q.      Now, are you aware or were you eventually made away

20   that Perfect Snacks did not actually generate 8.5 million in

21   sales?

22   A.      Yes.

23   Q.      And were you provided that information prior to

24   issuing your report?

25   A.      Yes.

1    Q.        Was that information that was available to you

2    before your report, or was that information that came to you

3    first in Mr. Lyon's rebuttal report?

4    A.        No.  I knew that when I submitted my report.

5    Q.        Okay, what about the specific numbers?  Did you get

6    those before you issued your report?

7    A.        No.  I don't believe so.

8    Q.        Okay.  If you had had those specific numbers, would

9    you have found them relevant or reliable, in your

10   estimation?

11   A.        Not really because I knew that the Perfect

12   Snacks -- that Perfect Snacks had stopped selling

13   ready-to-eat popcorn because of this litigation.  And so

14   I -- their actual sales would be less relevant in this case

15   because they stopped selling popcorn and for an external

16   reason.  Moreover, you know, the -- the actual sales may not

17   be as valuable as the projection because the projection is

18   based or Mrs. Fields and Perfect Snacks saying:  Here's what

19   we think we can do.

20        Now, if Perfect Snacks had some sort of significant

21   event, like the fire for MFGPC, then those expectations may

22   not be realized, but I would want to use, you know, what the

23   parties expected to have happen, not sales that are impacted

24   by Perfect Snacks stopping selling because of litigation or

25   any other significant events that may have caused them to

1   not achieve what both parties expected.

2   Q.        Your Honor, at this time we would like to renew our

3   motion in limine and exclude the evidence of Perfect Snacks'

4   actual sales that was not produced until after the -- after

5   discovery and after Mr. Kilbourne issued his first report.

6   For the same reasons that we set forth in our original

7   motion and for the additional reason that we believe the

8   testimony elicited by witnesses so far in this case

9   demonstrates that the information is unreliable, and it

10  would be prejudicial to us, if it was allowed to be admitted

11  at this point.

12          THE COURT:  Mr. Amani?

13          MR. AMANI:  Your Honor, they chose not to take any

14  discovery from Perfect Snacks, but they got ahold of the

15  discovery that we had at Mrs. Fields' in accordance with the

16  Court's order.  The Court initially said:  Take a look at --

17  give them all the information to April 2018.

18          Let me put this in context for Your Honor as well.

19  The Perfect Snacks contract was signed in September of 2017,

20  and if they went to market in early '18, they got -- they

21  actually had -- I think Mr. Kilbourne is mistaken.  He had

22  the actual numbers through the third quarter of 2018 when he

23  did his report and then the fourth quarter and the first

24  quarter -- the last quarter of 2018 and the first quarter of

25  2019.  Yes.  He got those numbers from the report of ours,

1    just the last two quarters.

2         But he already had.  He had enough to do the

3    analysis when he got the report to give you a rebuttal to it

4    today.  So he's had plenty of time to do it, and they could

5    have called up and asked for it.  And the only reason we put

6    it in is because he says this company, which had $186,000 of

7    sales in 2014 is going to do a million six in 2015 based on

8    that Perfect Snacks, and that contract of his.  Yet he knows

9    at that point that, in the first year, the company comes

10   nowhere -- even Perfect Snacks has come nowhere near to it.

11   I think it's entirely irrelevant, and the Court should take

12   it under consideration.

13        MS. WHITE:  Your Honor, we moved to compel exactly

14   this information.  It is information that is within the

15   damages period.  It is information that we asked for in

16   discovery.  It is information, like other categories of

17   information, that Mrs. Fields chose not to provide.  And it

18   is my impression, based on the briefing in the past, that at

19   this point, it is just -- it remains unclear what is left

20   that could be produced that would be, you know, at the last

21   minute suddenly helpful to them.  They knew all along the

22   reason why we would want this information.

23        It was readily apparent to anyone who has worked

24   for the damages expert before that the expert would want all

25   available data regarding both projections and actual sales,

314

1   would want information regarding the numbers, and they

2   intentionally excluded it.  They intentionally withheld it

3   until it was weaponized for us in their expert's rebuttal

4   report.  We think that is prejudicial and unfair, and as

5   you've heard throughout this case, this evidence is of

6   minimal value.  There is all sorts of reasons why the actual

7   sales of PSP at the end of the day aren't even the type of

8   things an expert should rely on for those few months that

9   they actually first started going to market with the

10  litigation pending, with all of the other issues, with the

11  fact that it turns out they were a terrible licensee who

12  defaulted almost right off the bat, an event that never

13  occurred for MFGPC.

14         So, at this point, we don't see any basis for

15  allowing that evidence to be admitted.

16         THE COURT:  As part of your argument, it arguably

17  goes to weight.  If it doesn't have any weight, what

18  difference does it make if it gets admitted?

19         MS. WHITE:  Well, we still think it's inappropriate

20  for it to be admitted considering the mischief that has

21  taken place throughout litigation in this case.

22         MR. AMANI:  And I object to this comment.  It's

23  just not fair.  Your Honor ruled that we give them certain

24  information.  We gave it.  Then we got the report.  Our guy

25  looked at it, and said:  He's going to this Perfect Snacks.

1  You should give him the later information.

2          And we did.  We didn't do any mischief in that.  We

3  followed the Court's instructions.  I'm sorry.

4          THE COURT:  Ms. white.

5          MS. WHITE:  It has been evident since this Court

6  ruled that other license agreements entered into during the

7  time frame and other popcorn sales during the damages period

8  were relevant categories of discovery, I do you understand

9  why Mrs. Fields believes that somehow that wasn't relevant

10  and requested.

11          THE COURT:  Well, they requested it.  You didn't

12  give it.  The motion is granted.

13          MS. WHITE:  Thank you, Your Honor.

14  Q.      BY MS. WHITE:  All right.  Mr. Kilbourne, I'd like

15  to turn to your opinion regarding MFGPC'S -- it's your third

16  opinion, MFGPC'S lost profits and your calculation that was

17  based on the minimum license fee in the Perfect Snacks

18  agreement.  Would you explain to us how the minimum license

19  fee in that other license agreement is helpful to your

20  analysis?

21  A.      Sure.  So, any time you have a license agreement,

22  it's a mechanism to divide profits between the licensor and

23  the licensee, the license agreement and the related royalty

24  rates.  That's what you're doing.  You're dividing profits.

25  And typically the licensee -- almost always the licensee

1    obtains more profits than the licensor.  The licensor grants

2    its intellectual property or other assets, and the licensee

3    brings to bear its manufacturing, marketing, sales expertise

4    and the work to get the product to market.

5         And in this case, what I did is I looked at that

6    rate, and basically your -- this 425, which is the minimum

7    license agreement, that was paid to Mrs. Fields, and she

8    would expect that Perfect Snacks would have more than 425 as

9    their -- as their -- as their profits.  And this is actually

10   borne out with industry research.  There was a report from

11   KPMG that looked at the split of profits between licensor

12   and licensee.  And they found that between 25 percent of the

13   gross margin to 25 percent of the operating margin went to

14   the licensor, and so 75 percent of those two ranges went to

15   the licensee.

16        And certainly the Mrs. Fields' and Perfect Snacks'

17   license agreement falls within that range, and so if

18   Mrs. Fields values the license as 425, then I would expect

19   that Perfect Snacks and MFGPC, as a surrogate, would value

20   it at least at 425,000 as well.  So it provides what I would

21   view as a minimum value of MFGPC'S license.

22        MS. WHITE:  (Unintelligible).

23        THE COURT:  We didn't hear that, Ms. white we

24   didn't hear the first part of that.

25   Q.    BY MS. WHITE:  So, does this -- does the minimum

1    license fee in Perfect Snacks' agreement provide you with

2    sufficient information to calculate a reasonable

3    approximation of MFGPC'S lost profits?

4    A.       Well, again, I would view it as a minimum, and I

5    think it's a valuable minimum.  It doesn't provide, you

6    know, the accuracy of what I think would be the actual

7    sales, but it gives us a floor, if you will, of what MFGPC's

8    lost profits are.

9    Q.       Now, you were also asked to calculate interest on

10   two unpaid invoices to Mrs. Fields or that Mrs. Fields owed

11   MFGPC; is that correct?

12   A.       Yes.

13   Q.       Okay.  And you calculated simple interest at 10

14   percent from the due date of each invoice?

15   A.       Yes.

16   Q.       Okay.  And at least in your report, which was -- I

17   think it was October, 20 of 2020, the total of those

18   outstanding invoices plus interest was a little over

19   112,000; is that right?

20   A.       Yes.  That's correct.

21   Q.       Now, did you prepare an updated calculation through

22   trial for purposes of your testimony?

23   A.       Yes.

24   Q.       Okay.  And did you include in that updated

25   calculation the set off of royalties that were owed by MFGPC

318

1    to Mrs. Fields?

2    A.      Yes.

3    Q.      Now let me pull up the other one.  I just want to

4    show you a final slide and ask you if this is your updated

5    calculation.  Do you see that?

6    A.      Yes.

7    Q.      Okay.  So do I now have an updated calculation

8    through trial for purposes of your testimony for the -- I

9    guess we'll call it the second column?

10   A.      Yes.  So, as you can see on this, the first column,

11   the amounts are unchanged, but the second column, which is

12   titled Unpaid Invoices Less Royalties and Interest, so, this

13   is the two unpaid invoices that were due from Mrs. Fields to

14   MFGPC, and it includes interest on those invoices through

15   tomorrow, the end of trial.  And then I subtracted from that

16   the offsets of the royalties that were due, which I -- plus

17   interest also at 10 percent, and I believe the amount of the

18   royalties due plus interest through tomorrow was about

19   $40,000, so the net of all that is 73,105.

20   Q.      So this resulted in slightly adjusted total

21   calculations for you; is that correct?

22   A.      Correct.  So, from what's in my report, it's about

23   $40,000 less than what's in my report.

24   Q.      Okay.  Now, Mr. Kilbourne, I want to ask you a few

25   more questions about some of the critiques that Mr. Lyon had

1  in his report.  In your -- well, let me ask you first, did

2  anything that Mr. Lyon say in his report in any way change

3  any of your opinions?

4  A.      No.

5  Q.      What is your understanding of the value of the

6  Mrs. Fields license according to Mr. Lyon?

7  A.      He set the value of the MFGPC license with

8  Mrs. Fields was zero, has no value.

9  Q.      Do you believe it's reasonable to take the position

10 that this license had no value to MFGPC?

11 A.      No.  No, I don't.  I mean, to begin with, we have

12 the Perfect Snacks' license agreement where Mrs. Fields said

13 that license agreement, which again, as we talked about is

14 comparable to the MFGPC license both in time period and

15 the -- and many other ways, and Mrs. Fields says that to

16 them it's worth 425.  And so, we know that it's worth 425 to

17 Mrs. Fields.  It has to be worth more than that to Perfect

18 Snacks.  So, to say that a license would be worth nothing, I

19 just don't see any -- any basis for doing that.

20 Q.      Let's -- let me ask you a few questions about the

21 assumptions that Mr. Lyon relied on to conclude that -- that

22 the license was essentially of no value.  One of his

23 opinions was that MFGPC was under-capitalized and so it

24 couldn't grow.  Do you agree with this?

25 A.      No, I don't.

1   Q.      Okay.  And why not?

2   A.      Well Mr. -- Mr. Lindley at different points made

3   decisions about how much he was willing to invest into --

4   into the company.  But that doesn't mean that he couldn't

5   have invested more or have obtained outside investments.  I

6   know that he was in the process of doing that.  And so the

7   fact that he may have put some self-imposed limitations on

8   his investment, which perhaps limited how quickly MFGPC

9   could grow, does not mean that it couldn't -- he couldn't

10  get more capital and further grow the company.

11  Q.      Now, Mr. Lyon relied on MFGPC'S revenues and

12  profits after the fire in 2013 to rebut some of your

13  opinions.  Do you agree with this?

14  A.      No.

15  Q.      And why not?  Why don't you find the financial

16  information from MFGPC after the fire to be helpful?

17  A.      Well, first of all, the Court specifically said

18  don't use it.  So that's a good reason.  But also, the

19  reason the Court said that is because the -- it's not as

20  relevant because you have a significant event, and so

21  looking at the operations of the company after a disastrous

22  event, again, as I said before, would be akin to looking

23  at -- at restaurant sales in 2020 during the pandemic and

24  trying to use that to forecast into the future.  I just

25  don't think it's appropriate to do that.

1    Q.        And Mr. Lyon also relied on MFGPC'S financial data

2    from 2015, after the license was terminated.  Do you agree

3    with that?

4    A.        Again, I don't.  He didn't give a basis for doing

5    that.  I don't know why you'd use data for after the end of

6    the license agreement.

7    Q.        And Mr. Lyon accused you of excluding over 66

8    percent of the actual costs incurred by MFGPC from 2009 to

9    2012.  Do you recall that?

10   A.        Yes.

11   Q.        Okay.  And I'm assuming you disagree with that?

12   A.        I disagree with it, and it's misleading.

13   Q.        Okay.  And can you explain to us a little bit why?

14   A.        So, as I mentioned before, we have 75 percent of

15   MFGPC's revenue was cost of goods sold.  That's by far the

16   most significant piece.  And I treated all of that as

17   variable, and so that reduces MFGPC'S lost profits.  And

18   then I looked at what's typically the overhead costs, which

19   are typically considered to be fixed in nature, and Mr. Lyon

20   was focusing in on those fixed costs, and that's where he

21   gets his 66 percent figure, ignoring or excluding from that

22   calculation the other -- you know, the other lion's share of

23   all MFGPC'S costs.

24   Q.        What about the costs that Mr. Lyon opined should be

25   included were employee costs.  Do you agree with that?

322

1    A.        No, I don't.

2    Q.        Okay.  Could you tell us why?

3    A.        All right.  So, during -- during MFGPC'S

4    operations, Mr. Lindley was the only employee.  He was

5    running the company.  And so, if you include his costs as an

6    employee cost, then -- I'll go back to the example I used

7    earlier.  Let's just suppose that the -- in a given period,

8    MFGPC's lost profits, so we're kind of done with the whole

9    calculation -- were a hundred-thousand dollars but that we

10   didn't include salary paid to Mr. Lindley which was through

11   a management fee to LHF, which then would have gone to

12   Mr. Lindley.

13            So, if we suppose that this management fee or the

14   salary would have been a hundred-thousand dollars, then you

15   would conclude that MFGPC had no lost profits and then

16   Mr. Lindley gets zero compensation.  He didn't receive this

17   salary, and so it's really an inter-company transfer.  You

18   have got to take out any salary or management fee or any

19   other sort of fee that would have gone to the owner,

20   otherwise you're going to kind of double ding the lost

21   profits.  So, you absolutely have to remove the management

22   fee or salary costs going to Mr. Lindley, which was

23   effectively all of the salary costs during operations from

24   2003 through 2012.

25   Q.        And that's because --

1          THE COURT:  Can't hear you, Ms. White.

2    Q.        BY MS. WHITE:  And that's because MFGPC never had

3    any employees; is that right?

4    A.        That's correct.

5    Q.        And Mr. Lyon also took issue with your reliance on

6    the PSP license, and he opined that what one company could

7    do with a license agreement can not be imputed to another

8    company.  Do you agree with this?

9    A.        I don't.  I just don't understand how he would make

10   that statement.  What we do in markets in valuation in lost

11   profit analyses is we look for comparable situations.  You

12   look for a comparable company, a comparable license.  And to

13   say that you can't look at a comparison, especially one as

14   good as Perfect Snacks, it's really an out-of-bounds comment

15   in my opinion.

16   Q.        We've no further questions.

17            THE COURT:  Thank you, Ms. White.

18            Mr. Amani you may cross examine.

19            MR. AMANI:  Thank you, Your Honor.

20                      CROSS EXAMINATION

21   BY MR. AMANI:

22   Q.        Good morning, Mr. Kilbourne.

23   A.        Good morning.

24   Q.        Mr. Kilbourne, let me ask, as I understand it you

25   were hired -- let me see if this is correct.  This is page

324

1    20 of your report.  You were hired to calculate MFGPC'S

2    damages from December, 2014 to April, 2018, right?

3    A.        Yes.

4    Q.        And you recognize that Mr. Lindley was terminated

5    on December, I think, 24, 2014, correct?

6    A.        That's my understanding, yes.

7    Q.        So, really, the period would have been beginning of

8    January, 2015, through the end of -- April 30, 2018.  By

9    December 24, 2014 they had no sales going on for the rest of

10   the year if they are not already in place.  Would you agree

11   with that?

12   A.        So, I started my calculation on January 1.  I

13   didn't use that stop period of 2014.

14   Q.        Good, and my understanding is you determined that

15   those damages consist of MFGPC'S lost profits from sales to

16   Mrs. Fields and all other parties?  I'm reading from

17   paragraph 22 of your report.

18   A.        Do you mind if I pull up my report, or do you want

19   to show it to me?

20   Q.        No.  I can put it up.

21             John, why don't you put up Mr. Kilbourne's report,

22   page 9.  It's Exhibit 60 page 9.  Go back to page 9 of his

23   report.  It's paragraph 22.

24   A.        Yes.  I see that.

25   Q.        And besides the -- the -- what I would call the

1    invoices, this was the only task you had to do was to figure

2    out their lost profits, correct?

3    A.        I think that's fair, yes.

4    Q.        And we're talking about lost profits from the sale

5    of Mrs. Fields' goods, correct?

6    A.        Lost profits to Mrs. Fields?

7    Q.        No.  The lost profits that MFGPC suffered in

8    connection with selling Mrs. Fields' products?

9    A.        Yes.

10   Q.        And -- and if you go back with me to page 2.

11            Would you go back to page 2, please.

12            You state that the way you went about doing that --

13   if you look at the second paragraph, paragraph 2 on that

14   page, the way you went about calculating that was you

15   utilized what's called conventional methodologies in your

16   analysis to calculate those lost profits of MFGPC from

17   January 1, 2015 to April 30, 2018; is that right?

18   A.        Yes.

19   Q.        And when you refer to conventional methodology for

20   doing that, what are you referring to?

21   A.        I would say all of the analysis in my report.

22   Q.        Any particular methodologies you were relying on?

23   A.        No.  I mean everything that's detailed in my

24   report.

25   Q.        And then you state that your opinions are given

326

1   with a reasonable degree of professional certainly.  Do you

2   see that?

3   A.      Yes.

4   Q.      You're certain -- as the professional you are,

5   you're reasonably certain that what you predict is going to

6   happen, be true?

7   A.      Yes.

8   Q.      Is a reasonable prediction of what's going to

9   happen.  Okay.  And let me go to your first table.  Table 1.

10          It's the first -- table 1 is on page 15.  There it

11  is?

12          And let me focus you on that.  You went over this

13  with Ms. White, but the sum total of your opinion, in terms

14  of numbers, is contained in this table, correct?

15  A.      Yes, with the exception of the update that we just

16  talked about.

17  Q.      You corrected me.  You're right.  The unpaid

18  invoices you corrected, and we saw that, and we'll come back

19  to it.  But that number is on the order of 73 thousand or

20  some such thing now, correct?

21  A.      Yes.

22  Q.      But these are the only damages you're opining on.

23  You don't have any other damages that you are opining on in

24  this case?

25  A.      No.

327

1   Q.      Okay.  And the starting point, if I'm not mistaken,

2   if -- according to what you've said is -- was MFGPC'S lost

3   profits based on MFGPC's historical sales; is that right?

4   A.      That's true for one of three methodologies I used,

5   yes.

6   Q.      And that was the first methodology you used?

7   A.      Yes.

8   Q.      And what you do -- is it fair to state that more

9   often than not, if you have a history of sales of an

10  existing company you're trying to project into the future,

11  that is probably one of the most valuable resources,

12  correct?

13  A.      Well, it's a -- I don't know that I would say the

14  most valuable, but more valuable than historical would be

15  actual data.  So, in this instance, where we have actual

16  revenue growth rates for the industry, that's more valuable

17  than historical growth rates.

18  Q.      Revenue rates for the industry are more valuable,

19  you're saying, than the 12 or 13 years of actual growth that

20  you have for this company?

21  A.      Yes, because the industry data is specific to the

22  damage period, whereas historical data is not the same as

23  the damage period, so it's another example.  If I were

24  looking at, you know, what happened during the damage

25  period, and we know what happened in the industry, that's

1    more valuable than what happened in some historical period

2    that precedes the damage period or, for that matter, what

3    was after the damage period.

4    Q.      So when it came to growth rates, you're not really

5    relying on MFGPC'S historical data, are you?

6    A.      No.

7    Q.      In fact, there is none of MFGPC'S actual data used

8    by you in determining the growth rate?

9    A.      That's not true.

10   Q.      What did you use to determine just the growth, the

11   rate of growth of sales?  What did you use of MFGPC'S to

12   determine the rate of growth from its historical sales?

13   A.      The actual sales from 2010 to 2012 is the baseline,

14   so that's the base point to use before you apply the actual

15   industry growth rate during the damage period.

16   Q.      Right.  That's exactly right.  So you have two

17   elements on the sales side.  You have the rate of growth and

18   the baseline, right?

19   A.      Yes.

20   Q.      And once you have those two, you project it.  And

21   my question to you, sir -- I'm sorry.  I think you

22   misunderstood.  When it comes to the rate of growth, your

23   rate of growth has nothing to do with MFGPC'S historical

24   rate of growth?

25   A.      Well, using -- specific to the rate of growth, you

329

1   are correct.  I used the actualized growth rate.  But in

2   getting to the numbers, you have to use MFGPC'S historical

3   rate of sales from 2010 through 2012.

4   Q.      That's for your baseline.  That's for you're

5   starting year, correct?

6   A.      Yes.

7   Q.      Your baseline starting year in this case is 2014.

8   You're going to start in 2014 and then you're going to look

9   forward and see how much can you grow to 2018, April 30,

10  2018, right?

11  A.      No.  You don't start with 2014 because that's --

12  that was -- that's not as reflective because of the other

13  incidents, including the fire.

14  Q.      You know, that raises an interesting thing.  You

15  keep saying 2014 and the fire.  Were you here for

16  Mr. Lindley's testimony?

17  A.      I was not.

18  Q.      Mr. Lindley testified that by the third quarter of

19  2013, he had recovered from the fire and was back in

20  business.  Did you know that?

21  A.      I don't know that he said he had recovered from the

22  fire.

23  Q.      No.  I'm telling you, based on the testimony he has

24  given for which you weren't here, he said in 2013 he was --

25  by the end of 2013, he was recovered and he was going

330

1    forward in 2014, the fire was no longer of impact to his

2    business.  Did you not understand that?

3            MS. WHITE:  Objection, Your Honor.  Misstates prior

4    witness testimony.

5            MR. AMANI:  I don't believe it does, Your Honor.

6            MS. WHITE:  I don't believe the witness testified

7    that he had fully recovered.

8            THE COURT:  Well, I'm trying to remember.  He did

9    say something about that, and I'm trying to remember the

10   exact time frame and whether he was fully revenue covered or

11   not.  What is it you want to ask him, Mr. Amani?

12           MR. AMANI:  Well, I'm going to get to the --

13   whether that was considered.

14   Q.       BY MR. AMANI:  He said -- I'll break it up for you.

15   The fire prevented this one company, Gabes, from making

16   popcorn for him for six months, so it was shut down.  And we

17   had Gabes' principal here today.  He said he was shut down

18   and after six months he could make popcorn, so that takes us

19   into June of 2013.  Did you understand that?

20   A.       I did not hear -- was it Mr. Gabes?  Is that who

21   you said?

22   Q.       I don't remember his same.  Joe Scavitto.  That's

23   right.  Joe Scavitto was from Gabes if I am not mistaken.

24   Yes.

25   A.       I did not hear his testimony, but even if he was

1  able to produce the middle of 2013, that doesn't mean that

2  there's no remaining impact from the fire in 2014.

3  Q.      And Mr. Lindley testified that he was back to

4  selling by the end of the summer of 2013.  He was back to

5  selling his product.  He had resources on which to produce

6  product, and there was nothing that prevented him at that

7  point from making whatever sales he thought were necessary.

8  Did you not understand that?

9  A.      Well, he --

10          MS. WHITE:  Objection.  Misstates prior witness

11  testimony.

12          MR. AMANI:  I don't have a transcript, Your Honor.

13          THE COURT:  Do you have the quotations, Mr. Amani?

14  We can argue all day about what he said.  Why don't you ask

15  him what you want him to --

16  Q.      What was --

17          THE COURT:  -- answer.

18          MR. AMANI:  I'm sorry, Your Honor.

19  Q.      BY MR. AMANI:  What was the impact of the fire on

20  2014 sales for Mr. Lindley if you know?

21  A.      Yeah.  Well, my understanding from my conversations

22  with Mr. Lindley is that he had not fully recovered from the

23  impact of the fire in 2014.

24  Q.      And why not?  Why did he tell you he hadn't

25  recovered?

1    A.        Well, I don't -- honestly I can't remember all of

2    the conversation, but if I recall, some of it is kind of

3    timing issues, and so I don't want to say this is exactly

4    what he told me, but by way of example I'll say it.  Even if

5    they are back to producing popcorn, there is a long sales

6    pipeline.  And so -- so, MFGPC maybe is producing the

7    popcorn, but because of the time frame that they were not

8    selling and they were not able to get to certain customers

9    or certain customers didn't buy because they weren't

10   available.  So that impact is not limited to just a narrow

11   period.  It can extend for quite some time, and according to

12   my conversations with Mr. Lindley, it did.

13   Q.        Mr. Kilbourne, did you look at Mr. Lindley's actual

14   quarterly sales, based on his royalty reports?

15   A.        Yes.

16   Q.        You did.

17             Can we have that.  That was Exhibit 12, I think.

18   Would you put up 13 and 14 for me instead of 12.  There we

19   go.  Okay.

20             So there you have Mr. Lindley's royal -- this is

21   the report that he gives to Mrs. Fields on a quarterly

22   basis.  You're aware of that, correct, Mr. Kilbourne?

23   A.        Yes.

24   Q.        All right.  Mr. Lindley testified that he keeps

25   track of these numbers himself contemporaneously.  Were you

333

1    aware of that?

2    A.        I don't know if I recall -- I'm sure he does, but I

3    don't know if I recall that specifically --

4    Q.        And these sales, I don't know if you -- when you

5    were looking through all the documentation you looked at

6    whether you noticed that these sales, the total gross

7    revenue on these royalty reports is less than what he shows

8    on his financial statements.  Were you aware of that?

9    A.        I don't recall it specifically.

10            MS. WHITE:  Your Honor, foundation.

11            MR. AMANI:  Well, do you want me to put up a

12    financial statement?

13            I can tell you now, Ms. White, the 2014 sales --

14    just to cut through it, if you want, I'll do it.  I think

15    you can get them actually from his own report.

16            Give me one moment.

17            Sales, according to your report -- oh, you don't

18    have 2013.  Actually, let's put them up.  Let's just do it.

19            Exhibit 55.

20            Keep in mind, 382 for '13 and 186 for '14.  We'll

21    come back to those numbers in a minute.

22            MS. WHITE:  Objection, Your Honor, relevance.  Why

23    does it matter whether or not there is a discrepancy between

24    the royalty reports to Mrs. Fields?  Are they continuing to

25    try to push this theory that they are going belatedly to

334

1   assert breach.

2           THE COURT:  What?

3           MS. WHITE:  That they are belatedly going to assert

4   breach?  I mean, what is the purpose of this.

5           MR. AMANI:  No.  Not at all.  We're going to get to

6   a baseline.  He's got baseline of, I don't know, $867,000 in

7   sales for this company in 2014.  So I'm trying to show the

8   comparison between Mr. Kilbourne's assumption that the

9   company had $867,000 of sales in 2014 and what the actual

10  sales were, and I have two different numbers from your

11  client, and I would like the Court to be aware of that.

12          THE COURT:  He's entitled to try to do that.

13          Go ahead.

14  Q.      BY MR. AMANI:  So let's take a look at 55.

15          Exhibit 55.  Just put up 55 for a moment and go to

16  2013.  Yes.  There we go.  Here we have $420,000 in sales

17  and --

18          MS. WHITE:  Objection.  Is this in evidence?

19          MR. AMANI:  I'm sorry.

20          MS. WHITE:  Objection.  Misstates the evidence.

21          THE COURT:  We can't hear you for some reason,

22  Ms. White.

23          MS. WHITE:  I'm objecting, Your Honor, because it

24  misstates the evidence.  The sales are only 375 on this

25  report.

335

1    MR. AMANI:  Oh, I'm sorry.

2    THE COURT:  Yeah.  That's correct, it says income

3    is 420.

4    Q.    BY MR. AMANI:  Well, you know what, let's go to --

5    so you have 375 here, and you have an income of 420.  Let's

6    look at '14.  Now this one you have total sales and total

7    income are the same, $207,443.  Do you see that?

8    A.    Yes.

9    Q.    Okay.  Now let's go back to -- let's go back to the

10   royalty report for a moment, which is Exhibit 12.  And in

11   the royalty report, if you look at it, for 2014 you have

12   186,629.80 in sales correct?

13   A.    Yes.

14   Q.    And you don't know what the difference is between

15   those two?

16   A.    Well, I don't know what the difference is without

17   looking in more detail.  I mean, you have -- it may be a

18   timing issue.  It could be that one of them is cash basis,

19   one of them is accrual.  In 2013 there were sales of 375,

20   and here he's reporting sales of 382.  So, it's higher.  And

21   then in 2014, it was 207, and it's 186, so it's lower.  So

22   there's likely something going on with timing or cash versus

23   accrual basis, but without looking at the detail of these,

24   which I've looked at it before, but I don't have it to

25   memory.  I couldn't tell you what the reason for the

1  difference is.

2  Q.      Okay.  And you didn't take any of that into

3  account?

4  A.      Yes, I did.

5  Q.      You did take into account the differences between

6  these numbers?

7  A.      Well, actually, not in these years, because these

8  were fire-impacted years, but looking at similar things for

9  previous years, I did take that into account.

10  Q.      How did you do that?

11  A.      Well, I took -- first of all what I did was any

12  sort of royalty or accruals for royalties in the financial

13  statements, I removed that, and then I just put in a 5

14  percent in all the years, and so that eliminates any

15  differences of accrual to cash or any of the timing

16  differences.

17  Q.      But you don't know if this is an accrual.  Did you

18  understand that Mr. Lindley had sales other than

19  Mrs. Fields' products?

20  A.      I don't think he has sales of other products, but

21  he may have reported some sort of income of some sort.  I

22  have looked at those details in the QuickBooks, but I don't

23  have them committed to memory.

24  Q.      You were unawares that he had sold other products

25  to, for example, Rite Aid?

337

1    A.        Again, I don't recall without looking back at the

2    detail.  If you want to pull that detail up for me, I can

3    look at it, but I don't have it committed to memory.

4    Q.        At least with respect to this report, it's

5    reporting $186,629.80 in sales through Mrs. Fields for the

6    year 2014.  Would you agree with me about that?

7    A.        I agree that's the number on this chart.

8    Q.        And based on your own work on how much was owed on

9    account of his invoices, you know for a fact that 70

10   thousand of those were sales through Mrs. Fields?

11   A.        No, I don't know that.

12   Q.        He had $70,000 of sales through Mrs. Fields in

13   2014, did he not?  Isn't that what you're interest rate is

14   being calculated on, on those invoices?

15   A.        I don't recall.  You'll have to show me those

16   invoices.  I don't recall the timing.

17   Q.        No need to that.  And in your report, just to go to

18   the punch line, you say that in 2014, if I'm not mistaken,

19   you say, in your --

20             Go back to his report for a moment.  It's 60.  And

21   go to this table.  Go to Exhibit 4.  Four.  Exhibit 4.  Keep

22   rolling.  It's an exhibit.

23             I'm sorry, Your Honor.  Mr. Cohen is doing the best

24   he can, Your Honor.  Ms. Ryan who worked with me for three

25   years on this case became seriously, seriously ill two weeks

1   ago, and we have lost her completely at this point in this

2   case, and I apologize.  And Mr. Cohen stepped in literally

3   at the very last minute to try to handle these exhibits for

4   me.

5            THE COURT:  Well, that's all right.

6            MR. AMANI:  Attachment 4 to Exhibit 60.  Do you

7   have Exhibit 60?  We're not pulling it up.  I want to go

8   back to -- there it is.  He found it.  Good for you.

9   Q.       BY MR. AMANI:  This is your calculation of sales

10  and profits based on what you call Mrs. -- MFGPC'S own

11  historical financial performance.  Correct?

12  A.       Yes.

13  Q.       And you say, in your calculation, that in 2014

14  Mrs. -- MFGPC had $867,819 in sales.

15  A.       No.

16  Q.       Well, that's your baseline, isn't it, for the year

17  before the year you're going to launch?

18  A.       No.  No.  Your statement is incorrect.

19  Q.       Okay.  Let me ask you a question.  So you're going

20  to go from 2012 straight to 2015, and we're skipping '13 and

21  '14?

22  A.       No.  No.

23  Q.       How can you explain it to me?

24  A.       Sure.  So what you see in this schedule at the top,

25  you see the actual sales of 2010 through 2012, which the

1    average of that is about $580,000, and then you have a

2    growth rate which is based on the actual historical growth

3    rate of the industry and Mrs. Fields' projection of what's

4    going to happen during the damage period.  And so that's

5    grown from 2012 forward, and into the damage period you have

6    2015, 2016, 2017 and through April of 2018.  So the sales in

7    2013 and 2014 are projected sales absent the buyer and

8    absent the actions of Mrs. Fields of terminating the license

9    agreement.

10    Q.       So absent those projected sales.  They didn't

11   happen, did they?

12    A.       No.  Those are projected sales.

13    Q.       They don't exist.  They never happened in 2013 and

14   2014?

15    A.       Correct.

16    Q.       In fact, the reality of 2013 and 2014, and I can

17   take you back to the royalty reports if you want, but we

18   went over them.  It was 186,000 and 300 and something.  300

19   something in 2013 and 186,000 in 2014.

20            Actually go back to the royalty report for one

21   minute if you don't mind, Exhibit 12.  '13 and '14.

22            I forgot to finish up with you on this.  Do you see

23   in the fourth quarter of 2013, do you see how much he had in

24   sales?

25    A.       Yes.

1  Q.      Mr. Lindley indicated that that showed that he had

2  recovered.  That was, as he himself said, half -- he did in

3  one quarter what he did -- half of what he had done the full

4  year before.  Do you have an explanation for that?

5  A.      Well, I mean, first of all, the fourth quarter is

6  typically the best quarter of the year.  It's the holiday

7  sales.  But you can -- having one quarter does not indicate

8  to me that MFGPC recovered fully from the fire, which is

9  what you were saying before.

10  Q.      So you're saying that Mr. Lindley is wrong when he

11  says that that's indicative of his recovery?

12  A.      Well, I wouldn't say it's wrong.  It's part of the

13  recovery, but I would say it's not fully recovered from the

14  fire.

15  Q.      Well, go backwards with me for a minute to 2013 and

16  '12.  Let's look at 2011 and '12, those are good.  Stay on

17  2011 and '12.  Now we have your sales here.  2011, and

18  that's one of the years you're relying on, correct?

19  A.      Yes, but I'm relying on the financial statements,

20  not the royalty reports.

21  Q.      All right.  But, based on the royalty reports --

22  I'm just comparing royalty reports at this point because

23  that's all I have quarterly numbers for.  But if you look at

24  the quarterly numbers that are being reported for

25  Mrs. Fields, in 2011 he's doing 284,000 whereas 2014 we just

1  showed you he did 300,000, but you're saying he's still

2  impacted.  It's still your testimony, to a reasonable degree

3  of professional certainty, that the impact of the fire is

4  still impacting him in the fourth quarter of 2013?

5  A.      Yes, and through 2014.  And that's based on

6  Mr. Lindley's explanations to me, which I thought were very

7  reasonable and made sense, given the circumstances and the

8  selling process, the selling pipeline.

9  Q.      Did Mr. Lindley explain to you that he deliberately

10  wanted to use -- what was the word he wanted to use?  I have

11  forgotten.  I don't have a transcript -- oh, throttle.  My

12  paralegal reminds me it was throttle.  Did Mr. Lindley tell

13  you will he deliberately throttled sales in 2014?

14  A.      My understanding was 2014 was both impacted by the

15  fire and by the fact that Mr. Lindley was reducing sales in

16  preparation for trying to get outside investors, so yes.

17  Q.      Your understanding is he told you he reduced sales

18  so as to be able to attract outside investors?  Is that your

19  testimony?

20  A.      Reducing sales maybe isn't the right way to say it.

21  I guess I want to revise that.  But he was focusing on

22  trying to get an outside investor, as opposed to actively

23  selling or running the business as much, so he had shifted

24  some of his focus.

25  Q.      Do you have any understanding of why he needed an

342

1    outside investor?

2    A.        He wanted to be able to grow the business and to

3    get more money in to make it -- to make it more profitable

4    and generate more revenue.

5    Q.        As I understand your model for his sales, it

6    assumes that he's going to get that outside investor, does

7    it not?

8    A.        Well, it's -- I mean, I think that Mr. Lindley

9    would probably say to grow it to the level that I'm

10   projecting, he would either have to make additional

11   contributions to the company or get outside money from a

12   permanent investor.  There would be some sort of money

13   coming in from some source.

14   Q.        And your model assumes that that money is coming

15   in.  Without it, you can't have that kind of growth, right?

16   A.        It's assuming that there is additional capital from

17   someone, Mr. Lindley or an investor.

18   Q.        Can you put the other one back up.  And now we're

19   back to his exhibit -- his attachment 4.

20           All right.  So let's go back to your attachment 4

21   now so I can better understand what you did here.  So,

22   you'll agree with me that his sales were either 207,000 or

23   186,000 in 2014.  Those were his actual sales, correct?

24   A.        No.  They were 382,000 in '13 and 186 in '14

25   is what -- the figures you put up before.

343

1    Q.       That's what I was saying.  I was talking about '14.

2    I'm sorry if you didn't hear me correctly.  I gave you both

3    numbers, 207 and 186 for '14.  You'll agree with me it's one

4    of those two numbers?

5    A.       I'll agree with you that's what's in the royalty

6    reports, but again, you have to remember there might be some

7    timing issues.  I don't recall what's in the financial

8    statements of MFGPC.

9    Q.       I'm sorry, Mr. Kilbourne, that wasn't my point.  My

10   point was to get you to agree with me the sales in 2014 were

11   somewhere around 200 grand.  They are either 207 or 186,

12   whatever it is.

13   A.       That's what's in the royalty report.

14   Q.       Right.  And under your theory, he's going to go

15   from sales of that number in -- those are the actual

16   numbers, right?

17   A.       Yes.

18   Q.       He's going to go from those to a million 50.  With

19   your reasonable degree of professional certainty, you're

20   almost certain that that's what he can do?

21   A.       Yes.

22   Q.       And even though his growth rate is only 21 percent

23   a year?

24   A.       Yes.

25   Q.       If you skip years '13 and '14 for growth purposes,

344

1    those don't count, he's actually going to have to grow 65

2    percent -- well, actually, the actual number is going to be

3    eight-fold or something along that line, correct?

4    A.        No.

5    Q.        Well, he's going to grow five-fold, I'm sorry.  200

6    to a million 50?

7    A.        Yeah.

8    Q.        But he's going to have --

9    A.        This business is easily scalable and so, you know,

10   we've seen in other years where sales have gone up and down

11   significantly; down because of external events, and up

12   because Mr. Lindley scaled it back up.  And so, being able

13   to scale his business back up, that's not -- that's not

14   unusual or difficult.  So, I think it's very reasonable.

15   Q.        I thought in 12 years of business, the maximum he

16   had ever done was 600?

17   A.        Around 600.  I think it was a little bit more.

18   Q.        And where had he ever doubled his sales in one

19   year?

20   A.        Well, he went from zero to 200-some-odd thousand

21   the first year, which is a pretty big scale up to go from

22   zero to that.  That's pretty substantial.

23   Q.        That was in 2003.  After 2003, between 2003 and the

24   present, how was his scaling?

25   A.        Well, from 2007 to 2008, he pretty much doubled

1  sales.

2  Q.      So you're saying that he's going to double sales

3  from 2012 -- well, you're not saying that.  You're actually

4  saying he's going to do five times as much sales between

5  2014 and 2015 based on this model, right?

6  A.      Yeah.  Yeah, and again, the business is very

7  scalable.  And to be able to return back to a sales level

8  that's pre-fire, you have to think that he's got a -- he has

9  the co-packers in place.  He has customers that have bought

10 from him in place before.  Being able to scale this type of

11 a business is -- I would not expect to be that difficult

12 given Mr. Lindley's experience in it and what he has done in

13 the past.

14 Q.      And then if you go, and you take a look at your PSP

15 sales --

16        Where is that one?  Yeah.  Go with me to attachment

17 6.  Can you get that one on?

18        In this version of your lost profits, this is the

19 one which you base it on PSP's projections, right?

20 A.      Yes.

21 Q.      In this version of your projections, his sales are

22 going to increase eight-fold between 2014 and 2015, right?

23 A.      Yes.  So this is actually perfect evidence, great

24 evidence of the scalability of the company.  So Mrs. Fields

25 and Perfect Snacks are saying Perfect Snacks can go from

1    zero to 1.6 million in one year.  And so that's these two

2    independent parties talking about the scalability of what

3    they expect will happen with Perfect Snacks.  And so this is

4    perfect evidence that shows that Mr. Lindley, who already

5    had a very established business with packers and a pipeline

6    and customers, could also scale the business.  So this --

7    this shows to us exactly what you're saying it shouldn't

8    show.

9    Q.      What -- what is it in Mr. Lindley's history that

10   shows he can do that?

11   A.      Well the --

12   Q.      A million 6.  What is it in his history of his

13   business that says he's going to go from 200,000 in sales in

14   2014 to a million 6 in 2015?

15   A.      Well, this --

16   Q.      To a reasonable degree of professional certainty?

17   A.      With a reasonable degree of professional certainty,

18   this is one piece of evidence that shows that because

19   Mrs. Fields thinks that Perfect Snacks can do it.  Perfect

20   Snacks thinks they can do it.  There is no basis to assume

21   that Mr. Lindley could not do it.

22   Q.      I'm sorry.  You didn't answer my question,

23   Mr. Kilbourne.  What is it in Mr. Lindley's history that

24   gives you the degree of professional certainty that he's

25   going to take the sales from 200,000 in 2014 to a million 6

347

1    in 2015?

2    A.        So, it would be all the history of his performance

3    in the past, from 2003 to 2012, where he went, again, from

4    zero to 600,000 in sales in a fairly short period of time.

5    He's had some ups and downs caused by external events, and

6    he's been able to recover from that and scale it back up.

7    So all that, along with this, tells me that's reasonable.

8    Q.        By the way, you know, you did that and you found

9    the analysis on the growth of the popcorn retail business I

10   think between '15 and up.  That was your 25 percent number

11   or whatever, some such number, correct?

12   A.        It was 23.6.

13   Q.        23.6.  And did you look backwards to see what the

14   growth of the popcorn business had been in the past?

15   A.        I don't recall.

16   Q.        No?  That was not of any importance to you?

17   A.        No.  I didn't say that.  I just said I don't

18   recall.

19   Q.        You don't recall what it was?  We had testimony

20   from Mr. -- I don't know if it was Mr. Scavitto, but one of

21   ours witnesses testified that the business -- Mr. Hornick

22   testified that the business exploded in 2008, that it grew

23   very fast also after 2016.  And he used the year 2008.  Did

24   you know that it was growing very rapidly between 2008 and

25   the present?

348

1    A.       If I do, I just don't recall that right now.

2    Q.       Mr. -- Mr. Rothschild showed Ms. Schmandt evidence

3    yesterday, I think it was Exhibit 38 in the TRO, R-38, which

4    showed that the popcorn business was growing very rapidly in

5    2010, '11, '12, '13 and '14 as well.  Did you know that?

6    A.       Well, I knew it was growing in the later years.  I

7    don't remember exactly which years the industry research

8    that I had --

9    Q.       How do you explain, if popcorn was growing so fast

10   in those earlier years, and Mr. -- MFGPC'S sales -- sales

11   were, as Mr. Lyon said, growing at effectively the rate of

12   inflation?

13          MS. WHITE:  I just want to get my objection on the

14   record, Your Honor, that counsel mischaracterized

15   Ms. Schmandt's testimony and the exhibit from yesterday.

16          MR. AMANI:  I didn't mischaracterize Mr. Hornick's

17   testimony this morning.  He used the year 2008.  He was very

18   clear.  He said there was a huge increase in '16, too.  But

19   he said it had been growing rapidly since 2008, and I'm

20   trying to understand, if that was the case, why -- how do

21   you explain that MFGPC's business isn't keeping up with that

22   national rate?

23   Q.       The point of my objection was not Mr. Hornick, it

24   was Ms. Schmandt.

25          THE COURT:

1      MR. AMANI:  Okay.  So I'll keep it to Mr. Hornick.

2      THE COURT:  All right.

3  Q.      BY MR. AMANI:  How do you explain that,

4  Mr. Kilbourne?

5  A.      Well, first of all, I don't know what -- I have to

6  say multiple things because you put in a lot in there.  I

7  don't know what this other fellow -- Mr. Hornick, is that

8  what you said?

9  Q.      Yes.

10  A.      I don't know what he said.  I don't know what data

11  he was relying on.  But you also said that MFGPC grew at the

12  rate of inflation.  Well, they didn't.  They grew at a much

13  higher rate than inflation.  Mr. Lyon, to get that growth

14  rate of inflation, used only two years of growth.  And if he

15  had used three years of growth, or all the years of growth,

16  he would have seen a substantially higher --

17  Q.      I actually wanted to get back to that point.

18  A.      I'm not done yet.  I'm not done yet.  Also you have

19  to look at -- you're trying to look at certain years.  I

20  mean there was growth in 2008.  If you say that there was

21  growth in 2008 that was higher than MFGPC'S, that may

22  have -- that may have been the case, but we'd also have to

23  understand if there were any other events that happened in

24  MFGPC in 2008.  So, you know, you're throwing all sorts of

25  stuff in there, and you're making a messy soup of nothing.

1    What I know is how much the industry growth -- that the

2    industry grew during the damage period.  We know that.  And

3    we also know that MFGPC grew in some years very quickly,

4    substantially, by 50 percent or more.  And we know that

5    MFGPC grew much more than the inflation rate.

6    Q.      I wanted to get back to your point about that.  You

7    made a point that --

8            THE COURT:  Mr. Amani, I assume you're not nearly

9    done with this witness; is that correct?

10           MR. AMANI:  No, Your Honor, not close.

11           THE COURT:  We'll take a 30 minute recess and

12   reconvene about 25 to.  Thank you.

13           MR. AMANI:  Thank you, Your Honor.

14                          (short break)

15           THE COURT:  Let's see.  We don't have Mr. Kilbourne

16   yet.

17           MR. ROTHSCHILD:  I'm here, Your Honor.

18           THE COURT:  Go ahead, Mr. Amani.

19           MR. AMANI:  Thank you, Your Honor.

20   Q.      BY MR. AMANI:  Mr. Kilbourne, if 2014 wasn't

21   impacted by the fire, but was in fact -- the sales were

22   as -- were deliberately scaled back, would that impact your

23   analysis?

24   A.      Under that hypothetical, I still would say probably

25   not because they were deliberately scaled back.

351

1   Q.      So there would be no change to your analysis

2   whatsoever?  You can still say with a reasonable degree of

3   professional certainty that he could go -- that MFGPC would

4   go from that scaled back amount to those million 50 and

5   million 6 numbers in the following year.  Is that right?

6   A.      Yeah.  Under your hypothetical, I think that would

7   be true because, again, you know, we see from the Perfect

8   Snacks and Mrs. Fields license that they could scale

9   Mr. Lindley has shown in the past that he could scale.  So

10  the fact that he -- if you're saying that he had

11  intentionally pulled it back, that means he could

12  intentionally increase it again.

13  Q.      You will agree with me that you understood that

14  Mr. Lindley didn't want to spend his own capital increasing

15  it anymore, correct?

16          MS. WHITE:  Objection.  Misstates prior testimony.

17          MR. AMANI:  I'm asking the witness, does he

18  understand that Mr. Lindley's position was that he was not

19  going to use his own capital to expand, he wanted to find

20  outside capital.

21          THE COURT:  Do you object to that question?

22          MS. WHITE:  Well, I object to the premise that he

23  couldn't use his own capital.  That's what I thought

24  Mr. Amani said the first time.

25          MR. AMANI:  I'm sorry, Ms. White.  I didn't say

352

1  that.  If I did, I apologize.  I just said he wasn't

2  prepared to.

3  Q.      BY MR. AMANI:  You understood that, correct?

4  A.      I mean, I don't know.  Mr. Lindley was looking for

5  outside capital, but it's not my understanding that he was

6  unable or unwilling to spend his own capital.  He certainly

7  had in the past, and I have no reason to believe he wouldn't

8  continue to do that the future.

9  Q.      If I heard you correctly just before we broke, you

10  did agree that in order to get to the numbers that you're

11  talking about, they would need additional capital?

12  A.      Well, I think that from my conversation with

13  Mr. Lindley, to grow it to kind of the next level, if you

14  will, he needed more capital from himself or from an

15  investor.

16  Q.      And where is the cost of that capital in your

17  analysis?

18  A.      Well, I'm not sure what you mean.

19  Q.      Well, you said you understood from Mr. Lindley that

20  he needed additional capital to grow to the levels you were

21  talking about, correct?

22  A.      Yes.

23  Q.      And there's a cost to capital.  Was he going to

24  borrow that money from a bank?  If you borrowed that money

25  from a bank you'd pay interest, right?

353

1    A.        Well, you certainly would if you borrowed money

2    from a bank, yes.

3    Q.        And that would be one of the costs, but you have no

4    costs built into your model for that interest, do you?

5    A.        Well, no, because I don't know that Mr. Lindley was

6    looking to borrow that money from a bank.  He was looking to

7    either invest more from himself or from another investor,

8    which would not be involved.

9    Q.        But if you got it from another investor, that would

10   be a cost to the company as well.  Wouldn't there -- there

11   would be an equity dilution at that point, and you would

12   have to include that in your cost, would you not?

13   A.        No, because that wouldn't change the lost profits

14   of the company.

15   Q.        Well, yes, but it would change the lost profits

16   from the entity as it existed in 2014.

17   A.        No, it wouldn't.

18   Q.        All right.  Go back to the base sales that we were

19   dealing with.

20             Could you put up attachment 4 again.

21             And this is your calculation of lost profits based

22   on MFGPC'S historical financial performance again?

23   A.        Yes.

24   Q.        We went over this.  Based on the actual numbers,

25   you're projecting that either they would increase sales five

354

1    times, if you look at this particular version, or if you

2    look at the PSP, eight times between 2014 and 2015.  That's

3    the reality, correct?

4    A.    Are you going back to your figure that you put

5    forward of actual sales in 2014 of around 200,000?

6    Q.    Well, are you disputing that the actual sales were

7    around 200,000?

8    A.    Well, you've pulled that from a report, a royalty

9    report, and I've looked at 2014, at MFGPC'S income statement

10   for 2014, but I don't have that number in front of me.  I

11   don't remember it.

12   Q.    It was 207.

13   A.    From their financial statements?

14   Q.    Yes.  207,000 for 2014.  Were you unaware of that?

15   A.    You haven't shown me that.  You have shown me

16   royalty reports.

17   Q.    I'm sorry.

18         55.  Exhibit 55.  I thought we put it up

19   previously.

20         2014.  Just the top part.  Go back.  Right there.

21   There you go.

22   A.    Right.  Thank you.

23   Q.    Do you agree with me now, 207,000?

24   A.    Yes.

25   Q.    And the other royalty report, I believe was about

1   186,000?

2   A.      Yes.

3   Q.      Do you recall that?  And so I was just rounding it

4   I mean for purposes of this conversation, to 200.  And let's

5   assume it's 200.  You're okay with -- we both know what it

6   says on the paper.  So you're assuming that he's going to go

7   from about $200,000 in sales at MFGPC to either a million 50

8   in 2015 or a million 6 depending on whether you use your

9   MFGPC historical numbers, as you call them, or your PSP

10  numbers.  Correct?

11  A.      Yes.

12  Q.      And you're growth rate is 21 percent annually,

13  correct?

14  A.      Yes.

15  Q.      So if you just do the math with me simply, if you

16  start with that 200, and let's use a 20 percent number, your

17  next year's sales would be 400 under your 20 percent growth

18  rate, the actual sales, right?

19  A.      That's incorrect.  You're doing a different --

20  that's not what I did.

21  Q.      Well, you said that growth would be 21 percent

22  annually based on what you looked at in the marketplace,

23  correct?

24  A.      Yes.

25  Q.      And Mr.  -- MFGPC's sales in 2014 were $207,000.

356

1    I'll give you the higher number.  Correct?

2    A.        Yes.  That's correct, but what you're doing --

3    Q.        Wait --

4    A.        What you're doing is not the analysis that I did.

5              THE COURT REPORTER:  Excuse me, Counsel and

6    Witness.  Just one at a time.

7              THE COURT:  Good advice.

8              MR. AMANI:  Yes, ma'am.

9              THE COURT:  I second her advice.

10             MR. AMANI:  Yes, ma'am.  Yes, sir.

11   Q.        BY MR. AMANI:  Let's just work with the $207,000

12   number.  You say that the growth rate that should apply to

13   this company is 21 percent annually, correct?

14   A.        Yes, but not from a figure of 200,000.

15   Q.        Well, but, wait a minute.  They have a different

16   growth rate from their actual sales in 2014 than you want to

17   apply?

18   A.        Come on, Mr. Amani, you know what I've done here.

19   We've looked at the schedule.  You know exactly what I've

20   done.  Don't try and modify what I've done.

21   Q.        Mr. Kilbourne, you've stated to a degree of

22   professional certainty the average rate of growth of this

23   industry is 21 percent, correct?

24   A.        That's what it was during the damage period, yes.

25   Q.        And you have agreed with me, have you not, that the

1    actual sales of this company in 2014 were $207,000?

2    A.      Yes.  But we have also discussed how that sales

3    level was compromised.

4    Q.      It may have been compromised, but it doesn't change

5    where the company started from in 2014, does it?

6    A.      Well, yes, it does, because the company is starting

7    from figures of around 600,000, in 2010, 2011, 2012 and then

8    they were negatively impacted by the fire.  So that matters.

9    Q.      And how does that matter when you have to

10   distinguish -- when you want to make just a simple

11   adjustment?  How am I going to go from '14 to '15 in

12   actuality?  We are dealing with actual profits of this

13   company, are we not?  That's -- that was the task, to figure

14   out or project the actual profits of MFGPC, correct?

15          THE COURT:  What is your question?  I'm not sure I

16   understand the question.

17   Q.      BY MR. AMANI:  My question is, is how is it that

18   you're just going to ignore 2014?  What's the basis for

19   ignoring it?

20   A.      Well, the first basis is that the Court said that

21   we should ignore the periods that were impacted by the fire,

22   and I agree with that both from a legal perspective, from

23   the Court saying it's the case, and from an economic

24   perspective.  That's appropriate.

25   Q.      Let me ask you this.  Do you think that the fact

358

1  that he had only -- that MFGPC had only $207,000 in sales in

2  2014, how do you think that impacted his ability -- their

3  ability to go out and generate new sales in 2015?

4  A.      Well --

5         MS. WHITE:  Objection.  Foundation.  He's not the

6  owner of MFGPC.

7         MR. AMANI:  Well, he's opining on what they could

8  do.

9         THE COURT:  Well, he is giving opinions about what

10  he is projecting what they can do.  That's really what the

11  question is about, so the objection is overruled.

12         MR. KILBOURNE:  Great.  So, look, we have multiple

13  data points that tell us this it was a very scalable

14  business, so the fact that the sales are 200 thousand-ish in

15  2014, because of the fire or because Mr. -- and/or because

16  Mr. Lindley elected to throttle the business back, does not

17  negatively impact his ability to increase them in 2015.

18  We've seen him do it in the past.  We have seen that both

19  Mrs. Fields and Perfect Snacks believed that you could go

20  from zero to 1.6 million in one year.  All that data tells

21  me that it's perfectly reasonable for Mr. Lindley to go from

22  200,000 to 1.1 million in one year.

23  Q.      Now, you've said something there I have to ask you

24  about.  Where did you get this zero to a million 6?

25  A.      Well, the Perfect Snacks license agreement was

1    signed and, in the first year -- actually it's 15 months,

2    but the first almost year period, both Mrs. Fields and

3    Perfect Snacks assumed and expected that Perfect Snacks

4    could go from zero to $1.6 million.

5    Q.        Did you understand that that was for two products

6    that Perfect Snacks already had in the marketplace?

7    A.        How could they have had products already?  They

8    didn't have a license agreement for that.

9    Q.        Do you understand what Perfect Snacks was selling?

10   A.        Yes.

11   Q.        They were selling something called Cookie Pop.  Do

12   you know how long?

13   A.        This --

14   Q.        Do you know how long they had been selling Cookie

15   Pop?

16   A.        No, but this was the start --

17   Q.        No, you --

18   A.        But this was the start of the license agreement

19   with Mrs. Fields.

20   Q.        Well, but they were going to put -- have you seen

21   Perfect Snacks's products?

22   A.        Have I, like, seen the physical products?

23   Q.        Yes.

24   A.        I'm not -- I have seen pictures of it --

25   Q.        Well, have --

360

```
 1   A.        -- but I have not the seen the physical products.

 2   Q.        Have you seen they have other ones?  They have

 3   Cookie Pop with Snickers on it.  They have Cookie Pop with,

 4   you know --

 5             THE COURT:  Mr. Amani.

 6             MR. AMANI:  Yes.  I'm asking if he has seen these.

 7             THE COURT:  Yeah, but you keep -- you keep -- you

 8   start asking a question before he's finished with his

 9   answers.

10             MR. AMANI:  I apologize, Your Honor.  That I didn't

11   intend to do.

12   Q.        BY MR. AMANI:  If I interrupted you, Mr. Kilbourne,

13   my apologizes.

14   A.        Is there a question pending?

15   Q.        Did you -- was it your understanding that Cookie

16   Pop was started from scratch?

17   A.        Well, I knew they were selling the Cookie Pop

18   before, but this is the first time they were selling any

19   product licensed with Mrs. Fields' brand .

20   Q.        This is the first time they have ever put

21   Mrs. Fields' name on their product -- on one of their

22   products?

23   A.        As far as I knew, it was the first license

24   agreement they had with Mrs. Fields.

25   Q.        Did you review the correspondence in this case
```

361

1  between Cookie Pop and Mrs. Fields?

2  A.        I'm sure I did, but I don't -- actually, I don't

3  recall if I did one way or the other.  If it was produced, I

4  probably did.  I just don't recall.

5  Q.        What did you understand Cookie Pop's distribution

6  circumstances to be, who they were distributing to?

7  A.        I don't recall that right now, one way or the

8  other.

9  Q.        Do you know how many products Cookie Pop had

10  contracted with Mrs. Fields for?

11  A.        I don't recall that.

12  Q.        Do you know if it was more than two?

13  A.        I don't recall one way or the other.

14  Q.        We had testimony that Mr. -- Mr. Lindley's products

15  were in different channels, he had a different number of

16  products in different channels.  Did you understand that?

17  A.        Yes.

18  Q.        Okay.  Was Cookie Pop in one channel or in

19  different channels?  Do you know?

20  A.        I don't recall.

21  Q.        Do you know which channel it was?

22  A.        Again, I don't recall.

23  Q.        Do you know who would -- the principal customer was

24  that Cookie Pop was looking to sell through?

25  A.        I don't recall that information.

362

1    Q.      Did you ever hear Wal-Mart discussed in the context

2    of Cookie Pop?

3    A.      I don't recall one way or the other.

4    Q.      And -- but did you have an understanding that

5    Cookie Pop was being sold by national retail stores on a

6    national level?

7    A.      Again, I don't recall the details of that.

8    Q.      What did you understand Mr. Lindley's sales at a

9    national level to be by 2013?

10   A.      I don't recall.  I mean, I've looked at the detail,

11   but I don't remember as I sit here.

12   Q.      Do you know whether by mid-2013 he had sales to any

13   national retailer?

14   A.      Again, if you want to pull up the detail of sales,

15   which I've looked at, we can, but I don't recall as we sit

16   here.

17   Q.      What happens if he doesn't get the capital somehow?

18   Would that affect your analysis at all?

19   A.      If Mr. Lindley doesn't get outside capital or

20   doesn't --

21   Q.      Doesn't get capital to go into the business,

22   additional capital that he talks about needing?  How would

23   that affect your analysis, if at all?

24   A.      I think, as I've mentioned before, based on my

25   conversation with Mr. Lindley, to kind of grow the business

363

1    to the next level, he would need additional capital whether

2    from himself or someone else.

3    Q.        So, how would it impact you -- how would it impact

4    your analysis if he did not -- if he was unable to get that

5    additional capital?

6    A.        I mean, I didn't do an analysis to measure how much

7    additional capital he would need and, you know, that's -- to

8    look at the detail of capital requirements versus sales

9    levels, I didn't go into that level of detail.

10   Q.        Did you discuss it with Mr. Lindley?

11   A.        No.

12   Q.        Did you have any understanding as to whether

13   Mr. Lindley had an understanding about how much additional

14   capital he would need?

15   A.        If I -- if he -- if I did know that, I don't recall

16   as I sit here.

17   Q.        As of 2015, do you have any understanding how long,

18   at that point, it would have taken Mr. Lindley to source

19   capital?

20   A.        I don't recall having a discussion about that.  I

21   may have looked at some documents, but I don't recall.

22   Q.        Your model assumes it would be available to him

23   almost immediately, does it not?

24   A.        My model assumes that whatever additional capital

25   would be needed to achieve those sales levels would be

364

1    available.

2    Q.        From the -- right out of the box, late 2014 or

3    early 2015, correct?

4    A.        Well, I'm not sure what you mean, but my model

5    assumes that whatever capital is needed at any point in time

6    would be available.

7    Q.        And what was your assumption about that capital,

8    that it would just -- that he would just able to get it,

9    correct?

10   A.        I just said, I didn't assume anything about the

11   capital, but I assumed it would be available, whether it was

12   from Mr. Lindley or through another source.

13   Q.        I think you answered yes to my last question, which

14   my question was, did you assume that that capital would just

15   automatically appear?

16   A.        I assumed that whatever capital was needed would be

17   available either through Mr. Lindley or through another

18   source.

19   Q.        As I understand your testimony now, there is no

20   cost associated with that capital?

21   A.        No.  That's not accurate.  There's always a cost to

22   capital, but to MFGPC it doesn't change their lost profits.

23   If another investor came in and said, you know, here's some

24   money to grow the business, the lost profits to MFGPC are

25   unchanged.

365

1    Q.        He doesn't have to pay that investor any additional

2    monies for putting in the money?

3    A.        The lost profits to MFGPC are unchanged.

4    Q.        Well, wouldn't MFGPC have to pay a portion of those

5    to a third party, the new investor?

6    A.        Well, that's not the way it works.  If we're

7    talking about a new investor to MFGPC then they are an owner

8    of some portion of MFGPC.

9    Q.        Well, in this particular case, Mr. Lindley is

10   seeking to collect for himself a certain amount of lost

11   profits, correct?

12   A.        Mr. Lindley or MFGPC?

13   Q.        And if he had to bring in an outside investor to do

14   all this -- these sales, at least some part of those profits

15   would have to be shared with someone else, correct?

16   A.        If there is an outside investor, then the profits

17   of MFGPC are shared with all the investors.

18   Q.        This 20 percent increase annually of popcorn sales,

19   did you investigate what the source of those increases were?

20   A.        It was -- it was actual historical sales increases

21   of ready-to-eat popcorn.

22   Q.        That was in the aggregate over the whole of the

23   United States, I assume?

24   A.        I believe so.  I'd have to go back and look at the

25   data from Mintel, which is the source of the data, but I

366

1    believe so.  If it was U.S. -- actually, I don't recall if

2    it was U.S. or worldwide.  I think it was U.S. data.

3    Q.      And is that -- by way of example, does that mean

4    the companies that in that business, they are all growing at

5    20 percent, or some of them are growing a lot faster to get

6    to that number?

7    A.      Obviously if it's an industry aggregate, you're

8    going to have some companies less, some companies more.

9    Q.      Did you investigate any companies that had grown

10   their popcorn business 20 percent or more for this time

11   frame?

12   A.      I don't recall if the data from Mintel, the actual

13   industry data was specific by company or if it was overall.

14   We'd have to look at that data, which is referenced in my

15   report.

16   Q.      We had testimony earlier today from one of the

17   co-packers that there were a lot of new entries constantly

18   coming and going into this business.  Were you aware of

19   that?

20   A.      I -- I mean, it -- that doesn't matter to me one

21   way or the other.

22   Q.      Well, if this 20 percent sale increase that you're

23   looking at, if that's as a result of new entry, as opposed

24   to existing companies' growth, would that impact your

25   analysis?

367

1   A.        No.  It's not relevant.

2   Q.        So it would not be relevant even if there were no

3   other company out there that grew at 20 percent, existing

4   company?  That wouldn't be relevant?

5   A.        Well, there clearly was other companies that grew

6   at 21 percent because that was the overall industry average

7   so there definitely were companies that grew 21 percent.

8   It's not possible to not have them.

9   Q.        Well, I don't know, I'll give you the example of

10  the electrical vehicle business.  Now, there's one company

11  that's come in in the last few years and grown leaps and

12  bounds, so one might say that the electrical vehicle

13  business is growing by hundreds of percentages, but it's

14  related to one company, the existing company, one new

15  company.  The existing companies are growing slow and

16  steady, to use the term of Mr. Lindley.  Do you understand

17  that that happens in industries?

18  A.        Well, of course, but you said that there could be

19  no company growing at 21 percent, and if the average is 21

20  percent, there are definitely companies growing at 21

21  percent or more.  What you're saying is impossible.

22  Q.        You're not -- you didn't take an average of

23  companies to get 21 percent, you took an average of in this

24  category it's been growing by 21 percent.

25  A.        I took the --

368

1    Q.      It could be hundreds of companies that add to it

2    every year and that would grow by 21.  That would grow the

3    overall category by 21 percent without any company growing,

4    by 21 percent, wouldn't it?

5    A.      No.

6            MS. WHITE:  Your Honor, if counsel could please

7    pause and give the witness an opportunity to respond in

8    full, that would be great.

9            THE COURT:  Well, I talked to you about that

10   before.  Please let him finish his answer before you start

11   asking another question.

12           MR. AMANI:  I apologize, Your Honor.  It's not

13   intentional.

14   Q.      BY MR. AMANI:  Let me talk about the costs of goods

15   in your model for a moment if you don't mind.

16           Would you put up the comparison that we did.

17           THE COURT:  You're on mute, Mr. Amani.

18           MR. AMANI:  Your Honor, I'm asking Mr. Cohen for a

19   document.

20   Q.      BY MR. AMANI:  Let me ask you about -- while I'm

21   looking for that -- the cost of goods.  You did a weighted

22   average from 2000 to 2000 -- 2003 to 2012, and you came up

23   with 25 percent, correct?

24   A.      Yes.

25   Q.      And I'll get to this exhibit in a minute.

369

1          You're going to have to email it to Ms. white and

2   Mr. Rothschild if you would.  It's just -- I'm trying to

3   keep it simple.

4          And Mr. Lyon talks about a trend.  Do you recall

5   that, in his report on the cost of goods sold?

6   A.      No.

7   Q.      You don't remember talking -- you don't remember

8   reading in Mr. Lyon's report about the trend on the cost

9   goods?

10  A.      I'm not sure what trend you're referring to.

11  Q.      Well, if you look at the three years you used '10,

12  '11 and '12, my recollection of those numbers is they went

13  from 28 percent to 22 percent -- maybe it was 17 1/2

14  percent -- in those three year?

15  A.      Yes.  That's correct.

16         MS. WHITE:  What are we talking about?

17         MR. AMANI:  The cost of goods sold.

18          MS. WHITE:  Got it.

19          MR. KILBOURNE:  It's actually the gross margin.

20  It's not the cost of goods --

21  Q.      BY MR. AMANI:  The gross margin.  I stand

22  corrected.  The gross margin.  And did your investigate what

23  the gross margin was for 2013?

24  A.      No.  I mean, I know I looked at it, but since that

25  was a fire-impacted year, I did not use that data.

1  Q.        I can take you back to it and show it to you and do

2  the math that I'm trying to avoid, but that would be 9

3  percent.  Does that refresh your recollection, it would be

4  about 9 percent?

5  A.        It does not refresh my recollection.

6  Q.        All right.  Well, I'm going to have to put up

7  Exhibit 55 again.

8            Can you do that for me, John, and take me to '13,

9  and then I'll go to '14.

10           Here we have 2013.  This is the income statements

11 you relied upon, correct?

12 A.        No.  I didn't rely on this.  It's a fire year.

13 Q.        That's right, '13.  But you relied on these income

14 statements generally when looking at MFGPC's financial data,

15 correct?

16 A.        I relied on MFGPC'S other income statements,

17 correct.

18 Q.        Right, the ones -- you stopped at 2012, right?

19 A.        Correct.

20 Q.        All right.  But looking at this one, you see the

21 gross profit is 38580?

22 A.        Yes.

23 Q.        And if you put that on top of 420026, you get 9

24 percent.  I assume if you put it on top of 375, you would

25 get something north of 10 percent.  Do you see that?

371

```
1    A.       Yes.

2    Q.       And do you have any understanding of which ones --

3    which one of those two numbers would apply to calculate the

4    profit margin, the gross profit margin?

5    A.       Not without looking at the detail of what's in the

6    other income, the 45,000.

7    Q.       But you will agree with me that it went down

8    between '12 and '13?

9    A.       Yes.

10   Q.       All right.  And then let's look at '14.  If you

11   look at '14, now, in this year, you have -- here are the

12   numbers you have, 207, cost goods 192, and a gross profit of

13   14,716.  Do you see that?

14   A.       Yes.

15   Q.       I did the calculation on my calculator and came up

16   with about 7 percent.  Would you agree with that?

17   A.       Yes.

18   Q.       And you didn't account for that number either, did

19   you?

20   A.       No.  Again because these were periods that were

21   impacted by the fire.

22   Q.       So you believe that the -- the gross profit number

23   in 2014 was also impacted by the fire; is that right?

24   A.       Yeah.

25   Q.       All right.  And did you have discussions with
```

1    Mr.  -- with Mr. Lindley about that?

2    A.      Yes.

3    Q.      And what did he tell you?

4    A.      He told me that '13 and '14 were impacted by the

5    fire.

6    Q.      And did he tell you why his gross margin was so

7    low?

8    A.      I'm sure -- it's clearly a reflection of lower

9    sales, which is from the fire.  But I don't recall if we

10   talked about it specifically.  I mean, once I understood

11   that '13 and '14 were fire impact periods, I didn't use the

12   data, so I'm not sure.  I don't recall what level of detail

13   I went into in my discussions with Mr. Lindley about, you

14   know, other -- other costs.

15   Q.      I was going to ask you about that.  Did you have

16   any discussions with him at all about what those other costs

17   were?

18   A.      I had lots of detailed discussions for the previous

19   periods, but for '13 and '14, I don't recall that I was

20   looking at -- I -- I don't recall a conversation with him

21   about those years.

22   Q.      What was it about the fire, for example, in 2014

23   that impacted his cost of goods, if you know?

24   A.      Again, we have discussed that, but I mean, if you

25   have a substantial decrease in sales, it's going to affect

1    your profit margins.  That's just -- it's going to.  Some of

2    it might be a timing issue, you know, you might have

3    purchases that happened in one period that affect the

4    profits in another period.  I mean, this is not unusual to

5    me.

6    Q.       All right.

7             Can you put that comparison document up for me.

8             MS. SCHMANDT:  Bijan, you're muted.

9             MR. AMANI:  Apologies.  I can't see it.  This

10   is a -- we have extracted from your report, your schedule

11   5.1 and your schedule 5, these line items, which I think

12   we've copied -- we have literally copied from your report.

13   And I'd like you to look at it and just confirm for me

14   that's your understanding, this these are your numbers?

15   A.       Well, it certainly looks like it.  I hope you're

16   not asking me to check every single number with my report,

17   but it appears --

18   Q.       No.  I'm representing to you, as a lawyer, we

19   literally copied it from off the page of your report.  We

20   haven't altered a thing on it except to put a heading on it

21   that says Exhibit 60, 5-5.1 comparison.  Do you see that?

22   A.       Okay.  Yes.

23   Q.       Now, my understanding from looking at this is, you

24   went through some kind of exercise where you looked at his

25   expenses from every year from 2003 to 2012 and eliminated a

374

1    large number of them from your analysis?

2    A.        Yes, I eliminated some of them, which this

3    comparison shows.

4    Q.        All right.  And just so I can understand this

5    fully, the total expenses that Mr. Lindley listed on his

6    financial statements from 2003 were 95,975.  Do you see

7    that?

8    A.        Yeah.  That's not -- that's not the total expenses,

9    though.

10   Q.        All right.  Let's get the definition down.  You

11   want to exclude the 75 percent, so go ahead and explain

12   that.

13   A.        So, that is -- that is the overhead expenses.  It

14   doesn't include any of the cost of goods sold.

15   Q.        Right.  Agreed.  So this is just the expenses that

16   would be applied to his net after paying for the cost of

17   goods?

18   A.        Yes, and overhead expenses.

19   Q.        And so you looked at all of his expenses over --

20   can I ask, did you go through all his books and look at

21   every expense?

22   A.        Well, I mean, I'm not going to say I went through

23   every single one, but, yeah, we -- I spent considerable time

24   looking at the detail of expenses not just overall

25   categories.

375

```
1   Q.        How much -- how much have you been paid so far in

2   this case?

3   A.        I don't -- I don't know.

4   Q.        Ball park.

5   A.        Maybe 20, 30, maybe 30, $40,000.

6   Q.        Do you have an outstanding bill?

7   A.        No.

8   Q.        When you went through -- all right.  So let's go

9   back to this.  2003.  You took his total expenses on -- when

10  I say his, MFGPC'S financial statement.  The total expenses

11  for 20 -- 2003 were 95,975, excluding the cost of goods

12  sold.  The expenses we are talking about here are just

13  overhead expenses.  Do you agree with me on that, 95,975?

14  A.        Yes.

15  Q.        And you reduced those to 66 -- you reduced those in

16  your mind to 6677?

17  A.        Yes, but there's an important part of that that we

18  need to look at.  So, let's look at the -- at the top

19  section, which is where I arrive at the 10 percent

20  incremental profit, if you see the third line down is

21  royalties, and if you look at the bottom section, which is

22  5.1, also the third line down is royalties, and so I took

23  out the royalty line because sometimes -- we know the

24  royalty rate is 5 percent, and sometimes there were some --

25  there was some variability in the royalty rate which I
```

376

1    attributed to probably, you know, timing differences.

2              And so, in the -- in 5.1 you see the total of the

3    royalty line of all the years was $199,000, and that number

4    is removed from the top section, but you'll notice that in

5    the lower right-hand corner it says, "Less 5 percent royalty

6    to Mrs. Fields of 5 percent."  So, essentially what I'm

7    doing is trying to clean up any sort of errors or timing

8    differences that may exist in the data, and so to say that

9    it went from the 95 thousand in 5.1, which is what their

10   data says, to my calculation of 66,000 is not accurate

11   because you've got to include the 5 percent of royalties.

12   Q.      So then it actually went from 109,000 or 110,000 to

13   66; is that right?

14   A.      No.  No.  It went from 99,000 to 66,000 plus 5

15   percent of whatever the revenue was on the royalties.

16   Q.      I see.  Okay.  So your 66 is a slight bit more when

17   you put the 5 percent back in?

18   A.      Not a slight bit more.  It's quite a bit more.

19   Q.      It's 14,000 more?  Is that what it is?  I'm trying

20   to understand how much.

21   A.      I mean, I don't recall what the revenue was in

22   2003, but it's probably fairly close to 14,000.  I mean, it

23   would be in that range.

24   Q.      You know he paid the 450,000 the first three 1/2,

25   four years, something like that on the minimums.  Do you

1    recall that?

2    A.        I don't know.  He paid minimum royalties.

3    Q.        Yes, didn't he?  2003, '4, '5, '6 and '7?

4    A.        I don't recall specifically, but I know he paid

5    some minimum royalties.

6    Q.        I'm sorry.  I missed your answer.

7    A.        I don't recall specific numbers.

8    Q.        Are they in your calculations, those minimum

9    royalties?

10   A.        Well, again, his 5 percent, so the 5 percent is in

11   my calculations, yes.

12   Q.        But he paid $450,000 up front for this -- for

13   this -- for minimum royalties.  We have established that in

14   the case already.  Where is that in your calculation?

15   A.        It doesn't matter because we're looking at the

16   feature periods where minimum royalties are not relevant.

17   It's the 5 percent.  So regardless of what he paid for

18   minimum royalties in early years is not relevant for doing a

19   calculation of lost profits in future years where the 5

20   percent would apply.

21   Q.        So those costs aren't included is what you're

22   saying.  The minimum isn't included, you're just including

23   the actual 5?  A number that's derived by multiplying 5

24   percent times the sales?

25   A.        Let me put it -- yeah.  What you're saying is

1    irrelevant.  Let me just give you an example.  Let's just

2    say the minimum royalty in 2003 was actually 15 percent of

3    sales.  Well, that's not valuable to tell us what his lost

4    profits would be in the future in '15, '16 and '17 because

5    the minimum royalties would not apply.  It's the 5 percent

6    that would apply.  That's what's relevant.

7    Q.       I'm sorry.  I screwed it up on my computer.  And

8    let's go through these.  I mean -- well, let's look at the

9    last -- the three years you used, 2010, 2011 and 2012.

10   Let's take a look at those three years, if you would, with

11   me.  You're saying that his variable costs at that -- I get

12   confused by this.  I'm sorry, Mr. Kilbourne.  You're

13   removing the variable costs or the fixed costs or something

14   else?

15   A.       What you want to do is understand what the variable

16   costs would be, so if you have a hundred dollars in sales,

17   you want to say:  How much would I incur in costs to

18   generate that hundred dollars?

19          And what I have concluded in this is that MFGPC

20   would have incurred $90 to generate every hundred dollars of

21   revenue, which means that their lost profits are $10.

22   Q.       And that $90 includes the $75 for the cost of

23   goods, correct?

24   A.       So the $90 you would incur includes $75 in cost of

25   goods sold and $15 of overhead costs in my example.

379

```
 1   Q.      And the 15 includes the 5 percent or not?

 2   A.      Yes.

 3   Q.      It includes the 5 percent royalty?

 4   A.      Yes.

 5   Q.      All right.  So you're basically saying, putting

 6   aside the royalty, their costs will be 10 percent of what,

 7   their total sales?

 8   A.      No.  I'm saying the cost would be 90 percent, which

 9   includes all of their costs, including the royalty.

10   Q.      And their overhead costs will be 10 percent?

11   A.      The overhead costs would be -- the overhead costs,

12   which are generally considered to be fixed costs, would be

13   ten -- would be $10.

14   Q.      That's that 10 percent?

15   A.      Yes.

16   Q.      And so you're just leaving it in the fixed costs?

17   A.      No.  I'm not sure what you mean by that, when you

18   say leaving it in.  Do you --

19   Q.      I'm trying to understand what you're taking out --

20   I'm sorry.  I interrupted you again.  Apologies.

21   A.      What I'm saying is for every hundred dollars of

22   revenue that MFGPC would have during the damage period, it

23   would cost them $90 to generate that so their lost profits

24   are $10.

25   Q.      Right.
```

380

1    A.        And that $90 consists of all the variable costs of

2    course of goods sold of 75 percent, the royalty rate of 5

3    percent, and 10 percent, which is the categories of what are

4    generally considered to be fixed costs, but I have

5    determined that some of them will be variable in nature.

6    Q.        I want to stay with just the 10 percent costs.

7    That's the only one I'm interested in at this point.  That

8    10 percent is fixed or variable or some combination of the

9    two?

10   A.        I would assume the 10 percent is variable, meaning

11   that MFGPC would incur that to generate their revenue.

12   Q.        As their overhead?

13   A.        It's an overhead -- they are overhead expenses,

14   yes.

15   Q.        And that's the 10 percent you're talking about?

16   A.        Yes.

17   Q.        And that includes things like marketing,

18   promotions, graphic design?

19   A.        It includes the categories that we're looking at

20   here and others.

21   Q.        You say the categories that we're looking at here.

22            Actually, you know what, can we go to his Exhibit

23   60 and take a look at that.  You're going to five, the one

24   with the footnotes; yeah.  Those footnotes.

25            And is it fair to state that this is the only place

1  you have explained in this report what you took out?

2  A.       No.  I explained some of it in the body of my

3  report as well.

4  Q.       Where in the body of your report?  Without flipping

5  through it, do you know generally where you did that?

6  A.       Not without flipping through it.

7  Q.       All right.  Go with me, if you would, then, to page

8  9.  It would be in this section, would it not, in Section

9  A?  And we can scroll down slowly, but I'd like you to point

10 out to us where you explained --

11 A.       Yes.  It would be in that section.

12 Q.       All right.  We'll scroll down slowly as you tell us

13 to so you can point out to us where that is.

14 A.       First of all, it's in paragraph 23.

15 Q.       That's the statement:  Thus incremental profits on

16 revenue is approximately 10 percent.

17 A.       MFGPC also incurred other incremental costs of

18 approximately 10 percent of sales --

19 Q.       Right.

20 A.       -- and would pay 5 percent of net sales in

21 royalties and then "thus," the sentence that begins with

22 "thus."

23 Q.       Okay.

24          And then you can go -- John, take me slowly to the

25 next page.

382

1    A.        I mean 24 is not direct -- you can stop there.  24

2    is not directly, but it's also saying, look, that is

3    consistent with what Mrs. Fields determined, and so

4    Mrs. Fields determined that a incremental profit margin of 9

5    percent, which is very close to my figure of 10 percent.

6    Q.        Okay.

7              Go onto the next page.

8              Anything else about your 10 percent in here?

9    A.        Nothing on there.

10   Q.        Go onto the next page.

11             So have we covered pretty much everything that you

12   would have said inside the body of the report for your 10

13   percent?

14   A.        Yes, I believe so.

15   Q.        Okay.  So now let's go back to your exhibit.  And I

16   don't really get an explanation -- will you agree with me

17   that in the body of your report, I can't -- there is no

18   explanation of what you've taken out and why to get to the

19   10 percent, correct?

20   A.        There's not a detail of it.  There's a --

21   Q.        It's Exhibit 60.

22   A.        There's an overall explanation but it's not going

23   through in a detailed line-by-line, which is what I do in

24   attachments 5 and 5.1.

25   Q.        Let's go to attachment -- go down to -- there.

383

1    And that's really -- these footnotes are your

2    explanation of what you took out, is it not?

3    A.    Yeah, combined with -- with the comparison to

4    attachment 5.1.

5    Q.    Right.  And you say you removed all fees for

6    accounting, administrative expense, automobiles,

7    charitables, dues and subscriptions, miscellaneous, parking

8    fees and tolls, printing, repairs, maintenance and supplies,

9    correct?

10    A.    Right.  So, if you look at -- if you look at the

11    next page, the next after 5.1.

12    Q.    Okay.

13    Go to that, please, John, the next one to 5.1.

14    Slow down.

15    A.    Yeah, right there.  You see the first line there is

16    an expense of accounting in 2009 for $900 and there's no

17    other expenses for any other years, so clearly this is a

18    one-time expense.  There is no basis to believe there would

19    be another expense like that during the damage period.

20    Likewise, you know, you can see several categories,

21    automobile expense, $102 in 2009.  No other expense in other

22    years.  So I removed expenses like that that were one-time

23    or incremental in nature.

24    Q.    What else did you remove?

25    A.    I also removed amortization and depreciation

384

1    expense, because that's not a -- it's not a cash expense I

2    removed interest because the interest was paid to LHF or

3    Mr. Lindley -- not all of it, but most of it.  And it's not

4    considered an operating expense.  I removed the management

5    fees or expenses that were paid to Mr. Lindley or to LHF.

6    Actually, they weren't paid, they were accrued, so they were

7    never actually paid.  But, again, those are like

8    inter-company transfers.  So those were removed.

9           And then I removed other one-time -- you know, some

10   professional fees that were one-time or design fees that

11   were paid to design packaging that were -- based on my

12   conversation with Mr. Lindley were one-time or incremental

13   in nature.

14   Q.      Okay.  Back to the previous one.  The only

15   person employed at Mrs. Fields at this periods of time was

16   Mr. Lindley, correct --

17   A.      That's correct.

18   Q.      You know?  All right.  And you removed all fees

19   that he would have taken?

20   A.      That's correct.

21   Q.      So you have no labor costs in this model, correct?

22   A.      Well, the labor costs are Mr. Lindley's, so whether

23   the profits are lost by Mr. Lindley or MFGPC, you know, it's

24   like an inter-company transfer.

25   Q.      I see.  So you're going to go from $200,000 in the

385

1    actual sales in 2014 to a million 50 in 2015 or a million 6,

2    depending on which of your two models you're using, and

3    there's going to be no labor involved in that; is that

4    right?

5    A.        Well, Mr. Lindley's labor.

6    Q.        So he's just going to do it for free; is that

7    right?

8    A.        It doesn't matter if he does it for free or if he

9    charges for it.  It's still a loss to him.

10   Q.        And so this is -- your -- you projection is that

11   MFGPC is going to grow in these years without any cost of

12   labor, none accounted for, correct?

13   A.        No.

14   Q.        That's not correct?  So correct me?

15   A.        Mr. Lindley's labor.

16   Q.        For which -- he's going to give it freely?

17   A.        What you're suggesting is Mr. Lindley should not be

18   compensated for any of his work.

19   Q.        No, just the opposite?

20   A.        And I can't agree with that.

21   Q.        No, I'm sorry.  I'm not understanding how a company

22   runs without any labor costs.  That's what I'm suggesting.

23   I'm not suggesting he shouldn't be paid.  I'm suggesting he

24   should actually be paid a lot of money.

25   A.        No.  What you're suggesting is he shouldn't be paid

1    anything because if you remove -- if you include all the

2    labor costs of Mr. Lindley and then reduce the lost profits

3    by his -- his contributions of salary or management fees, if

4    you take that out of lost profits, then you're saying he

5    shouldn't be compensated.  That is exactly what you are

6    saying.

7            THE COURT:  We've been -- we've been over this

8    topic about four times.  I think both of your positions are

9    clear.

10            MR. AMANI:  Okay.

11   Q.      BY MR. AMANI:  Can I and you about Exhibit 51 --

12   no, 49.  49.  And go with me to the critical needs section.

13            Critical needs.  Go back.  It's right here.  No.

14   Keep going.  I'm sorry.  Got it?  Good.

15            This was a presentation in January of 2014 to

16   Mrs. Fields?

17   A.      From who?

18   Q.      From -- well, it was from Cameron Broadbent who

19   testified earlier today.  He testified he presented it to

20   Mrs. Fields.

21   A.      Is he a Mrs. Fields employee?

22   Q.      He was a Mrs. Fields employee working with

23   Mr. Lindley at the end of '13 and early '14 to transition

24   somehow into helping Mr. Lindley grow his business.

25   A.      I'm just trying to understand.  Is this an internal

1  Mrs. Fields presentation?

2  Q.      No.  It's a presentation by somebody engaged by

3  Mr. Lindley to help him grow the business and was sent to

4  Mrs. Fields as a representation of what MFGPC's current

5  status was and what they were asking for.

6  A.      So this is an MFGPC presentation to Mrs. Fields?

7  Q.      Yes.  That's my understanding.

8  A.      Okay.

9  Q.      Have you seen this?

10  A.      I mean, we could look at my documents reviews.  I

11  saw a number of presentations like this, but I'd have to

12  look at my list and tell you for certain one way or the

13  other.

14  Q.      And under the critical needs, there is the very

15  first listing, and it falls under the second one, too, the

16  hiring of a senior manager.  Did you have any discussions

17  with Mr. Lindley about his critical needs for a senior

18  manager?

19  A.      I don't recall one way or the other.

20  Q.      And where in your cost structure is that -- is

21  there any -- within your cost structure, is there any

22  accounting for a senior manager?

23  A.      I don't have a senior manager in my cost structure.

24  I have Mr. Lindley's costs that he's contributing to the

25  company.

388

1    Q.      Did Mr. Lindley ever discuss with you what his

2    labor needs were with the company in order to grow it?

3    A.      Well, I know that Mr. Lindley had been the only

4    employee during the entire period of the company's

5    operation.

6    Q.      Did you have an understanding that he believed in

7    order to grow the company he would need additional

8    management assistance?

9    A.      Obviously at some point in time you need additional

10   labor costs, but I don't have -- I don't know at what point

11   that would have come.

12   Q.      Well, in your projections, you have projections

13   that go up in the numbers -- I think they go to a million or

14   something on the order of in you Mrs. Fields -- or in your

15   MFGPC projections.  You call it that.  They go on the order

16   of something like 3 million in annual sales, or 2.75

17   million.  Would there have been need for additional labor at

18   that --

19   A.      Well, first of all, those numbers you said are not

20   accurate.  I don't go up to a projection of 2.7.  I go up to

21   a projection of 1.5 million.  And so I -- that's assuming

22   that Mr. Lindley is going to continue to operate the

23   business and be able to scale it up.  To the extent that, as

24   revenue grows that you're going to generate additional

25   revenue, and it assumes higher costs as well.  And so, while

389

1    there's not a specific line item for employee costs, it's --

2    it's well within the increased costs to the company to

3    increase revenue.

4            So we're looking at percentages, so if you increase

5    the revenue to 1.5 million, you increase the costs to 90

6    percent of that, which very well could incorporate having an

7    employee or employees or part-time labor or something.

8    Q.      Okay.  I want to clear something up from what you

9    said because I'm confused.  The 75 percent, that's paid to

10   somebody else.  That's paid to co-packers, isn't it?

11   A.      Well, is -- I mean, the lines here, yes, but part

12   of that could be -- I mean, if some of this was brought

13   internal and there are internal costs of goods sold, that

14   could be employees that are -- that are being paid as well.

15   It doesn't have to be all external.

16   Q.      No.  But you just indicated that 90 -- you know, as

17   expenses -- as sales go up, you would have an increase in

18   the amount of I guess money you would have to pay to hit

19   that 90 percent.  We're only talking about the 10 percent,

20   aren't we?

21   A.      No.  No.  We're talking about 90 percent.

22   Q.      This senior manager they're would be hired here

23   would be in the 75 percent cost of goods?  That's where you

24   would put it?

25   A.      No.  If there is a senior manager that's hired,

390

1    that cost would be in overhead, which would be --

2    Q.       That would be in the 10 percent?

3    A.       -- which would be -- which would be a --

4            THE COURT:  He wasn't through with his answer,

5    Mr. Amani.  Let him finish his answer.

6            MR. KILBOURNE:  Which would be a fixed cost.  A

7    senior manager would be a fixed cost.

8    Q.       So that would be part of the 10 percent?

9    A.       Well, I mean you'd have to look at it.  But if it's

10   a fixed cost, it wouldn't be -- it wouldn't be relevant as

11   well.  If it's a fixed cost, you wouldn't reduce the revenue

12   by the fixed cost.

13   Q.       In this model of yours, where is the money coming

14   from to pay for this manager?

15   A.       Well, I think I've answered that question through

16   my several -- through just this whole line of questioning.

17   I think I've answered that.  Do you want me to go through

18   and say it all again?

19   Q.       No.  If you think you've answered it, I'll take

20   your answer.

21           Put up 51, please.

22           MR. KILBOURNE:  Can I interject.  I apologize, Your

23   Honor, but my computer is on low battery, and the way I've

24   got it set up, I've got some of my -- like the video device,

25   I might run out of batteries soon, and I might need to

1    change things.  If you -- if you could give me a couple of

2    minutes to readjust a couple things.  I apologize for that.

3    But I'm okay now.

4              THE COURT:  All right.

5              MR. KILBOURNE:  And I can continue on.

6              THE COURT:  Let's carry on.  How much more do you

7    have of this witness, Mr. Amini?

8              MR. AMANI:  I have a little bit, Your Honor.  I'm

9    not positive.

10             Can we go down to his presentation of September or

11   January -- June.  Yeah.  And is that the best we can do

12   size-wise?

13   Q.        BY MR. AMANI:  Let me ask you if you've seen this.

14             Go slowly, John.  Go up a little bit.

15             These were presentations that Mr. Lindley testified

16   he made to -- I think this one was to a family office group

17   in Greenwich, in 2012.  Have you seen this?

18   A.        I believe I have.  I think I could verify by

19   looking at my documents-used list, but I believe I have.

20   Q.        All right.

21             Go down, John.  Go to the section about what he was

22   going to use the money -- that he wants a million dollars.

23   Keep going.  Go slow.  Keep going.  Here.  Stop there for a

24   minute.

25             Did you see -- did you have any discussions with

1  Mr. Lindley about what's written on this page?

2  A.       I don't recall one way or the other.

3  Q.       Did you talk to him about the fact that he needed a

4  million -- he believed he needed a million dollars in equity

5  funding to lift off?

6  A.       I don't recall having that specific conversation.

7  Again, regardless of where the money is coming from, it

8  doesn't change MFGPC's lost profits.

9  Q.       Well, I'm trying to understand.  If you look at

10 this million dollars, look what he needs to use it for.  He

11 says he needs to use 500,000 of it to acquire talent to

12 manage the planned expansion.  Do you see that?

13 A.       Yes.

14 Q.       Where is that in your model, if at all?

15 A.       It's -- again, as I explained before, there's not a

16 specific line to cover additional fixed costs for

17 management.  But there is, within my analysis, the

18 assumption that 90 percent of all the revenue would be used

19 to cover costs.  And in some of that may have -- may have

20 been additional employees, but some of these employee costs,

21 a management type of person would be a fixed cost.

22 Q.       Mr. Kilbourne, as I understand it, you say that in

23 2015 he's going to have either a million 50 or a million 600

24 in sales, MFGPC, correct?

25 A.       Yes.

393

1   Q.      All right.  And that is going to give you, for

2   overhead, either a hundred thousand, a hundred thousand -- a

3   hundred maybe 5,000 or, in the million 6 case, 160,000 under

4   your model?

5   A.      150 or 160,000 would be the range, yes.

6   Q.      Right.  He says mere in his -- in his presentation

7   to investors as to what he needs money for, he says I'm

8   going to need $500,000 to just get that expansion going?

9   A.      What are you --

10          MS. WHITE:  Your Honor I --

11  Q.      That 500,000 in talent.

12          I'll finish my question, then you can object.

13          He's going to need $500,000 just for management

14  purposes to initiate and accomplish that kind of an

15  expansion.  And I'm trying to understand, in that model of

16  yours when it says a million 50 and a million 6, where does

17  that 500,000 come from, and how have you accounted for it?

18          THE COURT:  All right.  There is an objection.

19          MS. WHITE:  Thank you, Your Honor.  I object to the

20  extent he's misrepresenting what this liftoff was aimed at.

21  There is no evidence in this case that what Mr. -- what

22  MFGPC was representing in this particular document is tied

23  to a particular sales number that reflects or basically

24  correlates to what Mr. Kilbourne calculated.  These are

25  apples and oranges.

394

```
1          THE COURT:  Well, they are to some extent, but I'll
2    let him ask the question.  He's asked it.  Do you want to
3    answer it, or can you?
4          MR. KILBOURNE:  Yeah.  Yeah, I can.  And actually
5    that's the answer I was just going to give, at least in
6    part.  Mr. Lindley doesn't say, to achieve a million dollars
7    in sales, I need a million dollars in equity funding.  And
8    so, what's important here is the tie between what
9    Mr. Lindley is projecting to lift off and what's happening.
10   And there's no -- there's nothing in here that says he needs
11   a million dollars in funding to generate a million dollars
12   in sales, which, by the way, would be kind of ridiculous.  I
13   mean, you're not going to collect a million dollars in cash
14   to generate a million dollars in sales.  You just don't need
15   that level of investment to generate that level of sales.
16   Q.     Mr. --
17          Go to the --
18          Do you see what he wants to use the money for here,
19   what he tells he needs the money for?  He needs a million to
20   acquire -- 500,000 to acquire talent, 250 for the economic
21   order quantities and 250 to fund trade spending.  Do you see
22   those things?
23   A.     Yes.
24   Q.     You did or didn't have discussions about his own
25   projections of his needs?
```

1    A.       I don't recall if I did one way or the other about

2    these figures.

3    Q.       Go to the next page with me.  All right.  And then

4    he says he would need another 4 million in equity in funding

5    over the next two years.  Do you see that?

6    A.       To achieve orbital potential.

7    Q.       Exactly.  And then let's look at his projections.

8             And go to -- I think it's the next page.

9             There's his projections at this point.  So he's

10   going from 3 million, a larger number than you had, to 10

11   and 25 and so forth.  Do you see that?

12   A.       Yes.  So here he's saying he wants $4 million in

13   funding to get to $50 million in revenue.

14   Q.       But he wants 1 million to get to 3.

15   A.       No.  He doesn't say that.  Oh, yeah.  He says --

16             MS. WHITE:  I think we may have just lost

17   Mr. Kilbourne.  I heard a -- I wasn't watching.  Sorry.

18             THE COURT:  It looks like we have.  On another

19   topic, Mr. Amini, I've been reflecting on your request

20   yesterday about using Mr. Lindley's declarations.  Can you

21   hear me?

22             MR. AMANI:  Yes, Your Honor.

23             THE COURT:  I think the appropriate way to use

24   them, if you're going to use them, is to use them when

25   you're -- when he's on the stand.  Now, he's on your witness

```
 1   list?

 2           MR. AMANI:  Right.

 3           THE COURT:  If you're going to call him, then you

 4   can use him there to impeach.  That's the appropriate way.

 5   I'm not convinced they are hearsay, but that's the

 6   appropriate use of them.

 7           MR. AMANI:  Thank you, Your Honor.  I'll make sure

 8   I take that into consideration.

 9           THE COURT:  Are we going to get done with

10   Mr. Kilbourne today?  I have to end at two.

11           MR. AMANI:  Two is 20 minutes.

12           THE COURT:  Do you have much redirect?

13           MR. AMANI:  I don't think so, Your Honor.  I mean,

14   I probably have about 45 more minutes.

15           THE COURT:  You what?

16           MR. AMANI:  I probably have about 45 more minutes.

17           THE COURT:  45 more minutes?

18           MR. AMANI:  I'm guessing, Your Honor.  I'm the

19   worst person in the whole person to guess my own.  I

20   apologize for it, but I have never been a good projector.

21   I've never been good at projecting how long things take.

22           THE COURT:  You've already taken about as long on

23   cross as Ms. White took on direct.

24           MR. AMANI:  I understand that.  This is an

25   important part of the case, Your Honor.
```

1    THE COURT:  Well, we'll go 'til two and then

2  organize it so you don't take very long in the morning to

3  finish.

4    MR. AMANI:  I will, Your Honor.

5    MR. KILBOURNE:  I apologize.  Am I back again?

6    MR. AMANI:  Yes?

7    MR. KILBOURNE:  Can you hear me?

8    MS. WHITE:  Yes.

9    THE COURT:  Yes, we can.

10    MS. WHITE:  Yes, we can.  Can you hear us?

11    THE COURT:  Go ahead, Mr. Amani.

12    MR. AMANI:  Thank you.

13  Q.    Mr. Kilbourne, so when we were looking at it, we

14  were talking about the 1 million in funding, and I think you

15  were in the middle of something.  We can come back to it if

16  you have -- if you were still answering a question.

17  A.    Yes.

18  Q.    Okay.

19  A.    So he says that he wants 1 million funding in 2012

20  and 4 million by 2014, but that 5 million in funding is to

21  grow the business to 10 million in 2014, 25 in 2015, 35 in

22  2016, 50 in 2017 which is obviously orders of magnitude

23  larger than the projections that I --

24  Q.    Well, the 3 million on that page is one of the

25  orders of magnitude that you've seen, at least with respect

398

1    to the PSP projections isn't it?

2    A.        No.  It's -- my projection for PSP is substantially

3    less than that.

4    Q.        It's a million 6 for the first year?

5    A.        It's a million 6 in 2015 versus 25 million in this

6    projection.

7    Q.        Right.  But it's a million 6 in 2015 -- I've got to

8    find it.  And then it's 2 million 275 in '16 and 3 million

9    625 in '17?

10   A.        Right.  So, 3 million 6 in 2017 versus 50 million

11   in this projection.

12   Q.        I understand that, but in order to get to --

13   A.        So I --

14   Q.        I'm sorry.  In order to get to the first 3 million,

15   he was telling investors, at least in 2012 that he wanted a

16   million dollars, wasn't he?

17   A.        No.  No.  He's saying he wants a million dollars in

18   2012 and 4 million in 2014 to get to all these figures.

19   It's not -- you can't tie the million to the 3 million in

20   2013.

21   Q.        As it turns out, your model has no provision for

22   any of that in terms of that category, right?

23   A.        My model has no provision for assuming that sales

24   will go to 50 million in 2017.

25   Q.        You can take this down.

399

1          Go with me, if you would --

2          Let's take a look at.  Let's do attachment 7, go to

3    his report, attachment 7.

4          This was your interest calculation, which is --

5    A.     Yes.

6    Q.     -- now, instead of 112, it's 73.  Do you have the

7    actual -- because all we saw was the final, you're -- I can

8    ask Ms. white to put it back up.  I don't think we need it,

9    but I think it's a $73,000 number.  Do you have the math

10   that you did to this degree on this particular exhibit to

11   get to that 73?

12   A.     Yes.  So the change would be, obviously -- let me

13   just walk through it.  The two invoices of 9 thousand, 60

14   thousand, those are the same.  And the interest rate of 10

15   percent is also the same.  The only change would be that

16   interest is going from October 20, 2020 through July 15,

17   2020.  And so that $42,000 figure I think increased it to

18   about 117,000.  And then down below in the royalties, all

19   those figures are the same.  Same thing.  The interest

20   calculation of 16,000 would increase by a little bit.

21         And so essentially you have 112,000 minus 42,000.

22   If you adjust for the two interest calculations, that gets

23   us to the 73,000.

24   Q.     And the question I had for you though -- that I

25   actually had for you is that net amount owed to Mrs. Fields

400

1    is the 2660.  Do you see that?

2    A.      Yes.

3    Q.      Did you ever change that to account for the 2015

4    royalties that he gave us credit for?

5    A.      I did not.  I'm not aware of 2015 royalties.

6    Q.      Could you put up Exhibit -- is it 12?  Yes.  The

7    first page, very first page.  I think it's -- yes.  There it

8    is.  I've got the right number.

9            Are you familiar with this -- this -- this document

10   that he sent in or about July 11, 2015?

11   A.      I mean, wasn't the license terminated in December

12   of 2014?

13   Q.      And he had rights to sell up 'til June 30 of 2015.

14   Were you unaware of that?

15   A.      I don't recall being aware of that.

16   Q.      So you were unaware of the fact that his actual

17   final number was 2465643?

18   A.      As opposed to -- what's the other figure?

19   Q.      26660, I think, without seeing it.

20   A.      I'm sorry.  Say that again.

21   Q.      26660.

22   A.      So --

23           MS. WHITE:  Your Honor this is sort of an issue

24   that is not in dispute.  I'm not sure what the point of this

25   is.

401

1          THE COURT:  Good question.

2    Q.      BY MR. AMANI:  I'm -- You know, Your Honor, I'm not

3    sure whether it's in dispute or not because I came into it

4    thinking that the whole -- the royalties were all in

5    dispute.

6          THE COURT:  MFGPC doesn't contest this number; is

7    that correct, Ms. white?

8          MS. WHITE:  That is correct, Your Honor.

9          MR. AMANI:  So there is no contest that this number

10   has to be substituted for the 2660 (as spoken) in his

11   analysis?

12         MR. KILBOURNE:  So, are you saying that it should

13   be 24,656 instead of the 26,660 that I have?

14         MR. AMANI:  Yes.

15         THE COURT:  That's what everyone is saying.

16         MR. KILBOURNE:  Okay.  So you're saying the

17   actual -- I had -- my royalty figure is too high by about

18   $2,000.

19   Q.      Also put back his Exhibit 7, if you would for a

20   moment.  I have one more thing.

21         In your calculation, did you give any credit for

22   any interest to Mrs. Fields for royalties that weren't paid

23   timely?

24   A.      Yes, 10 percent from the due date all the way

25   through -- in this schedule, through October 20, 2020.  In

1  my updated schedule, through July 15, 2021.

2  Q.      All right.  So that, in other words, the royalties

3  on 15,952.32 for 2012 would have gotten also a 10 percent

4  addition?

5  A.      Yes.

6  Q.      I'm just looking to where I you would go to find

7  that.

8  A.      Well, it's shown in the simple interest line of

9  16,124.

10  Q.      Oh, I see.  Simple interest.  Just because I didn't

11  follow it, Mr. Kilbourne.  I'm sorry.

12  A.      No problem.

13  Q.      The 10 percent, that's 16124 is interest on what?

14  A.      So, you have got the -- it's the interest on the

15  royalties.

16  Q.      I see.  Okay.

17          You can take that down.

18          Your last -- your last -- your third analysis, or

19  maybe it was your second analysis.  I'm sorry.  Was that --

20  was the 425 you referred to, the $425,000?

21  A.      Yes.

22  Q.      And are you saying in that situation that that's

23  indicative of how much Mr. Lindley would have sold or

24  something different?

25  A.      Well, I'm saying that the 425 is the value that

1    Mrs. Fields ascribed to the license agreement.  And we know,

2    based on the industry data, that the licensee, the value

3    would have been more than what the value is to the licensor,

4    so I see the 425 as a floor, as a minimum of the value to

5    MFGPC.

6    Q.      And how is it related to lost profits over that 3

7    1/3 year?

8    A.      Well it's a -- again, it's a surrogate for what the

9    minimum value would be.

10   Q.      On the 425, have you now been -- has it been

11   explained to you now that that number is mistaken?

12   A.      No.  I don't believe it's mistaken.

13   Q.      Okay.

14          Put up the license agreement, the PSP license

15   agreement if you would.  Exhibit 19.

16          Did you have a chance to look at the license

17   agreement?

18   A.      I did.

19   Q.      My understanding is you read it pretty carefully

20   because you had some comments on how -- what it was like

21   relative to PSP's -- MFGPC'S license, correct?

22   A.      I did review it, yes.

23   Q.      Go with me to the payment section, if you would.

24          There it is, just keep that up.  That's it.  That's

25   it.  Got it.

404

1    This is the section you were relying on?

2    A.    Section 6.1 and 6.2.

3    Q.    Right.  And 6.2 is where you got that number from,

4    you got that -- oh, no, I'm sorry.  You got it from both of

5    them, correct?

6    A.    Yes.

7    Q.    So you added the 50,000 in 6.1 to the numbers in

8    6.2?

9    A.    Yeah.  So the numbers in 6.2 are 375, and the

10   number in 6.1 is 50,000, for a total of 425.

11   Q.    And do you see the first sentence of 6.1?

12   A.    Yes.

13   Q.    Which amount will be credited against the running

14   royalty owed during the first contract year.

15   A.    Yes.

16   Q.    Did you understand that that would then be

17   credited -- that 50 would become part of the 375?  Did you

18   not understand that?

19   A.    No.  I understand that the two of them combined is

20   the minimum royalty and that you have to include both of

21   them.

22   Q.    What do you -- you think the word "credited" means

23   in addition to the 375?

24        MS. WHITE:  Your Honor, to the extent he's calling

25   for a legal conclusion and asking for the expert to

1   interpret the contract, I'll object.

2           THE COURT:  That objection is sustained, but I

3   guess he can ask about his understanding of it and what he

4   did with it.

5   Q.      BY MR. AMANI:  Okay.  Your understanding,

6   Mr. Kilbourne -- is it your understanding -- well, you said

7   it.  Your understanding is that that 50 is in addition to

8   the 375?

9   A.      Right.  I don't remember the details going through

10  this, but I went through it carefully because initially I

11  had the same conclusion, that it was 375.  But as I studied

12  the agreement more carefully, I thought it was 425.  If I'm

13  wrong, I'm wrong, but that was my understanding.

14  Q.      And if you're wrong, how does that change your

15  analysis?

16  A.      Well, if I'm wrong then you would say that the

17  minimum royalty is -- instead of 425 is 375.

18  Q.      And your number would just simply change from 425

19  to 375?

20  A.      Yes.

21  Q.      Now, on that analysis you're assuming that sales

22  would be on the order of, at the 375 number, 7 1/2 million

23  and the 475 number or 425 number, 8 1/2 million over the

24  time frame?

25  A.      No.  You're really confusing that with my second

1    analysis, which is the minimum sales.  This is saying that

2    Mrs. Fields valued this license agreement as 425, and that's

3    what they -- that's what they -- that's what Perfect Snacks

4    paid for it.  And if Mrs. Fields valued it at 425, based on

5    industry data I would expect that the licensee would have an

6    even higher value than 425.  And so what I am saying is that

7    minimum value is 425.  The licensee, Perfect Snacks and the

8    surrogate MFGPC would be more than 425, which is why I said

9    that's a minimum value of mine.

10   Q.     And how are you assuming that MFGPC could have

11   actually realized that?

12          MS. WHITE:  Objection.  Asked and answered.

13          THE COURT:  It has been asked and answered.  The

14   objection is sustained.

15   Q.     BY MR. AMANI:  Are you assuming -- I'm sorry, Your

16   Honor, I'm confused by this.

17          Are you assuming that, in order to -- isn't that an

18   assumption that, in order to assume that kind of revenue,

19   minimum revenue, you would have to have corresponding sales

20   of some sort?

21   A.     Well, corresponding sales or value.  You know,

22   it's -- it's looking at the value that Mrs. Fields paid for

23   it which, again, based on industry data, is less than what

24   Perfect Snacks or MFGPC would have realized in the license.

25   Q.     I'm not understanding how that value would be

407

1    realized, however, from the way -- in your explanation.  How

2    does Mrs. -- how does MFGPC realize that 375 -- 425?

3    A.    I don't know how to say it further.  Mrs. Fields

4    said:  This license is worth 425 to us.

5          And we know that the purpose of a license agreement

6    is to divide the profits between the licensor and licensee.

7    If it's worth 425 to the licensor, it's worth more than 425

8    to the licensee.

9    Q.    All right.  Consistent with my inability to project

10   my own timing, Your Honor, I don't have anymore questions.

11         THE COURT:  No more questions?  Okay.  Well, I

12   believe you about your predictions on time.

13         How much redirect do you have?

14         MS. WHITE:  You know, Your Honor, I think very

15   little.

16         THE COURT:  What does that -- tell me what that

17   means.

18         MS. WHITE:  I'm hoping that means just a few

19   questions and we wrap it up today.  How strict is the 2:00

20   o'clock?  Is that a hard stop?

21         THE COURT:  It's pretty hard.  Let's see what

22   happens.  You've got five minutes at least.

23

24

25

408

1                          REDIRECT EXAMINATION

2     BY MS. WHITE:

3     Q.       All right, Mr. Kilbourne, counsel asked you about

4     PSP, Perfect Snacks, and represented to you that they had

5     been in business for awhile -- let me see if I can find

6     it -- and therefore that should have some meaningful impact

7     on their projections of sales in the first year or the

8     second year and third year and should be something for you

9     to take in mind.  I don't recall exactly what counsel said

10    about when they started, but I would like to share this

11    document.  Can you see this document?

12    A.       Yes.

13    Q.       Okay.  Now, I'll scroll to the top.  This is

14    Exhibit 18.  I believe this has already been admitted.  Am I

15    correct?  And it is an email correspondence between Frank

16    Florio of Perfect Snacks and Betsy Schmandt at Famous

17    Brands, which was Mrs. Fields, and I'll just let you know

18    it's email correspondence about the negotiations of that

19    license.  And I'm going to scroll down here.  There's a few

20    back and forths, and at the end of this email is an

21    attachment which is from the Dunn & Brad --

22    A.       Bradstreet.

23    Q.       Bradstreet.  So this is a report that Mr. Florio --

24    that Betsy Schmandt ran when investigating whether or not

25    Perfect Snacks should be a licensee.  And if you scroll --

1    scroll down here, we see the company overview, and it says

2    that Frank Florio is CEO in the year the company started in

3    2015.  Do you see that?

4    A.        Yes.

5    Q.        Does that give you any increased confidence in your

6    ability to -- in the opinions that you rendered before with

7    regard to the value of the negotiated terms in the Perfect

8    Snacks license?

9    A.        Well, it tells me that there were no sales of

10   anything for Perfect Snacks prior to 2015.

11   Q.        So, when counsel was asking you about the prior

12   sales of the Cookie Pop, the brand that later joined

13   Mrs. Fields, we're going to be talking about sales in just

14   the year prior to when they signed the license, aren't we?

15   A.        Yes.

16   Q.        And, again, I think you covered this pretty well,

17   about your -- there were a lot of questions about the amount

18   of capital that MFGPC might need in order to actually meet

19   the sales projections that you had put together.  You made

20   the observation that you don't need 1 million in capital to

21   generate 1 million in sales.  Do you have any sense of, you

22   know, whether 500 would be enough, 250, or is this just not

23   something that one can just grab out of the air?

24   A.        You can't just grab it out of the air, but it's

25   significantly less than a million.

410

1   Q.      And I know there were many, many questions about

2   the royalty rate reports and a lot of discussion about

3   different sources of data.  At the end of the day, you

4   relied on MFGPC's actual QuickBooks records; is that

5   correct?

6   A.      Yes.

7   Q.      Okay.  And you had access to all of their

8   QuickBooks records from 2003 on; is that correct?

9   A.      Yes.

10  Q.      And you were able to talk to Mr. Lindley about what

11  was in those records and reconcile anything that you felt

12  needed to be reconciled?

13  A.      Yes.

14          MS. WHITE:  Your Honor, I have no further

15  questions.

16          MR. AMANI:  One very short thing, Your Honor, if I

17  may, follow-up to you what she asked.

18          Could you put 18 back up there, Mr. Cohen, very

19  quickly.

20          THE COURT:  What are your questions?

21          MR. AMANI:  Well, I'd like to show -- just show him

22  that document right there.

23

24

25

411

                        RECROSS EXAMINATION

1

2    BY MR. AMINI:

3    Q.        Mr. Kilbourne do you see this is Exhibit 18.  You

4    looked at the Dunn & Bradstreet.  It started in 2015.  Do

5    you see that?

6    A.        Yes.

7    Q.        Do you recall that it says here -- and this is

8    before the signing of the PSP agreement -- that we're

9    excited to put Mrs. Fields on our current chocolate chip

10   Cookie Pop.  The current product is doing extremely well,

11   and our projected sales for this year, 2017, are a million 8

12   without club business.

13             Were you aware of that?

14   A.        I don't --

15             MR. AMANI:  Objection, Your Honor.

16             Hold on, Patrick.

17             Objection, Your Honor.  It's outside the scope of

18   my redirect and it's frankly unsubstantiated.  This is a --

19   there is no actual business records to reflect that.

20             THE COURT:  Well, it is outside the scope of

21   redirect, I think.

22             MR. AMANI:  She asked about the prior production

23   and the Dunn & Bradstreet 2015, and there were no sales up

24   to than point, and this is part of the same thing, Your

25   Honor.

412

1          MS. WHITE:  No.  I asked about the start date of

2     the company.

3          MR. AMANI:  Right, to show that they couldn't have

4     had sales before they signed the agreement, and then that

5     they did the sales saying, with the exhibit that we both

6     agreed could go in, that they had sales already and were

7     projecting a million 8 before they even signed our contract.

8          THE COURT:  Anything else, Ms. white, that you want

9     to say about that?

10         MS. WHITE:  I still think it's outside the scope,

11    Your Honor, and, you know, there is no actual data to

12    support those projected sales.  You know, it's

13    correspondence between these folks negotiating the contract.

14         THE COURT:  What is it you really want to ask him?

15    What's the question?

16         MR. AMANI:  I think he took care of it.

17         THE COURT:  What?

18         MR. AMANI:  Again, I think he's told us he was

19    unaware of it, so I think I did it.

20         I do want to ask what we're doing tomorrow because

21    I've lost track.  These witnesses are not going in in any

22    particular order.

23         THE COURT:  So your question is.

24         By the way, you're excused, Mr. Kilbourne.  Thank

25    you very much.

413

```
1              MR. KILBOURNE:  Thank you, Your Honor.
2              THE COURT:  So you're asking if they know who they
3     are going to call and in what order tomorrow?  Is that your
4     question?
5              MR. AMANI:  Yes.  Yes, Your Honor.  At this stage,
6     I would love to know.
7              MR. ROTHSCHILD:  Your Honor, I can address that if
8     you'd like.
9              THE COURT:  Yeah.  Go ahead.
10             MR. ROTHSCHILD:  Tomorrow, Your Honor, we have a
11    witness we subpoenaed from Mrs. Fields, Cassy Alvey, and I
12    believe she'll go first, followed by Ms. Susan Lindley.  And
13    then I believe we'll have wrapped up our case.
14             THE COURT:  Is that helpful, Mr. Amani?
15             MR. AMANI:  Very, Your Honor.
16             THE COURT:  All right.  Thank you.  We'll start
17    again at 8:30 in the morning.  We'll be in recess until
18    then.
19             MS. WHITE:  Thank you, Your Honor.
20             MR. ROTHSCHILD:  Thank you, Your Honor.
21
22
23
24
25      (Whereupon the proceedings were concluded for the day)
```

414

```
 1

 2                    REPORTER'S CERTIFICATE

 3  STATE OF UTAH              )

 4                             ) ss.

 5  COUNTY OF SALT LAKE        )

 6

 7         I, REBECCA JANKE, do hereby certify that I am a

 8  Certified Court Reporter for the State of Utah;

 9         That as such Reporter I attended the hearing of

10  the foregoing matter on July 13, 2021, and thereat reported

11  in Stenotype all of the testimony and proceedings had, and

12  caused said notes to be transcribed into typewriting, and

13  the foregoing pages numbered 218 through 413 constitute a

14  full, true and correct record of the proceedings

15  transcribed.

16         That I am not of kin to any of the parties and

17  have no interest in the outcome of the matter;

18         And hereby set my hand and seal this 3rd day of

19  August, 2021.

20

21

22

23

24         _____

25         REBECCA JANKE, CSR, RPR, RMR
```