415

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

 3   _____
     MRS. FIELDS FRANCHISING, LLC, a      )
 4   Deleware limited liability company, )
                                          )
 5                Plaintiff,              )
                                          )
 6        vs.                             )
                                          )
 7   MFGPC, INC., A California            )
     corporation,                         )
 8                                        )
                    Defendants.           )
 9                                        )
     _____)Case No. 2:15-CV-94 DAK
10   MFGPC, INC., a California            )
     corporation,                         )
11                                        )
         Counterclaim-Plaintiff,          )
12                                        )
            vs.                           )
13                                        )
     MRS. FIELDS FRANCHISING, LLC a       )
14   Deleware limited liability company, )
     and MRS. FIELDS FAMOUS BRANDS, LLC, )
15   a Delaware limited liability         )
     company, d.b.a. Famous Brands        )
16   International,                        )
                                          )
17       Counterclaim-Defendants.         )
     _____)
18

19           BEFORE THE HONORABLE DALE A. KIMBALL

20               DATE:  JULY 14, 2021

21           REPORTER'S TRANSCRIPT OF PROCEEDINGS

22               BENCH TRIAL VOLUME III

23               PAGES 414 - 558

24

25               Reporters:  REBECCA JANKE, CSR, RMR
                             (801) 521-7238
```

416

```
 1

 2                          A P P E A R A N C E S

 3

 4   FOR THE PLAINTIFF:     KIRTON, MC CONKIE

 5                          BY:  ROD N. ANDREASON, ESQ.

 6                          50 EAST SOUTH TEMPLE, SUITE 400

 7                          SALT LAKE CITY, UTAH 84145

 8

 9                          AMINI, LLC

10                          BY:  BIJAN AMINI, ESQ.

11                          131 WEST 35TH STREET, 12TH FLOOR

12                          NEW YORK, NEW YORK 10001

13

14

15

16   FOR THE DEFENDANT:     PARSONS, BEHLE & LATIMER

17                          BY:  JULIETTE P. WHITE, ESQ.

18                               BRIAN M. ROTHSCHILD, ESQ.

19                          201 SOUTH MAIN STREET, SUITE 1800

20                          SALT LAKE CITY, UTAH 84111

21

22

23

24

25
```

INDEX

| WITNESSES | EXAMINATION | PAGE |
|---|---|---|
| CASSIE ALVEY | Direct by Rothschild | 419 |
| | Cross by Amini | 442 |
| | | |
| SUSAN LINDLEY | Direct by Rothschild | 448 |
| | Cross by Amini | 457 |
| | | |
| BETSY SCHMANDT | Direct by Amini | 460 |
| | Cross by Rothschild | 468 |
| | | |
| GRANT LYON | Direct by Amini | 471 |
| | Cross by White | 501 |

418

```
 1   JULY 14, 2021                          SALT LAKE CITY, UTAH
 2                  P R O C E E D I N G S
 3                        * * *
 4        THE COURT:  We have all the usual players here, the
 5   lawyers and their representatives.  Mr. Rothschild, you may
 6   call your next witness.
 7        MR. ROTHSCHILD:  Your Honor, Brian Rothschild for
 8   MFGPC.  Can you hear me all right?
 9        THE COURT:  Yes.
10        MR. ROTHSCHILD:  Okay.  It sounded a little broken
11   when I was hearing you, so I wanted to make sure the line is
12   fine.  Your Honor, MFGPC calls Ms. Cassie Alvey to the
13   stand, please.
14        THE COURT:  I see her there.  I'll ask my clerk to
15   swear her in.
16                        CASSIE ALVEY,
17   the witness hereinbefore named, being first duly cautioned
18   and sworn or affirmed to tell the truth, the whole truth,
19   and nothing but the truth, was examined and testified as
20   follows:
21        THE COURT:  Thank you.  You may proceed,
22   Mr. Rothschild.
23        MR. ROTHSCHILD:  Thank you.
24
25
```

11:40:29 (line 4)
11:41:29 (line 7)
11:42:07 (line 21)

419

```
                          DIRECT EXAMINATION
 1

 2   BY MR. ROTHSCHILD:

 3   Q.        Good morning, Ms. Alvey.  Thank you very much for

 4   appearing here.  Just to confirm, you're here in response to

 5   the subpoena that we sent you?

 6   A.        Correct.

 7   Q.        Okay.  And I'd like the Court to get to know you

 8   briefly.  Can you tell me what your educational background

 9   is, please.

10   A.        Sure.  I played on a softball scholarship at Ricks

11   Junior College before it became B.Y.U. Idaho and then I

12   transferred to the University of Utah where I received a

13   B.S. In speech communications.

14   Q.        And when did you first go to work for Mrs. Fields?

15   A.        So, I met the general manager of the catalog

16   division -- it was called Mrs. Fields' Gifts at the time --

17   Jennifer Jobin, in the summer of 1999, and I started working

18   at the end of August of 1999 as her administrative

19   assistant.

20   Q.        And how long did you work for Mrs. Fields?

21   A.        Just over 15 years.

22   Q.        So, just for context, you were there when

23   Mr. Lindley approached Mrs. Fields and obtained the

24   trademark license for popcorn; is that accurate?

25   A.        It is.  I was always with the gifting division, so
```

11:42:30 (line 8)
11:42:53 (line 14)
11:43:26 (line 21)

420

1   that contract initiated with our -- what we called the

2   franchise support center or the franchising division that

11:44:00   3   was in a separate location, but very quickly my direct

4   manager Jennifer Jobin got involved, and I was in many of

5   those meetings because I handled our largest partnerships,

6   so I met Chris pretty quickly in the infancy of that

7   relationship, and that was probably late 2003 or early

8   2004-ish.

11:45:59   9   Q.      And you said you were in gifting at that point.

10   Did you ever change your responsibilities or where you --

11   where you worked?

12   A.      So I stayed within that division, but, yes, I

13   quickly -- we were a very small organization when I started,

14   a couple million dollars in sales, and we were doubling our

15   revenue every year, so I was lucky enough and ambitious

11:46:26   16   enough to just keep moving up over the years, so I had

17   probably seven or eight different positions, official titles

18   while I was there, but administrative assistant for about a

19   year.  And then I took over our online partnership, so this

20   was before -- this was right when the internet kind of

11:47:59   21   started for us, and we did several affiliate arrangements

22   that I organized.

23        And then I quickly took over our large partnerships

24   with FTD 1-800 Flowers we private labeled for, and Wal-Mart,

25   Costco, large online retailers that would re-sell our

1    product.

2    Q.        And you said that you -- you didn't have anything

11:48:25   3    to do with the division that -- that entered into the

4    contract with MFGPC; is that accurate?

5    A.        As far as the management, I didn't have any

6    leadership or responsibility as far as determining who we

7    licensed our product to.

8    Q.        So you have no knowledge of his agreement or the

9    terms of the agreement?

10   A.        Not, not any direct knowledge, no.

11:48:59   11   Q.        And, nevertheless, you said Ms. Jobin caused you to

12   interface with Mr. Lindley, for what purpose?

13   A.        So, I did the sales marketing and merchandising for

14   those large partnerships and then eventually -- I should

15   say, because I stopped short.  So, Ms. Jobin moved to

16   Florida, and my responsibilities increased.  I eventually

11:49:28   17   was the vice-president and general manager for the last

18   three years I was there.  I was running all operations for

19   the gifting division and reporting to the franchise division

20   that had moved to Bloomfield, Colorado, so I was running the

21   Salt Lake City operations and everything there.

22            So let me clarify that.  Specifically, I started

23   engaging because I did the merchandising of the products for

11:49:56   24   those companies, so I needed to know, you know, details of

25   pricing and shipping, coordinating for timing for getting

422

1    inventory in.  We also had a very large corporate partner

2    that I -- that we worked with called Quill, so that was the

11:50:14    3    office supply company that was purchased by  staples about

11:51:57    4    eight years ago, but they just did mail order gifting, and

5    we did promotional items for them.  So there's a lot of

6    coordination of inventory, management, procurement of the

7    items and then pricing those to make a good margin for our

8    clients.

9    Q.      So I'm to understand that some of those items

10   included popcorn; is that accurate?

11   A.      Yes.

12   Q.      And you sourced all popcorn through MFGPC?

11:52:26   13   A.      Correct.  They were our only vendor while I was --

14   the entire time I was there for popcorn.

15   Q.      And again -- again, what date did you leave

16   Mrs. Fields?

17   A.      So, I -- I officially left the third week of

18   September of 2014, but I stopped working in the office the

19   last week of August of 2014.  I did a four-week transition

11:52:55   20   for them because I had a lot of things I needed to turn over

21   to Kimberly Aylward who was my successor.

22   Q.      Okay.  Who were the clients to whom you sold --

23   well, I think you've kind of answered that, but, I mean, can

24   you give me an idea of what items you would sell using

25   popcorn in them?

1    A.        Sure.  So, again, getting towards the end of our

11:53:27    2    relationship, I also did all of the merchandising for the

3    direct catalog.  But we had -- when I was there, we had

4    several gift towers, so they would range for -- you know, we

5    were very seasonal, so at the holiday time you'd have

6    snowmen or gingerbread men, and one of the components of the

11:53:50    7    tower would be popcorn.  We also did gift tins that had

11:54:02    8    cookies, brownies, popcorn, taffy.

9        You know, there were other third-party vendors that

10    we worked to, to fulfill, but we -- obviously, anything

11    branded with our name was preferable so that we were -- you

11:56:24    12    know, we weren't giving Jelly Belly jelly beans free

13    advertising, and it was a lot more expensive, obviously, if

14    it wasn't a direct partner of ours.  So, gift tins, gift

15    towers, boxes, baskets, crates, you know, just all different

11:56:55    16    types of packaging we try to make appealing and reusable so

17    that clients would justify the cost of, you know, baking and

18    shipping something fresh and having to pay for that express

19    shipping and tried to make them reusable containers mostly

20    filled with products.

11:57:13    21        And then, specific to your question about the

22    partners, so we had the direct consumer catalog that went to

23    millions of people.  And then we also had online

24    partnerships with FTD, Costco -- the 1-800 Flowers

25    relationship ended in about 2010 when they purchased Cheryl

424

```
12:04:47    1    & Company, so that went away -- Wal-Mart.  I mentioned Quill
12:06:28    2    was a large corporate partner and then we had other
            3    corporate partners like American Express, Ameriprise
            4    Financial, several different oil companies.  They would use
            5    us during the holiday times and sometimes we would do
12:06:58    6    corporate websites that had branded items with their logo on
            7    it.  So there were various, and a number more, but I think
12:07:20    8    that gives you good exposure.
            9              THE COURT:  Ms. Alvey?
           10              MS. ALVEY:  Yes.
           11              THE COURT:  Could you slow down just a little.  A
           12    reporter has to take down everything you say, and you talk
           13    fairly rapidly.
           14              MS. ALVEY:  Okay.  I will slow down.  Sorry, Judge.
           15    Thank you.
           16              THE COURT:  Thank you.
           17    Q.       BY MR. ROTHSCHILD:  Thank you, Ms. Alvey.  How far
12:07:54   18    in advance of a holiday did you interface with MFGPC in
           19    order to put in orders?
           20    A.       We tried to be about six, five to six months out of
           21    a holiday because a lot of our packaging came from china,
           22    from overseas; our tins, our towers.  It was a lot cheaper.
           23    And then, with that container shipping, obviously we had to
12:08:28   24    have transit time on the water and then from rail or truck
           25    to get to us in Salt Lake City, so about five to six months
```

```
           1    prior to the holiday.  And then --
12:09:10   2    Q.       And that was --
12:09:14   3    A.       -- for Christmas -- sorry.  For Christmas, it was
           4    probably even a little bit more, six to seven months out.
           5    Q.       And that timing was the same for MFGPC, you had to
           6    interface with Chris Lindley approximately six months prior
           7    to whatever season you were filling orders for?
           8    A.       Yes.  We would get initial forecasts, so what we
12:09:56   9    would do -- the process was running last year's performance,
          10    then forecasting our marketing efforts and then we would put
          11    together a forecast of how many units of a parent skew, so
          12    how many snowmen towers would we sell?  And then you would
          13    reverse engineer what's called the BOM or the bill of
12:10:27  14    materials and that would have a skew of a popcorn item,
          15    whether it be like, what, peppermint, almond toffee or
          16    whatever.
          17    Q.       And -- pardon me.  How was the quality of MFGPC
          18    popcorn?
          19    A.       It was very good.
          20    Q.       Did it -- go ahead.
12:11:00  21    A.       So, we -- we were very particular about the quality
          22    testing while I was there.  We would do quarterly mystery
          23    shops of our product and ship it to one of our homes and
          24    then also order Harry & David or Fairytale Brownies, and we
          25    would compare ask contrast the -- Popcorn Factory was
```

426

| | |
|---|---|
| 12:11:29 | 1 |

another one, not a great direct comparison because they

2  didn't have a lot of the gourmet inclusions that our popcorn

3  did, but we would test them and taste test them, and it held

4  up very, very well.  Very comparative to Harry & David's

5  Moose Munch popcorn.  That was kind of our standard to meet,

12:11:57  6  and I think we met and exceeded it with some of our flavors

7  that Chris put together.

8  Q.      Did it ever happen that Mr. Lindley failed to meet

9  an order timely that you gave him?

10  A.      I -- you know, this is a long time ago.  I do

11  remember us having a couple of issues around one of his

12:12:26  12  manufacturers not being able to get the right inclusions or

13  us having nut shortages that caused delays, but we

14  communicated and worked through those.  I mean, over the

15  course of a decade, that is going to happen in supply chain.

16  Issues come up.  But I felt we worked through those.  I

17  don't have a recollection of feeling like, oh, you know,

18  they were terrible at this or we are always short popcorn,

19  you know.

12:12:58  20          And I'm sure there were times we had to expedite

21  shipping on our side.  Maybe we under forecasted and had to

22  rush an order or try to get additional production, but I

23  don't ever remember there being consistent failures.  And

24  there always seemed to be a supply chain or an inclusion

25  issue, scheduling at the manufacturers, those types of

427

1    issues.

12:13:29    2    Q.        Let the me ask you about something you just

3    mentioned.  You talked about forecasting.  How difficult is

4    it for you to pull up -- how difficult was it for you to

5    pull up prior years' sales?

6    A.        Instantaneous -- very easy.  It was a -- we did 70

7    percent of our revenue in a six-week period, so we had

12:13:59    8    refreshing web reports built over the years, and we improved

9    them, you know, every year so that we could look at them,

10    but instantaneous we could run sales reports.

11    Q.        And could you, from those reports, determine retail

12    price of the sales of any item?

12:14:24    13    A.        The parent skew, we could.  So you could run the

14    retail and then we would have a discount code field that you

15    could capture and then the total charge, right?  So those

16    three components were important to track.  The discount code

17    was how we tracked what marketing worked, so that was

18    paramount, but, yes, you could track at this parent skew

19    level.  If the retail was 49.99, it would capture the retail

12:14:59    20    and then capture the discounted sale price of that item.

21    Q.        And as a component, you wouldn't necessarily know

22    what percentage popcorn -- what percentage of that popcorn

23    was, but you could -- was there a way to break it out at

24    all?

25    A.        Well, so when creating a merchandise sheet -- so,

428

1    we had the bill of materials.  It started as a merchandise

12:15:29    2    sheet when we were creating the item, and that would have

3    all of the components so that a production individual would

4    be able to build that item on an assembly line.  But as far

5    as saying what the retail value of each component, we didn't

6    do that.  It was just -- we knew what our cost was.  We were

12:15:55    7    shooting to have north of a 70 percent initial margin, and

8    you know, on the retail.  That was much lower for partners,

9    in the 50 percent range.  But I couldn't tell you, like,

10    popcorn generated this much money as its little component of

11    a kit, no.

12    Q.    But you could, on any given item, by taking all of

13    the components and putting them together, tell me what the

12:16:28    14    cost of each item is and then, as a percentage, understand

15    the percentage on any given item?

16    A.    Yes.

17    Q.    Easily?

18    A.    Yes.

19    Q.    And how much of a -- I mean, how often did you have

20    to look at prior year sales in your job?

21    A.    Every holiday.  That's how we forecasted the

22    next -- the next year was we'd look back at the prior year's

12:16:58    23    sales, but then we'd also look back at the prior, like, day,

24    meaning -- so, Valentine's day falls on a Sunday.  That's

25    very bad for a Mrs. Fields' delivery service, right?  You

429

1   can't deliver on Valentine's day.  So we'd look back at the

2   previous year's sales but then also the like day sales.  If

12:17:26   3   that happened eight years ago or nine years ago, we would

4   try and use those bits of information to come up with our

5   forecast for the current season and then our marketing

6   budget, if we were doing more or less circulation of the

7   catalog or online marketing.

8   Q.      So, just to summarize, your job, a big part of it

9   was just being able to look back at each item and tell me,

10  with some precision, how much of it sold in each prior year?

11  A.      Yes.

12:18:00   12  Q.      And it was -- you had a system built to do it, so

13  it wasn't hard?

14  A.      Correct.

15  Q.      What was the name of the system?

16  A.      Sys Cornerstone was the most recent.  I worked --

17  we originally had an AS400 home-grown system when I first

18  started working there by the Park City Group, I believe,

12:18:28   19  Debbie Fields' husband created that system.  And then we

20  moved to a GUI interface called Exacta and then that

21  couldn't keep up with our demand of speed and so we moved

12:18:43   22  back to another AS400 platform called Assist Cornerstone and

23  that's what was being utilized when I left.

24          And then I should say, on top of that, we had a lot

25  of internal development.  So a gentleman by the name of Mark

430

1    Williams was our internal IT person dedicated to the gifting

12:21:28    2    division, and I had him build a lot of reports on an

3    intranet site so that it was easier to manipulate and faster

4    than programming in AS400, so the combination of that

5    interface that Mark built over the top of Assist

12:22:18    6    Cornerstone.

7    Q.    I'm showing you what has been marked as Exhibit AA.

8    A.    Okay.

9    MR. ROTHSCHILD:  Could I confirm with the Court

12:22:28    10    that that's accurate, this is AA?

11    THE COURT:  My clerk says it's BB.

12    Q.    BY MR. ROTHSCHILD:  I apologize.  This is BB.  Just

13    for the record, to make sure that we're clear, this is BB.

14    Do you recognize this sort of output format?

15    A.    Let me look at the column headings.  So, the vendor

12:22:56    16    number, yes.  So this to me looks like it's an inventory

17    procurement report, so something that would be pulled to

18    show what was purchased from a particular vendor.

19    Q.    Okay.  But is it -- is it, in your judgment,

20    extracted from the same systems that you had?

21    A.    Yes.

22    Q.    So, in your judgment, would it have been easy for

12:23:28    23    Mrs. Fields to provide the retail value of what it sold?

24    A.    The retail value of the parent skew you mean, like

25    we talked about before?

431

```
           1    Q.       Yes.

           2    A.       Yes.  Yes.  Oh, yes.  But this is a component

           3    report I believe that I'm looking at, so just how much of

12:23:58   4    each skew of popcorn they bought?  Is that correct?

           5    Q.       Sure.  Yes.

           6    A.       Okay.

           7    Q.       Okay.  I want to ask you, was MFGPC a good partner?

           8    A.       For me, I felt that they were a great partner, yes.

12:24:25   9    Q.       Did you help each other in any way?

          10    A.       Yes.  I -- I think we brain stormed a lot of ideas,

          11    especially around the Quill relationship.  The quantity that

          12    they would order was in the thousands, so our largest

          13    client, and we had to come up with new things to pitch them,

12:24:58  14    so we would lean on Chris to tell us, are there different

          15    flavors, something to change it up so we weren't always

          16    offering the same thing.

          17           And then I did reach out to Chris directly a couple

          18    of times when we were approaching new partners, like Costco

          19    and say:  Hey, I've never done in-store slotting.  It's a

12:25:25  20    different world.  I wasn't in the branded retail, direct,

12:25:31  21    you know, we were never in a direct consumer business, so it

          22    was different.  So I did reach out and ask for Chris'

          23    expertise on how to work best with buyers in a more

12:26:25  24    traditional branded retail space.  And he was very helpful.

          25    Q.       Oh, really?  So Mr. Lindley assisted Mrs. Fields in
```

432

|  |  |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| | 5 |
| 12:26:58 | 6 |
| | 7 |
| | 8 |
| | 9 |
| | 10 |
| 12:27:22 | 11 |
| | 12 |
| | 13 |
| | 14 |
| | 15 |
| | 16 |
| | 17 |
| 12:28:00 | 18 |

1    getting into, like, Costco and other similar places with its

2    own products?

3    A.        Yeah.  I don't think I could say he got us in

4    there, to be fair, but I -- I certainly asked for his advice

5    in working with those types of buyers that are particular

6    and different than the buyers I was used to working with and

7    the corporate clients.  They have a very rigid model of what

8    will and won't sell, so you have to kind of know how to

9    approach them.

10    Q.        I'm sharing with you what has been marked as

11    Exhibit S, a royalty report for sales of popcorn from MFGPC.

12    I'm going to move around this spreadsheet.  Do you see this?

13    A.        Yes.

14    Q.        Do you see in column 6 and 7.  This, is by the way,

15    the tab 2013 Q4.  So this is, by my estimation, your last

16    holiday season with the company.  Is that accurate?

17    A.        That is correct.

18    Q.        And you see here where you -- it looks like

19    Mrs. Fields' Gifts has purchased components from MFGPC; is

20    that right?

21    A.        Correct.

22    Q.        And that's what you're talking about, the

23    Mrs. Fields Gift Company is purchasing popcorn through

24    MFGPC, and he's reporting it here, accurate?

25    A.        Correct.

433

12:28:24  1    Q.        And you're saying that six months prior, he, --

        2    Mrs. Fields would have to have ordered its popcorn

        3    components in order to fill its -- fill its requirements for

        4    Q4.   Is that accurate?

        5    A.        I don't know that the order would have had to have

        6    been placed, but we would have provided an initial forecast,

        7    and P.O.'s would have been placed.   I don't recall our

12:29:01  8    specific, you know, lead time.   We typically would put those

        9    in the order entry system and say we need to place the P.O.

        10   We would wait, obviously, for cash management reasons to

        11   place an actual P.O.   So that wouldn't have been -- we

        12   wouldn't have wanted to have laid out the cash that early,

        13   but we would have been providing, you know, soft forecasts

12:29:26  14   to get an idea so he could start working on inclusions and

        15   scheduling manufacturing time with his partners.

        16   Q.        So I'm going to show you tab 2014 Q4.   This is one

        17   year later.   RVC is a franchisee; is that correct?

12:29:55  18   A.        I'm not familiar with that acronym.

        19   Q.        Sorry.   Suffice it to say, it's not Mrs. Fields'

        20   Gifts?

        21   A.        Correct.

        22   Q.        And then the remaining orders are from Big Lots.

        23   Do you see that?

        24   A.        Yes.

        25   Q.        I'll represent to you that Mrs. Fields terminated

434

|  |  |
|---|---|
| | 1 |
| 12:30:27 | 2 |
| | 3 |
| | 4 |
| | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| | 10 |
| 12:30:57 | 11 |

1    MFGPC on December 22, 2014.  So, to the extent that

2    Mrs. Fields used popcorn in 2014, it didn't source it from

3    MFGPC.  Would you say that's accurate?

4    A.      Yes.

5    Q.      This holiday?

6            MR. AMANI:  Note my objection.

7            MR. ROTHSCHILD:  What's your objection?

8            THE COURT:  What is your objection?

9            MR. AMANI:  I don't -- I'm not -- I'm not

10   understanding the question.

11   Q.      BY MR. ROTHSCHILD:  I'm asking, to the extent that

12   Mrs. Fields used popcorn in its 2014 holiday, it sourced it

13   from somewhere other than MFGPC, given that there are no

14   orders from Mrs. Fields in Quarter 4, 2014.  Is that

15   accurate?

16           MR. AMANI:  I'm sorry.  Withdrawn.

17           MS. ALVEY:  Yes.  I don't see any orders from them

18   on this document.

19   Q.      BY MR. ROTHSCHILD:  You don't think that

20   Mrs. Fields could have ordered from its new partner on

21   December 23 for the holiday season, right?

22   A.      No.  No.  You would have had to have placed those

23   orders -- I mean, we had already provided, I think, initial

24   forecasts, and I was not a part of -- I did not know that

25   that termination was coming when I left the corporation.

435

1    Q.        So, to the extent that MFGPC's business was down

12:31:59   2    from Mrs. Fields, in 2014, it was -- well, withdrawn.  I

3    don't know whether you can opine on that.

4              MR. AMANI:  Your Honor, I'd like to renew my

5    objection.

6              THE COURT:  Well, it's denied.  She's already

7    answered, and we'll let that stand.

8              MR. AMANI:  If Your Honor would permit me, I would

12:32:26   9    like to address the issue that was raised by that question

10    back and forth.  That's why I object to the whole issue.

11             THE COURT:  Go ahead.

12             MR. AMANI:  Thank you.  I don't believe there's a

13    claim that we -- prior to the termination in this case that

14    we bought popcorn from somewhere else.  It's the first I'm

15    hearing of it, at this moment.  There has been nothing said

16    about it until this second, so I'm concerned that that's

17    being implied to the Court.  There is nothing in this record

12:32:58   18    about -- there is no evidence about it, and this witness is

19    now speculating about sales in a period that she's gone.

20             THE COURT:  So you're -- basically your objection

21    is that the evidence is -- her testimony on than point is

22    irrelevant?

23             MR. AMANI:  It is.

24             THE COURT:  Mr. Rothschild?

25             MR. ROTHSCHILD:  I can very easily address that,

436

1    Your Honor.  Mrs. Fields has made a large issue of the idea

12:33:25  2    that MFGPC wasn't selling as much as it should have in 2014.

3    And I'm pointing out that it's largest customer, that

4    constituted half of its sales throughout its history, seems

5    to have mysteriously stopped ordering.  And as we've read in

6    the agreement, MFGPC has an exclusive right.  So, to the

7    extent that there is an explanation, I'm trying to offer

8    one.

12:33:58  9        MR. AMANI:  Your Honor, just briefly, what's the

10   claim?  I'm not hearing what the claim is relative to the

11   Complaint that is before the Court.

12        THE COURT:  That's a good question, Mr. Rothschild.

13        MR. ROTHSCHILD:  Your Honor, I'm not asserting a

14   new claim.  I'm asserting, to the extent that they are

15   claiming that sales were depressed in 2014, it is almost

16   certainly due to the fact that half of MFGPC's business,

12:34:29  17   which they were entitled to, was because Mrs. Fields must

18   have sourced popcorn outside the license.

19        MR. AMANI:  May I?

20        THE COURT:  Yes.

21        MR. AMANI:  There's two components there that are

22   problematic.  One.  Must have sourced outside the license.

23   There is nothing -- he has never even asked any questions

24   about that.  If he wanted to ask us for our purchases and

12:34:56  25   what our inventory was in '14, he was welcome to.  He only

1    asked for data from the beginning of '15 to '18 to see how

2    much we bought.

3        Two.  Okay.  Mr. Lindley testified already, and it

4    goes again with the Complaint.  I asked him specifically, I

5    said:  You're not suing Mrs. Fields or you don't have a

6    claim for not buying from you?

7        And he said:  That's right.

8        That's in his transcript.  So, again, I'm concerned

12:35:27    9    that the implications of this are not -- you know, there's

10   nothing to -- no basis upon which to go down this path and

11   these implications.

12       MR. ROTHSCHILD:  And, Your Honor --

13       MR. AMANI:  And he is now -- and this witness is

14   now testifying to  things that happened during a period of

15   time she wasn't even there.

16        MR. ROTHSCHILD:  Your Honor --

17       THE COURT:  That may be a problem.  What do you

18   have to say, Mr. Rothschild?

12:35:57   19   Q.    Ms. Alvey testified she left in September, October,

20   2014.  She said that ordering for gifts would have occurred

21   six months prior to the holiday, so we're looking at June,

22   when she in fact was at the company.

23       And second, Mr. Amani said that I never asked for

24   the information for this time period.  We are looking at the

25   discovery request right now.  And we had a fight about that,

12:36:29  1   and they refused to provide the information, providing

2   instead only information after the breach.  So we don't

3   know.  I'm asking the best available witness, and she says,

4   well, to the extent there was popcorn used, which they used

5   every single year for a decade, it came from somewhere else

6   because it didn't get sold from my client.  I mean, the

7   point is made, Your Honor, that there is an alternate

12:36:59  8   explanation for the lower sales in 2014, and it might be

9   another breach of the license, but we have not asserted a

10  claim for that.  So I don't think they are prejudiced.

11         MR. AMANI:  May I address the unfairness of this,

12  just the unfairness.

13         THE COURT:  Briefly.

14         MR. AMANI:  Okay.  Sure, we had a fight about

15  discovery.  The Court ruled '15 to '18.  If he had raised at

12:37:26  16  that time and implied that we were not buying from him and

17  bought from someone else, why would I not produce those

18  documents to show that?  I mean, I -- we're not trying to

19  hide anything in this case.  So I wasn't even given the

20  opportunity to respond to this now new claim and the Excuse

21  is:  Well, you opposed getting information earlier, when

22  there was no basis for it.  All he was arguing is you would

23  have bought popcorn from me, and you bought it from somebody

12:37:58  24  else.  Show me who you bought it from.  Not for '14.  He

25  wasn't implying we bought it from someone else before we

439

```
 1   terminated Mr. Lindley.

 2           Now is the very first time, on this day.  It's very

 3   unfair.  And it's very unfair to through that at us without

 4   an opportunity at all to respond and no place to prepare to

 5   respond for that.

 6           THE COURT:  Part of your defense, Mr. Amani, is

 7   that -- they are trying to show what they would have been

 8   able to do without the breach.  Part of your defense is,

 9   well, they had low sales.  They couldn't do it.  I think

10   they are entitled to explore some of the reasons why they

11   may have had lower sales.  I am going to allow this evidence

12   provisionally.

13           Go ahead, Mr. Rothschild.

14   Q.      Ms. Alvey, I mean approximately how large was the

15   gifting division when you left?

16   A.      32 million and change in revenue.  I think our

17   forecast for 2014 was going to be 33 1/2.  That's a guess.

18   I don't have those memorized.  It's been a number of years.

19   Q.      The last thing I want to explore with you is, how

20   important is, in your mind, having I think the longest

21   experience at Mrs. Fields as anyone we have heard from

22   during this entire trial, how important is the Mrs. Fields

23   trademark for MFGPC's business?

24   A.      Well, I would think it was very important.  When I

25   started there, the brand was very, very strong.  I will say
```

12:38:23 (line 6)
12:38:56 (line 14)
12:39:29 (line 19)
12:39:59 (line 25)

440

12:40:04    1    it has declined in awareness just because the footprint of

            2    the franchise locations has gone down so dramatically.  I

12:40:57    3    think the brand has lost a lot of that story.  Debbie Fields

            4    is gone, right?  So that has been mismanaged perhaps over

            5    the years and not as strong as it once was, but that is what

            6    our whole business was based on at gifting, to be able to

            7    put catalogs in people's homes and them to recognize,

            8    hopefully, a quality and a nostalgia to going into a

12:41:26    9    physician store and wanting to send that as a gift to

           10    someone else.

           11    Q.      How important was popcorn as a component in the

           12    products that gifting created?

           13    A.      So, the baked goods were paramount, right, cookies,

           14    brownies and variations thereof.  But as far as the

12:41:53   15    non-baked inclusions, it was our largest.  And then we had

           16    taffy and pretzels, and we tried jelly beans and different

           17    things seasonally, chocolates and all different things, but

           18    it was the biggest inclusion that we put into our products

           19    that was not baked in our facility.

           20    Q.      Okay.  Ms. Alvey I have nothing further for you, I

           21    want to thank you for being here today.

           22            THE COURT:  Thank you, Mr. Rothschild.

12:42:28   23            Mr. Amani, you may cross examine.

           24            MR. AMANI:  Your Honor, I need a moment only

           25    because of this new issue of what did we buy from them in

1    2013.  Exhibit S.  I just need a moment to find it.  It was

2    a complete surprise to me.  I apologize.

3            THE COURT:  All right.  Take a moment and find it.

12:42:55    4            MR. AMANI:  I'm looking.  If I could put you on

12:43:01    5    mute for a moment, Your Honor, and speak to my client.  Your

6    Honor, I'm not familiar with the document.  It's a large

7    Excel spreadsheet.  I need to stand up and speak to

8    Ms. Schmandt for a moment so she can point out to me where

9    the '13 and '14 sales are in Exhibit S -- unless the Court

12:44:48    10    is prepared -- given the informal you way we're doing this,

11    she would have whispered over to me and showed it to me in

12    the courtroom.  I could let her tell me putting it in front

13    of her, so I can ask the witness if those are the sales of

14    Mrs. Fields popcorn.

12:45:28    15        Ms. Schmandt indicates there are $79,000 of sales

16    in '13 and some $70,000 of sales in '14.

17            THE COURT:  And you want to talk to Ms. Schmandt

18    about that?

12:45:58    19            MR. AMANI:  For two minutes so that I can find it

20    on -- which means I've got to get up and get my phone, call

21    her, look at the exhibit with her and call you back.  I

22    apologize.

23            THE COURT:  That's all right.  Go ahead.  Go ahead.

12:46:20    24            MR. AMANI:  I'll do that, then.

12:52:49    25            THE COURT:

442

```
          1        MS. SCHMANDT:  Bijan, you're on mute.  We still
12:52:59  2   can't hear you, Bijan.
          3        THE COURT:  You're muted, Mr. Amani.  Now you're
          4   not.
          5        MR. AMANI:  Okay.  I'm sorry.  I'm technologically
          6   very challenged, Your Honor.  I apologize.
          7        Mr. Cohan, could you put --
          8        I've lost track of where we are, but she's my
          9   witness, correct?
12:53:27 10        THE COURT:  Yes.
         11                    CROSS EXAMINATION
         12   BY MR. AMANI:
12:53:41 13   Q.     Let me show you what's the royalty report, Exhibit
         14   S, again.  And if we could, let's go through it by quarter,
         15   if we could.
12:54:25 16        So, Jonathan, go to quarter 1 for 23 -- I mean
         17   2013, Q1.
         18        And if you see there, in line 10, you see
         19   Mrs. Fields' Gifts?
         20   A.     Yes.
         21   Q.     That line.  And is that indicative of popcorn that
12:54:58 22   was purchased by Mrs. Fields from MFGPC in the first quarter
         23   of 2013?
         24   A.     Sorry.  Let me just get familiar with these
         25   headings.  The product type is confusing me.  I've got
```

443

```
        1    six-ounce DMN.

        2    Q.      You don't know what that product is?

        3    A.      I'm just not familiar with that.  I mean, again,
12:55:28 4    it's a case of six ounces of something, but I don't know,

        5    I'm not familiar with DMN.

        6    Q.      Go to the second quarter of 2002 (as spoken), if

        7    you would, Jonathan.  We're going to go from quarter to

        8    quarter.

        9            There's no sales in that quarter, but as you recall
12:55:58 10   there was a fire at that point.  Do you recall the fire that

       11    Mr. Lindley had in one of the plants that prevented from

       12    purchasing in 2013?

       13    A.      Vaguely.  I remember there was some down time, but

       14    we would have had purchased through Valentine's day and

       15    Easter, but for that.

       16    Q.      Right.

       17    A.      So that would have affected potentially Father's

       18    Day.

12:56:25 19   Q.      That would have been in 2012, would it not, those

       20    purchases for Valentine's day of '13?

       21    A.      Yes.  They would have been in 2012, so the previous

       22    purchase order if that was for toffee nut.  I don't know
12:56:57 23   what that letters -- those letters were.

       24    Q.      All right.

       25            Let's go for 2013, Q4.
```

444

1      Do you see at the top there in the fourth quarter

2  of 2013, Mrs. Fields actually has several purchases, or at

3  least two purchases from MFGPC, correct?

4  A.      Yes.

12:57:30   5  Q.      You have -- these products -- you have that DMN

6  again?

7  A.      Yeah.  The peppermint crunch makes sense to me.

8  Again, the other things seem like an aggregate of maybe a

9  longer description that wouldn't have been in our system.  I

10  don't know what those things stand for.

11  Q.      All right.  But does this -- but do these volumes

12:57:58  12  of purchases at this time, do they generally comport with

13  the popcorn you would buy from him annually, for example, at

14  this point, I assume, for the Christmas season if not --

15  A.      Oh, I have a question.  Is there a hidden column?

16  I'm not seeing a quantity field.

17  Q.      Shoot.  I see ship date, invoice date.  These are

12:58:26  18  his royalty reports.  These are -- these are Mr. Lindley's

19  royalty reports, and I'm looking --

20  A.      I mean, I guess --

21  Q.      Is there another column after U, John?  No.  This

22  just gives you gross sales of 42,677, and it looks like

23  19,282.  So a total of, what is that, 61,000, $62,000?

12:58:58  24  A.      I divided that 42,000 -- I mean, like the toffee

12:59:01  25  nut would have been less expensive than an additive like the

| | |
|---|---|
| | 1 |  peppermint crunch, but roughly those units could make sense. |
| 13:00:25 | 2 | Again, I don't know the exact ones off the top of my head. |
| | 3 | Q.      Fair enough. |
| 13:00:53 | 4 | A.      That 42,000 divided 210, roughly 20,000 units.  And |
| | 5 | then whatever the -- the larger, that was for the popcorn |
| | 6 | test of a large drum of popcorn, so that would make sense. |
| | 7 | Q.      All right.  Go with me now to the first quarter of |
| 13:01:23 | 8 | 2014, and I'm -- no.  I don't see any sales there.  Let's go |
| | 9 | to the second quarter of 2014.  There's some sales.  So in |
| | 10 | 2014, you have some sales in the second quarter.  You have |
| | 11 | that $9,640 in gross sales, again that DMN indication? |
| | 12 | Let's go to the next quarter of '14.  Now we have |
| 13:01:58 | 13 | Mrs. Fields' Gifts DMN plus peppermint crunch.  There's a |
| | 14 | $60,000 order it looks like? |
| | 15 | A.      Yeah. |
| | 16 | Q.      And its due date is 10/3/14 it says? |
| | 17 | A.      So that would have been for holiday that year, sir. |
| 13:02:24 | 18 | Q.      Okay.  And go to the next one.  I guess there's |
| | 19 | none for the fourth quarter.  So the holiday for that year |
| | 20 | would have been purchased in the third quarter? |
| | 21 | A.      Correct.  We would have needed that in-house to |
| | 22 | start our pre-build process which, because we couldn't ship |
| | 23 | 30,000 packages in one day, in October and early November we |
| | 24 | would prepare finished good products and put them in the |
| 13:02:59 | 25 | freezer so they can just be stuck with a label and sent out. |

446

| | |
|---|---|
| 1 | Q.        You were there 'til September of -- oh, no, August |
| 2 | of 2014? |
| 3 | A.        I was physically in the building through the end of |
| 4 | August of 2014.  I stayed connected through VPN and |
| 5 | worked -- and did two trips with my successor, so I worked |
| 6 | officially through the end of September of 2014. |
| 13:03:29    7 | Q.        Is it fair to state that while you were there, the |
| 8 | whole time you were there, you bought your popcorn from |
| 9 | Mr -- |
| 10 | A.        I did. |
| 11 | Q.        From MFGPC? |
| 12 | A.        Right. |
| 13 | Q.        And is it fair to state, when you left, you were |
| 14 | unawares of any purchases, even in the pipeline, for popcorn |
| 15 | from anywhere else? |
| 16 | A.        That's correct.  I wasn't aware of any purchases. |
| 17 | Q.        In fact, you were unawares that Mrs. Fields had any |
| 13:03:57    18 | intention at that point of doing anything else other than |
| 19 | continuing business with Mr. Lindley in the ordinary course; |
| 20 | is that correct? |
| 21 | A.        Correct.  I was not in any meetings where another |
| 22 | vendor was brought up. |
| 23 | MR. AMANI:  You can take it down, John.  You can |
| 24 | take it down. |
| 25 | Thank you.  I don't have any other questions. |

1      THE COURT:  Do you have any other questions on any

2  other subject for this witness?

3      MR. ROTHSCHILD:  I do not, Your Honor.

13:04:30  4      THE COURT:  And, Mr. Amani, you don't have any

5  other questions on any other subject with this witness; is

6  that correct?

7      MR. AMANI:  No, Your Honor, I do not.

8      THE COURT:  And you don't either, Mr. Rothschild?

9      MR. ROTHSCHILD:  No.  Thank you, Your Honor.

10     THE COURT:  Thank you.  Then you may be excused,

11  Ms. Alvey.

12     MS. ALVEY:  Thank you.

13     MR. ROTHSCHILD:  Thank you, Ms. Alvey.

14     THE COURT:  And you may call your next witness,

15  Mr. Rothschild.

16     MR. ROTHSCHILD:  Your Honor, MFGPC calls Susan

13:04:59  17  Lindley, please.

18     THE COURT:  Would you swear the witness.  Wait a

19  minute.  I don't see her yet.  I see her name.

20     MR. ROTHSCHILD:  She looks like she's on.

21     You need to unmute yourself, Susan?

22     MS. LINDLEY:  Sorry about that.  I'm having trouble

13:05:26  23  with the camera on my computer, so Chris is on mine and I'm

24  on his now.

25     THE COURT:  All right.  We'll swear the witness.

448

```
         1              SUSAN LINDLEY,

         2    the witness hereinbefore named, being first duly cautioned

         3    and sworn or affirmed to tell the truth, the whole truth,

         4    and nothing but the truth, was examined and testified as

         5    follows:

         6              THE COURT:  You may proceed, Mr. Rothschild.

         7                   DIRECT EXAMINATION

         8    BY MR. ROTHSCHILD:

         9    Q.       Ms. Lindley, what's your education just briefly?

13:05:55 10   A.       I have a bachelor's degree in sociology from UCLA

        11    and an MBA from Pepperdine University.

        12    Q.       And what is your profession?

13:06:08 13   A.       I worked for nearly 29 years at Capital Group

13:06:45 14   American Funds, which is one of the world's largest

        15    investment firms.  And my last position there was as a V.P.

13:07:26 16   I was the head of global, physical and travel security.

        17    Q.       Do you have any ownership in LHF?

        18    A.       Yes, 51 percent.

        19    Q.       You're the majority owner of the company?

        20    A.       I am.

        21    Q.       And what is your understanding of the ownership of

        22    MFGPC?

13:07:56 23   A.       MFGPC is 100 percent owned by LHF.

        24    Q.       Do you have a position at MFGPC?

13:08:10 25   A.       I am the CEO and secretary.
```

449

1    Q.        Did you work though -- you mentioned just a moment

2    ago you worked at Capital Group for 20-plus years, so did

3    you work full time for MFGPC?

4    A.        I did not.

5    Q.        And, nevertheless, did you have any involvement

6    with the company?

13:08:56    7    A.        I certainly did.  Obviously Chris is my husband, so

8    we spoke about the work and the company constantly.  I was

9    kept apprised of and gave input on company matters, as would

10    any investor.

13:09:15    11    Q.        So, you said as an investor.  Did you invest in

13:10:07    12    MFGPC?

13    A.        I did.  I invested $385,000.

14    Q.        Approximately when?

15    A.        That was in 2005.

13:10:29    16    Q.        At any point was there a demand issue for MFGPC's

17    product?

18    A.        No.

19    Q.        Let me ask you, you said you didn't work there full

13:10:59    20    time.  Did you ever have any full-time employees?

21    A.        No.

22    Q.        I think it's been mentioned a few times that Chris

23    was a, quote, employee.  Would you agree or disagree with

24    that?

25    A.        Disagree.

450

Q.        Okay.  And did he work full time at the company, though, or not?

A.        Very much so.

13:11:26    Q.        Did he work full time there in 2014, a year which is definitely at issue in this case?

A.        Yes.

Q.        All the way through the end, including up to the termination?

A.        Up to the termination.

Q.        So, was this by design or did you -- I mean, why did you not have any employees?

13:11:54    A.        It was absolutely by design.  So, the model is that we used contractors, agencies, co-packers, brokers, as-needed to reserve our capital, to keep overhead low.  It allowed us flexibility to have resources when we needed them

13:12:26    and not be paying overhead for resources we didn't need when we didn't need them.

Q.        So, Mr. Lyon, in his report, and I'm sure we'll hear later in his testimony, states that -- and I'll represent to you that the lack of employees at the end was indicative of MFGPC's imminent demise in 2014.  Do you agree or disagree?

        MR. AMANI:  I will object to that characterization,

13:12:58    but Mr. Lyon will get on, and I am sure and respond to it.

        THE COURT:  Yes, he will.  You can answer that

451

1    question.

2         MRS. LINDLEY:  And I'm sorry, I didn't hear all of

3    the end of it.

4    Q.       Let my see if I can repeat that, which is Mr. Lyon

5    characterizes MFGPC's lack of employees in 2014 as

6    indicative of its imminent demise.  Would you agree or

7    disagree with that?

8    A.       I disagree with that.  It makes no sense, given

13:13:29   9    that we have never had employees and that is not the model.

10   Q.       I mean, did you have the -- the idea that you might

11   hire, either on a contract basis or on an employment basis,

12   some people like Cameron Broadbent, or I think a gentleman

13   named Chris Boyd was mentioned and even hired at one point.

13:13:57  14   So, I mean, does that fit within the model?

15   A.       Hiring consultants and contractors as-needed was

16   definitely a part of the model.  Again, we had the

17   flexibility to hire resources when we needed them but to

18   keep our overhead low so that we weren't paying a

19   salesperson if we didn't need them at that time.

20   Q.       What would have been the usefulness of hiring, a --

13:14:29  21   say, a Cameron Broadbent in a broker position?

22   A.       If we needed increased sales, then a salesperson

23   would be able to make that happen.

24   Q.       But did you push for increased sales in 2014 by,

25   say, hiring people?

452

13:14:57　　1 A.　　　In 2014 we did not hire new people, but I recall --

　　　　　　2 I'm not always clear on the years, since I wasn't completely

　　　　　　3 focused on this on a day-to-day, but we were always focused

　　　　　　4 on preserving our cash flow, protecting that.  So, as you

　　　　　　5 know, the three largest Mrs. Fields licensees and

13:15:28　　6 Mrs. Fields themselves went bankrupt.  They -- they did not

　　　　　　7 have the cushion that they needed to withstand business

　　　　　　8 storms that inevitably happened.  So, again, we were focused

　　　　　　9 on having the flexibility to hire when we needed to but to

　　　　　 10 not have to have someone on salary all the time if we did

　　　　　 11 not need them.

13:16:00　 12 Q.　　　Could you grow beyond the sort of general footprint

　　　　　 13 of the company without additional employees?

　　　　　 14 A.　　　Yes.

　　　　　 15 Q.　　　So if you scaled up --

　　　　　 16 A.　　　I'm sorry.  We didn't have any employees, so we did

　　　　　 17 not need employees to grow.

　　　　　 18 Q.　　　Okay.  So, if you scaled up and not doing, you

　　　　　 19 know, twice the business that you were doing from the

　　　　　 20 previous year, did you need employees to deal with that, for

13:16:29　 21 instance to make popcorn?

　　　　　 22 A.　　　No.  That would be the co-packer model where we

　　　　　 23 worked with a co-packer that had those employees.  We could

　　　　　 24 work with a broker that had sales employees.  We could work

　　　　　 25 with an ad agency that had employees for advertising.

453

1    Q.      All right.  I noticed Mr. Lindley testified earlier
13:16:57   2    that he sold into a couple of divisions of Costco, and I
3    think Costco Canada in year one or two of the license.  Do
4    you recall that?
5    A.      I do.
6    Q.      And why -- would it have been possible to push
7    sales into that division again?
8    A.      It would.
9    Q.      Why didn't you?
13:17:24   10   A.      That was not the plan.  Chris is extremely
11   experienced and talented as a marketer.  He's following
12   marketing, I'll say protocol.  That's not really the word I
13   mean, but there's something called the stage gate process,
14   where you are doing -- a proof of concept is a portion of
15   that.  Essentially you are going through the process of
13:17:59   16   getting a new brand, so in this case Mrs. Fields gourmet
17   popcorn out there, a new product out there.  So we were
18   looking at the various channels.  So, he did -- this proof
19   of concept would have been Costco, and he saw that it worked
20   there, refined things and then looked to other channels to
13:18:30   21   prove the concept of Mrs. Fields gourmet popcorn in those
22   other channels, such as retail, grocery, trade -- or drug
23   and clubs is what I was trying to think of.
24          So we looked -- so he was moving -- or looking at
25   proof of concept in those various channels.

454

13:18:59    1    Q.      Okay. And so, once he got that figured out, he

2    wasn't trying to continue sales in that channel necessarily.

3    Why? I mean, it's sort of unintuitive to me as a person

4    that doesn't work in this industry that once you had an

5    established sales channel that you wouldn't just keep, you

6    know, pushing out sales to that. I mean, why would you not

7    do that?

8    A.      Because of cash flow. So, as you can imagine,

13:19:28    9    Costco is so large. A large order, if we went national with

10    Costco, you need to have a cushion to ensure that if there's

11    a problem with any order, you don't go bankrupt. And so we

12    always looked at, you know, if you have $250,000 in capital,

13    that can service about a million dollars in sales, and so

13:19:58    14    once we tested Costco, the club channel, then we wouldn't be

15    able to use those resources and be safe in other channels if

16    we -- if our capital was tied up in Costco.

17        So we always had to be sure to keep that cushion so

13:20:25    18    that what befell the other licensees would not happen to us.

19    And he did that. He survived several --

20    Q.      Okay. Why -- I'm sorry. I couldn't hear that last

21    thing. I cut you off. Would you continue without me

22    interrupting. I'm sorry.

23    A.      Sorry about that. I was saying he did in fact

24    preserve the capital and keep that cushion and survive

13:20:59    25    several issues that arose during the time we were doing

455

1    business.

2    Q.      A lot has been made of MFGPC's ability to have

3    raised additional capital or pushed additional capital into

4    the company in the last few years.  Could you have taken on

5    equity investment in your mind?

6    A.      Yes.

13:21:29   7    Q.      Could you have taken on -- I'm sorry.  And were you

13:22:29   8    actively looking for it?

9    A.      As the Court has heard, he was engaged with

10   Peakstone Group, and there were other options.  We talked

11   with the co-packers.  We were looking at SBA loans.  So,

12   over the course of the company's history, we were actively

13   seeking funding.

13:22:57   14   Q.      And were you able to, for instance, cash flow

15   orders with trade credit from your co-packers?  Was that an

16   option?

17   A.      That was also an option.

18   Q.      Could you have pushed your own money, personal

19   money into the company?

20   A.      Certainly.

13:23:20   21   Q.      Tell me about after termination.  Did you put any

22   additional capital into the company in 2015, after the 2014

23   termination?

24   A.      No.  It would not make sense to invest in a company

25   when your license had been terminated.

456

```
 1    Q.        Did you, nevertheless, invest some money in 2015

 2    for other purposes?  I'm not talking popcorn, obviously.

 3    A.        Yes.  Sadly, the money that might have been

 4    invested into MFGPC, instead went into this lawsuit.

 5    Q.        Do you know how much?

 6    A.        About $250,000.

 7    Q.        So, in 2015, you were able to source approximately

 8    $250,000 in personal funds in just that year?

 9    A.        We were.

10    Q.        Would you, if there had been a popcorn opportunity

11    to, for instance, increase the size of the brand in that

12    time, would you rather have put that into popcorn?

13    A.        I would much rather have put that into MFGPC.

14    Q.        Would you have?

15    A.        I would have.  I put my -- the proceeds from the

16    sale of my home before I owned with Chris into this.  That

17    was the large investment back in 2005.  I believed in it

18    then.  I believed in it in 2014.

19    Q.        Financially speaking, what has the impact been on

20    MFGPC's owners?

21              MR. AMANI:  Objection, Your Honor.  Relevance.

22              THE COURT:  You can answer.

23              MRS. LINDLEY:  Thank you.  It's been financially

24    devastating.  I'm in my 50's Chris is in his 60's.  We were

25    so careful with our money.  We weathered these storms, and
```

13:23:57 (line 3)
13:24:27 (line 11)
13:24:57 (line 18)
13:25:26 (line 24)

457

1    it's gone and wasted in litigation that was based on the lie

2    that we did not pay the minimum guaranteed royalty.  And

13:25:56  3    when they found out that we had, they sued us anyway, and

4    forced us into this six-year ordeal.

5            MR. ROTHSCHILD:  Thank you.  I have no further

6    questions for Ms. Lindley.

7            THE COURT:  Thank you, Mr. Rothschild.

8            Mr. Amani you may cross examine.

9                    CROSS EXAMINATION

10   BY MR. AMANI:

11   Q.     Ms. Lindley, you had Chris Boyd as a consultant; is

12   that the case?

13:26:30  13   A.     Yes.

14   Q.     How long did Chris work at the company?

15   A.     I am not -- I can't answer to the level of detail

16   that you might like.  I will do my best with my

17   recollection, but I know it was in 2012, and then after the

18   fire, we had to let him go in 2013.

19   Q.     Why did you have him there?  What was he doing?

20   A.     He was -- at that point, we were actively engaged

13:26:59  21   with Peakstone.  We were thinking funding was imminent, and

22   that was a point at which it made sense to bring someone in

23   to push sales.

24   Q.     I see.  So you knew -- you understood, as you

25   started to grow, that you were going to have to add

458

```
           1   additional people once you got the financing?

           2   A.      We would hire on a consultant contractor basis

           3   as-needed, yes.

13:27:29   4   Q.      Was it your expectation, with some of the funds you

           5   were going to obtain from investors, that you would use that

           6   for hiring and personnel?

           7   A.      Chris and I would have discussed at the time, what

           8   it would have made sense to use the funds on.  I can't say

           9   for certain.  Chris is also, as you know from his history,

          10   an amazing salesperson.  So he did much of it himself.

13:28:00  11          MR. AMANI:  I don't have any other questions.

          12   Thank you.

          13          THE COURT:  Anything else, Mr. Rothschild?

          14          MR. ROTHSCHILD:  Nothing from me, Your Honor.

          15          THE COURT:  Thank you, Ms. Lindley.  You may be

          16   excused.  Thanks:  Do you have any other witnesses,

          17   Mr. Rothschild?

          18          MR. ROTHSCHILD:  Your Honor, I do not.

          19          THE COURT:  So you rest your case, I assume?

          20          MR. ROTHSCHILD:  We do.

13:28:30  21          THE COURT:  Mr. Amani?

          22          MR. ROTHSCHILD:  With the exception -- I'm sorry,

          23   Your Honor, with the exception, we may, and I should speak

          24   with Mr. Amani about this.  There were a number of

          25   stipulated exhibits that we have not actually, in the
```

1    record, talked about admitting, and I believe we should go

2    through those at some point, but as long as that is still

3    open, we rest our case.

4              MR. AMANI:  I don't have an objection to that, Your

13:28:58  5    Honor, and I would hope to talk about that after we finish

6    with the witnesses.

7              THE COURT:  All right.

8              MR. AMANI:  Stipulating to exhibits and perhaps

9    additional submissions.

10             THE COURT:  You may call your first witness.

11             MR. AMANI:  I call Ms. Schmandt, Betsy Schmandt,

12   Your Honor.

13             THE COURT:  You've already been sworn, and you're

14   still under oath, Ms. Schmandt, so go ahead.

15                       BETSY SCHMANDT,

16   the witness hereinbefore named, having been previously duly

17   cautioned and sworn or affirmed to tell the truth, the whole

18   truth, and nothing but the truth, was examined and testified

19   as follows:

13:29:35  20            MR. AMANI:  I'm going to try to do this myself

21   today, Your Honor.  Apologies to everyone.  Was I able to

22   put up Exhibit BB?

23             THE COURT:  Yes.

24             MR. AMANI:  Thank you, Your Honor.  Thank you.

25

460

```
                              DIRECT EXAMINATION
  1
  2      BY MR. AMANI:
  3      Q.      Ms. Schmandt, I'm showing you what was previously
13:29:59  4      marked as Exhibit BB.  Are you familiar with this document?
  5      A.      Yes.  This is a document that comes out of our
  6      system from Assist to recap the purchase orders from
  7      Mrs. Fields' Gifting to any vendor of record.
  8      Q.      And how was this document put together?
13:30:25  9      A.      So, this document, as I mentioned, basically
 10      originates out of Assist, which is essentially an ERP system
 11      that tracks the purchase orders.  So, you know, it is
 12      constrained by the information that is put into it.  So,
 13      when it spits it out, you know, it didn't necessarily have
 14      all this information with the each's and just had a quantity
13:30:59 15      that was -- most likely was cases but sometimes quantity,
 16      again constrained on the information put into it.
 17              So I did have to make a few modifications for just
 18      ease of understanding what was in our system versus, you
 19      know, what actually transpired, to understand the quantities
 20      purchased as well as the cost of each individual item.  But
13:31:29 21      in simplest terms, it tells you the vendor name, the P.O.
 22      number, the item that was requested, and that item number
 23      relates to the product, the component if you will, when
 24      ordered and when it was received.
 25      Q.      And what does it actually -- what does it actually
```

13:31:56   1    show?  What's demonstrated on this -- on this particular tab
           2    of this document?
           3    A.      Sure.  So this is basically capturing all the
           4    popcorn that Mrs. Fields' Gifting purchased during the time
           5    period we have been talking about.  You can see here that we
           6    purchased actually from two separate vendors, if you scroll
           7    down, so the first is Mrs. Fields' Confections.  The second
           8    is sir Walter Candy Corporation.
13:32:27   9    Q.      And let me just correct.  The time period we are
          10    talking about here was what?
          11    A.      This was December 23 through I believe it's
          12    April 30, 2018.
          13    Q.      December 23 of 20 --
          14    A.      2014.
          15    Q.      And so this is --
          16            MR. ROTHSCHILD:  Your Honor, can I lodge an
          17    objection.  We haven't established a foundation.  We know
          18    from prior testimony that Ms. Schmandt did not join the
13:32:56  19    company until 2016, so she's testifying about sales from
          20    2014 without a foundation.
          21            MR. AMANI:  I'm sorry.  I thought we had set up
          22    that you had examined her, established she was 30(b)(6) and
          23    she had gone back and collected all these documents.  Do you
          24    need me to go back through that again.
          25            THE COURT:  No.  The objection is overruled.

462

| | |
|---|---|
| | 1 |
| 13:33:28 | 2 |
| | 3 |
| | 4 |

Q.        BY MR. AMANI:  So, Ms. Schmandt, these are all the
popcorn sales or popcorn purchases that Mrs. Fields entered
into, to your knowledge, between December of 2014 and April
of 2018?

5    A.        That's correct.

6    Q.        And these would have been the same sales that, if

7    MFGPC were still operational, Mrs. Fields would have

8    purchased from MFGPC?

9    A.        I would assume so, yes, if --

10   Q.        And -- I'm sorry, did I interrupt?

13:33:57 11  A.        I would assume, if the company was still working

12   with MFGPC, that we would have sourced from them, as we had

13   in the past.

14   Q.        And looking down at the totals, you have an

15   original total and a revised total.  Do you see that?

16   A.        I do see that.

17   Q.        Do you want to explain what those two are?

18   A.        Sure.  So the first one that says original total,

19   of 153,800, roughly, was a recap of a very similar exhibit

13:34:29 20  that I reviewed with MFGPC's counsel in August of 2020.  He

21   had a number of source documents that didn't seem to match

22   this particular recap out of our system.  It was very

23   confusing, honestly, for all parties because we provided all

24   the source documents of the P.O.'s, but it didn't seem to

13:34:57 25  match this recap out of our system.  So I went back -- as

463

1    has been noted, I wasn't here, so it was not easily

2    understood to me at that time.

3          I worked diligently with a number of folks

4    internally to better understand what was happening and

5    really go item-by-item to make sure that we were capturing

6    it to the best of our ability, the cases, quantities,

13:35:27    7    each's, costs per unit, all of that information, and try to

8    tie it back together so that it made sense.  In the course

9    of that, we discovered I believe it's six additional P.O.'s

10    which are noted here in green.  So, along the left column

13:35:57    11    you can see there are -- there's a handful.  They are both

12    Mrs. Fields Confections P.O.'s as well as a Sir Walter P.O.

13    They are over different time periods.  They are different

14    quantities.  Really, there's not a real rhyme or reason why

15    they were not included.  It really wasn't intentional.

16          So, when we discovered that information on a deeper

17    look into this, we've added them to this sheet, and the

13:36:27    18    tally at the bottom captures those sales, so we go from

19    153,000 to 248,673.

20    Q.      When you said you discussed this 153 version with

21    counsel, you were referring to your deposition, were you

22    not?

23    A.      That's correct.

24    Q.      So that after your deposition is when you prepared

25    this document; is that right?

464

1    A.        That's when I modified this document, yes, to

2    better have all the information.

13:36:57    3    Q.        And did you subsequently speak to Mr. Rothschild?

4    A.        We did set up an informal meeting, I believe,

5    around September 11 of 2020 to review this.  It was a very

6    high-level cursory review of this document.

7    Q.        Did you answer -- did he have questions, and did

8    you answer them?

9    A.        He did have questions.  I did answer them.

10    Q.        Just briefly, so that we understand this, during

13:37:29    11    the period between December of 2014 and April of '18, where

12    did Mrs. Fields get the popcorn that it would have otherwise

13    purchased ordinarily from MFGPC?

14    A.        So, we purchased first from Mrs. Fields'

15    Confections, which was a new acquisition for us, which

16    happened to have popcorn capabilities.  Obviously, from

13:37:58    17    their name "Confections" they made a lot of other things

18    besides popcorn, but they did have popcorn capability.  We

19    did purchase from them.

20    Q.        They were -- they were related to Mrs. Fields,

21    correct?

22    A.        They were related to us, yes.  We acquired them

23    from the asset sale from a previous licensee named

24    Maxfield's.  They were a chocolate licensee at that time.

13:38:26    25    Q.        So you purchased popcorn from them between what

465

1   would be on this chart, is it fair to say May 1, 2015 until

2   approximately --

3   A.      I believe January of 2017, when we shut down that

4   plant.

5   Q.      And explain, when you say, "we shut down that

6   plant," will you explain to what you are referring?

7   A.      Yes, so we had bought that, as I mentioned, the

13:38:59   8   confections plant, at the end of 2014, primarily to get into

9   the chocolate business and to maintain the revenue that we

10  had been enjoying under our license with Maxfield's.  It

11  frankly took the company -- and, again, I wasn't here at

12  this time, but roughly speaking in 2015, it took the company

13  quite awhile to really realize that vision.  You can see

13:39:26   14  here, we were able to source some popcorn by May of 2015,

15  you know, through their ability to get that business up and

16  running.

17          They actually hired me in 2016 to launch a line of

18  chocolates, so I joined the company in February of 2016.  We

19  were pursuing that throughout 2016.  We made it to market

20  that fall with the chocolate line, and by about Thanksgiving

13:40:01   21  of 2016, management decided they no longer wanted to pursue

22  that line of business or anything related to the confections

23  business and started shutting it down.  So, really, by

24  January of 2017, that facility was no longer producing,

25  selling, doing -- it was no longer a viable business.

466

1    Q.        And so then, where did you obtain your popcorn from

13:40:30   2    subsequent to that?

3    A.        So, after that, we had to find another source of

4    that popcorn, and we went to Sir Walter to source that to

5    provide that for us.

6    Q.        And does this document that you prepared, does this

7    accurately reflect, to the best of your knowledge and

8    ability, all the purchases by Mrs. Fields of popcorn between

13:40:57   9    December, 2014 and April 30, 2018?

10    A.        All?

11    Q.        Yes.  All of its purchases, correct?

12    A.        Yes.  It reflects all the purchase orders.  The

13    number -- there is a discrepancy in how much we ultimately

14    received and were billed for, but it's, I think, within

15    about 12, $13,000, but this was -- this is the record of the

13:41:29   16    purchase orders, the request of what we wanted to purchase.

17    Q.        To your knowledge, other than those two entities,

18    you did not purchase popcorn from anybody else?  Mrs. Fields

19    did not purchase popcorn from anybody else in that time

20    frame, correct?

21    A.        That's correct.

22    Q.        And the sales that Mrs. Fields did in that time

23    frame, were those the same sales as they were doing when

13:41:55   24    they were -- what Cassie Alvey described today?  Was it the

25    same process, you were buying them and selling them to the

1    same places, Gifting and Quill and everything she talked

2    about?

3    A.        Roughly speaking, yes.  You know, I think we

4    established this the other day, you know, we were increasing

5    sales a little bit from, you know, just through the normal

6    course of business.  I didn't go back and review the sales

13:42:29    7    previous to this time to look at a direct comparison of new

8    accounts or other additional items that we were selling, but

9    it does appear that the numbers are in line with how much we

10   were purchasing according to MFGPC's royalty reports.  I

11   think you just reviewed those numbers in 23 -- 2013, excuse

12   me.

13:42:58   13        It looks like we purchased $79,000 worth of product

14   from MFGPC.  In 2014 we purchased approximately $70,000

15   worth of popcorn.  I think in 2015 we purchased something

16   like $55,000 worth of product, and it went up a little bit

17   from there.  So, you know, roughly speaking, the numbers

13:43:26   18   continued a similar cadence to, you know, from the -- in

19   that ball park, 70,000 to 102,000 in '17, so roughly

20   speaking.

21   Q.        And so the record is very clear, the '13 and '14

22   numbers you've just referred to, those are from

23   Mr. Lindley's own royalty report Exhibit S?

24   A.        That is correct.

25   Q.        That's what we went -- what we went through with

13:43:57  1    Ms. Alvey, and you pointed out to me so I could show it to

2    you?

3    A.        That's correct.

4              MR. AMANI:  Thank you, Your Honor.  I don't have

5    anything else for Ms. Schmandt.

6              THE COURT:  Thank you.

7              Mr. Rothschild?

8              MR. ROTHSCHILD:  Just briefly.

9                        CROSS EXAMINATION

10   BY MR. ROTHSCHILD:

13:44:15  11   Q.        I want to clarify something Mr. Amani just asked

12   you about.  You said they were roughly -- the popcorn sales

13   were roughly the same, after MFGPC was terminated, for the

14   following years.  But didn't you just testify also that the

15   first year was 50,000 and then the second year was

16   approximately 80,000 and the third year was approximately

13:44:58  17   102,000, or did I mishear you?

18   A.        That is true.  Correct.

19   Q.        So, you're telling me in two years they doubled,

20   but they stayed exactly the same.  Which is it?

21   A.        So, I guess the way we should think about this, or

22   at least the way I'm thinking about it, with your client we

23   were buying 70, $80,000 preceding termination.  There was a

13:45:26  24   lull in '15 when we pivoted to the Confections business and

25   then we came back at $84,000 in '16, so there was a lull

469

1    there.  And then it grew from there in '17 under a different

2    source, Sir Walter.  We were certainly not benefiting

3    internally from producing that product in 2017.

4         So there is a growth, obviously, you know, as with

13:45:57  5    most businesses.  You expect growth.  And so it doesn't seem

6    unusual to me we went from 80,000 in one year with your

7    client to a hundred thousand in '17.

8    Q.    But it's accurate to say that, of this exact

9    product, Mrs. Fields-branded popcorn -- and let me just ask.

13:46:29  10    You didn't sell anything but Mrs. Fields-branded popcorn,

11    right?  This is all Mrs. Fields popcorn?

12    A.    So, all this popcorn was -- either we made it --

13    so, I would agree, yes, Mrs. Fields popcorn, Mrs. Fields'

14    Confections products in Mrs. Fields-branded containers.  And

13:46:53  15    from Sir Walter, it appears that those items came in -- it's

16    hard to tell, clear cello.  It had a nutritional label on

17    the back.  I think it said something about produced on

18    behalf of Mrs. Fields.  So our name is on there.  It's not

19    really branded, but, at the end of the day, it goes into

20    Mrs. Fields' container so we would say it's Mrs. Fields'

21    popcorn.

22    Q.    Yeah.  I'm sure you wouldn't have produced to us

13:47:27  23    information about some other brands of popcorn, because this

24    litigation is about that, right?

25    A.    Probably not.

470

```
              1    Q.        Okay.  So you're telling me the sale of this exact
              2    product moved from 50 to 80 to a hundred in the three years,
              3    consistent with the industry?
              4    A.        I suppose so.  I mean, I don't know that there's a
              5    correlation between the two things, but clearly those are
13:47:59      6    the numbers.  Those are the growth rates.
              7              MR. ROTHSCHILD:  Your Honor, I have nothing else
              8    for Ms. Schmandt.
              9              THE COURT:  Thank you.  Do you have anything else,
             10    Mr. Amini?
             11              MR. AMANI:  No, Your Honor.
             12              THE COURT:  Thank you.  Your next witness,
             13    Mr. Amani.
13:48:28     14              MR. AMANI:  Defendant calls Grant Lyon.
             15              THE COURT:  Do you want to take a break first and
             16    start with him after the break, or do you want to --
             17              MR. AMANI:  That would be great, Your Honor.  That
             18    would be good.
             19              THE COURT:  We'll be back in at 10:15 mountain
             20    time.
             21              MR. AMANI:  Thank you, Your Honor.
             22                        (Short break.)
             23              THE COURT:  Let's see, Mr. Lyon, I'll have my
             24    courtroom deputy swear you in.
             25
```

471

```
1                     GRANT LYON,

2    the witness hereinbefore named, being first duly cautioned

3    and sworn or affirmed to tell the truth, the whole truth,

4    and nothing but the truth, was examined and testified as

5    follows:

6             THE COURT:  You're muted, Mr. Lyon.

7             MR. LYON:  I do.  How about that?

8             THE COURT:  That's good.  Thanks.

9             MR. LYON:  Thank you.

10            MR. AMANI:  Your Honor?

11            THE COURT:  Go ahead, Mr. Amani.

12            MR. AMANI:  Thank you, Your Honor.

13                     DIRECT EXAMINATION.

14   BY MR. AMANI:

15   Q.     Good morning, Mr. Lyon.

16   A.     Good morning.

17   Q.     Tell -- would you please tell the Court your

18   educational background.

19   A.     I have a bachelor's degree in accounting from

20   Brigham Young University as well as a master -- MBA from

21   B.Y.U.

22   Q.     And will you please, if you would, describe your

23   employment history.

24   A.     Starting in 1989, when I graduated from MBA school,

25   I began my career with Arthur Andersen, I was there from '89
```

472

1    to '97 working in their litigation support and bankruptcy

2    practices.  In '97 I left Andersen and for about a year I

3    was the V.P. of capital markets for a New York stock

4    exchange REIT, R-E-I-T.  While I was there, we sold the REIT

5    and then, in 1998 with the close of the sale, I started my

6    own financial advisory consulting practice in bankruptcy and

7    litigation called Odyssey Capital Group.  In 2002, I was

8    purchased by Ernst & Young Corporate Finance and was a

9    managing director there for two years.

10           In 2004 they sold that group.  I went back to my

11   self-employment practice at LHFT Capital Group.  Since then,

12   I was purchased a third time by a forensic accounting firm

13   out of the Cayman Islands.  I had a three-year contract

14   there with them.  And then now I'm a co-founder and partner

15   of a firm called ARETE, A-R-E-T-E, Capital Group.  And we do

16   primarily investing.  We act as interim CEO's and CFO's, and

17   we will act as independent board members for companies that

18   need independence on the board for whatever reason.

19   Q.     Do you have any licenses?

20   A.     I had a -- I am a -- I was a registered certified

21   public accountant in the State of Arizona.  I let that

22   license lapse as I started to do more board work, so it's

23   currently inactive.  I also held a series 7, 63 and 24

24   broker/dealer licenses at the time I was at Ernst & Young

25   Corporate Finance.

473

```
 1   Q.      Have you ever testified in any matter?

 2   A.      Yes, sir.

 3   Q.      Have you ever testified as an expert in any matter?

 4   A.      Yes, sir.

 5   Q.      Have you ever been qualified as an expert in any

 6   courts?

 7   A.      Many times, in both State, Federal and Federal

 8   Bankruptcy Courts.

 9   Q.      Have you ever conducted any damage analyses as an

10   expert?

11   A.      Yes.

12   Q.      And how about lost profits analyses as an expert?

13   Have you done that in your career?

14   A.      I have.

15   Q.      A few times, many times?

16   A.      Six to eight on damages and lost profits, 30 to 40

17   on other expert areas involving cash flows and projections.

18   Q.      And are you familiar generally with licenses?

19   A.      Do you mean --

20   Q.      Product licenses?

21   A.      Yes.

22   Q.      Have you had any experience with those?

23   A.      I have.

24   Q.      In what capacity?

25   A.      There was a time in the early 2000's for about a
```

474

1   couple of years that I was the primary advisor to a series

2   of health and beauty aid drug stores where I both worked

3   with the franchisees in their relationships with the parent

4   and also with the parent in their relationships with the

5   franchisees.

6           MR. AMANI:  Your Honor, this is ordinarily -- at

7   least as I do it, this is ordinarily where I would move to

8   have Mr. Lyon admitted as a rebuttal expert.

9           THE COURT:  Well, we don't do that in Federal

10  Court.  Just go ahead.

11          MR. AMANI:  Okay.  Thank you, Your Honor.

12  Q.      BY MR. AMANI:  What were you asked to do in this

13  case, Mr. Lyon?

14  A.      Primarily two things.  The first was to review the

15  expert report of Mr. Kilbourne and comment on that, and the

16  second to come up with my own estimation of lost profits.

17  Q.      And what did you do?  What did you review, if

18  anything, to do that?

19  A.      Obviously I reviewed the Kilbourne report.  I

20  reviewed historical financial records provided by the

21  debtor.  I reviewed a number of PowerPoint presentations

22  that I've noticed have been exhibits during the last couple

23  of days.  I reviewed some emails back and forth, which I

24  have also seen as exhibits.  I read Mr. Lindley's deposition

25  testimony and reviewed other general business records that I

1    was provided.

2    Q.       Did you also -- have you also sat through this

3    proceeding?

4    A.       Yes, I have, since the beginning.

5    Q.       And you've listened to all the testimony to this

6    point?

7    A.       I have.

8    Q.       And has that had any impact on what your -- what

9    you reported in your expert report?

10   A.       It has.  It has had.

11   Q.       And what impact has it had?

12   A.       A couple of things.  One, per the deposition

13   transcript that I cite in my report, I had thought that

14   Mr. Lindley was transitioning out of this business, this

15   business being the MFGPC business.  After listening to this

16   testimony today -- and when we go through my report, I'll

17   show you the cites to his deposition which led me to believe

18   that.  As we've listened to the testimony the last couple of

19   days, it seems like he was around.  Doesn't quite square in

20   my mind with with what he said in deposition testimony, but

21   listening to this I would give him the benefit of the doubt

22   and say he was still actively, in his words, full-time

23   involved in this company up until the termination if 2014.

24   Q.       What other, if any, impact has anything you've

25   heard at the trial had on your expert report?

476

A.        The other material impact, which we'll get to, is

the margin calculation.  The fact that the margins were low

in the 2013 and 2014 time periods, i.e., after the fire,

specifically in the 2014 time period.  I thought that was on

account of the business winding down because of the fire.

Consistent with what I just said, that Mr. Lindley said no,

he was there full time, and that those margins, those lower

margins, specifically in 2014 were primarily related to

commodity price issues.

I think he mentioned in his testimony on Monday

that nuts and chocolates and so forth, the swings in those

prices at the commodity level, could have a major impact on

his margin and, in fact, that's what he was seeing in 2014.

The reason that's important -- and we can talk more about it

in my report when we go through the details -- is

Mr. Kilbourne uses a weighted average of approximately 25

percent margin.  I take issue with that.  And my opinion,

and I believe is supported by the fact that those low

margins, especially in 2013 and 2014 were a continuing trend

of margins going lower and that they were related,

specifically in '14, to commodity price increases which were

inputs to Mr. Lindley's business, which caused margins to

continue to shrink.

Q.        Anything else as a result of the testimony that you

think has impacted your report?

1    A.       On an unmaterial point, I said in my report that

2    Mr. Kilbourne took a simple average of historical margins,

3    and I heard that it was a weighted average.  I stand

4    corrected.  Weighted average.  But it doesn't affect my

5    report.

6    Q.       You reviewed, obviously, Mr. Kilbourne's report?

7    A.       Yes, sir.

8    Q.       What would you say, if you can, the principal

9    differences are between your approaches to this profit

10   calculation?

11   A.       Well, there's a fundamental difference.  And I mean

12   no disrespect to Mr. Kilbourne.  In fact, as I look at his

13   resume', I would mention, he comes from a fine university

14   background in my opinion.  It happens to be the same as

15   mine.  But Mr. Kilbourne seems to be what I would call a

16   practitioner.  Again, he's very well credentialed.  No

17   disrespect to him at all.  Practitioners tend to take

18   formulas and say:  Okay, if an industry grew at X percent,

19   therefore this company can grow at X percent, or if a

20   ten-year historical margin average is X, I'm going to use

21   that ten-year margin for my analysis.

22        Again, I'm not faulting him.  Mine's more of a

23   practical approach.  What are we dealing with right now?

24   What were the sales actually in 2014, for example?

25   Mr. Kilbourne would use a hypothetical assumption and grow

478

1    sales at 21 percent from a base of 2012, get to a base of

2    $867,000 or so in 2014, but doesn't recognize the fact that

3    the company only had $207,000 of sales, for instance, in

4    that year.  I'm dealing with what was actually happening.

5    He's dealing more with what a practitioner would do, which

6    is what I would call a hypothetical.

7            Another one -- and I believe I'm the devil

8    incarnate listening to the last couple of days of testimony

9    for saying a couple of things which I don't agree with, but

10   I'll get to that in a minute -- is Mr. Kilbourne assumed

11   that all the necessary capital to achieve the sales that he

12   is using in his projections would be available.  I take

13   issue with that.

14           Now, here's the devil incarnate problem issue.  In

15   my report, based upon deposition transcript, I said, you

16   know, Mr. Lindley is saying he doesn't have the ability to

17   fund the growth.  What I'm hearing now is:  Well, I could

18   have funded the growth.  I had the capital, at least up to

19   some level, but I wasn't willing to do so.  I didn't want to

20   take more of my savings and invest into a business beyond

21   where I was at in the 2012 level.

22           Again, okay.  So the practical reality is,

23   somewhere capital has to come to meet Mr. Kilbourne's growth

24   rate.  Mr. Lindley, per his deposition transcript, didn't

25   have it or, per his testimony the last couple of days, said:

1    Well, I had it, but I wasn't willing to do it.

2         That means that capital would have had to come from

3    an outside source.  I've been in the investing business -- I

4    am in the investing business.  I understand what it means to

5    try to get capital.  Mr. Kilbourne says that's a given.  I'm

6    saying that is not a given.  That is something you have to

7    go get, and if the current investor is either, A, unable, or

8    B, unwilling to invest additional capital, that issue has to

9    be addressed in order to be able to achieve the level of

10   sales that you are projecting, Mr. Kilbourne.

11        That's where I'm taking issue.  So, that's what I

12   mean by more practical, where are we now, versus a

13   hypothetical, where could we be?  Difference of how we have

14   approached our valuation methodologies.

15   Q.       Thank you.  All right.  Let's take a look at your

16   report and please tell me I have this up on the screen?

17   A.       I see it, sir.

18   Q.       Okay, thanks.  Mr. Lyon, is this your report as of

19   November 27, '20, your rebuttal expert report in this case?

20   A.       Yes.

21   Q.       I don't know if it's been received, Your Honor.  I

22   would move at this time that it be received in evidence.

23        THE COURT:  Ms. White?

24        MS. WHITE:  We -- I believe we stipulated to it,

25   and I think it's already been used.  I think it's already

1    been marked as an exhibit.

2              THE COURT:  Fifty-six, is it?

3              MR. AMANI:  It is Exhibit 56, yes.

4              THE COURT:  Has it been admitted?

5              THE CLERK:  Yes.

6              THE COURT:  It has been admitted.

7              MR. AMANI:  Thank you.

8    Q.        BY MR. AMANI:  Mr. Lyon, let's talk about

9    Mr. Kilbourne's report.  You understood he took how many

10   approaches to trying to estimate MFGPC's profits for the

11   period December '14 to April '15?

12   A.        Three different approaches.

13   Q.        All right.  Let's -- why don't we go through them

14   seriatim.  So I want to take you to the historical results.

15   On MFGPC's historical results, you looked at those, did you

16   not?

17   A.        I did.

18   Q.        And what, if anything, did you conclude?

19   A.        Well, if you can maybe go down a little bit to the

20   top.  There.  Okay.  So there, if you could just stop right

21   there.  The -- the results here are from Exhibit 55 as well

22   as Mr. Kilbourne has some of the same results.  And all I

23   did here was I took Exhibit 55, which were the QuickBooks

24   from the company, and I put them in a format to try to

25   calculate EBITDA.  So, I didn't change any of the revenue or

481

income.  I didn't change any of the gross profit.  I didn't

change any of the net income.  I just split out the

amortization, depreciation and interest expenses so I could

get a feel for what the EBITDA of the company was.  So this

is just a recreation or re-summarization of the information

that was presented in Exhibit 55.

You will see that there is information for the year

2015, which is after the termination date.  That was for

reference purposes only because it was part of the

information I saw.  I in no way rely upon that.  I heard

somebody say that I relied upon 2015 earlier in these

hearings.  I have not, so just to dispel that issue.

But what came out of this is, if you look at years

2010, 2011 and 2012 -- and it's been talked about quite a

bit in this hearing -- is that the business seems to have

reached a natural what I'll call plateau in around the 2010

time period.  And that's consistent with what Mr. Lindley

said in his deposition testimony and, as I understand it and

also what I heard over the last couple of days, that from

2003 forward he was testing -- he was trying to get his

product line designed.  He was testing in different

channels, and I understand that.  You will have some

start-up time in years here.  It looks like that start-up

time was about six years, '03 to '09, and by the time 2010,

2011 and '12 came around, he had hit that $600,000 kind of

1    base level of sales.

2         I think in testimony earlier, Mr. Lindley, in

3    response to a question, said he was kind of keeping the

4    business warm at around the $600,000 level and that he

5    would, at the right time, in his mind, try to find excess

6    capital or additional capital to grow the business beyond

7    that plateau threshold $600,000 level and that -- and here

8    comes now the devil incarnate again.  Mr. Lindley says he

9    had enough capital to continue that frame, but he didn't

10   want to invest anymore of his own money.  I think he took

11   umbrage with the fact that I said he couldn't invest

12   anymore.  We'll come to that in a second.

13        Key point.  We plateaued -- the company is

14   plateauing at around the $600,000 level, consistent with

15   Mr. Lindley's testimony, with what we have heard in the last

16   couple of days and what I've seen in the financial records.

17   I also noticed, if you look down at the gross profit

18   percentage line, and it's towards the bottom third of the --

19   of this little table here.  It goes from a 15.5 percent in

20   '09 to 28.4, to 22 1/2, to 17 1/2.  Mr. Kilbourne took a

21   ten-year average from 2012 back.  We'll get to it in a

22   little bit more, but I don't think that's appropriate.

23        You continue to see a gross margin percentage

24   decline in '13, and '14.  Mr. Lindley was talking about

25   specifically in '14 that that was primarily, in his mind, as

483

1  a result of commodity price increases and that he chose to

2  limit or, in his words, throttle the sales in 2014 at

3  approximately the $200,000 level because he didn't want to

4  invest more at that time or grow more when he would be

5  incurring losses.  And that's consistent with what I see

6  here, so in that regard his testimony is consistent.

7       So, key points to take a way from this document.

8  Sales had plateaued at around the $600,000 level.  Okay.

9       2.  That the actual sales in 2014 were around

10  207,000.

11       And, 3.  The gross margins had continued to

12  decline.

13  Q.    And just to review it, going to your page 8 of your

14  report, you have these losses here.  How did that impact

15  your report?

16  A.    Well, over the four-year time period, there were,

17  as reported, losses of $202,000 for that four-year time

18  period.

19  Q.    And why did you focus on that four-year time

20  period, that four-year time period?

21  A.    Because, again, we were now in the 2010 period at

22  least, forward.  We're in that plateau stabilization period.

23  So he's ramped up.  He's got his model built in his mind.

24  He's got his products fairly proven, and now we're in what I

25  will call a stabilization or what Mr. Lindley would call a

484

1    kind of keep warm stage.

2    Q.      Do you recall Mr. Kilbourne's growth rate was

3    then -- he applied a growth rate of what?  Do you recall?

4    A.      He applied a growth rate of 21 percent.

5    Q.      And how do you respond to that?

6    A.      Well, again, let's see what the actual growth rate

7    was, okay?  So the actual growth rate in what I'll call the

8    stabilization time period, 2010 through 2012, was on average

9    approximately 2.35 percent which is calculated, as you can

10   see, on the bottom of page 8 and then bleeding over a little

11   bit into page 9.

12   Q.      And what did you conclude from that, if anything?

13   A.      That the keep warm plateau number is going to

14   basically grow at inflation.  You're not having any real

15   growth.  So I looked at what would inflation be over those

16   two years, and it, lo and behold, was the same number, which

17   lead me to conclude that if you're going to be in the

18   plateau, slow growth, keep warm business area, that the

19   company, by 2012, had reached that level and that its growth

20   would be basically at inflation unless they were going to

21   try to ramp up, but that wasn't Mr. Lindley's business plan

22   at this time, the ramping up at this time.

23   Q.      Now, this growth rate was actually consistent with

24   what Mr. Lindley's plan was, was it not?

25   A.      It seems to be.  I mean, he's kind of saying:  I'm

485

1  plateauing around 600,000, and therein, I grew -- he didn't

2  say this, I'm now concluding.  He grew at about the

3  inflation rate as a plateaued business.  That makes sense to

4  me.

5  Q.       We talked about the gross margins already earlier.

6  You refer to them here on page 9.

7  A.       Correct.  So, you see a continuing decline in gross

8  margins versus what Mr. Kilbourne did was a historical

9  ten-year weighted average.  I don't see anywhere in

10  Mr. Kilbourne's report where he says, but the actual margins

11  at least in 2012 were materially below the ten-year average.

12  Again, this goes back to the hypothetical versus what's the

13  reality number when we're dealing with?

14       I've sat on approximately 30 boards of directors,

15  and I'm on a private equity investment board where we are

16  looking at, every week, companies specifically in the food

17  business.  If you were to show me, as a board member, this

18  track of gross margin declines and then the company were to

19  put forward a ten-year historical 25 percent gross margin,

20  that would not pass the smell test with me.  You have to

21  take into account that these margins are now consistently

22  declining for every year beginning in 2012, versus take a

23  ten-year historic.

24       That's my -- one of my largest critiques of

25  Mr. Kilbourne's analysis is, he is not taking into account

486

1    actual resorts -- results specifically in the 2013, '14 and

2    really 2012 time frame and explaining why his number, 25

3    percent, is so materially different than what we are

4    actually seeing.

5    Q.        And -- and -- and of course you took into

6    consideration the $207,443 reported on the financial

7    statement for gross sales in 2014, correct?

8    A.        Yes.  All I know is that, in 2014, the reported

9    sales were 207,000 and that if you're going to grow

10   something from a base, you need to grow it from the actual

11   base, not some hypothetical base where you've retroactively

12   applied a 21 percent gross margin or 21 percent sales rate

13   and you are materially different, 860-ish thousand to

14   $200,000 of sales at your beginning base.  That is a second

15   material difference between Mr. Kilbourne's report and my

16   report.

17   Q.        Did you hear anything at this trial, in testimony

18   at this trial, that you would -- that goes into your

19   consideration of these numbers, this 207,000?

20   A.        Specifically the 207,000?

21   Q.        Yes.

22   A.        That Mr. Lindley was throttling sales, his word, in

23   the 2014 time frame.  And he did that in order to avoid more

24   losses.

25   Q.        And prior to listening to his testimony, what had

1    you assumed in this report, if anything, different?

2    A.      As far as the 200 in the sales?

3    Q.      Right.

4    A.      I haven't.  Later on, we'll see two versions of my

5    estimated damage analysis.  One assumes a base of 207, which

6    is the actual base, and one assumes a base of $600,000 in

7    sales, which is what I will call the plateau base that the

8    company experienced in the 2010-through-2012 time period.

9    Q.      And I guess you've already really addressed the

10   need for new funds.  I don't think we need to go over that

11   again.

12   A.      Well, I would say, if you read the little excerpts

13   from the deposition -- and I'm reading the second one.  This

14   is in the 2012 time frame, it looks like.

15           Question:  I missed -- I didn't hear something.

16   You said you were intentionally throttling the business?

17           Answer:  Right.  I refused to expand the business

18   at a rate greater than I knew that I could personally cash

19   flow.

20           That's the basis for me saying he didn't have the

21   ability to fund the growth was his statement in deposition.

22           Quote:  I knew that I couldn't -- I refused to

23   expand the company at a rate greater than I knew that I

24   could personally cash flow.

25           Okay.  I heard what he said over the last couple of

488

1    days.  I think that's maybe what he meant to say is, "what I
2    was willing to cash flow."  I don't know what he meant to
3    say.  I just know what he said in deposition.
4            So then you -- someone asks:  So you needed funds
5    from an outside source in order to grow; is that fair?
6            Answer:  Correct.
7            So, that's the basis for me saying for him to grow
8    he needed additional capital, and per his deposition
9    transcript, at least, it was referred to an outside source.
10   Q.      All right.  Let me take you to page 15 of your
11   report.  Here we go.  Does that -- that describes, does it
12   not, the key elements of the Kilbourne report that you
13   addressed?
14   A.      Correct.
15   Q.      Why -- why don't we go -- just very briefly please
16   look through the six items.  I think we've addressed a few
17   of them, but I want to make sure we've covered everything.
18   A.      So the first would be gross margin, which I think
19   we have spoken about.  Mr. Kilbourne uses a 25 percent
20   weighted average of sales.  I used more of what they were
21   actually incurring in 2012 supplemented by what happened
22   actually in 2013 and 2014 and used the 2012 number of 17 1/2
23   percent, or the actual number in 2012.
24   Q.      Let's talk about the incremental operating costs.
25   A.      Okay.  Here's another one where I think I'm the

489

1    devil incarnate here.  My point is Mr. Kilbourne does not

2    include, in his analysis, any additional labor costs.

3    Q.      Now, what's the importance of that?

4    A.      Because -- and here's where we may be having a

5    semantic -- or I may be having a semantics issue.  In my

6    mind, those are employees.  What I've heard over the last

7    two days is, that's not the business model that Mr. Lindley

8    was employing, that he was the only person, you know, not as

9    an employee, because he says he's the owner, but he has no

10   additional labor costs and that he would hire or they did

11   hire consultants or others when they needed that labor

12   assistance or that human resource assistance.

13          Mr. Kilbourne reduces the amount of consulting fees

14   in his analysis.  So if you're not going to hire employees,

15   that's okay.  You have to supplement that need with

16   consultants.  Mr. Kilbourne removes that from his analysis

17   where now, as I listen to Mr. and Mrs. Lindley, their whole

18   business plan was:  Don't add employees, we will add

19   consultants.

20          And that's okay, but Kilbourne does not take into

21   account that expense.  And that's one of my biggest issues

22   that I have with Mr. Kilbourne's analysis.  Having said all

23   of that, you will see in my analysis coming up, I used his

24   10 percent number.  I don't agree with it, but I used it in

25   my analysis.

490

1    Q.        Describe this chart on page 16, if you would, for

2    the Court that we're looking at.  What did you do there?

3    A.        Okay.  So if you go back up to page 15 for a

4    minute -- for a second, this is under the incremental

5    operating costs.  And there was a back and forth over the

6    last couple of days of whether this is the total cost

7    because of the gross margin, cost of goods sold or whether

8    these were operating costs.  So I want to be clear, I am in

9    the incremental operating costs portion of the income

10   statement right now.

11          So let's go down.  So, what I noticed was that the

12   actual expenses -- I'll do the total column -- for the four

13   years shown or $632 -- $632,000 of operating costs.  Let's

14   be clear, when I say total actual expenses, I mean total

15   actual operating expenses -- we are not talking about costs

16   of goods sold now -- and that the expenses included in the

17   Kilbourne report for those four years was approximately

18   210,000 or a reduction of 422,000.

19          Some of those reductions deal with consulting fees

20   and marketing fees and -- but what we heard in the business

21   model from Mr. Lindley is those are the types of fees that

22   they bring on consultants and others, versus hiring

23   employees.  So Mr. Kilbourne's report has no cost for labor,

24   zero, reduces the consulting line, so in my mind he doesn't

25   fairly account for the incremental costs that somebody is

1  going to have to incur to fund the growth -- and this is a

2  key point -- that Mr. Kilbourne is projecting.

3          I'm not taking issue at, can you keep the company

4  warm at 600,000 in this section.  I'm taking issue with, you

5  cannot grow the way Mr. Kilbourne is saying you will in his

6  calculation and only -- and not take into account what I

7  will call labor costs, whether we're going to call that

8  employee or consultant.  I don't want to get in that

9  semantic debate.  I'm just saying additional costs

10  associated with human resource needs that a company would

11  have.  That's my biggest complaint about Mr. Kilbourne's

12  operating section here.

13          Again, however, I used his 10 percent number in my

14  analysis.

15  Q.      I wanted to make sure I established that.  Thank

16  you.

17  A.      Okay.

18  Q.      All right.  Let's look at -- I guess maybe we

19  should go to the specific differences.  I think they are on

20  page 20.

21  A.      Okay.

22  Q.      There we go.

23  A.      So --

24  Q.      This is your analysis using Mr. Kilbourne's --

25  A.      Correct.

492

```
1    Q.        Some of Mr. Kilbourne's assumptions and
2    substituting some of them, correct?
3    A.        Correct.  So I wanted to try to concisely lay out
4    what are the key differences.  And that's what this little
5    chart on page 20 does.
6    Q.        Let's go through them.  So you use a gross margin
7    of 17 1/2 percent.  Mr. Kilbourne uses 25 percent?
8    A.        Correct.
9    Q.        Correct.  And I don't think we need to go over that
10   one again.  Incremental costs.  Despite your criticism of
11   them, you're sticking with the 10 percent that he chose?
12   A.        Correct.
13   Q.        Royalty rate of course is 5 percent.  I don't think
14   there's any dispute.  Talk to me about that payroll column.
15   What is that?
16   A.        Okay.  So, remember, at the time I wrote this,
17   based upon the deposition transcript, I assumed Mr. Lindley
18   was phasing out and that somebody would have to fill that
19   role.  So, I took the average between the $40,000 that
20   Mr. Lindley was charging -- expensing the company.  I
21   realize he wasn't paid it -- expensing the company a year,
22   and the $70,000 that they had used to hire somebody
23   previously.  I used a simple average.  I just said, okay,
24   it's somewhere between 40 and 70.  Middle point is 55,000.
25   Q.        So your understanding, by the way, in this model
```

493

1    that you did, this is the only labor cost that's in there,

2    correct?

3    A.        Correct.

4    Q.        And in Mr. Kilbourne's report, there are no labor

5    costs involved?

6    A.        Correct.

7    Q.        Take me through the last three lines, if you will.

8    A.        So the incremental profit line is just a summation

9    of his, Mr. Kilbourne's 25 percent gross margin minus 10

10   percent incremental minus 5 percent royalty gets to the 10

11   percent incremental profit number.  Given I have a payroll

12   number in there, you really can't do it from an apples to

13   oranges basis, but if you just took my 17 percent,

14   subtracted the 10 and the 5, you would get to a 2.5 percent

15   incremental profit number versus his 10 percent, excluding

16   any labor.

17   Q.        And sales growth.  We talked about this briefly in

18   this context?

19   A.        We did.  So I assumed in my report that the company

20   will not exceed, on a real basis, this $600,000 of

21   stabilized plateau, keeping it warm sales number in one

22   scenario and that, if that's the case, then you are going to

23   grow by inflation.  The consequence of that business

24   decision, good or bad, is that you will be growing by

25   inflation, just like you did in the 2010 through 2012

494

1    period.

2    Q.       And it's fair to state you get there because you

3    assume -- I don't know if you assume, but you don't believe

4    that Mr. -- that MFGPC has sources of capital at this point?

5    A.       So, correct.  In other words, either Mr. Lindley

6    is -- doesn't have it, what I originally thought, or wasn't

7    willing to put it in, which is what I heard over the last

8    couple of days, says you've got to go to the outside world

9    to get it.  Now I'm putting my investor hat on, which I wear

10   everyday.  He's not going to get a loan because there's no

11   real EBITDA here, which bankers really want to look at is

12   coverage.  I don't believe he's going to get an equity

13   infusion here.  He tried.  He wasn't successful in doing

14   that.  I think that speaks for itself.

15        And that's basically when he thought he had an

16   evergreen license, right?  Now we're talking about a license

17   that would expire in three years and four months.  So, I do

18   not assume he's able to get the new capital that would

19   require -- that would be required to hit the numbers that

20   Mr. Kilbourne is projecting.  He probably could do it if

21   he's going to keep it warm at the $600,000 level.  I take no

22   issue at that.  What I'm taking the issue of is to grow the

23   way Mr. Kilbourne is suggesting he can grow, I don't believe

24   he can do that because he's not going to be able to get

25   capital from the outside source, and he said he was not

495

1   willing to put more capital in.

2   Q.      Let's go now to -- explain to me on page 22, what

3   do we have here?

4   A.      Okay.  So the top of page -- could you make that a

5   little bit bigger?  I'm sorry.

6   Q.      Just a moment.  Let me see if I know how to do

7   that.

8   A.      Just go a little bit more.

9   Q.      Hold on.  Is that big enough?  I'm just seeing if I

10  can expand it, if I make it bigger, if you can see it?

11          MR. LYON:  I would be more focused on, Your Honor,

12  if you can see it okay.

13          THE COURT:  I can see it okay.

14          MR. LYON:  And if you would move it over just a

15  little bit.  There we go.  So here's my analysis based on a

16  2007 base year.  So you'll see, base 2014 revenue of 207443.

17  That's what they did.  I then applied an inflation rate, and

18  you can see those inflation numbers at the bottom, .7, 2.1,

19  2.1 and 1.9.  Those are from -- that's actual inflation.  So

20  I grew the sales at those inflation rates.  I then applied a

21  17 1/2 percent margin like we've spoken about to get a gross

22  margin of -- I'll just -- let's do the total column for a

23  minute so we're all on the same page.  So we have a revenue

24  of 750,000.  We had a gross margin of 17.5, which is the

25  131,000 number.  We apply a 10 percent non-payroll operating

496

1    costs.  That's for the Kilbourne report.  We talked about

2    that.  You can see that's 75,000 or 10 percent of 750.

3          I applied a 5 percent royalty number.  That got me

4    to 37,000 of royalties that would be paid.  So the income

5    before salaries over the five-year period, would be

6    approximately $19,000.  If you add the 55,000 a year of

7    salaries that we spoke about, that cost would be about

8    188,000, leaving you with a loss of 169.  Now --

9    Q.      And the -- I didn't mean to interrupt.  I'm sorry.

10   A.      If we were to eliminate the salary line because

11   we're not going to assign any labor costs here, that

12   Mr. Lindley is able to be the only person and he can run the

13   entire management, which, at this level, I think he probably

14   could, and if he wasn't transitioning out, which is what I

15   thought he said in the deposition, but what he is now

16   telling me he is not, you would eliminate the 188.  So,

17   instead of having -- instead of having a lost profits of

18   negative 169, you would have a lost profits figure of

19   approximately $19,000.  So, it really comes down to, do you

20   assign any labor costs or not?

21   Q.      And then, below that, we have the same analysis, do

22   we not, except you assume that Mr. Lindley, even though he

23   did only $200,000 of business in 2014, was capable of doing

24   600?

25   A.      Correct.  So I said, okay, let's give him the

1   benefit of the doubt.  Let's waive a wand and in 2015 he's

2   able to go from actual to 200,000 or so, back up to his

3   plateau number of 600,000, and when I do that, apply the

4   same methodology, you can see the income before salaries is

5   approximately $54,000.  That would be the lost profits

6   number.  If you take out the salaries, because you want to

7   assign the burden to this company with some amount of labor,

8   that number would be a negative 134,000.

9   Q.      I'd like to -- unless you have something else, I'd

10  like to turn to Mr. Kilbourne's second and third method of

11  damages.

12  A.      Okay.

13  Q.      Those related to the Perfect Snacks deal.  You

14  understood that, correct?

15  A.      Correct.

16  Q.      And based on that minimum sales analysis, these

17  are -- I'm looking for them.

18  A.      Go up just a little bit on page 23.

19  Q.      Yes.

20  A.      Sorry.  Okay, so now, go down a little bit.  You

21  see the header Minimum Sales Analysis.

22  Q.      Yes.

23  A.      Okay.  So I took Mr. Kilbourne's attachment 6, and

24  I extracted some of the data.  Now let's kind of go down a

25  little bit.  And here's what Mr. Kilbourne is using as his

1    basis for lost profits, specifically the revenue line.  Now,

2    I look in 2017, for instance, Mr. Kilbourne is saying that

3    per this methodology, the company would have $3.6 million of

4    sales.  This is where I start to say, man you've got to have

5    some additional labor costs in here.

6            You're not going to be able to effectively, from

7    2014, actual levels, have a 19 times or 18 times increase,

8    200,000 to 3.6 million, and not have to expand either

9    through employees or additional consultants and through

10   marketing reps and advertising reps and potential slotting

11   allowances, everything that goes to trying to get to that

12   level of increase.  Eighteen times?  I don't believe that's

13   realistic.

14   Q.      But you saved your -- your biggest critique, I

15   think, of that.  I want to skip a few pages there?

16   A.      Go back up a little bit.

17   Q.      Uh-huh.

18   A.      So, keep going.  Keep going.  So, the implied

19   growth rate --

20   Q.      Uh-huh?

21   A.      -- in attachment 6 is 42 percent, 53 percent and 10

22   percent.

23   Q.      Measuring it from -- when you say applied growth

24   rate, what are you measuring?

25   A.      Back up a little bit to page 24.  Down.  Right

1   there.  Okay.  From 1.6 million to 2.275 million is

2   approximately a 40-ish percent increase in sales.  2.275

3   million to 3.625 million is approximately 50-ish.  Go down

4   and you'll see the actual numbers, what we were just looking

5   at.  59.3 percent.  And then, in 2018, the growth is 10.3

6   percent.

7   Q.      Annualized, correct?

8   A.      Annualized.  So, Mr. Kilbourne, in using attachment

9   6 to calculate damages, is assuming a growth rate even more

10  than his 21 percent growth rate, which I don't agree with.

11  Q.      And then, Mr. Kilbourne -- unless you have

12  something further about that analysis, Mr. Kilbourne's last

13  analysis was the minimum fee analysis; is that correct?

14  A.      Correct.

15  Q.      And you had a criticism of that, did you not?

16  A.      Two things.  One.  I think the number is 375, not

17  425, and I think that was discussed during Mr. Kilbourne's

18  testimony.  You know, Your Honor can read the contract as it

19  says, but it sure seems to me to be 375.  But, second,

20  again, that assumes that certain sales numbers would have to

21  be achieved.  I mean.  You can roughly say that 375, divided

22  by .05, the royalty rate, you would have to have about

23  700 -- $7.5 million of sales over that time period, right?

24  Six.  Yeah, 7 1/2 million dollars of sales compared to, if

25  you go back up a little bit to the other chart -- keep

500

1    going.  So, 8.833 compared to 7.5.  That's still

2    unrealistic, given we're starting at a base of 200,000 or

3    even 600,000, and we still haven't had any additional costs

4    for -- I'm going to say labor.  I'm not saying employees.

5    Could be consultants.  Any additional labor type costs.

6         That's why I don't think it's relative.  It also

7    highlights, you know, Mr. Kilbourne went at great odds in

8    his testimony to say, well, this is a perfect comparable.

9    It may be, in his mind, but the companies that are executing

10   on this business are not comparable.  One company,

11   Mr. Lindley's company, is saying:  I'm keeping myself slow

12   and steady.  I'm keeping myself at al plateau until I can

13   find additional capital growth.  I'm keeping it warm.

14        Okay?  Nowhere in Mr. Lindley's business plan that

15   I've seen or heard over the last two days says:  I'm going

16   to explode my growth from 600,000 to 3.6 million in 2 1/2

17   years.  That wasn't his mind set.  His mind set -- and I

18   don't fault him for it -- is slow and steady.  Creep before

19   you leap, I think he said at one point in time.  Going from

20   600,000 to 6 million is not slow and steady, is not creeping

21   before you leap.

22        So, whether or not the maximum amount of revenue

23   could be achieved by one company and their business plan

24   doesn't mean that another company, under their business

25   plan, could achieve the same thing.  They may say:  I don't

501

1    want to do that.  I don't want to invest more of my money.

2    I don't want to grow super fast because, in my experience,

3    people flame out and go into bankruptcy, like he cited a

4    number of times.  So my business plan, Mr. Lindley's

5    business plan is slow and steady.  Creep before leap.

6         And I take issue with Mr. Kilbourne's analysis that

7    he doesn't take that business plan into account here.  Those

8    are my main critiques of Kilbourne's Perfect Snacks.

9    Q.    Thank you, Mr. Lyon.  Your Honor, I have no further

10   questions.

11        THE COURT:  Thank you, Mr. Amani.

12        Ms. White, you may cross examine.

13        MR. LYON:  Your Honor, could I just go grab a drink

14   of water quickly?

15        THE COURT:  Sure.

16        MR. LYON:  Would that be okay?  I apologize.  Thank

17   you.

18        Good morning, Mrs. White.

19                        CROSS EXAMINATION

20   BY MS. WHITE:

21   Q.    Good morning Mr. Lyon.  I would like to start with

22   a few questions about your background and experience.  It

23   looks like from your CV that you have a lot of experience as

24   a Chapter 11 trustee; is that right?

25   A.    I do.

502

1  Q.        And as a receiver as well?

2  A.        More with Chapter 11 trustee, but I do have some

3  receiver experience.

4  Q.        And overall, you know, what percentage of your work

5  is as a receiver or a trustee?

6  A.        Today or ten years ago?

7  Q.        Let's start with over the past ten years.

8  A.        A receiver versus a trustee, I would say 90 percent

9  is Chapter 11 trustee and 10 percent as receiver.

10 Q.        Okay.  How about anything other than those two

11 categories?

12 A.        Yes.  That's probably maybe 20 percent or 25

13 percent of my work during those ten years.

14 Q.        And let me just narrow that question a little bit.

15 What about your work as an expert witness?

16 A.        During the last --

17 Q.        How much of it is -- and I apologize.  I paused.  I

18 try to pace myself, as I have been training myself out of

19 speaking too quickly.  Let me state the question this way.

20 I'm interested in the combination of receiver and trustee

21 versus non-bankruptcy work, essentially.  In the past ten

22 years, in your work as an expert witness, what proportion of

23 that work has been in the receivership or trustee or other

24 bankruptcy type work?

25 A.        If you will let me maybe phrase it a little bit

503

1    differently so we can -- this is always a dance.  It's even

2    harder when we're not face-to-face, right?  So my bankruptcy

3    trustee work is comprised of two areas.  One, sitting as a

4    formal Chapter -- being appointed as a formal Chapter 11

5    trustee.  Two, advising companies, as an advisor, that are

6    in bankruptcy.  That portion of my work, probably 50-ish

7    percent.  The other 50 percent, I would say, maybe a

8    quarter, 20 percent, is in what I'll call the litigation

9    expert testimony outside of bankruptcy category and then

10   sitting on boards of directors.

11          Over the last five years, my practice has shifted

12   more to sitting on boards.  I have sat on about 30 different

13   boards of directors now over the last ten years.  That's

14   accelerated over the last five years.  And then there was a

15   large time where I was the financial advisor to the

16   Government of the Bahamas with the Bahamian Prime Minister.

17   That would have been in the '04, '05, '06 time frame, and

18   that took up a large majority of my time.

19   Q.      Well, maybe -- maybe I can just get at it this way.

20   I'm trying to sort out how much work you have done as a --

21   well, as an expert witness, and let's even just say as a

22   consultant in litigation that does not involve bankruptcy in

23   any way.

24   A.      It's 20 to 30 percent of my time over the last

25   years.

504

1    Q.        Okay.

2    A.        Now, if you were to rewind before ten years ago,

3    that number would be greater.

4    Q.        Oh.  Now, I see, from your report that you have

5    experience in a wide range of industries.  And you've, you

6    know, identified at least in the trustee/receivership

7    experience about 14 different matters; is that right?

8    A.        That seems about right.

9    Q.        And am I understanding that just is capturing the

10   last ten years, right?

11   A.        I think my CV goes back to 2008.  I'm not sure what

12   one you're looking at.

13   Q.        So, and that looks like real estate.  I think you

14   mentioned a REIT earlier that you worked with, hospitals,

15   hotel industry, defense contractors, golf, mortgage.  Did I

16   miss anything?

17   A.        I think there's a manufacturing client in there.

18   Once again, I don't know if that was ten years ago or 12

19   years ago, but --

20   Q.        Okay.  Were all --

21   A.        This is all Chapter 11 trustee section now, right.

22   Q.        Correct.  Because I appreciate there's different

23   sections in your report, and it's a little confusing the way

24   things are set out?

25   A.        In my CV or my report.

505

1   Q.      In your CV.

2   A.      Thank you.

3   Q.      So those are all going to be high value companies

4   in financial distress, right?

5   A.      For the most part.

6   Q.      Was there anything in the retail food industry in

7   that experience?

8   A.      No.  That's in the consulting side that we talked

9   about before.  I do sit on the board currently of a

10  restaurant chain based in California.  And I also sit on a

11  large private equity firm out of New York where they are

12  looking at potential acquisitions in the food and beverage

13  and retail, food retail business.  And we have weekly calls,

14  and we review potential deals, and I -- I assist them in

15  evaluating whether they want to invest in those or not.

16  Q.      Okay.  So, at this point -- and so those are your

17  recent engagements, right?

18  A.      The current engagements, yes.  Those are current

19  engagements.

20  Q.      All right.

21  A.      Currently I am chairman of the board of a

22  restaurant chain, and I also serve as an advisor to a

23  private equity firm in trying to decide if they are going to

24  invest in food-related businesses.

25  Q.      Okay.  And prior to those two experiences, what

506

1  other experience did you have in the food industry?

2  A.      Oh, a couple.  I've been quite active in the

3  grocery store business as an advisor in helping a -- it's

4  probably four or five grocery stores I've worked with, both

5  in helping them improve their operations and finding

6  capital.  Luckily we kept them out of bankruptcy.  And then

7  I have been quite active in what we call the SBA health

8  beauty segment.  You would call it the drug store business,

9  like a CVS or a Wal-Mart -- sorry -- CVS or a Walgreens

10 where they also have a front-end component that deals with

11 what you normally see in a CVS, cosmetics, snacks, pop, that

12 sort of thing.  And I've worked with both franchisees and

13 franchisors in that industry.

14 Q.      So, when you're describing things like grocery

15 stores and drug stores, that's sort of like the retailers,

16 right?

17 A.      Yes, different segments but in the retail market.

18 So I understand shelf space, slotting allowances,

19 planograms, end caps, all the things that I think

20 Mr. Lindley would smile as we're talking about, how someone

21 gets placed into those types of channels.

22 Q.      And the work that you have done for them, that's

23 been in the past ten years?

24 A.      The -- the health and beauty aid was primarily in

25 around 1999 to 2002.  The grocery business probably was --

507

1    the last grocery business I want to say was maybe five years

2    ago, so five years ago and later.

3    Q.       And what type of work did you do for them, again,

4    because I'm trying to find them on your CV.

5    A.       Well, they may not be on my CV because they weren't

6    officially a case.  What you see on my CV are primarily

7    cases because you'll see the cites.  And so not all of my

8    non-cited work is on my CV.

9    Q.       Okay.  Okay.  So now we're describing really other

10   background experience you have, but not in the context of

11   serving as an expert witness, right?

12   A.       That's correct.

13   Q.       Okay.  So how about as an expert witness?   How

14   many times have you been retained as an expert for a company

15   in the food industry?

16   A.       In the food industry where I'm testifying?  I

17   testified as an advisor in the bankruptcies of a couple of

18   food industries back in the 2000's.  That was primarily some

19   of those franchisees that we talked about in the health and

20   beauty world.  I've testified in a meat packing company, but

21   that would have been about 12 years ago.  That's what I'm

22   remembering off the top of my head.

23   Q.       Okay.  Now, with regard to your experience as an

24   expert witness, I see from your CV a number of examples of

25   testifying in Bankruptcy Courts regarding liquidations and

1    feasibility; is that right?

2    A.       That's correct.

3    Q.       Okay.  And do you have a sense of the number of

4    times you've testified as an expert witness or served as an

5    expert witness in a case that involves a company that's not

6    in financial distress?

7    A.       Six to eight, but not all of those got to trial.

8    That's probably not right.  That's probably low.  It's

9    probably closer to, well, eight to ten.

10   Q.       Sounds like less than ten?

11   A.       There are a couple -- you know, the most recent one

12   was a lost profits analysis or damage analysis on two

13   different bank loans.  Those are two different cases, so

14   they had similar fact patterns, so is that one or is that

15   two?  So you --

16   Q.       And thank you.  You answered one of the questions I

17   was going to ask you was about the bank loan case.  The best

18   I can tell is I can only see a few where you've testified on

19   damages at all.  So how many times have you testified

20   regarding damages?

21   A.       Eight to ten.

22   Q.       Okay.  So anything that's not bankruptcy that you

23   have done has been about damages?

24   A.       Damages or lost profits, yes, I think.  This is

25   just off the top of my head.  That would seem right.

509

1   Q.        Can you point me to any of those in your CV?

2   A.        I don't have it in front of me, and they may --

3   like I said, my workload has shifted over the last ten

4   years, right?  We're talking about things that might have

5   been about 15 years ago, so they might not be in my CV

6   because my CV cuts off.

7   Q.        Okay.  Okay.  So, would these -- would these

8   matters six, eight, ten, where you have been retained as an

9   expert to testify on damages, you said that -- have any of

10  them involved intellectual property in particular?

11  A.        Yes.

12  Q.        Damages as a result of the use or misuse of

13  intellectual property?

14  A.        Correct.

15  Q.        Okay.  How many?

16  A.        Well, I can specifically when -- remember one

17  involving Microsoft, where a client had hired me who was --

18  felt they had been breached.  They provided the spell

19  checkers for Microsoft in different languages, and they had

20  a licensing agreement with Microsoft, and they felt

21  Microsoft had breached that and owed them money.  And if you

22  want to know what Mr. Bill Gates' office looks like, it's

23  pretty small.

24  Q.        I've met Mr. Bill Gates.  I know.  Okay.  Now, how

25  would you describe the methodology that you employed to

1  reach your conclusions regarding the viability of MFGPC's

2  operations?

3  A.      Okay, well, I didn't really opine, necessarily, on

4  the viability.  What I opined on was any potential lost

5  profits.

6  Q.      But I thought part of your opinion was that they

7  weren't able to achieve the sales necessary for the lost

8  profits that were projected, correct?

9  A.      So is that we're talking about viability?  Is that

10 with what you mean by viability?

11 Q.      Yes.

12 A.      Okay.  So --

13 Q.      I --

14 A.      Please.

15 Q.      Go ahead.

16 A.      No.  Please.

17 Q.      No.  I was -- I was using language that you had

18 used in your report, and concepts that you had set forth in

19 your report.  I realize you might have adjusted them now as

20 a result of testimony, but I'd like you to explain the

21 methodology used to reach the conclusion that MFGPC is not

22 capable of achieving the revenues that are projected by

23 Mr. Kilbourne.

24 A.      Okay.  So there's a couple of components.  The

25 first component was Mr. Lindley's own testimony, which said,

1    again, per deposition transcript, and we can go back and

2    read it in my report if you want to.  He was unwilling to do

3    it or, from what I have heard over the last couple of days,

4    he was unable to do it.  He needed third-party capital or,

5    from what we have heard over the last couple of days, he was

6    unwilling to do it, so that led me to believe, okay, then

7    third-party capital would need come into this business.

8           When I looked at the operating performance and the

9    EBITDA numbers, I realized, based upon what I do everyday

10   now, that a bank loan was not going to be realistic here.

11   There would not be any interest coverage based upon -- in

12   certain years, based upon what I was seeing and that, when a

13   bank would go through a due diligence process, in my opinion

14   they would have an issue about whether or not that license

15   was truly evergreen.  That would be of concern to them.

16   Q.     Okay.  Can I stop you right there.  That second

17   answer you said about analyzing the EBITDA and concluding

18   that a bank loan would not be feasible?

19   A.     Uh-huh.

20   Q.     Could you point me to where, in your report, you

21   explained that?

22   A.     I don't.  That's because I didn't.  I didn't take

23   that into account because of how I wrote my report.  All

24   right?  I wasn't asked to ascertain what amount of capital

25   was needed.  You asked me what I thought about, and that's

1  what I was trying to answer.

2  Q.      Okay.  So, Your Honor, I move to strike the second

3  part of his first response.  It has not been disclosed in

4  the report.  It was not part of the opinion that he was

5  originally asked to render.  It's now a new opinion being

6  offered at trial.

7          THE COURT:  The motion is denied.  It goes to

8  weight.

9  Q.      BY MS. WHITE:  All right.  So, Mr. Lyon, so now you

10  have now done additional analysis and you've determined that

11  based on the EBITDA for MFGPC, that you don't think they

12  could qualify for a bank loan in 2014; is that right?

13  A.      That's correct.

14  Q.      Okay.  Okay.  And I know I stopped you in the

15  middle of your answer, but I'd like to go back and ask my

16  question again because I wasn't asking about the information

17  that you relied on to reach your conclusion.  I was asking

18  about the methodology that you employed, and I was wondering

19  if you could explain that to me?

20  A.      So, I was trying to answer your question, which I

21  understood was predecessing, you were focused on viability

22  and whether or not sales numbers could be hit.  That's my

23  understanding of the premise of your question.  Is that

24  correct.

25  Q.      Yes, and the methodology you employed to reach your

1   conclusion.

2   A.      Okay, and specifically we're talking about the

3   numbers that Mr. Kilbourne has put forward, correct?

4   Q.      That's correct.

5   A.      Okay.  So -- so, let's maybe back up a little bit.

6   From a 2014 level, actual sales level of 207,000, if you're

7   okay, I'm just going to round to 200,000 just so it makes it

8   easier.  Going from 200,000 to, in one case, in 2 1/2 years

9   to 3.6 million, okay?  That's an 18 times increase.  That

10  magnitude of sales would require additional capital.  Did

11  you have a question?

12  Q.      And what methodology did you use to reach that

13  conclusion?

14  A.      My experience of 34 years in this business of

15  running thousands of projections, of sitting through

16  hundreds of board-of-director meetings, of being an expert

17  witness in bankruptcy 30 to 40 times, plus it's just --

18  Q.      Now, I --

19  A.      -- common sense.

20  Q.      I'm sorry, I don't mean to cut you off.

21  A.      I apologize if I cut you off.

22  Q.      Now, I know that you just mentioned that you

23  testified in Bankruptcy Court 30 or 40 times, and I think

24  you actually slipped and referred to MFGPC as the debtor at

25  some point in your testimony; is that right?

514

```
1    A.        If I say debtor, I meant defendant because that's
2    how I describe -- that's how they are kind of listed.
3    Correct.  If I said debtor, I would mean defendant.  I
4    apologize.  You say bankruptcy, and my mind goes to debtor.
5    Q.        Well, when you are testifying, perhaps your mind
6    goes to debtor, where you have spent a lot of time.  All
7    right.
8            I'd like to turn to some of the data I know that
9    you started talking about a little bit.  I will be asking
10   you more questions about it.  So, your opinion, you've got
11   it set up in your report as, in part, you based on
12   historical results.  And I understand you've now modified
13   your opinion a bit as a result of testimony at trial, but
14   when you first went in -- and I'm assuming this is still
15   true, you relied primarily on financial statements from
16   what, January, 2009, through what, December of 2015?  That
17   was what was in your report.
18   A.        I'm going to take a little bit of exception with
19   your word "rely," and I'm not trying to nitpick you, I'm
20   just trying to make sure we're on the same page.  I didn't
21   rely on anything in 2015, and I talked about that in my
22   direct.  Okay.
23           Yes, I have a column, and maybe if my report were
24   up, it might be easier, but I think it's on page 7.  I have
25   a column that has 2015 just because I had those results.  I
```

515

1  just put them in the spreadsheet.  But primarily I'm working

2  in the years '09 through 2012, yes, because that's the --

3  like we've talked about, it seemed to be the stabilization

4  time period.  That's why it's plateauing around that

5  $600,000 level.

6  Q.      So -- because I was going to ask you something.

7  Why did your start back in 2009?

8  A.      Because I wanted to see what the year right before

9  the plateau year looked like.

10 Q.      Okay.  So you went in and you looked at the

11 financials, and you concluded that there was a plateau year,

12 and then you added one year before as, what, a comparison

13 point?

14 A.      Not only looking at the financials but reading

15 Mr. Lindley's deposition transcript, that it appeared that

16 what he was saying in his deposition was financially playing

17 out in his numbers, for lack of a better way to say it, in

18 terms of reaching a level and saying:  I'm not willing or

19 can't -- we went through that whole semantical debate --

20 putting more money in to go to the next step.

21         And that appears to be at about a $600,000 level.

22 So I wanted to see, okay, what did the year prior to that

23 look like?  I wanted to see what kind of growth he was

24 experiencing between '09 and '10 from this standpoint.

25 Q.      And what did you see?

516

1    A.        It might be helpful if we put my report up, but if

2    you want me to answer off the top of my head, I can.

3    Q.        No.  No.  No.  No.

4    A.        Okay.  So, in '09 I see approximately $480,000 in

5    sales, right?  And then he goes up by about a hundred

6    thousand to 575.  And then I start to see the plateau.

7    Q.        And you know that there was a fire in 2013, in 2013

8    at one of MFGPC's co-packers, right?

9    A.        I do.

10   Q.        Okay.  And you observed in your report, after all,

11   that that fire materially impacted operations in 2013?

12   A.        Correct.

13   Q.        Okay.  But you're still concluding that -- that --

14   that 2012 was the plateau, despite the fact that we just

15   don't know what would have happened in 2013; is that right?

16   A.        Correct.  I'm just looking at actual numbers, not

17   making any hypothetical adjustments.  I'm just saying, these

18   are the actual numbers.

19   Q.        Now, in -- so -- so I -- I don't know if you will

20   notice this off the cuff.  You're a numbers guy.  Maybe you

21   will.  What's the average growth rate if you include 2009 in

22   your calculation, 2009 through 2012?

23   A.        I don't know it off the top of my head.  But I

24   can -- we can kind of guesstimate it, if you'd like.  I mean

25   you grew.

```
1    Q.       I --

2    A.       Go ahead.

3    Q.       I took a shot at it and it looks like it was 8

4    percent.

5    A.       Is that saying from '09 through '12?

6    Q.       Yes.

7    A.       Yeah.  I mean, if you're still in the growth mode.

8    I don't dispute that that may be the number.  But that's not

9    what I'm trying to say in my report.  I'm saying, after

10   you've plateaued, you grew at an inflationary rate.  So, you

11   know, every business, hopefully, has a stage, right?  You're

12   growing, where you should have higher than inflation growth

13   rates.  You're investing into that company to do it, similar

14   to what Mr. Lindley said he has done, right?  He was

15   investing into it to get it to a stage where he wants to try

16   to take it to the next level.

17           Well, 2009 appeared to be, from the actual results,

18   still in that growth mode, and in about 2010 he hit that.

19   He hit that move to the stabilization mode until you have

20   another round of financing to -- I think his kind of meme

21   was boost off or go into space or hit orbital.  So, I don't

22   think it's appropriate to say, what's the growth rate from

23   2009 to '12 because you've crossed now life segments in a

24   business.  And what I'm trying to say is, once he hit the

25   stabilization level, 2010, actual numbers are, he grew at
```

518

1    inflationary rates.

2    Q.        And you are concluding that it was the

3    stabilization level based on testimony you've heard at

4    trial; is that correct?

5    A.        Two things.  Testimony -- three things.  Testimony

6    at deposition, testimony at trial, and the actual numbers

7    that I'm seeing in the 2010 through 2012 sample -- time

8    frame.  That's the whole keeping it warm that was discussed

9    on Monday.

10   Q.        And -- and just to be clear, you don't know what

11   would have happened in 2013 if he hadn't had the fire,

12   right?

13   A.        I don't think anybody does.  I don't think

14   Mr. Lindley does.  I don't think anybody does.

15   Q.        Right.

16   A.        But I do think, based on actual results in '10, '11

17   and '12 that if he didn't have additional funds from some

18   sort, he couldn't materially grow -- let's be careful about

19   what I'm about to say -- consistent with what Mr. Kilbourne

20   is saying, right?  I'm not saying he couldn't nominally

21   grow.  I'm not saying he couldn't have grown to $620.  I'm

22   not saying that.  I'm taking at issue at the numbers that

23   Mr. Kilbourne has in his analysis.

24            I mean, we hear over and over again from

25   Mr. Lindley, slow and steady.  Creep before you leap, and

1    the numbers reflect that.

2    Q.        And I assume you're going to employ the same --

3    well, actually, I won't make that assumption.  I want to

4    talk a little bit now about your calculation of the gross

5    margin for MFGPC.

6    A.        Okay.

7    Q.        And first we'll talk about the average growth

8    margin.  I'm now -- so, in your report before, you know, you

9    gave a, one of your early data points in your analysis was

10   you sort of summed up the losses, the EBITDA losses over,

11   you know, what, 2009 to 2012?

12   A.        Correct, as reported, right.  I'm just summing up

13   what was reported.

14   Q.        Right.  And so then when you were calculating the

15   growth rate, you just looked at 2010 through 2012; is that

16   right?

17   A.        Correct, unless there was another infusion of

18   capital that would allow the company to go forward at a

19   higher level, consistent with Mr. Lindley's, A, business

20   plan, and, B, testimony.

21   Q.        Now you didn't know about the testimony when you

22   originally came up with the (unintelligible) did you?

23   A.        Deposition testimony.

24   Q.        Just the deposition testimony.  Okay.  So then you

25   go in to calculate the average growth margin, and again you

1  dropped 2009.  I think I've heard your explanation of why.

2  And then you add in 2013 and 2014, which are the

3  fire-impacted years, as we know.

4  A.      I take a little exception to that.

5  Q.      Why did you do that?

6  A.      Okay.  So -- I'm sorry.  I cut you off.  My

7  apologies.

8  Q.      No.  No.  No.  You're fine.  Go ahead.

9  A.      Okay.  So -- might it be possible to put my report

10  up just so we can all see the numbers that I'm looking at.

11  Q.      Sure.

12  A.      There's the chart that's around Section 3.1,

13  probably around page 7 or 8, that range.

14  Q.      Is that what you're -- hold on.

15  A.      I think that would help this discussion, if that's

16  okay.  Yes.  Right there.  No.  You had it right there.

17  Okay.  So, I think the question was, gross margin and

18  exclusions, correct?

19  Q.      That's correct.  It's, why was it appropriate to

20  include 2013 and 2014 when calculating the gross margin for

21  the company and dropping 2009?

22  A.      Okay.  So let's take that question one at a time.

23  Point number 1.  I did not factor in the 2013 or 2014 into

24  the gross profit calculation.  I noted what they were, but

25  if you'll see under 2012, the actual gross profit was 17.5

521

1   percent.  That's what I used.  Oh, please don't move that.

2   Yes, right there.

3   Q.      I apologize?

4   A.      Okay.  You look at 20 -- now let's go to 2009.

5   That was 15.5 percent, lower than my 17.5 percent number.  I

6   did not include that.  My point is, starting in 2010, you

7   see 28.4 percent.  Then you see a decline.  Then you see

8   another decline.  Then you see a fourth decline, and then

9   you see a fifth decline in gross margin, the 9.2 and the 7.1

10  and the 2013 and 2014 levels.  I'll stop right there to make

11  sure you see that.

12  Q.      I do.

13  A.      Those are not included in my analysis in coming up

14  with the 17.5, but what they do do is support saying, okay,

15  what we did not see was a spike back up in gross margin, and

16  what I learned in the last couple of days, through

17  Mr. Lindley's deposition testimony, that at least in 2014,

18  that 7.1 percent margin was primarily a factor of commodity

19  prices going up, and that was the reason he, quote,

20  throttled his sales back to 200,000.

21          So, as I look at this, I say:  Okay.  I see

22  decline, I see decline, I see decline.  I then continue to

23  see decline after the fire.  And now I have understanding

24  that in 2014, Mr. Lindley, A, was still involved full time,

25  so it's not like this margin went away because somebody

1    wasn't at the helm; and, B, that he was experiencing

2    commodity input price issues, or the industry was, and that

3    drove that margin down.  Again, I didn't use the 7.1

4    directly, I used it as a support for my 17.5 percent number.

5    That trend continued.

6    Q.       Right.  That trend continued during a year in which

7    there was a fire and he lost a lot of inventory?

8    A.       Okay.  But let's talk -- that wouldn't necessarily

9    go into a gross profit calculation.

10   Q.       I'm going to have to --

11   A.       I'm sorry.

12   Q.       I'm going to have to stop you there for a moment,

13   Mr. Lyon, I have a different question for you.

14   A.       Okay.

15   Q.       Did MFGPC have consistent growth margins over the

16   years?

17   A.       No.  They were up and down.

18   Q.       Do you remember what some of those were?

19   A.       I remember seeing a chart from Mr. Kilbourne.  I

20   think you might have presented a demonstrative exhibit on

21   Monday or Tuesday.  I saw one that was in the 4 percent

22   range and one that was in up to 40 percent range, but you're

23   in the growth mode then, right?  You're probably still

24   tinkering around with how you're sourcing contracts and what

25   works and what doesn't work, and do you have to take things

523

1    back and so forth.  But once you're in the --

2    Q.      Did you -- did you hear any testimony at trial

3    about that --

4    A.      No.  You're asking me.

5    Q.      -- or is that just speculation on your part about

6    why those margins were going up and down over the years?

7    A.      It's speculation.  I thought that's what you were

8    asking me.  I apologize if I misunderstood your question.

9    Q.      No.  I was just asking you if you were aware of the

10   high variability?

11   A.      Oh, I'm sorry.  Yes.

12   Q.      So, for example, in 2005, MFGPC's --

13   A.      This is what I was thinking.

14   Q.      -- growth.  Right.  Was 44 percent.  Then it

15   dropped down to 7 percent in 2006, right?

16   A.      Correct.

17   Q.      Then it goes to 35 percent and then down to 16

18   percent or so?

19   A.      Uh-huh.

20   Q.      But at the end of the day, I do understand that you

21   chose one year's growth margin for your calculation; is that

22   correct?

23   A.      Yes and no.  And I don't mean to be evasive, so

24   maybe let me -- if you would let me expand, maybe I can

25   answer your question.

524

1   Q.        Well, let's just be clear.  You state in your

2   report that you only had the year 2012, the 17.5 percent in

3   your analysis; is that correct?

4   A.        Correct.  But it also says it's supported by many

5   things, right?

6   Q.        I understand.  I understand.

7   A.        Right?

8   Q.        I just want to make sure we were clear on that

9   first point, that you used one year, just 2012.

10  A.        I used the actual -- yes, the actual results that

11  were achieved in 2012, but I then went on to look at whether

12  or not that was reasonable, right?  I just didn't blindly

13  say:  Okay, why don't I just choose the last year.

14  Q.        Okay.

15  A.        There was more methodology behind that choice than

16  just blindly taking the last year.  That's the point I was

17  trying to make.

18  Q.        And the reason you thought -- the reason you

19  thought it was reasonable is because there were declines

20  subsequent to that?

21  A.        Two things.  I mean, let's look at this chart

22  because I think it helps illustrate why I did what I did.

23  From 2003 -- let's just kind of walk it through together.

24  Down.  Right, 35 to 29 percent?  Up.  Down.  Up.  Up.  Down.

25  Up.  Down.  Down, the first year we've seen consecutive down

525

1    years.  Something is changing here because we're seeing now,

2    other than what we saw before, we're seeing consecutive down

3    years.  We continued to see those down years in 2013 and

4    2014.

5            And I appreciate there was a fire, but what we

6    heard from Mr. Lindley in 2014 is his margin compression --

7    let me be careful.  I don't want to misstate him, but the

8    reason he throttled growth is because he was having pressure

9    from commodity prices.  That has nothing to do with the

10   fire.

11   Q.        So.  It's your understanding that -- you heard

12   Mr. Lindley testifying that the only reason he had low

13   margins in 2014 was because of commodity pricing?

14   A.        No.  I never said only.  All I remember is that he

15   said he throttled -- the discussion, as I remember it --

16   and -- if you want to pull up Exhibit 55 -- we can, is that

17   Exhibit 55 was on the screen, and in 2014, he had lost

18   $22,000, and his gross margin was 7-ish percent.  And

19   Mr. Amani was asking him, gross profit margin, gross margin

20   was about 7 percent, maybe 7.1 -- you can pull it up if you

21   want -- and at that level, and at a $200,000 sales level,

22   there was a $22,000 loss, and that Mr. Lindley said:  I

23   purposely throttled my sales because had I had sales of

24   600,000 -- again, back to that stabilization level -- his

25   losses would have been three times the 22,000 number or

1  $66,000.

2        That's what he said.  He then went on to explain in

3  that whole discussion -- I don't know the sequence

4  exactly -- that one of the reasons his sales were throttled

5  was because there were higher commodity prices.

6  Q.    Okay.  So it was one of the reasons, but it wasn't

7  the only reason, right?

8  A.    I don't know.  It's the only reason I saw in his --

9  that I'm remembering in his deposition.  We can check the

10  transcript.

11  Q.    Okay.  So then -- but you also heard him testify

12  that commodity pricing was always an issue with his margin,

13  right?

14  A.    Right.  He said priced --

15  Q.    Right?

16  A.    He said --

17  Q.    So this was something that was constantly an issue

18  for his company and explained the wide variability of his

19  gross margins over the years, right?

20  A.    It could.  But now we have had five consecutive

21  years of gross margin decline.  And the issue I have with

22  Mr. Kilbourne is, if I am looking at that, I need to be able

23  to say or justify in my mind, why am I continuing to see

24  gross margin decline, and why are those declines so much

25  greater than what I am projecting at, at 25 percent?  You

527

1    have to do that.

2    Q.      Okay.  And I understand.  I understand that you

3    find that the two years, including the fire and subsequent

4    to the fire to be helpful to your analysis.  I'm asking,

5    though, do you also recall that he explained that the mix of

6    goods in any given year had an impact on his gross margins?

7    A.      It could, but the actual --

8    Q.      My question, Mr. Lyon, was, do you recall him

9    saying that?

10   A.      Okay.  So ask the question again.

11   Q.      Do you recall Mr. Lindley testifying that the mix

12   of products in any given year also had an impact on his

13   gross margins?

14   A.      It could.  Yes.

15   Q.      No.  No.  I guess -- I'm sorry.  I'm asking you if

16   you heard it.  I'm not asking your opinion about it.

17   A.      That's what I thought you were asking.  I did hear

18   that.

19   Q.      Okay.  Okay.  So you understand that there were at

20   least two different reasons why his gross margins changed

21   over the years with such variability, correct?

22   A.      That could have caused the change, yes.  That's how

23   I would say it.  Yes.  There are lots of --

24   Q.      I'm --

25   A.      There are lots of variables that can change that.

528

1    Q.       Okay.

2    A.       You can --

3    Q.       And do you have -- there is no question pending

4    yet.

5    A.       I thought I was answering.  Okay.

6    Q.       Do you have any understanding of material changes

7    in either commodity pricing or the mix of products that

8    would somehow lead to a continuing decline in Mr. Lyon's

9    gross margin?

10   A.       Mr. Lindley's margin?

11   Q.       Yes, Mr. Lindley's.  The L's will confuse me today.

12   I can already tell.

13   A.       It's the whole debtor/defendant thing.  I get it.

14   Other than Mr. Lindley's testimony and the actual results

15   that I saw, no.

16   Q.       Okay.  So that's helpful because one of the things

17   that I wanted -- that I was going to ask next was, did you

18   look at anything other than the financial records and, you

19   know, obviously the deposition before the trial and the

20   testimony at trial?

21   A.       That would be the -- and there's some emails,

22   right, going forward, some of the business records that I

23   had already said I reviewed.  I think I already said what I

24   reviewed, right, earlier on.  It's that universe of

25   information.  That would be what I reviewed to come up with

1    my view.

2    Q.        Okay.

3    A.        Coupled with my years of experience in doing

4    projections that say, if you're going to deviate from actual

5    results, you better explain why you're doing it because if

6    you don't, it brings up the question, why are we having this

7    problem?  Why is the margin declining versus the Delta from

8    what you're saying my average should be?  That needs to be

9    explained.

10   Q.        Mr. Lyon, there is no question pending.

11   A.        Well, I was continuing to answer your question, I

12   thought.

13   Q.        So, Mr. Lyon, I know that you've been sitting here

14   through trial and listening to the testimony everyday.  Is

15   that right?

16   A.        Yes, ma'am.

17   Q.        And when you did your original report, you were

18   paid a flat fee of 25,000, right?

19   A.        Correct.

20   Q.        Okay.  And now you're being paid 675 an hour to sit

21   through this trial?

22   A.        That's correct.

23   Q.        Okay.  And obviously you have been listening to the

24   testimony, and to the extent it has changed your opinion,

25   you have tried to articulate that; is that right?

530

1    A.        Correct.

2    Q.        All right.  And so, you heard Mr. Lindley testify

3    that he was intentionally moderating the growth of his

4    company, correct?

5    A.        Throttling was the word that I heard.

6    Q.        All right.  And you heard him testify that he could

7    take on debt to capitalize the company?

8    A.        I heard Mrs. Lindley say that they might be able

9    to.  I don't remember.  Maybe I mis -- I'm not remembering

10   correctly Mr. Lindley saying that.  They didn't do that,

11   but --

12   Q.        Right.  Right.  I mean, it's pretty apparent from

13   your opinion that it's important that none of this actually

14   happened.  Do you believe they could have taken on debt to

15   capitalize the company?

16   A.        At what time?

17   Q.        At any time.  Let's start there.

18   A.        Okay.  So let's break it down.  In the early growth

19   years, no, because they were running larger losses.  In

20   the -- what I'll call the stabilization year, from 2010

21   through 2012, I still don't believe that.  We kind of talked

22   about this.  You shut me down on it, but we can talk about

23   it now.  Their EBITDA was either zero, darn close to zero or

24   negative.  Banks look at EBITDA from a coverage ratio

25   standpoint in deciding whether to lend loans.  Sometimes

531

1    banks will lend loans on an asset-based level based on

2    inventory, but there is nominal inventory here.  That's his

3    business model.  So I do not believe he could have had an

4    asset-based lender come in.  I do not believe he could have

5    a term lender come in because he doesn't have EBITDA.

6            So -- and then, after 2013, no, not after the

7    fire and the resulting actual sales decline.  So, as I look

8    at all three segments of the time frame, I do not believe he

9    could have had a bank loan.

10   Q.      Okay.  So he and Mrs. Lindley are wrong in your

11   opinion; is that correct?

12   A.      Well, wrong in what, that they could have gotten a

13   bank loan?

14   Q.      Correct?

15   A.      And, again, we're talking over a long period, but,

16   yes, I would disagree.  I have been in that shoes.  I have

17   been asked to make those loans before.  They would not get

18   them.

19   Q.      What about getting trade credit with his

20   co-packers?

21   A.      Well, interesting question.  So if we go back to

22   the working capital discussion, because that's a working

23   capital item, right?  Mr. Lindley said that normally he gets

24   paid on a 60-day basis.  That's his accounts receivable, and

25   that his trade was 30 to 45 days.  And that Delta of 60 days

532

1   to 30 to 45 days is what's -- sorry.  Is what is creating

2   the working capital need.  Now companies can fill that,

3   right, but stretching vendors.  In theory, if I were to

4   match my account receivable collection day with my account

5   payable collection day, say they were both at 60, I would

6   have nominal working capital needs; maybe payroll, rent,

7   whatever, but pretty nominal from a working capital

8   standpoint.

9        But because he didn't have the same terms on the

10  collection side that he had on the payment side, that was

11  creating that gap.  And if sales are constant, you're not

12  going to have that much of a difference because you're not

13  moving on sales.  It's a relative question.  If I increase

14  sales, that's when I start to have to need working capital.

15       So, could he have stretched vendors?  Might have.

16  He's own testimony was that it was 30 to 45 days.  He didn't

17  want to stretch vendors, from what I heard his payment

18  history was.  But make no mistake, there are repercussions

19  when you stretch vendors.  There are.

20  Q.      So, but I -- so, I know that you are recalling

21  Mr. Lindley's testimony here, but do you recall the

22  testimony of Mr. Hornick and Mr. Scavitto yesterday that

23  they were open to longer terms, to sharing revenue with him

24  and to a variety of other possible relationships with him?

25  A.      I do.  And those are some of the consequences I'm

533

1    talking about if you start to stretch vendors.  It's not

2    free money.

3    Q.       I'm not asking whether it's free money.  I don't

4    think any of this is free money.

5    A.       You're asking -- I'm sorry.

6    Q.       No.  I'm just asking if there were options

7    available to him and if you heard the testimony regarding

8    one of those options?

9    A.       I did, and there probably were options available to

10   him.  My point is, those options come with a price, and

11   that, quote, price, is not in these numbers.  You mentioned

12   yourself revenue sharing.  If they have to share revenue,

13   that means there's less revenue going to Mr. Lindley's

14   company.  That's the consequence or a consequence of using

15   your vendors to fund your working capital needs.

16   Q.       Do you recall Mrs. Lindley testifying today that

17   they could have put another $250,000 into the company if

18   they wanted to, if they didn't have to use it on legal fees?

19   A.       I did.

20   Q.       So that's another option for capital for them

21   that's available, correct?

22   A.       It's available, but Mr. Lindley's testimony was he

23   wasn't willing to do that.

24   Q.       Are you sure that's what Mr. Lindley's testimony

25   was?

1  A.      Well, I remember two things, okay?  And I took a

2  note.  If you'd let me refer to my notes, it might help, but

3  I don't know if that's objectionable to you.

4          THE COURT:  Do you want him to refer to his notes?

5  Q.      BY MS. WHITE:  I'd rather you just tell me your

6  best recollection?

7          THE COURT:  Best recollection.

8          MR. LYON:  Best recollection, both the last couple

9  of days, was that he was not willing to put more of his

10  money in.  He didn't want to dip more into his 401(k).  For

11  deposition testimony, which we cited a minute ago -- not a

12  minute ago, an hour ago, he said he wasn't able to fund

13  additional growth.  We can look at my report to get the

14  exact transcript from the deposition.  We read it an hour

15  ago, about that he needed outside capital.

16         THE COURT:  I think we've talked about this two or

17  three times.

18         MR. LYON:  Kind of ad nauseam, Your Honor, I agree.

19  Q.      BY MS. WHITE:  A little beyond the scope of some of

20  my questions, but I understand you want to try to provide a

21  full response.  And did you -- you also heard testimony from

22  Mr. Lindley that they did have cash reserves to cover

23  moderate growth, right?

24  A.      Correct.  Moderate growth.

25  Q.      Okay.

535

1   A.        And I don't disagree with that.  Moderate growth is

2   inflation growth type to me.

3   Q.        Yeah.  I didn't ask you whether or not you agreed

4   with that.  I have a different question.

5             THE COURT:  Just answer the question, Mr. Lyon, and

6   we might go a little faster.

7             MR. LYON:  I will do my better -- I will do better,

8   Your Honor.

9   Q.        BY MS. WHITE:  What's your definition of moderate

10  growth?

11  A.        What industry -- for this company?  Would be at or

12  a little above inflation.

13  Q.        And what would be your definition of explosive

14  growth?

15  A.        Levels that Mr. Kilbourne is projecting.

16  Q.        Okay.  So, reaching 1.5 million in revenues by 2017

17  would be explosive growth?

18  A.        Off of a base of 200,000 in 2014, yes.

19  Q.        How about off of a base of 600,000?

20  A.        So that would be -- your number was 1.05?

21  Q.        1.5.

22  A.        1.5 in a two-ish year time period, so 2.5X growth?

23  Yes.  That would be explosive.

24  Q.        Okay.  What about from 600 to 1.5 over a five-year

25  period?

536

1    A.        Getting a little closer to moderate growth.

2    Q.        Okay.  So that's -- you know, so five years, 600 to

3    1.5, that's moderate?

4              MR. AMANI:  Objection, Your Honor.

5              THE COURT:  He said it was getting closer to

6    moderate is what he said.

7              MS. WHITE:  Okay.  Closer to moderate.

8              MR. AMANI:  I have a larger objection, Your Honor.

9    I have no idea where this is going, moderate.

10             THE COURT:  Pardon me?

11             MR. AMANI:  The larger objection that I don't see

12   the relevance of any of this.  We have been at it for

13   awhile.  I don't see that it's relevant, the definition of

14   moderate versus explosive.

15             THE COURT:  Well, that objection is overruled.

16             MR. LYON:  And, Ms. White, I heard 1.05, 600,000 to

17   1.05.  If I misheard, and you're asking me 600,000 to 1.5,

18   that's more than moderate.

19   Q.        BY MS. WHITE:  Okay.  Well my reference points are

20   the numbers in Mr. Kilbourne's report.  So I was trying to

21   say 1.5.

22   A.        If you're asking me from 600 to 1.5 million in a

23   two-year time frame, that is more than moderate growth.

24   Q.        Understood.  How about from 600 to 1.5 million in a

25   five-year time frame?

1   A.        So, that would be approximately 15 percent growth,

2   five years, 1.5.  You're probably at about a 15 to 16

3   percent growth rate there, off the top of my head.  That's

4   more than moderate.

5   Q.        But 17.5 percent is the growth rate that you

6   chose -- no.  That was your gross margin?

7   A.        Correct.

8   Q.        You liked inflation.

9            THE COURT:  How much more time do you need with

10  this witness, Ms. White?

11           MS. WHITE:  Probably another half hour or so.  Your

12  Honor, to be frank, there have been some shifts in his

13  opinion testimony and so I'm just trying to respond on the

14  fly.  So I was going to ask when you wanted to take a break,

15  if we wanted to try to drive on through before the break.

16           THE COURT:  Well, we'll take a break.

17           How many more witnesses are you going to call,

18  Mr. Amani?

19           MR. AMANI:  Subject to whatever Mr. Lyon has to say

20  still, none.

21           THE COURT:  All right.  Let's be in recess until

22  12:30 mountain time and then try to get that done in a half

23  hour or less.  Now, let me ask you another question.  Are

24  you going to put on any rebuttal?  I'm no fan of rebuttal if

25  that helps you make your decision.  I don't hear any answer

538

1    at all.

2         MS. WHITE:  At this point we're not planning on it,

3    Your Honor.

4         THE COURT:  Are you planning on closing arguments

5    or would you rather include that in whatever you submit by

6    way of amending your proposed findings and conclusions?

7         MR. AMANI:  You know I would --

8         MS. WHITE:  You know, Your Honor -- you go ahead,

9    Bijan.  You started first.

10         MR. AMANI:  I was going to say, I would prefer to

11    be able to read this transcript because there has been a lot

12    of back and forth about what certain people had to say;

13    Mr. Lindley, of course, being the principal one.  I'd like

14    the opportunity to read it rather carefully.  And I was

15    going to suggest, Your Honor that we supplement and not

16    rewrite everything, but literally try judiciously to

17    supplement our findings of fact and conclusions of law with

18    citations.  And then, if it would be of help to Your Honor,

19    I would very much enjoy a back and forth session if that was

20    something that Your Honor felt would be constructive for the

21    Court.

22         THE COURT:  Ms. White?

23         MS. WHITE:  Well, Your Honor, we were planning on

24    closing arguments and are certainly not opposed to them.

25    So, if there is time and opportunity for them today, I think

1    we'd be interested.

2         THE COURT:  There is some merit to the suggestion

3    from Mr. Amani that that's after you've proposed -- submit

4    your amendments to proposed findings and conclusions.  Is

5    there any objection to that?

6         MS. WHITE:  So, is he suggesting that we do

7    amendments and then have closing arguments?

8         THE COURT:  Yes.

9         MS. WHITE:  Okay.  We'd be comfortable with that,

10   Your Honor.

11        THE COURT:  What about timing?

12        MR. AMANI:  That would depend on our court

13   reporters, Your Honor.  You know, we didn't ask for

14   expedited.  I did get an expedited of Mr. Lindley's last

15   night very kindly from one of the reporters.  But I could be

16   ready within two weeks of the transcript of the last three

17   days.

18        THE COURT:  Becky, give us an idea of when --

19   apparently they're going to order a transcript.

20        THE COURT REPORTER:  Well, I want to say 30 days

21   out, Judge.

22        THE COURT:  30 days?  Somebody told us they could

23   do it in a week, didn't they?

24        THE COURT REPORTER:  Two days' worth?

25        THE COURT:  Well, there's only -- I mean, we are

540

1   only talking about 2 1/2 days.

2          Elizabeth, did you talk to somebody about -- did

3   you talk to Patti about something about that?

4          MR. AMANI:  If I may, Your Honor, I spoke to Patti

5   last night, and Patti was kind enough to give me, this

6   morning, 125 pages of her day.  She said it was very rough.

7   I have to compliment her on rough because it was pretty

8   accurate to my thinking.  But she seems to have given me

9   what would be, by my guess, half the transcript of that day.

10         THE COURT:  Half the transcript from Monday?

11         MR. AMANI:  Yes.  I have pages 24 to 148.

12         THE COURT REPORTER:  I guess I could say two weeks

13  if absolutely necessary.

14         THE COURT:  Two weeks.  And then, a week after

15  that, you ought to be able to supplement and then we can

16  have the closing arguments.

17         MR. AMANI:  Thank you, Your Honor.

18         THE COURT:  All right.  We'll figure out the dates

19  later, and we'll see you about 12:30 mountain time for the

20  rest of the testimony.

21         MR. AMANI:  Thank you, Your Honor.

22         MS. WHITE:  Thank you, Your Honor.

23                       (Short break.)

24         MS. WHITE:  This is the best way for me to -- so I

25  had to get that reinstated.

541

1          THE COURT:  Are you okay now?

2          MS. WHITE:  I am if you can hear me.

3          THE COURT:  I can hear you.  We can hear you.  Go

4    ahead.

5          MS. WHITE:  Great.  Thank you, Your Honor.

6    Q.        BY MS. WHITE:  Mr. Lyon, you know, I think we'll be

7    able to only take a few more minutes here.  It's not going

8    to take too much longer at this rate.  Now, it appears

9    obviously you've been impressed by some of the testimony at

10   trial and that has changed some of your opinions, but I

11   would like to run through your report and just make sure I

12   understand what still stands.  So if you will -- can you see

13   that?

14   A.        Yes, ma'am.

15   Q.        Okay.  Great.  Now, in your report you opined that

16   the company could not grow sales, and you're referring to

17   MFGPC.  The company could not grow sales beyond 600,000 due

18   to lack of funding because it was undercapitalized is that

19   still your opinion?

20   A.        Yes, 600,000 being other than nominal sales that

21   we've talked about, being inflation type sales.

22   Q.        Okay.  And, originally, that opinion was based on

23   deposition testimony, correct?

24   A.        Correct.

25   Q.        And now it's based on deposition and trial

542

1    testimony, correct?

2    A.       Correct.

3    Q.       Okay.  Now, you also opined that the fire in

4    January, 2013, severely impacted the business; is that

5    right?

6    A.       Correct.

7    Q.       And is that still your opinion?

8    A.       Yes.

9    Q.       And you opined that, by July of 2014, the company

10   had no full-time employees; is that right?

11   A.       Correct.

12   Q.       Okay.  And is that still your opinion?

13   A.       Yes, with the caveat that I don't know what we're

14   calling Mr. Lindley, employee/owner.

15   Q.       Now, in reaching your conclusions -- apologies.  I

16   wanted to stop sharing for just a minute.  I mean, I'm

17   understanding now that your testimony is not that MFGPC was

18   going out of business; is that correct?

19   A.       In the 2014 stand frame -- time frame?

20   Q.       Correct.

21   A.       Correct.

22   Q.       Because you -- you stated in your report that they

23   were marginally viable before the fire, and after the fire

24   basically they were no longer viable.  That was what was in

25   your report, correct?

543

1    A.      Correct, now that I understand Mr. Lindley was not

2    leaving.

3    Q.      So, now, because Mr. Lindley is staying, you think

4    the business is still viable; is that correct?

5    A.      I think the business has marginal, if no

6    profitability.  So, viable?  Could it limp along with only

7    Mr. Lindley being employed and effectively having no

8    earnings?  Yes.  I think they could do that for 3 1/2 years.

9    Q.      And if I'm understanding your testimony now, your

10   biggest critique of Mr. Kilbourne's analysis is essentially

11   you believe that MFGPC could never achieve the projected

12   sales levels for any of his calculations; is that correct?

13   A.      Correct, plus the gross margin discussion that we

14   had.  So it's twofold.  Sales growth, and profitability

15   gross margin.

16   Q.      Because you believe there needs to be an employee

17   salary included as part of the incremental costs?

18   A.      No.  Gross margin, cost of goods sales minus cost

19   of goods sold.

20   Q.      Oh.  So you are talking about because you believe

21   it should be 17.5 percent?

22   A.      Correct.

23   Q.      Okay.  And you also still believe, though, that

24   there should be a salary added in there for the calculation,

25   correct?

1    A.        Salary or commensurate consulting expense to fill

2    the need that he would need to have to grow the sales that

3    Mr. Kilbourne is projecting.

4    Q.        Okay.  And so it is your testimony -- or it's your

5    opinion that that additional salary needs to be considered

6    as part of the incremental costs for the calculation?

7    A.        Yes.  As long as salary includes consultant, based

8    upon the discussion Mr. Lindley had about they don't hire

9    employees, they hire consultants when they need to.

10   Q.        Right.  And I just -- I understand you put a salary

11   line in your calculations and we've seen those.  And I just

12   want to make sure I'm understanding, that's essentially one

13   of the incremental costs that you think needs to be added,

14   correct?

15   A.        Well, there's two different issues.  Okay?  So that

16   55,000 that's in my report was a proxy if Mr. Lindley was

17   leaving.  Somebody would have to take that up.  It's now my

18   understanding, based upon trial testimony, that he wasn't

19   leaving.  So there's -- there's no need to put somebody in

20   there to take, quote, his spot.  That's a separate issue

21   than the critique I had with Mr. Kilbourne of some of the

22   expenses he excludes when coming up with his 10 percent

23   incremental profit, his 10 percent incremental cost number.

24   Even though I used that number, I still have a critique of

25   Mr. Kilbourne's analysis as it relates to some of the costs

545

1    he took out.

2    Q.        No.  I understand that you think that

3    Mr. Kilbourne's incremental cost calculation is entirely

4    unhelpful.  I'm confused though.  So, just to be clear, is

5    it still your opinion that that $55,000 -- let me show

6    you right here.

7    A.        Okay.

8    Q.        You see there where there's the payroll addition --

9    A.        I do.

10   Q.        -- in your calculation?  It's still your opinion

11   that that needs to be there, correct?

12   A.        Incorrect, that if Mr. Lindley is staying, you

13   would not have that 55,000, and if you go down to the

14   spreadsheet version, you know, kind of the analysis, it

15   might help.

16   Q.        Hold on.  So let me break this down.  Okay.  So,

17   because Mr. Lindley is still there, you are now removing

18   that; is that correct?

19   A.        Yes, if the sales stay below 600,000.

20   Q.        Okay.  So then I'm going to stay on that screen for

21   a moment.

22   A.        Okay.

23   Q.        Because I'm not seeing any of this in your report,

24   so I want to make sure I understand exactly what your

25   opinion is now.

546

1  A.       Correct.  This is based upon trial testimony,

2  right?  That's why it wouldn't be in the report.

3  Q.       So, you say if it stays at 600, you keep that

4  payroll number in there, correct?

5  A.       No.  I'm saying, if Mr. Lindley stays and if the

6  sales number stays below 600 million -- 600,000 a year, it

7  comes out.

8  Q.       Okay.  Okay.  That's helpful.

9  A.       Okay.

10  Q.      So let me restate that and make sure I understand

11  it.  So that now that you understand that Mr. Lindley works

12  for free, he does sweat equity, whatever he does, you -- if

13  you stay at 600, you would no longer have that payroll line

14  in there and you would just go with the 17.5 percent, the 10

15  percent, the 5 percent royalty rate and the sales growth of

16  inflation; is that correct?

17  A.      Correct.

18  Q.      Okay.  Now, am I understanding correctly that your

19  opinion here at trial is now that if they were to exceed

20  600, you're going to need to add employee costs as an

21  incremental cost?

22  A.      Okay.  Around 600, right?  If they go to 601, no,

23  but a material amount above 600,000, they would have to

24  start adding either employee costs or consultant type costs,

25  so whether they hire somebody or whether they hire a

1    consultant, they would need to expand the human resource

2    assets of the company.

3    Q.      Okay.

4    A.      I'm just trying to be sensitive to the no-employee

5    model.

6    Q.      No.  No.  I understand.  There's been a lot of

7    attention paid to whether or not somebody is strictly an

8    employee, and I think I understand your point.  You're just

9    talking about bodies doing work, correct?

10   A.      Correct.

11   Q.      Right.  So, you did not, in your report, attempt to

12   calculate what additional employee, you know, people doing

13   labor work would be needed in order to grow from say 600 to

14   a million, did you?

15   A.      Correct, because I didn't believe they could do it,

16   so I didn't calculate that additional cost.

17   Q.      Okay.

18   A.      You are correct.

19   Q.      Okay.  So you didn't believe that they could do it

20   then because you thought they were going out of business,

21   correct?

22   A.      No.  I thought they were undercapitalized.

23   Q.      Undercapitalized, couldn't grow.  And so you didn't

24   do it then.  Now, you still believe that they cannot grow.

25   Isn't that fair?

548

1   A.        Right.

2   Q.        Without capital?  Okay.  So then -- so then you

3   still don't have an opinion as to what would be needed for

4   purposes of adding some sort of salary, employee cost in

5   order for them to grow to 1 million or 1.5, do you?

6   A.        There is nothing now -- if we modify the payroll

7   like we have been speaking, there is no cost of

8   labor/consultant in my report because I'm assuming

9   Mr. Lindley could do it all at a sales amount of around

10  $600,000.

11  Q.        I understand.  And so then I am asking, you have

12  not calculated what would be required --

13  A.        Correct.  I have not.

14  Q.        -- for human resources in order to reach 1 million

15  or 1.5 or 3 million or anything else, correct?

16  A.        That is correct.

17  Q.        Okay.  Thank you.  All right.  Now, in rendering

18  your opinions in this case, it's my understanding that you

19  based your analysis on -- obviously you had access to the

20  financial records, correct?

21  A.        Correct.

22  Q.        Okay.  And you had access to the testimony prior to

23  trial?

24  A.        Of Mr. Lindley.

25  Q.        Yes.  And you relied on that?

```
 1   A.        Correct.
 2   Q.        Okay.  And then trial testimony, right, of all the
 3   witnesses?
 4   A.        Correct.
 5   Q.        Okay.  And the documents in this case, as you
 6   pointed out to me earlier, correct?
 7   A.        Correct.
 8   Q.        And -- and you used your past experience to aid you
 9   in rendering your opinions, correct?
10   A.        Correct.
11   Q.        Okay.  Did you refer to any third-party sources for
12   information to assist you in forming your opinions here?
13   A.        Yes.
14   Q.        What third-party sources?
15   A.        The Bureau of Labor's inflation rate.
16   Q.        Understood.  And that you included in your report.
17   Is there anything else?
18   A.        No.
19   Q.        Okay.  Any industry data about, you know, companies
20   of this size?
21   A.        No.
22   Q.        Okay.  Any industry data about the food industry?
23   A.        Nope.
24   Q.        Any industry data about, you know, trends in
25   confections or popcorn or snacks or anything like that?
```

1    A.        Not if it wasn't in the body of documents that we

2    have spoken about.  Some of that was.

3    Q.        Okay.  So it's just entirely limited to your own

4    experience and the data we have discussed so far?

5    A.        Correct, which had some of the components that you

6    were asking me about third party; industry, growth, etc.

7    Q.        Right.  But none of those apply here because you

8    don't think that MFGPC could grow at any of those rates,

9    correct?

10   A.        That's correct.

11   Q.        Even if the actual data is everybody else grew at

12   those rates?

13   A.        Right, because they hadn't been growing at those

14   rates.  Some of those rates were pre-2012.

15   Q.        Mr. Lyon, does the -- does the Mrs. Fields -- does

16   a license with Mrs. Fields for the Mrs. Fields' trademark

17   have any value to anybody?

18   A.        Yes.  If they can exploit -- because they have

19   additional corporate assets to exploit the license.  It

20   would mean nothing to me.

21   Q.        But you didn't try to determine the value of that

22   license for anybody in your report, did you?

23   A.        No.  My report is a lost profits analysis.

24   Q.        Did you have -- did you make any attempt to

25   determine the value of it for MFGPC?

1  A.      No, only as it extends to its ability to

2  incorporate that in its reparations.

3  Q.      And obviously not Perfect Snacks?

4  A.      No.

5  Q.      Mr. Lyon, what do you think would be necessary to

6  restore MFGPC to the position it was in before the license

7  was terminated?

8  A.      You mean in 2014?

9  Q.      Correct.

10  A.      And when you mean restored, you mean operationally?

11  Q.      No.  I mean, if one were to award damages in this

12  case, and you had to restore MFGPC, as nearly as possible,

13  to the position it was in before the license was terminated,

14  what would be needed?

15  A.      18 to $54,000.

16  Q.      And where do you get that?

17  A.      If you could pull my report back up, I'll show you.

18  Q.      All right.  Tell me which page to go to.

19  A.      Okay.  Right there.  Just -- maybe if you could

20  just kind of move the page up just so we get the headers.

21  Do you see the line that's about halfway down that says

22  Income Before Salaries?

23  Q.      Okay.  So you're going to point out to me that if

24  you take out the 55,000 for each year, there's a little bit

25  of a buffer left over?  Is that the number you're referring

552

1    to?

2    A.      That's one of them.  So, with the starting base of

3    207,000 of sales, and if I don't include any cost for

4    labor/consultants, whatever we're calling this person then

5    the number --

6    Q.      Let me cut to the chase, Mr. Lyon, sorry, but I

7    just -- I know that I have talked about a lot of your

8    opinion over and over again, and let me just see if I can

9    summarize this quickly.  So, your range that you just gave,

10    am I understanding correctly that you're basically saying --

11    and let me see if I can highlight this.  We are down on

12    these two lines.

13    A.      Go up a line.

14    Q.      Well, so if you've got -- if you don't subtract

15    salaries, then what is it, like 15,000, something like that?

16    A.      Well, that's the 18772 I was asking you to

17    highlight.

18    Q.      Yes.  So this is the number that's the first one

19    you gave me?

20    A.      That's the 18,000, correct.

21    Q.      Okay.  And then down here, income before salaries,

22    this is the other one.  That's what you believe?

23    A.      Yes, ma'am.

24    Q.      Okay.  And that's sort of new as a result of the

25    trial testimony; is that correct?

553

```
1   A.        Right, excluding the salary number.  That's the
2   only thing we're doing, right --
3   Q.        Okay.
4   A.        -- in the discussion we're having.
5   Q.        Okay.  And you've explained in your -- in your
6   testimony all of the reasons why you now believe that is
7   your opinion; is that correct?
8   A.        I think so.
9   Q.        All right.
10            We have no further questions.
11            THE COURT:  Thank you, Ms. White.
12            Mr. Amani?
13            MR. AMANI:  No, Your Honor.  I have no further
14   questions.
15            THE COURT:  Thank you.
16            Mr. Lyon.  You're excused?
17            MR. LYON:  Thank you, Your Honor.  Nice to be in
18   your courtroom.
19            THE COURT:  Nice to have you.
20            The defense rests, I take it?
21            MR. AMANI:  We do, Your Honor.
22            THE COURT:  You are not calling any rebuttal, I
23   think you said?  Is that right.
24            MS. WHITE:  No, Your Honor.
25            THE COURT:  All right.  So we'll get the transcript
```

554

1   on July 28, two weeks from today.

2        Becky's still on, I assume?  Is she there?  We've

3   lost our reporter.  Now we've got to find out when we lost

4   the reporter.  Maybe we need Mr. Lyon back

5        MR. AMANI:  I'll email him.

6        MR. ROTHSCHILD:  It is possible that the court

7   reporter could work from the recording?

8        MR. AMANI:  I have no objection to that.

9        THE COURT:  Yeah.  It's all being recorded.  Okay.

10  And if you could -- I mean, you will know about where you're

11  going and then you'll get the transcript.  And, let's see.

12  What -- July 28 is a Wednesday.  August -- what did we say

13  about getting the proposed findings and conclusions, your

14  amendments to the proposed findings -- or your supplements.

15       MR. AMANI:  Your Honor said a week.  As long as

16  we're starting on a Wednesday, I would ask for Friday,

17  August 6.

18       THE COURT:  What day would that be, the 6th?

19       MR. AMANI:  The 6th, yes, Your Honor.

20       THE COURT:  Okay.  August 6 we'll get your

21  supplements, and if you're available, we'll have August 9

22  closing arguments, the following Monday.  We can do that by

23  Zoom.  Are you available?

24       MS. WHITE:  I think so, Your Honor.  And, Your

25  Honor, I suppose -- I'm definitely open to the compressed

1    time frame.  If transcripts are available and produced to us

2    as they are available, that would probably help counsel

3    speed the process along.  I don't know if you want to put us

4    in touch with whoever is doing it.

5              THE COURT:  Yeah.  Elizabeth will get in touch with

6    you about that.

7              MS. WHITE:  Okay.

8              THE CLERK:  It will be the reporter for the day of

9    the trial.

10              THE COURT:  Oh, the reporter for the day of the

11    trial, so it's Patti Walker for Monday, and Rebecca Janke

12    for yesterday and today.  And how long do you need for

13    closings?

14              MS. WHITE:  Half an hour, an hour.  I don't know.

15    What do you say, Bijan?

16              MR. AMANI:  A half an hour each, Your Honor.

17              THE COURT:  I'll give you an hour.  Let's start at

18    9:30 on the 9th of August.  All right.  Now, what about

19    exhibits?  Do we need to make sure they're all the ones that

20    are in that are supposed to be in?

21              MR. AMANI:  I understood that Mr. Rothschild --

22    once we get our papers all together, I understood that

23    Mr. Rothschild, despite what we have been talking about with

24    the three of us, we will try to resolve whatever we have.  I

25    know there are missing pieces, probably, and if we have an

556

1    issue, I guess we can raise it with Your Honor on the 9th.

2            THE COURT:  Raise it with me if you have an issue,

3    but let's get all the exhibits in that are supposed to be

4    in.

5            THE CLERK:  I'll file what I have, or I can email

6    it.  We can wait for the official list after the 9th.  I

7    don't know what people want.  I have a list right now of

8    what's in.

9            MR. AMANI:  I would appreciate it if you gave us

10   both the list if that will help us and maybe cut down on

11   some discussion.

12           THE CLERK:  I'll just email it to you all today.

13           MR. AMANI:  Thank you.

14           THE COURT:  The list that we think we've admitted.

15           THE CLERK:  Yes.

16           THE COURT:  Which may not include stipulated

17   exhibits that you did not offer during trial, and I assume

18   you'll want those in.  And then you can tell us, and I'll

19   issue an order and put them in, and if there's a conflict

20   I'll rule on it.  All right?

21           MS. WHITE:  Appreciate that, Your Honor.

22           THE COURT:  Anything else?

23           MR. AMANI:  No, Your Honor.

24           MR. ROTHSCHILD:  We have our court reporters back

25   now, I note.  We might want to be able to resolve with them.

557

```
1            THE COURT:  Oh, Becky?

2            THE COURT REPORTER:  Yes, Judge.  All of a sudden

3    the screen just totally froze.  You were still there but you

4    weren't moving, so I had Kelly get on, but I'm on now, too,

5    so --

6            THE COURT:  It was recorded though, right?

7            THE COURT REPORTER:  Yeah.  And what I will do, if

8    everyone is fine with that, is I will just take it off of

9    the recording.

10            THE COURT:  Yeah.  Let's do that.  And then, if

11   there's any problem, they'll us, I'm sure.

12            THE COURT REPORTER:  Yeah.  Sure.

13            THE COURT:  Lawyers aren't shy about pointing out

14   what they think are errors.

15            THE COURT REPORTER:  I know they aren't.  Okay.

16            THE COURT:  Now, Becky, while you were off, we set

17   a July 28 transcript, the two weeks you asked for -- or

18   agreed to reluctantly.  And they were requesting whether or

19   not, as you get some big hunk of it done, you could just

20   give it to them so they have it in pieces, and they'll get

21   it all quicker.

22            THE COURT REPORTER:  Yeah.

23            THE COURT:  Is that all right.

24            THE COURT REPORTER:  Absolutely.  And I'll give

25   them the first day as soon as I get that done.
```

558

```
 1              THE COURT:  All right.

 2              THE COURT REPORTER:  If you need before lunch and

 3    after lunch, that would probably be good, too.

 4              THE COURT:  Thank you.  And you can get ahold of

 5    Patti Walker for day 1.  Apparently she's done a lot of it.

 6              THE COURT REPORTER:  Ed was first, wasn't he?  No.

 7    Patti was.

 8              THE COURT:  Ed was in on the sentencing.  He didn't

 9    do it.

10              THE COURT REPORTER:  So I will tell Patti she needs

11    to get what she gets done as quickly as she can to you -- to

12    the attorneys.

13              THE COURT:  Yes.  All right.

14              THE COURT REPORTER:  All right.  And then

15    everything by the 28th.  Okay.

16              THE COURT:  And if you can do it sooner, why

17    everybody would be happier, probably.

18              All right.  Thank you all.  We'll be in recess.

19              MR. AMANI:  Thank you, Your Honor.

20              MR. ROTHSCHILD:  Thank you, Your Honor.

21              MS. WHITE:  Thank you, Your Honor.

22

23

24

25              (Whereupon the proceedings were concluded.)
```

1

2                          REPORTER'S CERTIFICATE

3     STATE OF UTAH              )

4                                ) ss.

5     COUNTY OF SALT LAKE        )

6

7            I, REBECCA JANKE, do hereby certify that I am a

8     Certified Court Reporter for the State of Utah;

9            That as such Reporter I attended the hearing of

10    the foregoing matter on July 14, 2021, and thereat reported

11    in Stenotype all of the testimony and proceedings had, and

12    caused said notes to be transcribed into typewriting, and

13    the foregoing pages numbered 415 through 558 constitutes a

14    full, true and correct record of the proceedings

15    transcribed.

16           That I am not of kin to any of the parties and

17    have no interest in the outcome of the matter;

18           And hereby set my hand and seal this 4th day of

19    August, 2021.

20

21

22

23

24           _____

25           REBECCA JANKE, CSR, RPR, RMR