Juliette P. White (9616)
Brian M. Rothschild (15316)
Alexandra L. Hodson (*Pro Hac Vice*)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, UT 84111
Telephone: 801.532.1234
Facsimile: 801.536.6111
jwhite@parsonsbehle.com
brothschild@parsonsbehle.com
ahodson@parsonsbehle.com

*Attorneys for MFGPC, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MRS. FIELDS FRANCHISING, LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> MFGPC, INC., a California corporation, <br><br> Defendant. | **MFGPC, INC.'S SUPPLEMENTAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** <br><br> Civil No. 2:15-cv-00094-DAK-DBP <br><br> Judge Dale A. Kimball <br><br> Magistrate Dustin B. Pead |
| MFGPC, INC., a California corporation, <br><br> Counterclaimant, <br><br> v. <br><br> MRS. FIELDS FRANCHISING, LLC, a Delaware limited liability company, and MRS. FIELDS FAMOUS BRANDS, LLC, a Delaware limited liability company, dba Famous Brands International, <br><br> Counterclaim Defendants. | |

Defendant and Counterclaimant MFGPC, Inc. ("**MFGPC**"), through counsel, respectfully submits its Supplemental Proposed Findings of Fact and Conclusions of Law.

The Court held a bench trial by remote Zoom conference from July 12, 2021 through July 14, 2021 (the "**Trial**").  MFGPC was represented by Juliette White, Alexandra Hodson, and Brian Rothschild of Parsons Behle & Latimer.  Mrs. Fields Franchising, LLC and Mrs. Fields Famous Brands, LLC (collectively, "**Mrs. Fields**") were represented by Bijan Amini of Amini LLC and Rod Andreason of Kirton McConkie.

At the Trial, the Court heard testimony from witnesses and received exhibits into evidence. The Court has reviewed and considered the pleadings on file, the testimony of the witnesses, exhibits received into evidence at the Trial, and the parties' supplemental proposed findings of facts and conclusions of law.

The Court concludes that MFGPC has proven Mrs. Fields owes it $70,223 for unpaid invoices for products purchased plus $47,623 in unpaid and overdue interest.  Thus, MFGPC is owed $117,845 minus what it owes Mrs. Fields for royalties plus interest in the amount of $61,789, for a net of $56,056 due to MFGPC.   In addition, MFGPC was damaged in the amount of [$916,170/$464,916/$425,000] as a result of Mrs. Fields' breach of the Trademark License Agreement dated April 30, 2003 between the parties (the "**Trademark License Agreement**"). (Ex. 3.)   Accordingly, the Court grants judgment in MFGPC's favor in the amount of [$972,226/$520,972/$481,056] plus attorneys' fees and costs to be determined at a later date.

## FINDINGS OF FACT[1]

### I.   THE PARTIES

1.   MFGPC is a corporation organized under and existing pursuant to the laws of the State of California, with its principal place of business in Mission Viejo, California.

2.   Mrs. Fields Famous Brands, LLC is a limited liability company organized under and existing pursuant to the laws of the State of Delaware.

3.   Mrs. Fields Franchising, LLC is a limited liability company organized under and existing pursuant to the laws of the State of Delaware.

### II.   BACKGROUND

4.   On April 30, 2003, Mrs. Fields, through a predecessor entity, entered into a Trademark Licensing Agreement with LHF, Inc.  Under the Trademark License Agreement, LHF obtained a license to develop, manufacture, package, distribute, and sell prepackaged popcorn products bearing the "Mrs. Fields" trademark.  Christopher Lindley executed the Trademark License Agreement on behalf of LHF.  (Ex. 3.)  On June 30, 2003, with Mrs. Fields' permission, LHF assigned its rights and obligations under the Agreement to MFGPC—another entity managed by Mr. Lindley.  (Assignment, Ex. 4.)

5.   On December 22, 2014, counsel for Mrs. Fields sent a letter to MFGPC.  The letter states, in relevant part--

> Our records indicate that MFGPC . . . has paid royalties of merely $5,206.22 since the fourth quarter of 2011 and no payments whatsoever since the third quarter of 2012. Pursuant to section 6(a) of the [Agreement], MFGPC was required to pay [Mrs. Fields] a Guaranteed Royalty of $100,000 a year.

---

[1] To the extent any finding of fact constitutes a conclusion of law, it is adopted as such.

> Pursuant to Section 16 of the [Agreement], the Agreement would not automatically renew at the conclusion of its five-year term in 2012 if, among other things, MFGPC had failed to remit its Guaranteed Royalty to [Mrs. Fields], Because of MFGPC's failure to do so, the Agreement did not renew, the license terminated and MFGPC lost any right to use the Mrs. Fields mark or to represent itself as a licensee of Mrs. Fields.
>
> To the extent that MFGPC claims that the Agreement did renew, notwithstanding the failure to pay Guaranteed Royalties, the Agreement is hereby terminated pursuant to Section 16(b)(ii) for MFGPC's failure to pay Guaranteed Royalties for periods beyond July 2012.

(Letter from Avery Samet, Ex. 13.)   This letter was factually inaccurate in almost every conceivable respect. *First,* there was no requirement that MFGPC pay "a Guaranteed Royalty of $100,000 a year." The Guaranteed Royalty is defined as four payments that MFGPC was required to make during the Initial Term. (Trademark License Agreement, Ex. 3 at § 6.) The Initial Term ended in 2008, and thereafter MFGPC was only required to pay "Running Royalties" at a rate of 5 percent of Net Sales (as defined in the Trademark License Agreement). (*Id.* § 5(b).) *Second,* the second Option Period ended in 2013, not 2012. (*Id.* § 16.) *Third,* the Agreement *did* automatically renew at the end of the second Option Period, and Mrs. Fields had, in fact, confirmed the renewal in writing on June 21, 2013. (Email from Trevor Robinson, Ex. 46.) MFGPC therefore retained a license to manufacture and sell "Mrs. Fields" branded popcorn. *Fourth,* the Agreement could not be terminated "pursuant to Section 16(b)(ii) [based on] MFGPC's failure to pay Guaranteed Royalties" because MFGPC had paid the Guaranteed Royalty in full. (Trademark License Agreement, Ex. 3 at §§ 6, 16(b)(ii).) *Fifth*, MFGPC and Mrs. Fields had a history of offsetting invoices from MFGPC to Mrs. Fields for the sale of popcorn against amounts due for Running Royalties. (Email, Ex. L.) At the time of the letter, Mrs. Fields owed MFGPC $70,222.60

for prepackaged popcorn, and after accounting for Running Royalties owed, Mrs. Fields still owed MFGPC $26,660.43, which Mrs. Fields has never disputed. (Email and Invoices, Exs. 10, 11, M.) Accordingly, MFGPC was in material compliance with its obligations under the Trademark License Agreement.

6.      Mrs. Fields, by sending the letter purporting to terminate the Trademark License Agreement and failing to comply with the termination provisions of the Trademark License Agreement, breached the contract. (*See* Memorandum Decision and Order Granting MFGPC's Motion for Summary Judgment, ECF 132, August 20, 2018, which is hereby incorporated by reference.)

7.      In a response letter, MFGPC pointed out the numerous errors, provided an accurate analysis of MFGPC's rights under the Trademark License Agreement, and demanded that the Trademark License Agreement be reinstated. (Letter from Carolyn Dye, Ex. 14.) Mrs. Fields, however, responded by filing this lawsuit seeking a determination that it had properly terminated the Trademark License Agreement and seeking fees and costs. (Complaint, ECF 2, Ex. B.)

8.      After an appeal, this Court granted MFGPC's Motion for Partial Summary Judgment on liability. (Memorandum Decision, ECF 132.) Accordingly, all that remains is to determine MFGPC's damages for Mrs. Fields' breach.

## III.    AMOUNTS DUE TO MFGPC

## A.    Mrs. Fields Owes MFGPC for Unpaid Invoices and Interest for Popcorn Sales.

9.      There is no dispute that Mrs. Fields owes MFGPC $70,223 in unpaid invoices for popcorn sales to Mrs. Fields.

10.     There is also no dispute that MFGPC owes Mrs. Fields running royalties in the amount of $45,566.17.  This amount is slightly higher than the amount owed as of the termination because MFGPC sold a small amount of popcorn after termination as he was permitted to do under Section 17 of the Trademark License Agreement.  (Trademark License Agreement, Ex. 3 § 17.) However, Mrs. Fields, upon finding out that MFGPC was still selling Mrs. Fields branded popcorn, threatened MFGPC with legal action in violation of MFGPC's rights under Section 17, causing MFGPC to stop selling its inventory as was permitted under Section 17.  This action constituted an additional breach of the Trademark License Agreement and further damaged MFGPC. Accordingly, as Mr. Lindley testified, MFGPC was forced to dispose of $106,000 of Mrs. Fields-marked inventory and packaging.

11.     The amount due to MFGPC for unpaid invoices is $70,223 with interest thereon at the legal rate under Utah Code Ann. § 15-1-1 because no rate is specified in the Trademark License Agreement for overdue invoices.  The amount of interest at 10% per annum from the date of the last invoice through the date of the judgment is $47,623.

12.     This amount will be offset by the amount of $61,789 due to Mrs. Fields for royalties and interest at 5.25% (the prime rate in 2014 plus 2% pursuant to the Trademark License Agreement).

**B.     MFGPC's Damages Calculations.**

13.     As previously determined, the relevant period for calculating damages is the remainder of the third five-year term of the Trademark License Agreement, *i.e.*, December 2014 through April 2018.  (ECF 250 at 7.)

14.     MFGPC's expert, Patrick Kilbourne, testified as to three different calculations for MFGPC's damages.

15.     The first approach relies on the minimum license fee of the Perfect Snax License Agreement.  Assuming that Mrs. Fields and Perfect Snax anticipated a similar gross profit margin as MFGPC (25%), Mrs. Fields and Perfect Snax intended to allocate 20% of Perfect Snax's gross profits to Mrs. Fields.  This percentage is consistent with a study conducted by KPMG that Mr. Kilbourne relied on, which found that royalty rates generally fall within a range of 25% of gross profits to 25% of operating profits.

16.     Mr. Kilbourne testified that the terms of the Perfect Snax License were highly probative because the license was very comparable to MFGPC's license.  The two licenses involved the same products, with the same trademark, during a similar, and overlapping time frame.  Mr. Kilbourne also noted that the Perfect Snax License was less valuable than MFGPC's for a number of reasons, but did not make any downward adjustments in his calculations as a result, choosing instead to offer a conservative damages calculation based on those less valuable economic terms.

17.     Based on this calculation, Mr. Kilbourne determined that the Perfect Snax license fee of $425,000 represents a minimum value of MFGPC's License Agreement with Mrs. Fields during the District Court's prescribed damage period.

18.     The second measure of damages reflects MFGPC's lost profits based on MFGPC's historical sales data and incremental profits.  Mr. Kilbourne analyzed MFGPC's financial records and concluded that the historical incremental profit rate for MFGPC was 10%.  Data from Mrs. Fields validates his findings.  In a January 2015 presentation to Mrs. Fields' board of directors,

Mrs. Fields projected that its incremental contribution margin on confections sales, which included the ready to eat popcorn category, would be 9%.

19.     Mr. Kilbourne also concluded that MFGPC's annual growth rate would be 21%. He reached this conclusion based on several factors.  Mintel, a market research firm, reported that the actual growth rate for ready-to-eat popcorn sales increased by an average of 23.6% per year from 2012 through 2017.

20.     In the January 2015 presentation to Mrs. Fields' board of directors, Mrs. Fields projected that its confections sales (which included ready-to-eat-popcorn), would increase by an average of 18.5% from 2015 through 2018.  Per the terms of the Trademark License Agreement, Mrs. Fields was required to purchase any popcorn it chose to sell using the Mrs. Fields trademark from MFGPC.

21.     Based on the actual sales growth of 23.6% for this category of products during the relevant time frame and Mrs. Fields' contemporaneous forecasted sales growth of 18.5%, Mr. Kilbourne assumed that MFGPC's sales would have increased by the midpoint of these two rates, or 21% per year.

22.     Beginning in 2015, assuming a base amount of the average sales during 2010 through 2012 and an annual growth rate of 21%, MFGPC would have had $4.5 million in revenue during the period of January 2015 through April 2018.  Accordingly, based on MFGPC's historical incremental profit rate of 10%, Mr. Kilbourne determined that it experienced lost profits of $464,000 under this measure of damages.

23.     The third measure of damages reflects MFGPC's damages based on the economic terms of the Perfect Snax License Agreement.  (PSP Agreement, Ex 19.)  The PSP Agreement, as

Mrs. Fields' employee, Betsy Schmandt, observed, "was more restrictive" than MFGPC's license agreement. Mrs. Fields and Perfect Snax projected that the Perfect Snax License Agreement would generate minimum popcorn sales of $2,000,000 during the first 15 months of the agreement, $2,500,000 during the second year of the PSP agreement, and $4,000,000 during the third year of the PSP Agreement.

24.     The term of the Perfect Snax License Agreement was approximately three years and three months (September 17, 2017 through December 31, 2020), which is similar to the three-year four-month damage period established by the District Court (December 22, 2014 through to April 30, 2018).

25.     Given that Mrs. Fields and Perfect Snax expected minimum sales of $8,500,000 during a three year and three-month period, Mr. Kilbourne testified that it is reasonable to conclude that MFGPC would also have sold a pro-rata amount of $8,833,000 during a similar three-year four-month period if Mrs. Fields had not improperly terminated the License Agreement. Even Ms. Schmandt agreed that the PSP license agreement is "a useful proxy" for determining what MFGPC could have done under its license.

26.     MFGPC's incremental profit was approximately 10%, thus MFGPC's lost profits on revenue of $8,833,000 are $916,170. Accordingly, Mr. Kilbourne calculates MFGPC's damages as $916,170 under this measure of damages.

27.     Mrs. Fields offered testimony from its expert, Grant Lyon, regarding MFGPC's damages. In his expert report, Mr. Lyon did not offer any opinion or analysis as to whether MFGPC was capable of taking on debt under the Trademark License Agreement, whether MFGPC had access to other forms of equity, or the value of the unique license that MFGPC negotiated with

Mrs. Fields.  Mr. Lyon's opinion in his report was based primarily on his belief that, as of 2013, MFGPC had no employees, was undercapitalized, and could not achieve the sales estimated by Mr. Kilbourne because it was going out of business.

28.     Based on the testimony at trial, Mr. Lyon changed his opinion.  He had previously determined that MFGPC was a dying venture in 2012 and based his calculations on that premise. After listening to the testimony during trial, however, he conceded that the business was still alive and that he was incorrect in concluding that it had no employees, and instead opined that it  was merely at a plateau and, as a result, still incapable of achieving any of the sales estimated by Mr. Kilbourne.  One can only assume he did this to ensure that his damage calculations remained intact despite evidence at trial contradicting his original conclusions.  The Court finds that the evidence Mr. Lyon relied on to reach his conclusions regarding damages is insufficient, unhelpful and unreliable for determining MFGPC's damages.  As a result, the Court affords little weight to Mr. Lyon's opinions regarding MFGPC's damages.

29.     The Court finds by a preponderance of the evidence that MFGPC has established that it would have been able to achieve these profits.  The owner and manager of MFGPC, Inc., Mr. Christopher J. Lindley, is a savvy businessman with extensive experience in the snack food consumer product industry.

30.     Mr. Lindley testified that he chose the Mrs. Fields brand because of its credibility both with consumers and with the trade.  Indeed, the benefit of the Mrs. Fields brand to MFGPC was, first and foremost, to establish a relationship with the best co-packers, packaging suppliers, and retailers.

31.     In addition, Mrs. Fields' former employee, Cameron Broadbent, testified that Mrs. Fields had incredibly high brand recognition in the marketplace at 94 percent in 2000. Ms. Schmandt also testified that Mrs. Fields had brand recognition at 80 percent in 2013. Ms. Schmandt acknowledged that Mrs. Fields relies on the high brand awareness and the premium nature of the brand to assist licensees in getting placement and interest from retailers as well as consumers.

32.     Mr. Lindley obtained from Mrs. Fields the right to use the Mrs. Fields mark throughout the world on all manner of pre-packaged popcorn. Mrs. Fields itself had to buy Mrs. Fields branded popcorn exclusively from MFGPC. Accordingly, MFGPC sold Mrs. Fields $2.4 million worth of popcorn over the period of the Trademark License Agreement.

33.     Further, under the Trademark License Agreement, MFGPC could take on debt and equity investment, and could even sell the entire company without voiding the Trademark License Agreement. Mr. Broadbent testified that MFGPC's license was the most advantageous license he had seen granted during his thirteen-year tenure with Mrs. Fields.

34.     The Court also finds that Mr. Lindley had established relationships, including formal co-packing agreements, with multiple co-packers in the pre-packaged popcorn industry and demonstrated MFGPC's ability to produce a complex popcorn product in high volumes for large retailers such as Bed Bath & Beyond, Rite-Aid, Costco, and Nordstrom's, among others.

35.     MFGPC's former co-packers testified that MFGPC paid invoices on time and that it could have negotiated agreements with them if it were to expand. They also testified that they had capacity to scale up production for MFGPC and that the ready-to-eat popcorn industry was booming at the time MFGPC's license was terminated.

36.     In addition, the Court finds that MFGPC, through Mr. Lindley, had a demonstrated ability to recover from significant setbacks while operating MFGPC, including building up the business after a fire at a co-packer facility that shut down MFGPC's ability to sell pre-packaged popcorn for approximately nine months, recovering from a flood at a different co-packer's facility years earlier, and surviving the recession of 2008.   Further, Mr. Lindley could cover moderate growth of the business without an infusion of capital, and both Mr. and Mrs. Lindley testified that they had access to additional capital that they could and would invest in the company if needed to achieve moderate growth.

37.     Notably, there is no question that MFGPC sold a high-quality, desirable product. Mrs. Fields' former employee, Cassie Alvey, testified that MFGPC "met and exceeded" Mrs. Fields' standards with its popcorn products.

38.     Given Mr. Lindley's capabilities and experience as owner of MFGPC, the quality of MFGPC's product, the exclusive nature of the Trademark License Agreement, the extremely high brand awareness associated with the Mrs. Fields brand, the projected growth in the pre-packaged popcorn market when MFGPC's license was terminated, and MFGPC's capacity to scale up its business over time, the Court finds that MFGPC has proven that it is probable he would have met the numbers projected in Mr. Kilbourne's report but for Mrs. Fields' wrongful termination of the Trademark License Agreement.   Accordingly, the Court finds that MFGPC has established its damages with reasonable certainty based on each of Mr. Kilbourne's three damage calculations.

## IV.   CONCLUSIONS OF LAW[2]

### A.   Mrs. Fields Owes MFGPC $70,223.00 for Unpaid Invoices Plus $47,623.00 in Unpaid Interest at the Legal Rate Minus the Offset Amount Due to Mrs. Fields for Royalties.

1.   There is no dispute that Mrs. Fields owes MFGPC a net of $70,223 for unpaid invoices for popcorn.

2.   MFGPC is Entitled to Prejudgment Interest of 10% Per Annum on the Amounts Due for the Unpaid Invoices.

3.   Utah Code Ann. § 15-1-1(2) authorizes an award of prejudgment interest of 10% per annum to MFGPC on the amount Mrs. Fields owes it for the unpaid invoices because no contractual rate of interest is specified in the Trademark License Agreement for unpaid invoices. "The analysis in determining the appropriateness of a prejudgment interest award is whether a claim . . . is ascertainable with mathematical accuracy." *Canyon Country Store v. Bracey*, 781 P.2d 414, 422 (Utah 1989). Since Mrs. Fields never disputed the amount, and it is was ascertainable with mathematical accuracy since the amount was due, it is appropriate to award MFGPC prejudgment interest at the legal contractual rate.

4.   MFGPC has established with mathematical accuracy that Mrs. Fields owes it $70,223.00 in unpaid invoices for popcorn. Accordingly, the Court awards prejudgment interest at a rate of 10% per annum on the invoice amounts due.

5.   The prejudgment interest owed is $47,623.00.

6.   The total due to MFGPC before offset is $117,845.00.

---

[2] To the extent any conclusion of law constitutes a finding of fact, it is adopted as such.

7.      The offset amount owed to Mrs. Fields calculated at 5.25% interest (the prime rate in 2014 plus 2% pursuant to the Trademark License Agreement) is $61,789.00.

8.      Accordingly, the Court will enter judgment in the amount of $56,056.00, which reflects the net amount due to MFGPC for unpaid invoices and unpaid accrued prejudgment interest.

**B.      Mrs. Fields Breached the License Agreement, Causing MFGPC Damages for Lost Profits.**

  **1.      There is No Dispute that Mrs. Fields Breached the Trademark License Agreement.**

9.      As the Court previously determined, "Mrs. Fields improperly repudiated the [Trademark License] Agreement and is therefore guilty of total breach." (Memorandum Decision, ECF 132 at 28.)  The Court has identified other breaches by Mrs. Fields of the Trademark License Agreement based on the testimony and evidence, including that Mrs. Fields refused to allow MFGPC to sell off its inventory after termination in accordance with Section 17 of the Trademark License Agreement.  At this juncture, the only issue at trial with respect to Mrs. Fields' breach is the amount of damages owed to MFGPC.

  i.      <u>MFGPC is Entitled to Expectation Damages for Mrs. Fields' Breach of the Trademark License Agreement.</u>

10.      "To recover damages, a plaintiff must prove both the fact of damages and the amount of damages." *Ghidotti v. Waldron*, 2019 UT App 67, ¶¶ 11, 442 P.3d 1237, 1240. "The level of persuasiveness required to establish the fact of loss is generally higher than that required to establish the amount of a loss." *Id.* (quoting *Atkin, Wright & Miles v. Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 336 (Utah 1985)); *see also Cook Assocs., Inc. v. Warnick*, 664 P.2d 1161, 1166 (Utah 1983). "[D]amages in the form of lost profits . . . 'must be established with . . .

sufficient certainty that reasonable minds might believe from a preponderance of the evidence that the damages were actually suffered.'" *Id.* at ¶ 12, 442 P.3d at 1241 (quoting *Kilpatrick v. Wiley, Rein & Fielding*, 2001 UT 107, ¶ 76, 37 P.3d 1130).

11.     "Once a defendant has been shown to have caused a loss, he should not be allowed to escape liability because the amount of the loss cannot be proved with precision." *Winsness v. M. J. Conoco Distributors, Inc.*, 593 P.2d 1303, 1306 (Utah 1979); *see also Gould v. Mountain States Telephone & Telegraph Co.*, 6 Utah 2d 187, 192, 309 P.2d 802, 805 (1957). "Proof of damages may therefore 'be based upon approximations, if . . . the approximations are based upon reasonable assumptions or projections.'" *Austin v. Bingham*, 2014 UT App 15, ¶¶ 18–19, 319 P.3d 738, 743–44 (quoting *Atkin Wright & Miles v. Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 336 (Utah 1985)). "This is because once the fact of damages has been established, any uncertainty in the amount of damages must be borne by the wrongdoer." *Id.* at 744. "What constitutes such an approximation will vary with the circumstances." *Cook Assocs.*, 664 P.2d at 1166. "A record of past earnings obviously increases the certainty with which one could predict future profits." *Cook Assocs.*, 664 P.2d at 1166.

12.     "Typically, there are two types of damages a non-breaching party can recover in an action for breach of contract: general damages, which flow naturally from the breach, and consequential damages, which, while not an invariable result of breach, were reasonably foreseeable by the parties at the time the contract was entered into." *Castillo v. Atlanta Cas. Co.*, 939 P.2d 1204, 1209 (Utah Ct. App.1997) (citing 25 C.J.S. Damages §§ 1, 3 (1966))

13.     "[T]he injured party in a breach of contract action has a right to damages based upon his expectation interest as measured by '(a) the loss in the value to him of the other party's

performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform.'" *TruGreen Companies, L.L.C. v. Mower Bros., Inc.*, 2008 UT 81, ¶ 10, 199 P.3d 929, 931 (quoting *Ford v. Am. Express Fin. Advisors, Inc.*, 2004 UT 70, ¶ 39, 98 P.3d 15). "Alternative means of establishing the certainty of lost profits include expert testimony of profit potential, evidence of the actual profits of similar businesses, and evidence of subsequent earnings of the business claiming lost profits." *Cook Assocs.*, 664 P.2d at 1166 n.4.

14.     "The purpose of these damages is to compensate the nonbreaching party "for actual injury sustained, so that [the nonbreaching party] may be restored, as nearly as possible, to the position [it] was in prior to the injury." *TruGreen Companies*, 2008 UT at ¶ 10, 199 P.3d at 931–32; *see also Castillo*, 939 P.2d at 1209 (citing 25 C.J.S. Damages §§ 1, 3 (1966)); *Mahmood v. Ross*, 1999 UT 104, ¶¶ 19–20, 990 P.2d 933, 937–38.

15.     Utah courts "recognize the difficulty of calculating damages in these situations and thus allow a plaintiff to use as evidence a defendant's gains." *TruGreen Companies*, 2008 UT at ¶ 17, 199 P.3d at 933 (citing *K.W. Plastics v. U.S. Can Co.*, 131 F.Supp.2d 1265, 1269 (D. Ala. 2001) (noting that a court may consider "the defendant's subsequent profit from enjoyment of a comparable opportunity")); *see also Wirum & Cash, Architects v. Cash*, 837 P.2d 692, 711 (Alaska 1992) ("[T]he breaching party's profits can be a reasonable basis for estimating plaintiff's damages."); *N. Pac. Lumber Co. v. Moore*, 275 Or. 359, 551 P.2d 431, 435–36 (1976) (holding that defendant's profits "are a reasonable basis for estimating plaintiff's damages").

C.     **There Are Three Reliable Bases Established by MFGPC for Approximating its Damages for Mrs. Fields' Breach.**

16.     The Court heard testimony from MFGPC's expert witness regarding three different methods of calculating damages.  The Court finds that MFGPC established with reasonable certainty all three methods of damages calculations and adopts the method based upon the [economic terms of the Perfect Snax License Agreement with Mrs. Fields / historical financial and sales records of MFGPC / minimum license fee in the Perfect Snax License Agreement], as the Court finds that calculation best resembles the lost profits MFGPC sustained as a result of Mrs. Fields' breach of the Trademark License Agreement.  *See Austin*, 2014 UT App at ¶ 19, 319 P.3d at 744 ("[A]ny uncertainty in the amount of damages must be borne by the wrongdoer.") Accordingly, MFGPC's lost profits resulting from Mrs. Fields' breach are [$916,170/$464,916/$425,000].

### D.     **Mrs. Fields Did Not Establish that MFGPC Failed to Mitigate Its Damages.**

17.     Mrs. Fields asserts as an affirmative defense that MFGPC's counterclaim for breach of contract "is barred because MFGPC has failed to mitigate its damages . . . ." (ECF 98 at 6.) Mrs. Fields bear the burden of proving its affirmative defenses.  *Salt Lake City Corp. v. Jordan River Restoration Network*, 2018 UT 62, ¶ 60, 435 P.3d 179, 190.

18.     "[U]nder the doctrine of avoidable consequences the nonbreaching party has an active duty to mitigate his damages, and he may not, either by action or inaction, aggravate the injury occasioned by the breach."  *Watkins v. Ford*, 2013 UT 31, ¶ 42, 304 P.3d 841, 851, *as amended* (Aug. 6, 2013) (quoting *Mahmood v. Ross (In re Estate of Ross)*, 1999 UT 104, ¶ 31, 990 P.2d 933).

19.     "[A] non-breaching party may appropriately attempt in good faith to mitigate damages by attempting to honor the contract and work around problems presented by the breach."

*Breuer-Harrison, Inc. v. Combe*, 799 P.2d 716, 726 (Utah Ct. App. 1990).  Where a non-breaching party has taken reasonable steps to mitigate damages, it is appropriate for the Court to reject a mitigation of damages defense.  *See Hofheins v. Bajio Mountain W. LLC*, 2017 UT App 238, ¶ 43, 414 P.3d 531, 541.  "Generally, whether a party to a contract has acted reasonably 'is an objective question . . . .'" *Brady v. Park*, 2013 UT App 97, ¶ 56, 302 P.3d 1220, 1232–33 (quoting *Billings v. Union Bankers Ins. Co.*, 918 P.2d 461, 465 n. 2 (Utah 1996)).

20.     Mrs. Fields, which bears the burden of proof on its affirmative defense, offered no evidence whatsoever in support of the proposition that MFGPC failed to mitigate its damages.  In contrast, MFGPC established that it took reasonable steps to mitigate its damages caused by Mrs. Fields' breach of the Trademark License Agreement, including seeking reinstatement of the Trademark License with Mrs. Fields (Dye Letter, <u>Ex. 14</u>), attempting to sell its inventory (which Mrs. Fields stymied), and yet MFGPC demonstrated that it could not resuscitate a business built almost entirely around its right to use the Mrs. Fields brand on its products.  MFGPC could not salvage or operate the company in any way without the Mrs. Fields license.   Accordingly, the Court finds no basis to reduce MFGPC's damage award based on Mrs. Fields' mitigation of damages defense.

21.     The Court has considered Mrs. Fields' other affirmative defenses, including equitable defenses, but Mrs. Fields did not seriously argue or even attempt to support any of them with evidence, and, consequently, the Court finds no basis to reduce or sustain any of Mrs. Fields' defenses.

### E.      <u>Award to MFGPC.</u>

22.     The Court determines that Mrs. Fields owes MFGPC the following amounts:

     (1)     $$70,223 in unpaid invoices for popcorn.

     (2)     Accrued interest on $70,223 at a rate of 10% per annum from October 2, 2014 through the date of judgment, which is $47,623.[3]

     (3)     Expectation damages in the amount of [$916,170/$464,916/$425,000].

The total amount due to MFGPC for past-due invoices is offset by the $61,789 MFGPC owes to Mrs. Fields for royalties and interest, resulting in a net amount of $56,056 due to MFGPC for the past-due invoices. The total amount of damages and, therefore, the judgment that will be entered is [$972,226/$520,972/$481,056]

23.     The Court further finds that MFGPC is the prevailing party, having established that it was in material compliance with the Trademark License Agreement, that Mrs. Fields owed it a net balance of $26,660.43 at the time that Mrs. Fields wrongfully terminated the Trademark License Agreement, and that it has sought and proven damages for Mrs. Fields' breaches. Further, Mrs. Fields, after wrongfully terminating and refusing for more than six years to pay undisputed invoices, brought this case. Section 22(k) of the Trademark License Agreement provides that "the party prevailing in such proceeding shall be entitled to reimbursement of its reasonable costs and expenses, including reasonable accounting and legal fees. . . ." (Ex. 3 § 22(k).) Accordingly, MFGPC is directed to file an accounting and declaration establishing the amount of such costs and fees within 15 days hereof for the Court's consideration and augmentation of the judgment.

---

[3] "Under Utah law, compound interest is awarded only when 'the parties expressly agreed to compound interest.'" *Valley Elec. Consol., Inc. v. TFG-Ohio, L.P.*, No. 2:16-CV-00751, 2018 WL 794527, at *11 (D. Utah Feb. 8, 2018) (quoting *Mountain States Broad. Co. v. Neale*, 783 P.2d 551, 555 (Utah Ct. App. 1989)). The parties have not expressly agreed to compound interest here. Thus, this amount is based upon a simple interest calculation.

24.     Interest will continue to accrue on the judgment until paid in full at the legal rate

established under Utah Code Ann. § 15-1-1 of 10 percent, and the judgment may be augmented by

additional attorneys' fees and costs through the date of payment of the judgment in full.

A judgment will follow.

DATED:

BY THE COURT


_____

UNITED STATES DISTRICT JUDGE

The foregoing MFGPC, Inc.'s Supplemental Proposed Findings of Fact and Conclusions of Law

(prior to execution by the Court) is hereby adopted this _____ day of _____,

2021.

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of August 2021, I served a true and correct copy of the foregoing by filing a true and correct copy with the Court's ECF filing system, which sent a copy to each of the following:

<u>Co-Counsel for Mrs. Fields Franchising, LLC and Mrs. Fields Famous Brands, LLC</u>
Bijan Amini
Avery Samet
AMINI LLC
131 West 35th Street, 12th Floor
New York, New York  10001
bamini@aminillc.com
asamet@aminillc.com

<u>Co-Counsel for Mrs. Fields Franchising, LLC and Mrs. Fields Famous Brands, LLC</u>
Rod N. Andreason
KIRTON MCCONKIE
50 E. South Temple #400
Salt Lake City, UT 84111
randreason@kmclaw.com

PARSONS BEHLE & LATIMER


*/s/ Brian M. Rothschild*
Brian M. Rothschild
*Attorney for MFGPC, Inc.*