## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MRS. FIELDS FRANCHISING, LLC,<br><br>        Plaintiff/Counterclaim Defendant,<br><br>v.<br><br>MFGPC, INC.,<br><br>        Defendant/Counterclaimant. | **FINDINGS OF FACT &<br>CONCLUSIONS OF LAW**<br><br>Case No. 2:15-CV-00094-DAK<br><br>Judge Dale A. Kimball |

## I.   INTRODUCTION

This matter is before the court on MFGPC, Inc.'s ("MFGPC") breach of contract counterclaim that it asserted against Mrs. Fields Franchising, LLC ("Mrs. Fields"). Despite this case's lengthy history, the issue before the court was limited to only MFGPC's lost profits from Mrs. Fields' breach. Mrs. Fields' breach was already determined in this case. (Memorandum Decision, ECF No. 132 at 28.) Thus, from July 12–July 14, 2021, the court held a three-day bench trial on MFGPC's lost profits damages. At the trial, Brian M. Rothschild, Juliette P. White, and Alexandra L. Hodson represented MFGPC and Bijan Amini and Rod N. Andreason represented Mrs. Fields. The court, having reviewed the parties' filings, trial testimony, other relevant documents, and the law and facts relevant to MFGPC's lost profits, issues the following Findings of Fact and Conclusions of Law.

## II.   BACKGROUND

### *The Licensing Agreement*

On April 30, 2003, MFGPC[1] entered into a trademark licensing agreement (the "Licensing Agreement") with Mrs. Fields. Under this Licensing Agreement, MFGPC obtained an exclusive, worldwide license to develop, manufacture, package, distribute, and sell prepackaged popcorn products bearing the "Mrs. Fields" trademark. (Licensing Agreement, ECF No. 292-3 [hereinafter Licensing Agreement].) For the use of the trademark, MFGPC agreed to pay five percent of net sales as running a royalty and a flat rate of $400,000[2] to Mrs. Fields. (Licensing Agreement at §§ 5, 6.) The term of the Licensing Agreement was for periods of five years, which would automatically renew at the end of each period unless certain conditions were met. (Licensing Agreement at § 16.) The Licensing Agreement automatically renewed in April 2008 and April 2013. Thus, the final term at issue here was from April 30, 2013, to April 30, 2018.

### *MFGPC's Sales History*

Soon after signing the Licensing Agreement, MFGPC began operating under its business model of using copackers to handle all the manufacturing and packaging of the branded, prepackaged popcorn. MFGPC's financial records show the following:

---

[1] This agreement was actually entered into by LHF, Inc., which was MFGPC's predecessor entity. Christopher Lindley solely managed both entities and the parties do not dispute that this transfer was proper. So, the court states that MFGPC entered into this agreement for simplicity's sake.

[2] This was to be paid as follows: $50,000 upon signing, $50,000 in year two, $100,000 in year three, $100,000 in year four, and $100,000 in year five. (Licensing Agreement at § 6.)

| MFGPC's Historical Sales Data | | |
| --- | --- | --- |
| Year | Total Sales | Profit/(Loss) |
| 2003 | $326,041 | $16,895 |
| 2004 | $344,999 | ($36,018) |
| 2005 | $353,012 | ($74,410) |
| 2006 | $334,344 | ($194,863) |
| 2007 | $377,186 | ($136,318) |
| 2008 | $606,913 | ($5,814) |
| 2009 | $484,064 | ($175,583) |
| 2010 | $575,219 | ($24,326) |
| 2011 | $599,493 | $10,801 |
| 2012 | $602,015 | ($18,979) |
| 2013 | $420,026 | ($96,463) |
| 2014 | $207,443 | ($22,600) |

(Ex. 55, 60 at Attachment 5.1.) The parties do not dispute the sales numbers detailed above.

As the numbers show, MFGPC suffered a few setbacks, impacting sales in 2013 and 2014. First, in 2013, MFGPC lost its national account with Rite Aid, which was one of MFGPC's largest customers. (Tr. 47:6–10; 106:7–22.) While losing the Rite Aid account certainly impacted MFGPC's net sales, the most notable setback was the January 2013 fire (the "Fire") next to MFGPC's copacker facility. The Fire caused MFGPC to suffer severely depressed sales for the next eight months. (Ex. 49 at 3.) MFGPC's financial statements show, however, that it had largely recovered by the end of 2013, doing roughly $300,000 in sales during the fourth quarter of 2013 (or, 70% of 2013's total sales). (Ex. T, Calendar 2013 Recap.) Mr. Lindley's testimony during direct examination conforms that MFGPC was able to recover from the fire fairly quickly:

> Q: Were you able to actually recover from the [F]ire contrary to what it says here?
> A: Right. If you looked at the fourth quarter revenue, $300,000, which is half of what my typical year was.

(Tr. 93:11–14.)

Even though MFGPC had largely rebounded by the end of 2013, MFGPC's sales in 2014 remained low relative to its recent history. To explain this decrease, Mr. Lindley testified that he intentionally "scale[d] back" or "throttle[d] [his] own company" because "of the financial hits [MFGPC] [took] in 2013." (Tr. 157:21–22.) More specifically, Mr. Lindley testified that he needed to "make sure things were stabilized again before [he] went to try and get back to where he had been in the prior year" (Tr. 158:21–25.) There is no dispute that MFGPC did only $207,443 in sales in 2014.

### The Breach

As this court already determined, on December 22, 2014, Mrs. Fields breached the Licensing Agreement when it sent a letter erroneously asserting that MFGPC was in material breach and that Mrs. Fields could repudiate the agreement. (*See* Memorandum Decision, ECF No. 132 at 28; *see also* Letter from Avery Samet, Ex. 13.) Thus, Mrs. Fields breached the Licensing Agreement with three years and four months[3] remaining in the five-year term (January 1, 2015, through April 30, 2018). It is for that period (the "Damages Period") that MFGPC is entitled to lost profits damages. Under the terms of the Licensing Agreement, MFGPC's claims are "limited to recovery of any actual damages it sustains." (Licensing Agreement at § 22(n).)

### Unpaid Invoices and Interest for Popcorn Sales

The parties do not dispute that Mrs. Fields owes MFGPC $70,223 in unpaid invoices for popcorn sales that MFGPC sent to Mrs. Fields. Similarly, the parties do not dispute that MFGPC owes Mrs. Fields 45,566 in unpaid running royalties. The parties do dispute how the interest should be calculated on these figures. The court will address the interest issue below.

---

[3] For simplicity's sake, the parties and the court begin the damages period on January 1, 2015 instead of December 22, 2013.

***Perfect Snax Prime***

After the breach, on September 22, 2017, Mrs. Fields entered into a different licensing agreement with Perfect Snax Prime, LLC ("PSP") (the "PSP Agreement"). Under the PSP Agreement, PSP was permitted to sell "Mrs. Fields® co-branded ready-to-eat popcorn" for a term of three years and three months. (PSP Agreement, Ex. 19 at Ex. B.) Additionally, the agreement required PSP to pay royalties of 5% of net sales and minimum royalties during the three-year term of $50,000 in year one (2018), $125,000 in year two (2019), and $200,000 in year three (2020). (PSP Agreement at § 6.) These minimum royalty payments corresponded with "Minimum Sales Targets" of $2,000,000 in 2018, $2,500,000 in 2019, and $4,000,000 in 2020. (PSP Agreement at § 6.)

## III. DISCUSSION

This case involves a fairly straightforward claim for lost profit damages stemming from Mrs. Fields' breach of contract. To determine the damages in this case, the court will (A) set forth Utah's standard for determining damages in a breach of contract case before (B) turning to the parties' arguments regarding lost profits and (C) how the court should calculate the interest on the running royalties and unpaid invoices.

### A. Legal Standard

"To recover damages, a plaintiff must prove both the facts of damages and the amount of damages." *Ghidotti v. Waldron*, 442 P.3d 1237, 1240 (Utah Ct. App. 2019). "The level of persuasiveness required to establish the fact of loss is generally higher than that required to establish the amount of loss." *Id.* (citation omitted). Thus, a plaintiff only needs to establish lost profits damages with "sufficient certainty that reasonable minds might believe from a preponderance of the evidence that damages were actually suffered." *Id.* at 1241 (citation

omitted). More specifically, this means that damages may be "based upon approximations" so long as those "approximations are based upon reasonable assumptions or projections." *Austin v. Bingham*, 319 P.3d 738, 743–44 (Utah Ct. App. 2014) (citation omitted).

"What constitutes such an approximation will vary with the circumstances. Greater accuracy is required in cases where highly probative evidence is easy to obtain than in cases where such evidence is unavailable." *Cook Assocs., Inc. v. Warnick*, 664 P.2d 1161, 1166 (Utah 1983) (citation omitted). An approximation or "[r]easonable certainty requires more than a mere estimate of net profits." *Sawyers v. FMA Leasing Co.*, 722 P.2d 773, 774 (Utah 1986)*; see also Sunridge Dev. Corp. v. RB & G Eng'g, Inc.*, 305 P.3d 171, 176 (Utah Ct. App. 2013) ("Mere conclusions and conjecture will not suffice.. . . [A] plaintiff must provide supporting evidence" of lost profit damages. (quotation marks and citations omitted)). Indeed, the plaintiff "has the burden to produce a sufficient evidentiary basis to . . . permit the trier of fact to determine with reasonable certainty the amount of lost net profits." *Id.* (citation omitted).

In this instance, Plaintiff claims damages stemming from a breach of contract. Under Utah law,

> the injured party in a breach of contract action has a right to damages based upon his expectation interested as measured by (a) the loss in value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any other cost or loss that he has avoided by not having to perform.

*TruGreen Co. L.L.C., v. Mower Bros., Inc.*, 199 P.3d 929, 931 (Utah 2008) (citation omitted). The purpose of such damages is not to punish the breaching party. *Id.* at 933. Rather, the focus "is to compensate the nonbreaching party for actual injury sustained, so that the nonbreaching party may be restored, as nearly as possible, to the position it was in prior to the injury." *Id.* at 931–32 (citation and formatting omitted).

### B. Lost Profits Analysis

This case boils down to a battle of the experts. MFGPC retained Mr. Patrick Kilbourne to opine on its lost profits over the Damages Period. Mr. Kilbourne put forth three different measures of MFGPC's lost profits. (Ex. 60 [hereinafter Kilbourne Report].) Mrs. Fields expert, Mr. Grant Lyon, served both as Mrs. Fields' lost profits and rebuttal expert. (Ex. 56 [hereinafter Lyon Report].) Mr. Lyon's report mostly focused on rebuttal and only advances one theory of lost profits based on MFGPC's historical performance. To resolve the lost profits issue here, the court will examine the merits of each of the experts' different theories. The court will, therefore, discuss: (1) Mr. Kilbourne's PSP minimum licensing fee approach; (2) Mr. Kilbourne's PSP sales approach; and (3) both experts' values based on MFGPC's historical sales. After addressing the experts' opinions, the court will (4) make a final conclusion regarding the lost profits damages due here.

#### 1. PSP Minimum Licensing Fee Approach

Mr. Kilbourne's last approach was based on the PSP Agreement. In this approach, Mr. Kilbourne simply takes the total minimum royalty payments due under the PSP Agreement and argues that this is the "minimum value of the [PSP Agreement] and provides another data point for evaluating MFGPC's lost profits." (the "Minimum Fee Approach") (Kilbourne Report at 13.) Specifically, the Minimum Fee Approach simply sums up all the minimum royalty payments due to Mrs. Fields under the PSP Agreement. According to Mr. Kilbourne, the Minimum Fee Approach sets the floor of damages in this instance at $425,000.

Before turning to the merits of this argument, the parties disagreed over whether the minimum royalties due under the PSP Agreement was $425,000 or $375,000. The court must

first resolve this issue. A plain reading of the PSP Agreement clearly indicates that $375,000 is

the correct figure. Specifically, the PSP Agreement, section 6 states:

> **6.1 Initial Advance Payment.** On execution of this Agreement, [PSP] shall pay [Mrs. Fields] $50,000, which amount will be credited against the Running Royalty owed during the first Contract Year, as described in Section 6.2 below.. . .
>
> **6.2 Sales Targets and Running Royalties.** Through the Term of this Agreement, [PSP] will use its best faith efforts to achieve the minimum Net Sales for each Contract Year, as shown below. Further, [PSP] will, as described in section 6.3 below, pay [Mrs. Fields] a recurring amount (the "**Running Royalty**") equal to the greater of: (a) 5% of Net Sales, or (b) the Minimum Running Royalty for the respective Contract Year, as shown in the chart below:

| Contract Year | Minimum Running Royalty for Contract Year | Minimum Sales Target for Contract Year |
|---|---|---|
| **Effective Date through December 31, 2018** | **$50,000** | **$2,000,000** |
| **January 1, 2019 through December 31 2019** | **$125,000** | **$2,500,000** |
| **January 1, 2020 through December 31, 2020** | **$200,000** | **$4,000,000** |

(PSP Agreement § 6 (emphasis and formatting in original).) Contract Year "means each 12-

month period of the Term; provided, however, the 1st Contract Year begins on the Effective

Date and ends December 31, 2018. Each subsequent Contract Year consists of a calendar year."

(PSP Agreement § 1(e).)

Since both the Contract Year and the minimum Running Royalty are clearly defined in

the contract, Section 6.1 is unambiguous; the PSP Agreement's Minimum Running Royalty total

is 375,000. The first $50,000 due upon execution would be "credited against the Running

Royalty" for the first contract year described in the table above. Thus, the minimum royalties due

under the contract is simply the sum of $50,000, $125,000, and $200,000 displayed in the table, which is $375,000.

With the minimum value of the PSP Agreement's royalties out of the way, the court turns to Mr. Lyon's critique of the PSP Minimum Fee Approach. Mr. Lyon argues again that PSP's agreement cannot be compared to the Licensing Agreement at issue here because there is no proof that MFGPC was a similar company to PSP during the Damages Period. Thus, Mr. Lyon concludes that it "is inappropriate to compare what the value of a license agreement is worth to the licensor and impute that value of the agreement to the licensee when the licensee is out of business and cannot perform on the agreement itself." (Lyon Report at 26.) Additionally, Mr. Lyon argues that MFGPC could not do the amount of revenue required to reach $375,000 in profit—which would require just over $3,750,000 in sales according to Mr. Kilbourne's 10% incremental profit margin. The court somewhat agrees with Mr. Lyon's critiques.

Here, the court is unconvinced that PSP's minimum royalty payments are an accurate measure of MFGPC's lost profits. MFGPC has not adduced any evidence that it was planning on or could have sold its remaining license to the Mrs. Fields mark for any amount of money. The court may have entertained this as evidence of its lost value under the contract had they introduced such evidence. But, without this evidence, the court finds that the Minimum Fee Approach merely produces an estimate[4] of damages unrelated to MFGPC's lost profits and is therefore insufficient to establish damages to a reasonable certainty. *See Sawyers*, 722 P.2d at 774 ("Reasonable certainty requires more than a mere estimate of net profits."); *see also*

---

[4] This is at least tacitly acknowledged by Mr. Kilbourne's testimony and report in which he states that the Minimum Fee Approach's value "represents the minimum value of the agreement *to Mrs. Fields*. . .." (Kilbourne Report at 13 (emphasis added).) Thus, this does not give the court the value of the agreement or lost profits to MFGPC.

*Sunridge Dev. Corp.*, 305 P.3d at 176 ("Mere conclusions and conjecture will not suffice.... [A] plaintiff must provide supporting evidence" of lost profit damages. (quotation marks and citations omitted)). In addition, the value of the license to Mrs. Fields is an entirely different matter than the amount of lost profits MFGPC would have gained over the Damages Period. It is not automatically the case that the value of the mark to the licensor is always the same or less valuable than the mark is to a licensee. Lastly, as will be shown in Part III.B.2. below, MFGPC has not shown that it could reach $3,750,000 in net sales during the Damages Period.

For the foregoing reasons, the court will not accept Mr. Kilbourne's Minimum Fee Approach.

### 2. PSP Sales Approach

Mr. Kilbourne bases another set of MFGPC's potential lost profits estimations on the economic terms of the PSP Agreement (the "PSP Sales Approach"). As noted earlier, the PSP Agreement had a term of three years and three months and minimum "sales targets" of $8,500,000. Applying the minimum sales targets to this case, Mr. Kilbourne opines that it would be reasonable for MFGPC to have sold a pro-rata amount of $8,833,000. Then, Mr. Kilbourne borrows his 10% incremental profit rate from his historical sales approach (*see infra* Part III.B.3) to project that MFGPC suffered $916,000 in lost profits damages.

Mr. Lyon's largest critique of this method is that the PSP Sales Approach is unreliable because it is based on minimum "sales targets" and not actual performance and, therefore, is in no way related to MFGPC's ability to generate sales. Additionally, Mr. Lyon argues that for MFGPC to do $8,833,000 in sales during the Damages Period would require it to do unrealistic and unproven levels of sales beginning from its 2014 actual sales figure. The court agrees with

this critique and includes a table that it reproduced from Mr. Kilbourne's report below to aid in its discussion.

| Kilbourne's PSP Sales Approach | | | |
|---|---|---|---|
| Year | Revenue | Incremental Profit Rate | Lost Profits |
| 2014 | $207,443 | — | — |
| 2015 | $1,600,000 | 10% | $165,948 |
| 2016 | $2,275,000 | 10% | $235,957 |
| 2017 | $3,625,000 | 10% | $375,975 |
| 2018 (through April 30) | $1,333,333 | 10% | $138,290 |
| **Total** | **$8,833,333** | | **$916,170** |

(*See* Kilbourne Report, Attachment 6).

As the table makes obvious, MFGPC would have to grow unreasonably fast to reach $8,833,000 in sales by April 2018. Specifically, MFGPC would need to grow its sales by 671% from its actual sales in 2014 to reach $1.6 million in sales in 2015. Even assuming that MFGPC started from its highest sales figure of $606,913 in net revenue (2008), it would have to grow by 164% to a projected $1.6 million in sales in 2015. Again, even Taking Mr. Kilbourne's most generous projection of potential sales in 2014 of $867,819 (Kilbourne Report, Attachment 4), that would require an 84% growth rate to reach $1.6 million in sales in 2015. MFGPC offered no evidence of how it could achieve such rapid growth or that it was planning on such rapid growth in 2015 and beyond. In fact, Mr. Lindley testified that he "scale[d] back" or "throttle[d] [his] own company" to "make sure things were stabilized again before [he] went to try and get back to where he had been in the prior year." (Tr. 157:21–22; 158:21–25.) Without evidence of significant, concrete plans to grow so rapidly in 2015 and beyond, the court cannot find such growth is reasonable.

Additionally, the growth from year to year under the PSP Sales Approach would require a level of growth that MFGPC has not supported by its prior performance or any reliable future projections. The PSP Sales Approach's projections would require 42% growth from 2015 to 2016, 59% growth from 2016 to 2017, and 10% growth from 2017 through 2018. This is much higher growth than the 21% that MFGPC used in its Historical Sales Approach. (*See infra* Part III.B.3.d.) In short, from any of MFGPC's proposed 2014 net sales revenue figures, MFGPC's required growth to reach $8,833,333 in revenue by April 2018 is unrealistic and unsupported by any evidence. *See TruGreen*, 199 P.3d at 932 (noting that evidence of another company's performance—in that instance, the defendant's—"may be considered . . . *if shown to correspond, in whole or in part, with the loss of plaintiff*" (citation omitted) (emphasis added)).

For the foregoing reasons, the court finds that MFGPC has not demonstrated to a reasonable certainty that the damages under Mr. Kilbourne's PSP Sales Approach are an accurate measure of MFGPC's lost profits.

### 3. Historical Sales Approach

Both experts performed a lost profits damages estimation based on MFGPC's historical sales data ("Historical Sales Approach"). These approaches received by far the most time and attention during the trial. The court will discuss each of the experts' methodologies.

Mr. Kilbourne examined MFGPC's sales data from 2003 through 2012. Using this data, Mr. Kilbourne figured that MFGPC had a gross profit rate of 25% of total sales and would incur costs of 10% for incremental expenses and 5% in royalties. Thus, Mr. Kilbourne concluded that MFGPC had a profit rate of 10% of net sales (25% gross margin, minus 10% incremental costs, minus 5% royalty rate). Then, Mr. Kilbourne determined the growth rate by taking a simple average of MFGPC's year-to-year growth from 2003–2012 (23.6%) and averaging that with the

forecasted growth rate of the ready-to-eat popcorn industry over the Damages Period (18.5%). This method produced a 21% growth rate.

Using these historically-derived margins and costs figures and anticipated growth rate, Mr. Kilbourne took MFGPC's actual sales number in 2012 and grew that figure by his growth rate (21%) each year until April 30, 2018. Based on these assumptions, Mr. Kilbourne opined that MFGPC would have done $4.5 million in revenue during the Damages Period. Applying the 10% profit rate figure to that $4.5 million in revenue, Mr. Kilbourne opined that MFGPC would have lost profits of $465,000. The court includes its own recreation of Mr. Kilbourne's' Historical Sales Approach.

| Mr. Kilbourne's Historical Sales Approach Projections | | | | |
|---|---|---|---|---|
| Year | Projected Sales | Assumed Growth Rate | Assumed Incremental Profit Rate | Projected Lost Profits |
| 2012 | $602,015 (Actual Sales) | 21%[5] | — | — |
| 2013 | $716,909 | 21% | — | — |
| 2014 | $867,819 | 21% | — | — |
| 2015 | $1,050,495 | 21% | 10%[6] | $108,954.52 |
| 2016 | $1,271,624 | 21% | 10% | $131,889 |
| 2017 | $1,539,301 | 21% | 10% | $159,652 |
| 2018 (through April 30) | $621,108 | 21% | 10% | $64,420 |
| TOTAL | $4,482,527 | — | — | $464,916 |

(Kilbourne Report, Attachment 4.)

In contrast, Mr. Lyon's Historical Sales Approach does not take into account all of MFGPC's historical sales. Instead, Mr. Lyon looks at the data from 2010–2012. This selection of years was intended to ignore MFGPC's early years where it was, according to Mr. Lyon, in its

---

[5] Actual figure is 21.05%.
[6] Actual figure is 10.372%.

high growth period. In other words, Mr. Lyon opined that 2010–2012 represented MFGPC's

equilibrium period of sales and therefore is the most reliable period upon which to base lost

profit projections. In analyzing this data, Mr. Lyon opined that: (1) from 2009–2012, MFGPC

lost over $200,000; (2) from 2010–2012, MFGPC's annual sales growth was 2.35%, which was

equal to inflation over that period; and (3) from 2010–2012, MFGPC's gross margin was

declining from 28.5% in 2010 to 17.5% in 2012, demonstrating a downward trend that should be

taken into account.

Additionally, Mr. Lyon argued that MFGPC could not grow beyond its equilibrium sales

of around $600,000 without taking on an infusion of capital—which would impact the profits

MFGPC would take home. As evidence, Mr. Lyon pointed to Mr. Lindley's deposition and trial

testimony. In his deposition, Mr. Lindley testified that he "refused to expand the business at a

greater rate than [he] knew that [he] could personally cash flow." (Lyon Report at p. 11.) And,

when asked if he "needed funds from an outside source in order to grow," Mr. Lindley affirmed;

"Correct." (Lyon Report at p. 11.) Mr. Lindley reaffirmed this deposition testimony during trial

when he stated that he "had invested as much as [he] wanted to in scaling [MFGPC]" and that he

"didn't want to go deep into [his] 401 (k)" to fund additional sales or accounts. (Tr. 126:3–10;

150:6–14.)

The final portion of Mr. Lyon's report is all rebuttal to Mr. Kilbourne's opinions. In fact,

Mr. Lyon does not offer his final opinion—that there are no lost profits damages[7]—until the very

end of his rebuttal of Mr. Kilbourne's report. Specifically, Mr. Lyon takes issue with four areas

---

[7] At trial, Mr. Lyon changed his testimony and asserted that MFGPC likely suffered $18,000–
$54,000 in damages. Mr. Lyon altered his testimony after he recognized during trial that MFGPC
did not include costs for employees because MFGPC operated on a co-packing business model
under which Mr. Lindley was the only "employee" and did not pay himself a salary.

of Mr. Kilbourne's Historical Sales Approach: (a) the starting point for projecting damages; (b) the gross margin; (c) the incremental costs and profit rates; and (d) the growth rate. The court will address each in turn.

### a.  Correct Starting Point

As noted previously, Mr. Kilbourne's Historical Sales Approach begins its damages projection by growing from MFGPC's actual sales from 2012 straight through 2013, 2014, and the Damages Period. (Kilbourne Report, Attachment 4.) Thus, the starting point for Mr. Kilbourne's lost profits projections in 2014 is $867,819—$660,376 more than MFGPC's actual sales in 2014. Mr. Lyon argues that this approach "ignores reality. By using a base of $867,819 for 2014, versus an actual sales number of $207,443, Mr. Kilbourne drastically overstates the sales figures he uses in his damages calculation." The court agrees with Mr. Lyon.

The court finds that the correct starting point for calculating damages is MFGPC's actual sales in 2014. As noted above, the purpose of lost profit damages is "to compensate the nonbreaching party for actual injury sustained, so that the nonbreaching party may be restored, as nearly as possible, *to the position it was in prior to the injury*." *TruGreen*, 199 P.3d at 931–32 (emphasis added) (quotation marks, formatting, and citation omitted). There can be no dispute about the position that MFGPC was in at the end of 2014—$207,443 in revenue. MFGPC was undoubtedly suffering suppressed sales because of the Fire and losing the Rite Aid account. These events then prompted Mr. Lindley to slow sales during 2014. While there was some testimony that MFGPC intended to rebound in 2015, that does not impact the position from which MFGPC should begin its lost profits analysis. The court acknowledges that while these setbacks were unfortunate, they were nevertheless MFGPC's reality.

15

Thus, the court concludes that the experts were correct to not use 2013 or 2014 data to predict MFGPC's performance moving forward. Not using those years to make future projections does not mean, however, that MFGPC can begin at a revenue other than its actual sales in 2014. Accordingly, the court will begin its lost profits projection with MFGPC's 2014 actual sales figure of $207,443.

### b.   *Gross Margin*

The experts have a substantial gap in their respective gross margin percentages. Mr. Kilbourne selected a 25% gross margin based on a simple average of MFGPC's gross margin from 2003–2012. According to Mr. Lyon, this simple average approach is inappropriate because MFGPC's gross margins had been declining in the three years before the Fire. These three years, according to Mr. Lyon, represent an equilibrium level of sales and costs for MFGPC and, therefore, should be used to project MFGPC's lost profits during the Damages Period. Thus, according to Mr. Lyon, Mr. Kilbourne should have explained and/or accounted for the downward trend and not have used a simple average. Mr. Lyon suggests that the gross margin should be 17.5%—the gross margin in 2012—because it captures the downward trend.

In this instance, the court finds that MFGPC's gross margin is more accurate. The court was somewhat persuaded by Mr. Lyon's argument that MFGPC's gross margin had been declining from 2010 through 2012. But, it strikes the court as improper to simply select one year's gross margin without a more supported explanation. Mr. Lyon's 17.5% gross margin selection is the second-lowest gross margin percentage from 2003–2012. Additionally, Mr. Lyon's selection of 2012's gross margin percentage is a mismatch with his suggestion that 2010–2012 was an equilibrium period for MFGPC. If MFGPC had actually reached an equilibrium of sales over those years, Mr. Lyon should have averaged those three years' gross margins—which

coincidentally produces a gross margin of 23%, which is much closer to Mr. Kilbourne's gross margin of 25%.

For the foregoing reasons, the court is more persuaded that an average of all of MFGPC's gross margins is the more accurate figure. Thus, the court will use Mr. Kilbourne's selection of a 25% gross margin.

### c.   Incremental Costs and Profit Rates

Mrs. Fields argues that a 10% incremental profit rate is too high because the 10% in incremental costs is too low. According to Mr. Lyon, Mr. Kilbourne made too many deductions to MFGPC's incremental costs. Mr. Lyon does not, however, dispute all of the deductions that Mr. Kilbourne took from MFGPC's incremental costs. For example, both experts agree on removing royalty payments, salaries booked but not paid to Mr. Lindley, and amortization. Of the disputed costs, however, the court is most troubled by the deductions for payments made to Leon Richmond Designs for packaging design projects.

These fees to Leon Richmond Designs appear on MFGPC's financial statements in 2009 as a "Management fee" for $93,867 and as "Marketing expense[s]" in 2004, 2005, 2007, 2008, 2010, 2011, and 2012. That means MFGPC paid for this packaging design service in eight of the ten years from 2003–2012, totaling $248,214, or 36% of Mr. Kilbourne's adjusted total costs from 2003–2012.[8] Mr. Kilbourne justifies the removal of these costs because they are, as he opined, "incidental" or "one-time" costs. The court is unconvinced that these eight years of costs are irregular or "one-time." Indeed, MFGPC's entire business revolved around packaging Mrs.

---

[8] The 36% is if the court adds back the Leon Richmond Designs expenses to Mr. Kilbourne's adjusted sales chart. (Kilbourne Report at Attachment 5.) Additionally, if the court conducts this same analysis using Mr. Lyon's selected years (2010–2012), the expenses paid to Leon Richman Designs is $45,369, or 28% of its total costs.

Fields-branded popcorn. Trial testimony suggests that MFGPC required new packaging designs nearly every year and holiday. Most importantly, however, MFGPC did not submit any evidence showing that these costs would not be necessary moving forward—when the history showed this was a substantial, recurring, and important expense.

Despite the court's—and Mrs. Fields'—concern over the removal of these figures, Mrs. Fields did not propose a different costs percentage. The court is not inclined to perform its own calculation of MFGPC's incremental costs and profit rates despite its concern with the deductions. In fact, Mr. Lyon does not make this calculation either, opting instead to use Mr. Kilbourne's 10% figure. (Lyon Report at pp. 15–17; 20–23.) The court will do the same and adopt Mr. Kilbourne's 10% incremental costs figure.

### d. Growth Rate

Mr. Lyon takes issue with Mr. Kilbourne's 21% growth rate. As Mr. Lyon contended, MFGPC's equilibrium period (2010–2012) is indicative of what MFGPC's sales would have been going forward. During that period, and according to Mr. Lyon, MFGPC's sales grew at the same rate of inflation. Additionally, Mr. Lyon argued that the growth rate moving forward should not include MFGPC's high-growth early years or account for the industry-wide projected growth rates. Mr. Lyon opined that MFGPC's early years are not indicative of its growth because from 2003–2009 MFGPC was in its early, high-growth stage. As for the industry-wide growth rates, Mr. Lyon believes that the industry's growth can be entirely unrelated to how a single company will perform and cannot, without evidence, be used as an estimate of one company's growth.

In this instance, the court rejects Mr. Lyon's low growth estimate because his inflation-tied growth rate was based on the assumption that MFGPC had hit a plateau or equilibrium level

of sales at around $600,000 in revenue. Since the court has determined that MFGPC is starting from $207,443, its growth rate would likely be much higher than inflation. Also, Mr. Lyon's growth figure conveniently leaves out 2009–2010 data. This year's data is included in his other estimations, is similar in revenue to MFGPC's equilibrium period, and has a higher growth rate than the growth from 2010–2012. In short, Mr. Lyon should have, at the very least, included the growth from 2009–2010 to keep his methods consistent. When the 2009–2010 growth is included, Mr. Lyon's theory that MFGPC was only growing at inflation is unsupportable. Lastly, the court finds that it was appropriate for Mr. Kilbourne to account for the fact that the industry was expected to grow substantially throughout the Damages Period. It is reasonable for the court to find that the industry's growth would have aided MFGPC's growth. Thus, while MFGPC had not consistently grown at 21% in its past, it is realistic to expect that it would grow faster than inflation and at a rate expected in the industry.

For the foregoing reasons, the court will adopt MFGPC's growth rate of 21%

### 4.  Lost Profits Conclusion

To recap, the court adopted MFGPC's 25% gross margin percentage, 10% incremental profit margin, and 21% growth rate. Thus, the court has adopted Mr. Kilbourne's Historical Sales Approach in all but one aspect; the court begins the damages calculation from MFGPC's actual sales figure in 2014, not the 2012 actual sales figure. With these final conclusions regarding the experts' opinions, the court finds that MFGPC is entitled to $111,133 in lost profits. The court includes a table of its lost profits conclusion below.

| Lost Profits Conclusion | | | | |
|---|---|---|---|---|
| Year | Revenue | Incremental Profit Margin | Growth Rate | Lost Profits |
| 2015 | $251,110 | 10% | 21% | $26,044 |
| 2016 | $303,968 | 10% | 21% | $31,527 |
| 2017 | $367,954 | 10% | 21% | $38,163 |
| 2018 (through April 30) | $148,469 | 10% | 21% | $15,398 |
| **TOTAL** | $1,071,501 | | | $111,133 |

### C.  Interest on Royalties and Unpaid Invoices

As noted above, the parties do not dispute that Mrs. Fields owes MFGPC $70,223 in unpaid invoices for popcorn sales that MFGPC sent to Mrs. Fields or that MFGPC owes Mrs. Fields $45,566 in unpaid running royalties. The parties only dispute how the court should calculate the interest on these figures.

MFGPC argues that the court should calculate the interest on the unpaid invoices under Utah Code. § 15-1-1 (10% simple interest per annum) but that the interest on the royalties should be calculated according to the Licensing Agreement (5.25%, which is the 2014 prime rate plus 2%). (*See* Licensing Agreement §§ 1(k), 5(d).) Using this method, the unpaid invoices plus interest is $117,846 and the running royalties owed plus interest is $61,789. The net of these numbers would result in $56,507 due from Mrs. Fields to MFGPC.

In contrast, Mrs. Fields argues that the court should take the net amount at the time of breach and add the interest due under Utah law. This was the method originally employed by MFGPC. (Kilbourne Report at Attachment 7; MFGPC's Proposed Findings of Fact and Conclusions of Law, ECF No. 292 at pp. 4–5.) Under this method, the court would simply subtract the unpaid royalties ($45,566) from the unpaid invoices ($70,223) to get a net figure of $24,656. The court would then add the 10% simple interest per annum to that $24,656, which results in $41,132 due to MFGPC.

The court finds that Mrs. Fields' calculation of interest is the correct method for three reasons. First, this is the method that both parties agreed upon during trial. (Tr. 400–01.) It was only after trial that MFGPC revealed this new method whereby the interest on unpaid royalties is calculated separately from the interest for unpaid invoices. Adopting MFGPC's method this late in litigation is unfairly prejudicial to Mrs. Fields. Second, the Licensing Agreement requires that the prime rate be the rate "publicly announced by Citibank N.A. plus two percent." (Licensing Agreement at § 1(k).) MFGPC has not submitted any evidence about where its 5.2% prime rate came from. Thus, MFGPC has failed to carry its burden to show this would be the correct rate even were the court persuaded by its argument. Third, the court should calculate the damages to restore MFGPC to the position it would have been in absent Mrs. Fields' breach. Thus, the correct method would be to offset the amounts due at the time of breach and then calculate interest on the net amount.

For the foregoing reasons, the court will adopt Mrs. Fields' method and order that Mrs. Fields pay MFGPC $41,132 for unpaid invoices. This figure includes interest calculated from December 22, 2014[9], through August 26, 2021.

## IV.    CONCLUSION

For the foregoing reasons, the court orders Mrs. Fields to pay MFGPC $111,133 in lost profit damages plus $41,132 for unpaid invoices. In total, Mrs. Fields owes MFGPC $152,265. Interest will continue to accrue on the judgment until paid in full at the legal rate established under Utah Code § 15-1-1.

---

[9] The court uses the date of breach instead of the dates used by the parties because both parties were behind on their respective payments for some time leading up to the breach.

DATED this 26th day of August, 2021.

BY THE COURT:

DALE A. KIMBALL
United States District Judge